1                  UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ALABAMA
2                       SOUTHERN DIVISION

3

4    UNITED STATES OF AMERICA,        2:13-CR-154-SLB-JEO

5              V.                     Birmingham, Alabama

6    CLIFTON LAMAR DODD,              October 7, 2013

7              Defendant.             9:00 a.m.

8    * * * * * * * * * * * * * * * * * * * * * * * * *

9

10                REPORTER'S OFFICIAL TRANSCRIPT OF
                             JURY TRIAL
11                           VOLUME I

12

13         BEFORE THE HONORABLE SHARON LOVELACE BLACKBURN
                  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20   COURT REPORTER:

21   Julie A. Martin, RMR, CRR
     Federal Official Court Reporter
22   1729 Fifth Avenue North, Ste 325
     Birmingham, Alabama  35203

23

24

25

1                          * * * * *

2                    A P P E A R A N C E S

3                          * * * * *

4     FOR THE UNITED STATES:

5     Michael Whisonant
6     Chinelo Dike-Minor
      1801 4th Avenue North
7     Birmingham, Alabama   35203

8
      FOR THE DEFENDANT:
9
      P. Russell Steen
10    2172 Pelham Parkway
      Pelham, Alabama   35124
11

12                        I N D E X

13    GOVERNMENT'S WITNESSES:      D     C      RD      RC

14    Bridget Williams            34    38

15    Cindy Collins               40

16    Orlando Reynolds            47    55

17    Joseph Ronsisvalle          57

18    Sharon Massingale           61    65(Voir Dire Examination)

19    Mark K. Smith               72    78

20    Eric Starr                  84    89      91      93

21    Steven Mathews             110   118

22

23

24

25

* * * * *

P R O C E E D I N G S

* * * * *

1   THE COURT:  All right.  We're here this morning

2   in the case of United States of America versus Clifton

3   Lamar Dodd, CR-13-154.  The marshal is running a little

4   bit late or the transportation is running a little late

5   to get Mr. Dodd here.  He should be here in just a few

6   minutes, but I thought we might go ahead with the voir

7   dire.

8        I don't consider that something that requires

9   the defendant's presence; but, Mr. Steen, I'm happy to

10   wait if you think this is something he needs to be here

11   for.

12        MR. STEEN:  I think we can go forward on that.

13        THE COURT:  So you waive his presence on this

14   part?

15        MR. STEEN:  Yes, ma'am.

16        THE COURT:  First, going over the government's

17   voir dire, I either ask or cover all of the ones except

18   the ones I'm telling you.  Do you have them in front of

19   you?

20        MR. WHISONANT:  Yes, ma'am.

21        THE COURT:  For instance, I don't say does

22   anyone know, Number 3 for instance, does anyone know or

1   is anyone related by blood or marriage to the

2   defendant's attorney, Russell Steen.  I ask does anyone

3   know the defendant's attorney.  I don't ask it

4   necessarily in the exact way that you all have phrased

5   it.  But if they know him, then we will find out if

6   they're going to be related by blood or marriage.

7        I don't ask Number 10.  You can ask it, but

8   I think that, once I finish voir dire, you will probably

9   feel that you don't need to ask it.  In other words, I

10  ask about the victims of crime.  Do you all have it in

11  front of you now?  I ask if it's something sensitive

12  that I think they might want to be seen at sidebar, I

13  tell them -- are you there, Mr. Whisonant?  You look

14  like you're still turning pages, Number 10.

15       MR. WHISONANT:  Yes, ma'am, I'm there.

16       THE COURT:  But I will ask them if they want to

17  be seen at sidebar, but I don't think you'll need to ask

18  that question; but, if you feel you do after you hear

19  the voir dire, you can.

20       MR. WHISONANT:  Yes, ma'am.

21       THE COURT:  I don't ask Number 11; but, after

22  the voir dire, I don't think you'll need to ask that

23  either.  Well, maybe I will add that one.  I think I

24  will add 11 or I will add something like 11.

25       What I will do is, after I ask all the

1   questions about you, any member of your family or close

2   personal friend ever been arrested, accused or convicted

3   of an offense, and all of those I take at sidebar, we

4   usually find out if they've had a bad experience.  But

5   at the end, when everybody is present, I will say, other

6   than the people that have seen me at sidebar, and I will

7   ask that question.

8             MR. WHISONANT:  Thank you.

9             THE COURT:  Well, I think Number 14 is

10  boilerplate.  That doesn't apply here.  I don't ask 16

11  but you can ask.  I don't ask 17 but you can ask.  I

12  don't ask 18 but you can ask.  I think I cover 18

13  though.  I ask something like 18.  I don't ask 21, but

14  you can ask.

15            Did the defendant have any objections to any of

16  the United States' requested voir dire?

17            MR. STEEN:  No objections, Your Honor.

18            THE COURT:  With regard to the defendant's

19  proposed voir dire, again, I don't ask it necessarily in

20  exactly the way you phrased it, but I either cover it or

21  ask it -- well, I don't think I ask any of them exactly

22  the same, but I cover the essence of the question.

23            Number 7, I don't ask, but you can ask.  I

24  think I cover 8 and 9.  I believe I cover 8 and 9.  I

25  don't really like 10.  When I say I don't like it, I

1  don't think I would want you to ask that, in other

2  words, does not believe they can sit as a juror.

3  They're being asked downstairs in qualifications right

4  now if any of them have any vacation time or -- they're

5  not asked that question, but if there's something that

6  would prohibit them from sitting there.

7         I think I cover that any way, because I ask

8  this question -- let me see.  I think I do cover it

9  though.

10        MR. STEEN:  If I'm not mistaken, in the last

11 trial we had, you covered pretty much what it says,

12 saying --

13        THE COURT:  I believe I do cover it now that

14 I'm thinking about it.  I do say this:  Can any of you

15 think of any matter which you should call to the court's

16 attention which may have some bearing on your

17 qualifications as a juror or which may prevent your

18 rendering a fair and impartial verdict based solely on

19 the evidence and my instructions to you on the law.

20 I think that covers Number 10.

21        MR. STEEN:  And that is well enough for us,

22 Your Honor.

23        THE COURT:  Okay.  How long do you all want for

24 voir dire?  I would think ten minutes would be enough.

25        MR. WHISONANT:  Yes, ma'am.

1          MR. STEEN:  Plenty, Your Honor.

2          THE COURT:  How long do you want for opening

3   statements?

4          MR. WHISONANT:  I would think about 15 minutes.

5          MR. STEEN:  I could probably use about five or

6   ten minutes.

7          THE COURT:  Okay.  Now, my rule is opening

8   statements, and you both have been here before, except I

9   think this is your first trial with me.  Let me make

10  sure I'm pronouncing your name.  You say it for me.

11         MS. DIKE-MINOR:  Chinelo Dike-Minor.

12         THE COURT:  Chinelo Dike-Minor.  Welcome.

13  Happy to have you.  Whoever does opening, I just don't

14  want you right up next to the jury box.  You can be sort

15  of between the podium and the jury box.  And during voir

16  dire also, you're not required to stand behind the

17  podium; but, during questioning of witnesses, you are.

18         You don't have to ask my permission to approach

19  a witness.  If you need to approach a witness, just go

20  show him the document you need to show him.  My rule is

21  don't hover.  In other words, if you have to stand there

22  for a few minutes just to get the basic questions out;

23  but, as soon as you possibly can, get back to behind the

24  podium, and particularly that's true if it's an adverse

25  witness.  I don't want counsel with an adverse witness

1    standing there very long.  I believe that's all the

2    preliminary things I would say to you.

3           How long do you think the trial is going to

4    last?  It seems to me it's going to take longer than

5    you're anticipating.

6           MR. WHISONANT:  I'm anticipating about three

7    days roughly, and I don't know how long Mr. Steen will

8    take.  We should be -- I think we should get our case on

9    and be finished by some time on Wednesday.

10          THE COURT:  All right.  I'm going to tell them

11   four days just in case.

12          MR. STEEN:  That would sound good.

13          THE COURT:  Are any of you expected to be

14   witnesses in the case, or are you all just here to

15   observe the trial?

16          MR. STEEN:  This is family members, Your

17   Honor.  They will not be called as witnesses.

18          MR. WHISONANT:  In the back, in the yellow

19   shirt, Mr. Williams will be a witness.

20          THE COURT:  Do you want the rule invoked?

21          MR. STEEN:  I do, Your Honor.

22          THE COURT:  What the rule requires, sir, is

23   that, if you plan to be a witness in the case, my

24   courtroom deputy will take you to a witness room.  And

25   probably I would say, unless the government wants to see

1  him, he could be excused for at least two hours, not at

2  least, but probably two hours.  Maybe I should say an

3  hour and a half.  I doubt I will get through in two

4  hours, but just in case.  Go ahead.  What are your

5  thoughts?

6          MR. WHISONANT:  I was going to say he could

7  probably come back after lunch actually.

8          THE COURT:  Yes, because we have opening

9  statements and all that.  All right.

10         Mr. Dodd won't be here until 9:45.  We're in

11  recess until 9:45.  And then, sir, you can come back

12  after lunch.  I would say you can come back -- he's

13  talking to his friend.  Sir, the witness, they will call

14  you later on this morning at a break, but I would say

15  you're at least on break until 1:00 o'clock.

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  They may need to talk to you right

18  now, I don't know.  The defendant's not going to be here

19  until 9:45.

20         MR. STEEN:  May me and Mr. Whisonant approach

21  for just a second?  Just a question.

22         THE COURT:  I like for things to be on the

23  record, so let's go to sidebar.

24         (Sidebar outside the presence of the jury.)

25         MR. STEEN:  Just out of an abundance of

1   caution, the two witnesses that we have are inmates, and

2   I don't know exactly what they will testify to as of

3   now.   However, the last time that I had this happen, the

4   judge did appoint counsel for them just in case they

5   testify and it incriminates them in some way that the

6   government may want to charge them.

7           THE COURT:  I've never done that.

8           MR. STEEN:  If it is, because I was afraid to

9   talk to one of them when I went up to visit this week

10  because of that aspect.

11          THE COURT:  I don't think there's a requirement

12  here.  They're not under investigation.  If they commit

13  perjury and -- let me say this:  I've never known the

14  government, although I'm sure they've done it, to charge

15  a witness who commits perjury.  I don't know if that

16  will happen or not.  So I'm not going to say that it

17  couldn't happen in this case, but they're swearing to

18  tell the truth under oath, and I don't know what the

19  government might do if they think they lied and the

20  defendant is then convicted, the jury doesn't believe

21  their testimony, but I'm not going to appoint counsel.

22          MR. STEEN:  Just out of abundance of caution I

23  wanted to cover that.

24          THE COURT:  Are they going to be admitting to

25  the crime itself?

1          MR. STEEN:  That's what -- I don't think.

2          THE COURT:  I shouldn't ask you that.

3          MR. STEEN:  One of them may, Judge.  I don't

4    know.  So that's -- that was --

5          THE COURT:  Let me go think about it since I

6    have a little time here.  I will see about that.  What

7    are your thoughts in case they might be admitting to the

8    crime?

9          MR. WHISONANT:  I would have to listen to think

10   they're going to admit to a crime.  They're not under

11   investigation for this crime.

12         THE COURT:  What if they came in and said I

13   wrote that letter, I sent it, it was not the defendant,

14   it was me?

15         MR. WHISONANT:  Then I would probably charge

16   them with perjury.

17         THE COURT:  Not the crime?

18         MR. WHISONANT:  Not the crime, with perjury,

19   and I believe -- my theory is that Mr. Dodd wrote the

20   letters.

21         THE COURT:  Not your theory.

22         MR. WHISONANT:  It's more than a theory.

23         THE COURT:  I hope you say you believe the

24   facts are that Mr. Dodd wrote the letters.  Well, I will

25   go look at that aspect of it.  I haven't thought about

1  it and thank you so much for bringing that to my

2  attention.   Thank you.

3          (Brief recess)

4          (At sidebar)

5          THE COURT:  Mr. Steen, you said that you might

6  have two witnesses and questioned whether I should

7  appoint counsel for them.  And to determine that, I

8  really need to know what you think they're going to

9  say.  And I thought, if they are going to incriminate

10  themselves and/or commit perjury, even though it's a

11  little bit odd, but I would call first the federal

12  defender's office and see if they want to represent one,

13  but it depends on what they're going to say.

14          MR. STEEN:  Mr. Smith may have testimony that

15  would put him in the line of what the accusations are

16  here.

17          THE COURT:  Okay.

18          MR. STEEN:  I think Mr. Spencer is -- the most

19  I think I can get out of him would probably be that he

20  had seen some of the letters in the cell prior to them

21  being mailed out, whether he knows exactly who mailed

22  them out or who might have contributed to putting them

23  together, I'm not certain.

24          THE COURT:  He's going to say what or what do

25  you think he's going to say?

1          MR. STEEN:  The letters that were written, I

2   think Spencer may say that this Williams that will be

3   testifying for the government was putting pressure on

4   some of the inmates in order to help him get these

5   things out.  And so that may put him in the middle of

6   it, too, but I think Smith is probably going to be

7   closer to that.

8          THE COURT:  Will you call, not now, call the

9   federal defender's office.  Is he already here?

10          MR. STEEN:  They're not even in the

11   courthouse.  Now, Spencer is in Cullman.  Floyd told me

12   that they thought that Smith would be back and probably

13   would be in the Hoover jail.

14          THE COURT:  At lunch, because I don't want to

15   hold up this, at lunch talk to Susan about where they

16   are and call for the one who is going to be possibly the

17   most likely to take --

18          MR. STEEN:  I think Smith may be the one.

19          THE COURT:  And then the other one, if you

20   would call the duty magistrate judge and have them

21   appoint somebody for the other one.

22          The other one, do you think he needs it or not?

23          MR. STEEN:  I'm not so sure about Spencer.

24          THE COURT:  Let's Don't do that until tomorrow

25   because the government is going through Wednesday, so

1  let's don't do any of this.  You go ahead and give a

2  heads up to the federal defender about Mr. Smith.  Let's

3  don't worry about the other one until you talk to him

4  again and see what the nature of the testimony is.

5  Okay.

6          MR. STEEN:  Sounds good.

7          THE COURT:  Let me back track here.  Unless

8  you're going to say something about it in opening

9  statements.  Are you going to talk about his testimony

10  in opening statement?

11          MR. STEEN:  No.  My opening statement is going

12  to be very brief.

13          THE COURT:  With regard to the 404(b), I want

14  to talk about that after we got the jury, because it's

15  before opening but after we have the jury.

16          Actually, I want to get some idea about the

17  404(b) evidence.  Can you right now tell me about this?

18          MR. WHISONANT:  Mr. Dodd mailed some anthrax

19  hoax letters in the spring of 2010.  He was later

20  indicted, and he was in jail pending trial.  He was in

21  the Jefferson County jail in April of 2011 when the

22  letter was received by the Jefferson County courthouse,

23  which is Count One, and then he was later --

24          THE COURT:  Let me go back to the first

25  charge.  Those letters were mailed in the spring of

1   2010?

2           MR. WHISONANT:  Yes, ma'am.

3           THE COURT:  Who had that case?

4           MR. WHISONANT:  I did.

5           THE COURT:  What judge?

6           MR. WHISONANT:  Judge Proctor.  And I believe

7   he ultimately plead -- was it 23 counts?

8           MR. STEEN:  I think it was 23.

9           MR. WHISONANT:  Of mailing anthrax hoax

10  letters.  He pled in July of 2011, the day of trial, the

11  day the trial was to begin.  In the interim, he was in

12  custody first in Jefferson County in April of 2011.

13  That's when the first letter in Count One was mailed.

14  And then on June 15th, the letters in Counts Two through

15  Six, we believe were mailed and that was when he was in

16  custody in Calhoun County.  And then the last letter was

17  mailed, I forget, but it was subsequent to that, it was

18  in September.

19          We have a witness who will testify that Dodd

20  told him that he sent the letters so that the Feds would

21  need him as a witness to testify and that we would drop

22  the charges against him that he was in jail on at that

23  time.

24          THE COURT:  I mean, the government would need

25  him to testify --

1          MR. WHISONANT:  About who wrote the letters

2     that he mailed out from --

3          THE COURT:  In 2010?

4          MR. WHISONANT:  In 2011, the second set of

5     letters, the letters that were mailed out while he was

6     in jail waiting to go to trial.  The witness is going to

7     say that Dodd told him that he mailed those letters out

8     in order to get the government to use him to testify

9     that Michael Bole wrote those letters.

10          THE COURT:  So he would get a deal on the 2010

11     letters?

12          MR. WHISONANT:  Right.

13          THE COURT:  And he was going to testify that

14     somebody else wrote the 2011 letters?

15          MR. WHISONANT:  And we would drop the case

16     against him.

17          THE COURT:  I don't know about intrinsic

18     though.

19          MR. WHISONANT:  The case agent is going to say

20     that when he saw the letters, the very first letter, the

21     April letter, he said he saw handwriting, and he had had

22     a case with Michael Bole, and he was the case agent on

23     Dodd.  He said he knew it wasn't Michael Bole.  His

24     handwriting was completely different.  He said it looked

25     to him like Dodd wrote those letters.

1          So he goes -- based on that, he goes and talks

2     to Calhoun County.  He starts -- he talks to them about

3     how they process the mail up there.  And he learns that

4     they record all the phone conversations.  So he listens

5     to Dodd's phone conversations, and he hears one where

6     Dodd is talking -- excuse me -- where Shannon Williams

7     is talking to his brother Shawn Williams, telling him

8     that he's got a package of letters that another inmate

9     has asked him to --

10          THE COURT:  I think there's a transcript of

11     that conversation.

12          MR. WHISONANT:  That's right, yes.  So that's

13     how it evolved from that.  So --

14          THE COURT:  Let's talk about extrinsic and how

15     you would get it in there under 404(b) assuming I don't

16     find it intrinsic.

17          MR. WHISONANT:  Well, I believe it's

18     intertwined in telling the story to the jury,

19     specifically, when Mr. Matthews testifies about how he

20     even went to Mr. Dodd as a suspect in this case.  Then

21     when the other witnesses testify, like Mr. -- when Shawn

22     Williams testifies, they're in jail together, and he

23     knows why Dodd is in jail.

24          THE COURT:  You're not addressing the question

25     of motive, you're not addressing 404(b) elements;

```
 1   right?  You're still considering it or arguing like it's

 2   intrinsic.

 3         MR. WHISONANT:  I believe so strongly that it

 4   is.  I believe the letters show that they're similar in

 5   the type, in plan, scheme.  I think that the letters

 6   show that they are -- I'm trying to think how best to

 7   phrase this.  I think they tend to show his motive and

 8   --

 9         THE COURT:  Go back to the other witnesses that

10   you have that are going to be in the jail with him, and

11   I'm going hear from you, Russ.  Graham, can you go back

12   there and just make sure Susan knows to come tell us

13   when she's got everybody seated.  Come back in after you

14   tell her that.  I'm sure she knows it.

15         MR. WHISONANT:  We have Shawn Williams who is

16   going to testify about the phone call, and we have a

17   transcript of that.  We have the two brothers, both ends

18   of the phone call, and they're going to testify about

19   that.  Then the agent, Mr. Mathews goes to talk to Shawn

20   Williams while he's in jail, and he tells him about the

21   letters.  He talks to the brother Shawn.  They intercept

22   the letters in the mail.  And that's where the five

23   letters that are in Counts Two through Six come from.

24         THE COURT:  All right.  Russ, let me hear from

25   you.  We will probably have more discussions about this
```

1     obviously.

2          MR. STEEN:  The ones that he pled to, that he

3     pled to, I mean, they are his handwriting.  As being

4     intertwined into this, I think there's going to be more

5     players involved with the possibility of diverting the

6     eye of guilty away from Mr. Dodd, one of the witnesses,

7     Mr. Shannon.  Secondly, the forensics on that does not

8     say Mr. Dodd wrote any of the letters.  So it would be

9     hard to --

10          THE COURT:  I thought I was reading some of

11     them that it was likely.

12          MR. STEEN:  They said probably.

13          THE COURT:  Probably.

14          MR. STEEN:  But in the standards that they use,

15     they're supposed to have he did it, we can't tell he did

16     it, or he didn't do it.  And the probably in there that

17     he did it is especially knowing the known letters that

18     she examined and looking at the testimony that

19     Mr. Williams is going to give is going to be hard to say

20     that it's intertwined in anything together with that.

21          First and foremost, the third prong of 404(b),

22     is this going to be so prejudicial to him that there is

23     no way we're going to get a fair trial out of this if

24     that's introduced without something else that's laid

25     down more concrete into that, Your Honor.

1          THE COURT:  Okay.  I tell you what, go ahead

2     and respond quickly, but she has the jury seated, so I

3     don't want to wait any longer.

4          MR. WHISONANT:  Our expert is going to say

5     there are four possibilities in forensics for a forensic

6     examination.  One, that he did not write the letters,

7     one that he did write the letters and then that he

8     probably didn't or he probably did.  Probably did is

9     about as good as you're going to get unless --

10          THE COURT:  We're going to talk about this --

11     finish this later.

12               (Jury impaneled and sworn.)

13          THE COURT:  Before I begin my instructions,

14     it's just something I've done all the years I've been a

15     judge.  It helps me if I just look at a juror instead of

16     looking at all of you at once.  So I'm to going start

17     with Ms. Kaiser and move down.

18          And I don't want anyone to think that I'm

19     saying this particular instruction to one person.  I

20     don't mark where I'm switching.  So I'm saying all of

21     this to each of you individually and collectively, but

22     it's something I do now, and it's something I do when I

23     give my final instructions.

24          Ladies and gentlemen, now that you have been

25     sworn, I will give you some preliminary instructions to

1  guide you in your participation of the trial.  After all

2  the evidence is received, you will decide the disputed

3  issues of fact.  You will then have to apply to those

4  facts, the law as the court will give it to you, and you

5  must follow the law whether you agree with it or not.

6         The evidence from which you will find the facts

7  will consist of the testimony of witnesses, documents,

8  and any other things that are received in the record as

9  exhibits.  Certain things are not evidence, and must not

10  be considered by you as evidence, and I will list them

11  for you now.

12         Shortly, we will hear opening statements from

13  attorneys.  And, at the end of the trial, you will hear

14  closing arguments from counsel.  What the lawyers say

15  during their opening statements and in closing arguments

16  is not evidence in the case.  Nevertheless, what they

17  say to you in those openings statements and closing

18  arguments should be helpful to you, but keep in mind

19  that what they say is not evidence.

20         Objections to questions are not evidence.

21  Lawyers have an obligation to their clients to make an

22  objection when they believe evidence that is being

23  offered is improper under the rules of evidence.  You

24  should not be influenced by an objection or by the

25  court's ruling on it.

1           So, in other words, if I sustain an objection

2   to a question, you should not guess or speculate as to

3   what the answer to that question might have been nor

4   should you draw any inference from the question itself.

5   Likewise, if an objection to a question is made and I

6   overrule the objection and allow the witness to answer

7   the question, you should not place undue emphasis on

8   that answer but treat that answer just as you do all the

9   other evidence in the case.

10          If you are instructed that an item of evidence

11  is received for a limited purpose during the trial, you

12  must follow that instruction.  Anything you may have

13  seen or heard outside this courtroom is not evidence in

14  the case.  You are to decide the case solely on the

15  evidence admitted during the trial and my instructions

16  to you on the law that you must apply to those facts.

17          Now, there are two kinds of evidence in both

18  civil and criminal cases, direct evidence and

19  circumstantial evidence.  Direct evidence is direct

20  proof of a fact such as the testimony of an eye witness.

21          An example of direct evidence would be this:  A

22  witness testifies, "Last night I drove home through a

23  snow storm."  If that witness' testimony was believed,

24  that would be direct evidence that it snowed during the

25  night.

1          Circumstantial evidence is proof of facts from

2    which you can infer or conclude that other facts exist.

3    An example of circumstantial evidence would be this:  A

4    witness testifies, "Last night when I went to bed there

5    was no snow on the ground.  This morning when I awoke

6    there was snow on the ground."  The witness did not see

7    it snow, but there was snow when the witness awoke.  If

8    that witness' testimony was believed, that would be

9    circumstantial evidence that it snowed during the night.

10         The law makes no distinction between the weight

11   to be afforded to both circumstantial evidence and

12   direct evidence, it requires only that you consider all

13   of the evidence in the case, both direct and

14   circumstantial evidence, and, if you find that evidence

15   is sufficient, to find him guilty beyond a reasonable

16   doubt, then that's the only way that can occur.

17         I'm not sure I said that correctly, but I want

18   to make sure that I do.  Direct evidence and

19   circumstantial evidence can both be considered.  It will

20   be up to you to decide whether that evidence presented

21   by the government is sufficient that you find the

22   defendant guilty.  You may find that the evidence is not

23   sufficient.

24         It will be up to you decide which witnesses to

25   believe, which witnesses not to believe and how much of

1    any witness' testimony to accept or reject.  You are the

2    sole judges of the credibility or the believability of

3    each of the witnesses in the case.

4         As I've stated several times, this is a

5    criminal case.  The burden of proof is on the United

6    States to prove the defendant's guilt beyond a

7    reasonable doubt.  Proof beyond a reasonable doubt is

8    proof of such a convincing character that you would be

9    willing to rely and act upon it without hesitation in

10   the most important of your own affairs.

11        During the trial, I will decide all issues of

12   law and procedure that will arise.  And, at the

13   conclusion of the trial, I will instruct you on the

14   rules of law that you must follow and apply in reaching

15   your verdict.

16        I want to tell you now, and I will tell you

17   again at the end of the case, nothing I may say during

18   the course of the trial is intended to indicate or

19   should be taken by you as indicating what your verdict

20   should be.  In other words, if I sustain an objection,

21   if I overrule an objection, do not consider that I am

22   favoring one side or the other.

23        During the trial, you should pay close

24   attention to the testimony.  Although we have a court

25   reporter who is taking down every word that's being

1  spoken, there will not be a transcript of the testimony

2  available to you in the jury room during your

3  deliberations.

4        However, on the other hand, I do permit note

5  taking.  At the conclusion of opening statements -- I

6  don't allow note taking during opening statements,

7  because it's not evidence in the case, but before the

8  first witness is called, Ms. Harper will pass out

9  notepads to you with pens or pencils, your preference.

10  And, if during the trial you would like to take notes,

11  you will be permitted to do so.  On the other hand,

12  you're not required to take notes.  That will be left up

13  to each of you individually.

14        If you do decide to take notes, I require that

15  you leave your note pads in your chairs overnight during

16  the trial.  No one disturbs the jury box during the

17  trial.  And at the conclusion of the trial, obviously,

18  you can take your notes with you to the jury room during

19  your deliberations and at the conclusion of the trial,

20  take your notes home with you.

21        Although, the transcript will not be available

22  during the trial, any exhibits that are received in

23  evidence during the trial will be with you in the jury

24  room.  So if, for example, an exhibit is offered into

25  evidence and received in evidence and either maybe it is

1　passed to you all to look at or it is passed to you to

2　look at but you think I would like to look at that

3　exhibit more carefully, do not be concerned because any

4　exhibit that's received in evidence will be with you in

5　the jury room during your deliberations.

6　　　　Now, a few words about your conduct as jurors.

7　You will not be required to remain together during the

8　recesses of the court.  I've been a judge for 23, almost

9　24 years, and that means you will be free to go home at

10　night and during the resources of the court.  So it's

11　important that you follow these instructions that I'm

12　going to give you with regard to the recesses.  And I

13　mean the recesses that we take in the morning and

14　afternoon recess, a short break, a lunch recess and

15　obviously the night recess.

16　　　　The first instruction is I think hard in one

17　way and easy in another.  The first instruction is do

18　not discuss the case among yourselves or with anyone

19　else during the course of the trial.  I think it's

20　probably not too difficult to follow the instruction to

21　not discuss it among yourselves during the trial.  It's

22　probably a little more difficult to follow the

23　instruction about not discussing it with anyone else,

24　but it's very important that you follow that

25　instruction.

1          I always tell my jurors I'm sure that, if I was
2   selected to sit on a jury, my family members or friends
3   would say every single day tell me about what you heard
4   today.  And when you get home tonight, they may say tell
5   us about what you heard today.  Even though I'm sure
6   that each of you think you would not be influenced at
7   all about what a family member or friend might say to
8   you about what you say you heard in court, and this is
9   very, very important, the problem is that it would be
10  improper for you to even hear the views of someone else
11  who was not sitting here hearing every single word of
12  the testimony and hearing my instructions as to the law
13  that you have to apply.

14         So when you go home tonight and your family
15  members start asking about the case, I think you have a
16  general idea from opening statement as to what the case
17  is about and from my reading the indictment to you and,
18  of course, as you know, the defendant pleads not guilty
19  to the charges, but you can tell your family members or
20  friends the judge says I can tell you what the charges
21  are briefly and the defendant pleads not guilty, but I
22  can't say anything else to you about the trial until
23  it's over.  You'll have your notes, if you decide to
24  take notes or, if not, I'm sure you will remember all
25  about it, so they just have to wait a few days before

1    you can talk to your family members or friends.

2         The second instruction I give in every single

3    case, not that this will be a problem, but that's do not

4    allow anyone to discuss the case in your presence.  I

5    don't think that would ever happen, but if it did

6    happen, by some chance you heard -- I don't think this

7    will happen -- that someone came up to you to try to

8    talk about the case or you overheard someone talking

9    about the case in the courthouse, in the bathroom or

10   downstairs at the snack area, you need to let me know

11   that you've overheard some discussion about the case by

12   letting Ms. Harper know.  Go directly to Ms. Harper, but

13   don't tell any other juror that you've overheard

14   something.  And, again, I don't anticipate that

15   happening, but do not allow anyone to discuss the case

16   in your presence.

17        The third instruction is one that I always

18   wanted judges to give when I was sitting where the

19   lawyers are sitting here, and that is I always felt the

20   jurors must think I'm the rudest person in the world

21   that I'm not speaking to them when I'm on the elevator

22   with them or in the bathroom with them.  Although, it's

23   human tendency to converse with people with whom we are

24   thrown in contact, do not during the course of this

25   trial have any conversation, even of just a very minimal

1    nature with anyone you've come to associate with as

2    being involved in this case.

3          Now, if you say good morning or if they

4    accidentally say good morning to you in the elevator,

5    you don't need to come tell Ms. Harper that.  I've had

6    jurors one time come tell Ms. Harper, I didn't think

7    about it and I asked one of the lawyers if they had

8    change for a dollar or something like that.  I mean,

9    it's okay if they forget or if you forget, but I just

10   think it's better if we really just keep the separation

11   during the course of trial.

12         They're all very friendly people, and I'm sure,

13   in normal circumstances, they would be very pleasant

14   with you and you with them, but I would just ask that

15   you understand why they're not being pleasant.  It's not

16   that they're being rude.

17         I give this instruction in every case.  I have

18   no thought or idea that this case would receive any

19   publicity in the news, but if it did and you happen to

20   open the paper and see something that was written about

21   the case, please do not read it.  Sometimes news

22   articles don't report everything that's being --

23   sometimes they report things that are not proper for the

24   jurors to consider.  So, again, I don't see a reporter

25   in here today, but if there happens to be some news

1    about it, please don't read anything in the news.

2          During the trial, it will be necessary for me

3    to confer from time to time outside your presence with

4    the lawyers with regard to evidentiary issues or other

5    matters that I may need to discuss with them outside

6    your presence.  During those times, I may leave you in

7    the jury box.  I may ask you to step into the jury room.

8          I can promise you that I will try to limit

9    those interruptions as much as possible.  I'm very, very

10   conscious of my jurors' time.  We're all doing our jobs

11   here, but you all are away from your families and jobs

12   and other responsibilities.  And so I try to make sure

13   that my jurors are in that jury box as much of the day

14   as possible, but there just are going to be times that

15   you will have to wait while we discuss some matters that

16   need to be outside your presence.

17         And during those times, I would ask that you be

18   patient and remember at all times the importance of the

19   matter that you're here to consider, the importance of

20   the matter to the United States and the importance of

21   the matter to Mr. Dodd.

22         Now, when the trial is over -- first, let me

23   say this:  There will be opening statements.  Then the

24   government proceeds with what's called the government's

25   case in chief.  The defendant, as I mentioned, has no

1  burden whatsoever.  He does not have to offer any

2  evidence or to prove his innocence, because the burden

3  is on the United States.  But if he does choose to offer

4  evidence, the United States is allowed to present

5  rebuttal evidence if it chooses.  Closing arguments, the

6  government goes first.  The defendant then gives his

7  closing arguments.  And because of that burden, the law

8  permits the United States to have a rebuttal argument.

9         Now, while you were having lunch -- and by the

10 way, I hope it was a good one -- but when you were

11 having lunch, we were all working, and particularly the

12 lawyers, so they have not had a break all morning.  So I

13 am going to give them, not that long, but I'm going to

14 give them until 1:30 to have a break, short break, and

15 then we will come back, and we will have opening

16 statements.

17        From now on, I'm going to have you come in

18 through the jury room.  You all can be on break also

19 until 1:30, but my instructions about not discussing the

20 case with anyone else or among yourselves and also

21 you're free to stay in the jury room.  So we will start

22 the trial at 1:30.  And thank you all very much.

23        (Jury excused.)

24      (Open court, outside the presence of the jury.)

25        THE COURT:  Since the rule has been invoked, I

1  don't know who might be a witness, but if there are any,

2  you need to tell Susan.  Do you have any witnesses that

3  are here?

4           MR. STEEN:  Not here, Your Honor.

5           THE COURT:  All right.  Thank you.

6           (Lunch recess)

7           (Sidebar outside the presence of the jury)

8           THE COURT:  I forgot to talk to you about the

9  404(b) evidence.  I had my through clerk pull some

10 cases.  It may be relevant to prove identity, but I

11 really can't tell quite yet.  Is this one of your first

12 witnesses?

13          MR. WHISONANT:  It will be later on.

14          THE COURT:  I will get a better idea then.  It

15 depends on how close they are in similarity to whether

16 it can be identity and I need to understand the context

17 of the time for me to determine whether it's intrinsic.

18 So extrinsic, it might be relevant -- I mean if it's

19 intrinsic.

20          MR. WHISONANT:  For motive or intent.

21          THE COURT:  Motive won't come into play because

22 motive would be for this crime.  Motive is not to

23 introduce the prior crime.  It's why he committed this

24 crime.

25          MR. WHISONANT:  Right, to commit this crime so

1  he could get out of the prior crime.

2         THE COURT:  You're right.  It should be.

3  That's fine.  But you don't need it right now?

4         MR. WHISONANT:  I don't need it right now.

5         (Open court.  Jury present.)

6         THE COURT:  All right.  Be seated.  Ladies and

7  gentlemen, at this time, we're going to hear opening

8  statements from counsel.  Although what the lawyers say

9  now is not evidence in the case, nevertheless, it should

10  be helpful to you to follow the evidence as it comes

11  in.  So I ask that you give close attention to both

12  sides as they make their opening statements.

13  Mr. Whisonant.

14         (Opening Statements by the parties)

15         MR. WHISONANT:  Your Honor, the United States

16  calls Bridget Williams to the stand.

17     **BRIDGET WILLIAMS, GOVERNMENT'S WITNESS, SWORN.**

18         THE CLERK:  Would you state your name, please?

19         THE WITNESS:  Bridget R. Williams.

20         THE CLERK:  Spell your last name for the

21  record.

22         THE WITNESS:  W-I-L-L-I-A-M-S.

23         THE CLERK:  And in what city and state do you

24  reside?

25         THE WITNESS:  Winston, Alabama.

1                 **DIRECT EXAMINATION**

2    **BY MR. WHISONANT:**

3    Q.    Where are you employed?

4    A.    The State of Alabama Criminal Courts.

5         THE COURT:   Ms. Williams, can you lean into the

6    microphone and project your voice?   Thank you, ma'am.

7    Q.    How long have you worked there?

8    A.    Eight years.

9    Q.    And what is your job there?

10    A.    I'm a court specialist II.

11    Q.    What are your duties as a court specialist II?

12    A.    I have various jobs.   I do subpoenas.   I open up the

13    mail.   I do warrants, recalls.

14    Q.    Where is your office located?

15    A.    We're on the ninth floor of the Criminal Justice

16    Building at 801 Richard Arrington Boulevard.

17    Q.    That's here in Birmingham?

18    A.    Birmingham.

19    Q.    And could you describe your office for the jurors?

20    A.    You walk in the door, there's a long partition, and

21    then there are desks and cubicles inside the office.

22    Q.    And is it as big as this courtroom?

23    A.    Bigger.

24    Q.    Bigger than this courtroom?

25    A.    Yes.

1   Q.   Is your office located there in one of those

2   cubicles?

3   A.   Yes.

4   Q.   Were you working back on April the 12th?

5   A.   Yes.

6   Q.   I'm sorry, April the 12th of 2011?

7   A.   Yes.

8   Q.   How many folks usually work in your office?

9   A.   At the time, I believe it was eight.

10  Q.   And what are the regular working hours in your

11  office?

12  A.   8:00 to 5:00.

13  Q.   Do you process the mail at any particular time

14  during the day?

15  A.   Yes.

16  Q.   What time do you do you that?

17  A.   Generally, it was right before lunch, before 12:00,

18  or after 1:00.

19  Q.   And --

20       THE COURT:  Mr. Whisonant, I'm going to ask you

21  to speak up.  Your back is to the jury, but I'm having

22  trouble hearing you right here.  I know you've got a bad

23  throat problem today, but you need to speak into the

24  microphone, if you would.

25  Q.   Did you process the mail on the afternoon of April

1  the 12th, 2011?

2  A.   Yes, I did.

3  Q.   Did anything unusual happen when you processed the

4  mail?

5  A.   Yes.

6  Q.   What happened?

7  A.   I opened the mail.  I generally open it all at one

8  time, and then I go back, and I separate it out as it's

9  supposed to be distributed.

10        And this particular day, there was a letter,

11  and I read the letter, so that I would know where to

12  send it to, and then I noticed there was some white

13  powder on it, coming out of it.

14  Q.   Did you get any of the white powder on you?

15  A.   I did get some on my pants.

16  Q.   Did you get it in your desk area?

17  A.   Yes, on my desk.

18  Q.   What did you do after you noticed the white powder?

19  A.   I said something to one of my co-workers, and I do

20  know I went and washed my hands.

21  Q.   If you were to see that letter again, do you think

22  you might recognize it?

23  A.   Yes.

24  Q.   Let me show you what's been marked as Government's

25  Exhibit 1 for identification.

1    A.   Yes, I remember.

2    Q.   I don't know if you looked at the inside.  What is

3    that, please, ma'am?

4    A.   This is the letter that was in the envelope.

5    Q.   And did you tell anybody else about the letter?

6    A.   Yes, my co-workers.

7    Q.   Did you -- who was your supervisor at the time?

8    A.   Cindy Collins was my supervisor.

9    Q.   Did you tell her about it?

10   A.   Yes.  She wasn't in the office at that moment.

11   Q.   How long was it before she returned?

12   A.   Maybe a half an hour.

13   Q.   In the meantime, did you tell your co-workers about

14   it?

15   A.   Yes.

16   Q.   Did you tell Ms. Collins when she returned?

17   A.   Yes.

18   Q.   After you told Ms. Collins about it, what happened?

19   A.   She made a couple of phone calls to get someone to

20   come up and take a look at the letter, and she made them

21   aware that there was powder in the envelope at that

22   time.

23   Q.   Did you see any firemen or first responders come to

24   the office?

25   A.   I remember someone coming.  I can't say exactly who

1   it is right now.

2   Q.   And what happened to the letter?

3   A.   The letter was still there when I left that day.

4   Q.   Was it still in your office cubicle?

5   A.   No, it wasn't in my cubicle.  I believe the young

6   men that had come over, I mean, they were there still in

7   the office.

8   Q.   So the last time you saw the letter though it was

9   not in your cubicle, the firemen had it?

10  A.   Someone of authority had it.  I can't say exactly,

11  you know.

12  Q.   Other than washing your hands, did you have to go

13  through any kind of decontamination procedure?

14  A.   I did not.

15  Q.   Did they offer that to you?

16  A.   No, sir.

17  Q.   Ms. Williams, when you got that white powder on you,

18  what did you think it was?

19  A.   The first thing I thought was anthrax.

20  Q.   Were you frightened by that?

21  A.   I was.

22          MR. WHISONANT:   Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24  **BY MR. STEEN:**

25  Q.   Good afternoon, Ms. Williams.  Just a couple of

1  questions for you.  You said you did not have to go

2  through any process of decontamination yourself; is that

3  correct?

4  A.   Correct.

5  Q.   And it was not offered to you by any firemen or any

6  other person in authority, was it?

7  A.   Not that I can remember.

8  Q.   Did anybody in authority tell you that you were in

9  danger?

10  A.   No, sir.

11          MR. STEEN:  No further questions, Your Honor.

12          THE COURT:  All right.

13          MR. WHISONANT:  That's all we have, Your Honor.

14          THE COURT:  Ms. Williams, you can step down.

15  Thank you very much.

16          MR. WHISONANT:  Your Honor, we would call Cindy

17  Collins to the stand.

18      **CINDY COLLINS, GOVERNMENT'S WITNESS, SWORN.**

19          THE CLERK:  Would you state your name, please?

20          THE WITNESS:  Cindy Collins.

21          THE CLERK:  And spell your last name for the

22  record.

23          THE WITNESS:  C-O-L-L-I-N-S.

24          THE CLERK:  And in what city and state do you

25  reside?

1          THE WITNESS:  Trussville, Alabama.

2              **DIRECT EXAMINATION**

3  **BY MR. WHISONANT:**

4  Q.   Ms. Collins, where are you employed?

5  A.   State of Alabama.

6  Q.   And how long have you worked there?

7  A.   20 years.

8  Q.   What's your job there?

9  A.   Court specialist V.

10  Q.   And do you supervise Bridget Williams?

11  A.   Yes.

12  Q.   And where is your office located?

13  A.   801 Richard Arrington Junior Boulevard.

14  Q.   And is your office located separate and apart from

15  where Ms. Williams' office is located?

16  A.   No, same office.

17  Q.   Same office?

18  A.   Yeah.

19  Q.   Were you working on April the 12th, 2011?

20  A.   Yes.

21  Q.   And how many people do you usually supervise?

22  A.   15.

23  Q.   And what were your regular workings hours that day?

24  A.   8:00 to 5:00.

25  Q.   How is the incoming mail processed?

1  A.   It comes through the county, and it comes to our

2  office, and one person opens it.

3  Q.   And is that usually Ms. Bridget Williams?

4       THE COURT:  Can you lean in, speak into your

5  microphone?

6       THE WITNESS:  Yes.

7       THE COURT:  Thank you.

8  Q.   Is that Ms. Williams?

9  A.   Yes.

10      MR. STEEN:  Objection to leading, Your Honor.

11      THE COURT:  All right.  Don't lead your

12  witness.  Go ahead.

13  Q.   Who processes the mail?

14  A.   Bridget Williams.

15  Q.   And did she process the mail on that day?

16  A.   Yes.

17  Q.   And was anything unusual reported to you?

18  A.   Yes.

19  Q.   What was that?

20  A.   A white powder substance was all over her desk.

21  Q.   Who brought that to your attention?

22  A.   She did.

23  Q.   What did you do?

24  A.   I called warrant detail, our sheriff's department.

25      THE COURT:  I'm sorry, you called who?

```
 1              THE WITNESS:  The sheriff's department.
 2   Q.   Did you see any white powder on Ms. Williams?
 3   A.   Not that I remember.
 4   Q.   When Ms. Williams initially found it, if you know,
 5   were you out of the office?
 6   A.   Yes.
 7   Q.   Do you know how long it was from the time she found
 8   it until you returned to the office?
 9   A.   Probably an hour, hour and a half.
10   Q.   During that period of time, do you know what
11   Ms. Williams did?
12   A.   No.
13   Q.   And when you returned to the office, were you
14   immediately made aware of this?
15   A.   Yes.
16   Q.   And did you immediately thereafter call the
17   authorities?
18   A.   Yes.
19   Q.   As a result of your phone call, what happened?
20   A.   They came up and looked at it with some machine they
21   had.
22   Q.   Did you learn the results?
23   A.   Not that day.
24   Q.   What happened in the office when they came in?
25   Could you describe that for the jury?
```

1   A.   They came in and told us we couldn't leave, because

2   it was almost close to going home.   They looked at it,

3   and they called some other people.

4   Q.   And at some point when the -- did the other people

5   actually come into the office?

6   A.   Yes.

7        THE COURT:   Are you all able to hear?   Are you

8   all hearing okay?

9        (Jury affirms.)

10       THE COURT:   I guess it's just me then.   I'm

11  following but I'm straining.

12  Q.   Would you describe for us what happened when the

13  other people arrived, please?

14  A.   They all looked at it, and then I think they called

15  higher -- they kept calling other people to come in.

16  Q.   About how long did all this take?

17  A.   Just a few minutes, and then they called, I think,

18  the FBI and fire department, and all them came.

19  Q.   Were any of them wearing any protective clothing

20  when they came to the office?

21  A.   The sheriff's department, no, but then the fire

22  department had on those white suits when they came up,

23  or it might have been the FBI.   I'm not sure who was in

24  the white suits.

25  Q.   What did the men in the white suits do?

1  A.   They put it in a machine and tested it at first.

2  They looked at it, and then they took it.

3  Q.   Were these suits full body suits?

4  A.   Uh-huh.

5  Q.   And what about the white powder that was on the

6  desk, what happened to that, if you know?

7  A.   I think they cleaned it up.

8  Q.   And did they -- are you aware of whether or not the

9  courthouse was closed?

10  A.   Yes.

11  Q.   Was it closed?

12  A.   Yes.

13  Q.   As a result of this?

14  A.   Yes.   They evacuated everybody.

15  Q.   Did you remain in the office, or were you evacuated?

16  A.   They made me remain there.

17        THE COURT:   I'm sorry, what?

18        THE WITNESS:   They made me stay there.

19  Q.   Who else remained in the office, if you know?

20  A.   Bridget Williams and another woman in our office.

21  Q.   Were you ever told by anyone what the white powder

22  was?

23  A.   Not that day, no.

24  Q.   When you saw the white powder, what did you think it

25  was?

1    A.   I didn't know what it was, but I knew it wasn't

2    normal.

3    Q.   Did anybody else get any white powder on them?

4    A.   No.

5    Q.   Was anybody decontaminated that day?

6    A.   No.

7    Q.   Do you recall whether or not the first responders

8    offered decontamination to anybody?

9    A.   Well, they told us they were going to shower us and

10   everything, and they pulled out everything.  We could

11   see them, the showers and everything, but we didn't have

12   to do that.

13   Q.   What do you mean they pulled out everything?

14   A.   There was like a mat down on the first -- on the

15   ground outside, and it looked like they were putting up

16   some kind of curtains and stuff like that.

17   Q.   Could you see out your window from your office to

18   see this?

19   A.   Uh-huh.

20   Q.   What floor is your office on?

21   A.   Ninth floor.

22   Q.   And the floor that you're speaking about where they

23   put things out, where is that?

24   A.   Front of the building on the first floor.

25   Q.   On the first floor?

1    A.    Yeah.

2    Q.    Okay.  Do you have a judgment as to how many people

3    responded?

4    A.    20.

5    Q.    Did you see any fire trucks or hazmat trucks?

6    A.    Yes.

7    Q.    Do you have a judgment as to how many of those

8    responded?

9    A.    Two maybe.

10   Q.    And how long did this entire incident last?

11   A.    Three hours.

12   Q.    What time were you released to go home that evening,

13   if you know?

14   A.    About 7:30.

15   Q.    Was Ms. Williams allowed to go home earlier than

16   that?

17   A.    Yes.

18   Q.    What time was she allowed to go home?

19   A.    I don't remember.

20   Q.    If you saw that letter again, do you think you could

21   recognize it?

22   A.    No, because I didn't really look at it.

23   Q.    Okay.  Has your office or have you received any

24   training about how to handle white powder letters like

25   that?

1  A.   No.

2          MR. WHISONANT:  That's all I have, Your Honor.

3          MR. STEEN:  No questions, Your Honor.

4          THE COURT:  All right.  Ms. Collins, you can

5  step down.  Thank you.

6          MR. WHISONANT:  We would call Lieutenant

7  Orlando Reynolds to the stand.

8          **ORLANDO REYNOLDS, GOVERNMENT'S WITNESS, SWORN.**

9          THE COURT:  Would you state your name, please?

10          THE WITNESS:  Orlando Reynolds.

11          THE COURT:  All right.  Thank you, Officer

12  Reynolds.  If you would sit down, thank you.

13                    **DIRECT EXAMINATION**

14  **BY MS. DIKE-MINOR:**

15  Q.   Lieutenant Reynolds, if you wouldn't mind speaking

16  into the microphone when you respond.

17  A.   Sure.

18  Q.   What is your full name?

19  A.   Orlando Lorenzo Reynolds.

20  Q.   Where are you employed?

21  A.   Birmingham Fire and Rescue.

22  Q.   And how long have you been employed there?

23  A.   16 years.

24  Q.   Are you assigned to any particular unit?

25  A.   Yes.  I'm assigned to engine 13, which is our decom

1   and hazmat unit.

2   Q.   What is your current position or title?

3   A.   I'm a lieutenant there.

4   Q.   And what are your responsibilities?

5   A.   My responsibilities consist of day-to-day operations

6   and paperwork, grounds operation and any hazmat decom

7   calls that we may have.

8   Q.   If you could explain to the jury what hazmat means.

9   A.   Hazmat is hazardous materials.  They may come in as

10  a liquid, powder, bomb threats, stuff like that.

11  Q.   Did the fire department respond to a white powder

12  incident on April 12th, 2011?

13  A.   We did.

14  Q.   And were you involved in that response?

15  A.   Yes.

16  Q.   If you could walk us through the response.  Tell us

17  what happened.  So, for instance, how was the department

18  alerted of the incident?

19  A.   We were alerted first by a 911 call and dispatched

20  the appropriate apparatuses to the location.  It came

21  over dispatch, and our engine and decom unit responded

22  to the address that they gave us.

23  Q.   Can you tell us who precisely responded?

24  A.   It was three agent companies, which are fire trucks,

25  the guys you see go up and down the street everyday; an

1   EMS IV who is over EMS.  He's a supervisor over that.

2   Q.   What is EMS?

3   A.   EMS is emergency medical, and the rescue unit which

4   are ambulances, which we normally take people to the

5   hospital in, we had three of those out there also, along

6   with the battalion chief and, of course, the police.

7   Q.   About how many firemen or women would you say

8   responded?

9   A.   Approximately 25, 30 firefighters.

10  Q.   And when the firemen or women got to the scene, what

11  did they do?

12  A.   First, we find out exactly what we have, what kind

13  of call it is.  Once we found out what it was, we set up

14  the appropriate equipment like a hazmat -- a hazard

15  materials pool.  We got dressed in our entry suits,

16  which are Tyvek suits we use for white powder calls.

17  They are all over suits.  They cover us from head to

18  toe, pretty much get all that stuff ready, get back-up

19  teams, EMS teams, in case someone go down, and we make

20  entry into the building.

21          THE COURT:  Let me stop you for a second.

22  You've been saying April 12th.  Is that the date?

23          MS. DIKE-MINOR:  Yes, Your Honor.

24          THE COURT:  But the indictment --

25          MR. WHISONANT:  There is a variance, yes,

1   ma'am.

2          THE COURT:  You may have said the address you

3   went to, but what was the address?

4          THE WITNESS:  I didn't say the address.

5          THE COURT:  I didn't think so.  Where did you

6   go?

7          THE WITNESS:  It was I think 719 maybe Richard

8   Arrington Boulevard.

9          THE COURT:  What was the location, what was the

10  --

11         THE WITNESS:  It was the courthouse, the county

12  jail courthouse, whatever.

13  Q.  (By Ms. Dike-Minor)  You said then you proceeded

14  into the building?

15  A.  Yes.

16  Q.  And how many firemen entered the building?

17  A.  We always have a team of two, so approximately two

18  will go in -- well, two will go in, and two will

19  standby.  So we had approximately 16 -- three teams of

20  six people ready to go in, but two actually made entry.

21  Q.  And I think you said some of this, but those that

22  entered were they wearing any sort of special equipment?

23  A.  Yes.  Those are our Tyvek suits that we use for

24  white powder calls.  They cover us from head to toe,

25  totally encapsulated.

1  Q.  And when they got into the building, what did they

2  do then?

3  A.  They were directed to the letter or whatever it was

4  that we had.  We have an Aurora that we overpack the

5  letter in, and we use the machine to kind of tell us

6  exactly what it is.

7  Q.  You said you had an Aurora?

8  A.  Aurora, yes.

9  Q.  Could you tell the jury what that is?

10  A.  Aurora is a machine that we have that can read

11  through plastics, paper and let us know what's inside

12  that particular -- whatever it is that we maybe think is

13  contaminated.

14  Q.  Did you use the Aurora?

15  A.  Yes, we did.

16  Q.  What did you use it on?

17  A.  We used it on the letter that we was reported to.

18  Q.  Okay.  What did you learn using that?

19  A.  We learned by using the Aurora that it was -- I

20  think it was soap that was inside the letter.

21  Q.  Did you do anything else with the letter?

22  A.  Yes.  After that, we overpack it, make sure it's

23  safe with regards to what it says, and we turn it over

24  to the next authority.

25  Q.  Who was the next authority?

1   A.   The FBI was on the scene, and we turned it over to

2   the FBI.

3   Q.   Okay.  You said earlier that you set up

4   decontamination pools, I believe?

5   A.   Yes.

6   Q.   What precisely are those?

7   A.   Decontamination pools are three pools with several

8   shower heads inside of them.  We hook them up to a water

9   source; so as people come out that may be contaminated,

10   we can clean them up.  And the pools will actually

11   collect the water.

12   Q.   Do you know about how much the fire department

13   response cost that day?

14          THE COURT:  I don't see that as being

15   relevant.  I don't see any relevance unless you want to

16   see me at sidebar.  I don't see relevance.  Move on.

17          MS. DIKE-MINOR:  Nothing further, Your Honor.

18          THE COURT:  If you want to see me at sidebar

19   about it, but I don't see it.

20          MR. WHISONANT:  May we see you at sidebar?

21          (Sidebar outside the presence of the jury)

22          MR. WHISONANT:  It's not an element of the

23   crime, but there is a provision in 1038 that requires

24   the payment of any funds expended by a first responder.

25          THE COURT:  Is that something that goes to the

1    jury or is that something for me?

2         MR. WHISONANT:  Under the latest case law, I'm

3    not sure whether its goes to the jury or not.  That's

4    why --

5         THE COURT:  It doesn't increase the penalty?

6         MR. WHISONANT:  It says that the person shall

7    pay whatever that amount is.  So we have a letter from

8    the police department that says or the fire department

9    that says the cost.  Their expenditure was like 1,500 or

10   whatever on this.  So that's the only reason I'm

11   bringing it up, but I'm trying to find that provision

12   right now.

13        THE COURT:  Well, the only reason I would let

14   it in is if it's something that has to go to the jury

15   that they have to find beyond a reasonable doubt.  If

16   not, I don't see the relevance of it.  But if you think

17   it does, I will just say, ladies and gentlemen, at this

18   point I'm not sure this is an issue you have to decide

19   or not and only -- it may have no relevance.

20        MR. WHISONANT:  Well, it's not -- it's not

21   relevant in that it's an element, I'm just trying to be

22   very cautious.

23        THE COURT:  You have to research it, but I'm

24   not going to present it just for no reason.  In other

25   words, you know what I mean.

1          MR. WHISONANT:  Yes.

2          THE COURT:  And I'm going to tell them right

3    now, I'm not sure this is an issue that you would have

4    to decide or not, because I don't know that.  I'm going

5    to let the answer in, but note it may not be relevant,

6    because I'm not trying to -- unless it's something that

7    they have to decide, which I don't think it is something

8    they have to decide, but it might be.  I haven't had a

9    case like this, so before we have our charge conference,

10   you need to let me know that.

11         MR. WHISONANT:  Okay.

12         (Open court.  Jury present.)

13         THE COURT:  Ladies and gentlemen, I'm not sure

14   if the answer is relevant or not.  I think all the

15   lawyers agree it's not an element of the crimes charged,

16   but it could be something that you all have to decide.

17   I'm not sure yet.  I'm going to let the answer in in the

18   event that it is something that I have to give to you

19   all to decide.

20         So the question, Lieutenant Reynolds, is do you

21   know how much this response cost the fire department?

22         THE WITNESS:  Yes, approximately $1,600.

23         THE COURT:  $1,600?

24         THE WITNESS:  Yes, ma'am.

25         THE COURT:  Okay.  Thank you.

1    MS. DIKE-MINOR:  Nothing further.

2    THE COURT:  Thank you.

3                    **CROSS-EXAMINATION**

4    **BY MR. STEEN:**

5    Q.   Lieutenant Reynolds, just to go back to this cost

6    factor, you said it was approximately $1,600; is that

7    correct?

8    A.   Yes.

9    Q.   How did you come up with that figure?

10   A.   Well, our chief would turn in a detailed report

11   about personnel use --

12            THE COURT:  I don't know what's wrong me today,

13   but I am having trouble hearing everybody.  I'm going to

14   ask the lawyers -- I'm going to start projecting my

15   voice more.  Mr. Whisonant has got an issue today.  But

16   everybody else, please project your voices, and I'm

17   going to ask the witnesses, too.  I can hear you but I'm

18   straining.  I don't know why exactly.  So please project

19   your voice and all the lawyers.  Even if it sounds

20   unnatural to you, please do it.

21            Go ahead, sir.  How did you come up with that

22   figure?

23            THE WITNESS:  We turned in a detailed incident

24   report that came from our office downtown.

25   Q.   (By Mr. Steen)  It wasn't you that made that

1   determination, was it?

2   A.   No, sir.

3   Q.   So you are only relying on somebody else's figures?

4   A.   Turned in from my chief downtown, yes.

5   Q.   But he's the one that calculated it?

6   A.   Yes, sir.

7          MR. STEEN:  No further questions, Your Honor.

8          THE COURT:  All right.  You can step down,

9   Lieutenant Reynolds.  Thank you.

10          MR. WHISONANT:  Your Honor, we would call

11   Special Agent Ronsisvalle.

12      **H. JOSEPH RONSISVALLE, GOVERNMENT'S WITNESS, SWORN.**

13          THE CLERK:  Would you state your name, please?

14          THE WITNESS:  H. Joseph Ronsisvalle.

15          THE CLERK:  And spell your last name for the

16   record, please.

17          THE WITNESS:  R-O-N-S-I-S-V-A-L-L-E.

18          THE CLERK:  In what city and state do you

19   reside?

20          THE WITNESS:  Currently I'm in Washington,

21   D.C., for an 18 month temporary duty, but typically I'm

22   here in Trussville, Alabama.

23                    **DIRECT EXAMINATION**

24   **BY MS. DIKE-MINOR:**

25   Q.   Agent Ronsisvalle, where are you employed?

1   A.   With FBI.

2   Q.   What is your position there?

3   A.   I'm the weapons of mass destruction coordinator.

4   Q.   And how long have you been employed by the FBI?

5   A.   15 years.

6   Q.   How long have you held your current position?

7   A.   Just over ten years.

8   Q.   In that role, what are your duties?

9   A.   Part of my duties are to go around the state and

10  work with any facilities or places that have biological

11  chemical radiation, any kind of agents that could be a

12  threat to society, especially from the criminal or

13  terrorist, that type of thing, work with them on

14  prevention and response in case there were to be a

15  response, and then also local agencies response

16  agencies, emergency management, public health, fire and

17  hazmat, that type of stuff, so that we have the proper

18  protocols in place if we have to respond to an incident.

19  Q.   Thank you.  Did you have occasion to take custody of

20  any evidence in this case?

21  A.   Yes, I did.

22  Q.   And on what date?

23  A.   I believe it was April 12th, 2011.

24  Q.   Agent Ronsisvalle, I've just provided you with

25  Government's Exhibit 1. Do you recognize it?

1    A.    Yes.

2    Q.    What is it?

3    A.    It's a letter that was sent to the Judicial Circuit

4    office there, Criminal Justice Services Center, and

5    that -- I guess there was some powder that had been

6    exposed on a table there when a lady opened it, and we

7    responded on that date to collect this with the local

8    fire and hazmat team.

9    Q.    Did you have occasion to take that letter into

10   custody?

11   A.    Yes.  Let me just state for the record that when I

12   receive it into my custody it's already been overpacked

13   and put into a bucket and decontaminated, so when I take

14   it I'm not at risk.  So I didn't pick it up like this.

15   I picked it up in a bucket and took it down to the lab.

16          However, I do give them a camera to take

17   pictures, so that I know from pictures they brought out

18   to me on my little camera disk, the little disk that I

19   look at, shows this letter and what's in it here.  So I

20   do recognize that, yes.  Does that make sense?

21   Q.    Yes.  I believe it does.  On April 12th, 2011, you

22   did take that letter into custody?

23   A.    Yes.

24   Q.    Into your custody in the bucket?

25   A.    Right.

1  Q.    What did you do with it?

2  A.    Typically, we have a conference call with our

3  headquarters to make sure it's safe to have me to take

4  it.  We work through some protocols.  And once they

5  agree I can take it, we decide how am I going to get it

6  to the lab and so forth.

7          Typically, I take it either that night or the

8  next day depending on how crucial it is, what's

9  happening.  We decided it was kind of late, and we were

10 able to take it next day to the lab.  So I secured it in

11 my vehicle, made sure it was locked up at night and kept

12 it overnight in my possession.

13 Q.    Then what?  What did you do you?  You said the next

14 day you took it where?

15 A.    To the state public health lab which is in

16 Montgomery and turned over custody to them for the

17 analyzation.

18 Q.    And this next day, what was the date?

19 A.    The 13th, I guess.

20 Q.    And did you have occasion to again take custody of

21 the letter?

22 A.    Yes.  When they finished doing their analyzation on

23 it, I don't have the date in front of me, but it's on

24 the chain of custody, then I recollected it down from

25 the lab and brought it to the postal inspector, Steven

1    Mathews.

2    Q.   And at all times the package was in your custody,

3    did you or anyone else open it, touch it, alter it, take

4    away from it or alter or change it in any form?

5    A.   No, I didn't.

6    Q.   Agent Ronsisvalle, I've just shown you what's been

7    marked for purposes of identification as Government's

8    Exhibit 19.  Do you recognize it?

9    A.   Yes.

10   Q.   Could you tell us what it is?

11   A.   This is a chain of custody form that we regularly

12   use when we do collect the evidence from a crime scene.

13   We have the fire department, whoever is collecting it,

14   basically fill this out with our supervision.  And then

15   we take it and we collect it, sign a chain of custody

16   and bring it down to the lab.

17          So it's a state public health lab form that we

18   use in conjunction with them to make sure the evidence

19   has all the proper protocol being done, and that is

20   approved by us when we take it.

21   Q.   Does that document reflect the chain of custody that

22   you've testified to?

23   A.   Yes, it does.

24          MS. DIKE-MINOR:  Nothing further, Your Honor.

25          MR. STEEN:  We have no questions, Your Honor.

1          THE COURT:  Thank you very much.  You're

2     excused.

3          MS. DIKE-MINOR:  Your Honor, the United States

4     calls Dr. Massingale.

5        **SHARON MASSINGALE, GOVERNMENT'S WITNESS, SWORN.**

6          THE CLERK:  Would you state your name, please?

7          THE WITNESS:  Yes.  My name is Sharon

8     Massingale.

9          THE CLERK:  Spell your last name for the

10    record, please.

11         THE WITNESS:  M-A-S-S-I-N-G-A-L-E.

12         THE CLERK:  In what city and state do you

13    reside?

14         THE WITNESS:  Currently, I live in Tuskegee,

15    Alabama.

16         THE CLERK:  Thank you.

17                **DIRECT EXAMINATION**

18    **BY MS. DIKE-MINOR:**

19    Q.   Dr. Massingale, could you please introduce yourself

20    to the jury?

21    A.   Yes.  My name is Sharon Patricia Smith Massingale.

22    And I am, as I said, from Tuskegee, Alabama, but I work

23    in Montgomery, Alabama with the Alabama Department of

24    Public Health.

25    Q.   Thank you.  Did you supervise the examination of a

1   package containing white powder for this case?

2   A.   Yes.  As the director of the laboratory, I'm

3   responsible for all testing that's done in my

4   laboratory.

5   Q.   Before we get into that, let's just learn a little

6   bit more about you.  Where did you go to university?

7   Did you go to university?

8   A.   Yes.  I went to three here in the State of Alabama.

9   I graduated from Alabama A&M University with a degree in

10  zoology.  I then went to Tuskegee University where I

11  received my masters in biology with a specialty in

12  molecular genetics.  Then I graduated with my doctorate

13  from Auburn University with a degree in microbiology,

14  and my specialty was molecular testing.

15  Q.   Did you have any further education?

16  A.   That's it.

17  Q.   You said that you currently work with the Alabama

18  Department of Public Health; correct?

19  A.   That's correct.

20  Q.   When did you start working with them?

21  A.   I started working for the department December 20th,

22  1999, my 18th wedding anniversary.

23  Q.   What is your current position there?

24  A.   I currently serve as the public health laboratory

25  director.

1    Q.   And did you start at that position?

2    A.   No.  I actually began as an entry level

3    microbiologist, and I have worked my way up through

4    microbiologist and then a senior microbiologist and then

5    a molecular specialist, and now I am the laboratory

6    director.

7    Q.   Do you have any certifications, any professional

8    certifications?

9    A.   Yes.  I am certified as a high complexity laboratory

10   director with a specialty in microbiology.

11   Q.   Are you a member of any professional organizations?

12   A.   Some, but most notably the Association of -- well,

13   let me give you the -- it's AAFA and also APHL, the

14   Association of Public Health Laboratories.

15   Q.   Now, let's go back to the package that your office

16   examined that you supervised.

17   A.   Yes.

18   Q.   You said you supervised the examination of a package

19   containing white powder in this case; correct?

20   A.   Yes, ma'am.

21   Q.   And I have shown you what's been marked as

22   Government's Exhibit 1. Do you recognize that?

23   A.   Yes.  This is one of the ones that we examined in

24   our laboratory.

25   Q.   And do you know the date on which that package was

1  examined?

2  A.   In April 2011.

3         MS. DIKE-MINOR:   At this time, Your Honor, the

4  government would move to admit --

5         THE COURT:   I'm sorry.   What did you say the

6  date -- is that the date you received it or is that the

7  date what?

8         THE WITNESS:   It was in our laboratory in

9  April.   The receiving date on the sheet, I think it's

10  2011.

11         THE COURT:   The receiving date is what?

12         THE WITNESS:   I'm sorry.   I don't remember the

13  specific date.   I have to look at the log in sheet to

14  give you the specific date.

15         THE COURT:   What date did you just say?

16         THE WITNESS:   April, I think it's April 2011.

17  I'm not sure.

18         THE COURT:   April 2011.   What was the question

19  that you answered that to?

20         THE WITNESS:   When did we receive it?

21         THE COURT:   You received it in April 2011?   I

22  just want to make sure I understand you.   I'm not

23  saying -- is that what you're saying, you received it on

24  April 2011?

25         THE WITNESS:   Yes, ma'am.

1          THE COURT:  Has Government's Exhibit 1 been

2    identified by anybody else?

3          MS. DIKE-MINOR:  Yes, by two other witnesses.

4          THE COURT:  I wrote down -- hold on one

5    second.  Did Ms. Williams --

6          MS. DIKE-MINOR:  Yes.

7          THE COURT:  Who identified it?

8          MS. DIKE-MINOR:  Ms. Williams identified it who

9    was the woman who received it, Ms. Collins as well.

10          THE COURT:  Not Ms. Collins.

11          MS. DIKE-MINOR:  No, she did not.  I'm sorry.

12    Just Ms. Williams, and then Agent Ronsisvalle who took

13    custody of it.

14          THE COURT:  Okay.  I didn't write that number

15    down.  Okay.  It's received.  Any objection?

16          MR. STEEN:  Yes, Your Honor.  May I voir dire

17    the witness, please, on this particular document?

18          THE COURT:  Okay.

19                    **VOIR DIRE EXAMINATION**

20    **BY MR. STEEN:**

21    Q.   Dr. Massingale?

22    A.   Yes, sir.

23    Q.   Did you perform any tests on this document that has

24    been presented to you?

25    A.   I supervise the laboratory people that do the

1  testing.

2  Q.   Did you perform any tests on this document that you

3  have been presented?

4  A.   No, sir.  I just provide the supervision.

5  Q.   Were you there -- were you present when it was

6  tested?

7  A.   Our laboratorians take pictures of every letter of

8  this sort that comes in, and I review the photographs.

9  Q.   Let me --

10  A.   And the test results.

11  Q.   Let me ask the question a little more plainly.  Did

12  you see that document that was received in your office

13  tested?

14  A.   I saw a picture.

15  Q.   Did you see it tested?

16  A.   No, sir.

17  Q.   Okay.  So you can't testify as to what happened to

18  that document, can you?

19  A.   I can based on protocol, sir.

20  Q.   By looking --

21      THE COURT:  Let me see the lawyers at sidebar

22  just briefly.

23      (Sidebar outside the presence of the jury)

24      THE COURT:  Is there some reason you didn't

25  call the person who did the testing?  This is hearsay.

1        MR. WHISONANT:  She's not available.

2        THE COURT:  Why is she not available?

3        MR. WHISONANT:  I don't recall off the top of

4   my head.  But this -- the testing was done at her

5   direction as laboratory director.  The protocols were

6   followed, which she then reviewed and can testify about.

7        THE COURT:  I'm just not sure that it's not

8   hearsay.  I'm not trying to be difficult here.  I just

9   think it might not be admissible because she didn't do

10   -- I think every test I've ever had would be I performed

11   this test and this is what I did on it, not a supervisor

12   coming in and saying this is what the test results at

13   our lab show.  It may be.  I would like to see some

14   cases on it before I admit it through her.

15        MR. WHISONANT:  Okay.

16        THE COURT:  I mean, maybe I would say it goes

17   to the weight, but I'm not sure that's right.  You think

18   it's --

19        MR. WHISONANT:  It's my recollection that I

20   have used supervisors in the past to testify in

21   situations like this, but we can get some --

22        THE COURT:  I'm not trying to be difficult.  If

23   I knew it off the top of my head, I would say, but I

24   think it's important.  Do you know for sure it's not

25   admissible?  There's no reason for us to take a break

1   and get the --

2          MR. STEEN:  I've never been able to have a

3   document admitted or seen or questioned that it wasn't

4   the actual tester that did it.

5          THE COURT:  Well, I don't remember one.  I'm

6   not saying that I haven't had any.

7          MR. STEEN:  I'm like you, I've never had it

8   happen to me.  I have been able to keep it out because

9   it wasn't the tester, and I can't ask her certain

10  questions if she's not the tester as to exactly how it

11  was done, and nowhere on this report does it even say

12  that she supervised it or reported it or anything.

13         THE COURT:  Who was the person that did do the

14  testing there?  That's just the chain of custody.

15         MS. DIKE-MINOR:  The next page is --

16         MR. STEEN:  Your Honor, right here, for lab use

17  only, it says who received it and did that.

18         THE COURT:  I tell you what we'll do, I'm just

19  going to right now let -- what is she going to say?

20  What do you want her to say?

21         MS. DIKE-MINOR:  All she's going to say is the

22  that the white powder was not anthrax, is not

23  hazardous.  First, I wanted to admit Government's

24  Exhibit 1, which is the letter itself, and it was

25  identified it by Ms. Williams who received it.

1          THE COURT:  Well, you could have offered it

2     through her than through this witness.

3          MR. WHISONANT:  Yes.

4          THE COURT:  Well, I mean, did she ever see this

5     letter herself?  Did she get it herself?

6          MR. WHISONANT:  I don't believe that she did.

7          THE COURT:  Well, I think we need to --

8          MR. WHISONANT:  Okay.

9          THE COURT:  I don't know.  You could be right,

10    there may be a case that says that's completely fine.  A

11    supervisor can come in and say what the test results

12    were, but not knowing that for sure, I'm not going to

13    let that come in.

14         MS. DIKE-MINOR:  Okay.

15         THE COURT:  If you want to take a short break

16    and call somebody over at your office and have them

17    start looking at it.  I mean, we could have her wait and

18    call the next witness.  Do you see what I'm saying?

19    Maybe you all could get an answer.

20         MS. DIKE-MINOR:  Now, I would just note that

21    without her testimony, the jury is just going to be

22    wondering is this anthrax.

23         THE COURT:  There's testimony that it's not

24    anthrax.

25         MR. STEEN:  We've already got testimony from

1  the fireman that it was soap.  Do you want to call

2  Ms. Williams back?  I will waive the excuse if you want

3  to call Ms. Williams back and get it in.  She's the only

4  -- Ms. Collins didn't see it.

5          THE COURT:  The charge is that it's a hoax, not

6  that it was real.  So if they think it's real, then you

7  might not have proved Count One, although there is the

8  firemen who said we tested it on the scene, it appeared

9  to be soap or with their little field test was soap.

10 But I don't think that's as definitive as having a lab

11 test saying it was soap.  Because if it's anthrax, to me

12 you don't establish Count One.

13         MR. WHISONANT:  Right, right.

14         THE COURT:  So my thoughts are you should have

15 -- I could put one of my clerks on it, and I guess --

16         MR. WHISONANT:  Well, we can have somebody --

17 there's people there.

18         MR. STEEN:  I don't have anybody.

19         THE COURT:  I will ask Becky.  I'm going to

20 tell them I have a legal issue, and she can step out and

21 call your next witness.

22         (Open court.  Jury present.)

23         THE COURT:  Ladies and gentlemen, there's a

24 legal issue I have to take up.  I am going to ask you to

25 step out, and I am going to let the government call

1    their next witness.

2              (Outside the presence of the jury)

3              THE COURT:  Who is the name of person that did

4    the test on Government's Exhibit 1, who is that person?

5              THE WITNESS:  Evelyn Franklin.  She did --

6    there are several components to the test.  There are

7    several components.

8              THE COURT:  Don't say what they are.

9              THE WITNESS:  There's three different people.

10             THE COURT:  Are they all still at your office?

11             THE WITNESS:  Yes.

12             THE COURT:  They're all still there?

13             THE WITNESS:  Yes.  I'm sorry, one has retired.

14             THE COURT:  All right.  I'm sorry.  Call your

15   next witness for now.

16             (Open court.  Jury present.)

17             MR. WHISONANT:  We would call Major Mark Smith

18   to the stand.

19             **MARK K. SMITH, GOVERNMENT'S WITNESS, SWORN.**

20             THE CLERK:  Would you state your name, please?

21             THE WITNESS:  Mark K. Smith.

22             THE CLERK:  And spell your last name for the

23   record.

24             THE WITNESS:  S-M-I-T-H.

25             THE CLERK:  In what city and state do you

1    reside?

2              THE WITNESS:  Montgomery, Alabama.

3                    **DIRECT EXAMINATION**

4    **BY MR. WHISONANT:**

5    Q.   Mr. Smith, where are you employed?

6    A.   The 46th civil support team of the Army National

7    Guard.

8    Q.   And what is your job there, sir?

9    A.   Nuclear medical science officer.

10   Q.   And are you a member of the Army National Guard?

11   A.   Yes.

12   Q.   What is your rank, sir?

13   A.   Major.

14   Q.   How long have you been in the guard?

15   A.   The Army Guard for 13 years.

16   Q.   And did you serve in the military prior to that

17   time?

18   A.   Prior Air Force, prior Navy, 23 years altogether.

19   Q.   Working with the guard, is that a full-time job?

20   A.   Yes, it is.

21   Q.   Where are you stationed?

22   A.   At Maxwell -- outside of Maxwell.  I'm sorry.

23   Q.   And what is your current position with the guard?

24   A.   Science officer.

25   Q.   How long have you been a science officer?

1    A.    13 years.

2    Q.    Has that always been at Maxwell?

3    A.    It's a specialized -- each state has a team

4    specialized for WMD full time.  And prior to 2004, from

5    2000 to 2004, I was a science officer in Minnesota for

6    their team as well.  There's one science officer per

7    team per state.

8    Q.    What is your education?

9    A.    I have a chemistry degree, a bachelors in chemistry

10   degree.

11   Q.    Where did you obtain that?

12   A.    Jacksonville State.

13   Q.    Do you have any professional licenses or

14   certifications?

15   A.    I do not.

16   Q.    What about any specialized military education?

17   A.    With all the training and everything that I've

18   gotten over the years, no official certificates,

19   emergency responder and FEMA and all those certificates,

20   but no other than that.

21   Q.    And have you taken any FEMA professional development

22   courses?

23   A.    All of them.

24   Q.    And as a nuclear medical science officer, are you

25   familiar with both chemical and biological weapons?

1    A.   Yes.

2    Q.   And are you familiar with anthrax?

3    A.   Yes.

4    Q.   What is anthrax?

5    A.   Anthrax is the disease caused by Bacillus

6    anthracis.  It is a bacteria, a spore-forming bacteria.

7    Q.   Is it considered a deadly biological agent or

8    toxin?

9              THE COURT:  Are you offering him as an expert?

10             MR. WHISONANT:  Yes, ma'am, we are.

11             THE COURT:  Any objection?

12             MR. STEEN:  No, Your Honor.

13             THE COURT:  All right.

14   Q.   I asked you is anthrax considered a deadly

15   biological agent or toxin?

16   A.   Yes.

17   Q.   Why is that?

18   A.   Because of the lethality and acute onset.  Within

19   one to six days, a person will start having effects.

20   And if it's -- if it's inhalation, it's up to 95 percent

21   fatality.

22   Q.   So how can you contract anthrax?

23   A.   Cutaneous, the skin, GI, ingest or inhalation.

24   That's the three common ways that you can get it.

25   Occupationally, it's been known for years, woolsorter's

1    disease and stuff like that.  People have gotten it

2    through occupational hazards, working with infected

3    animals.

4    Q.   You said if you inhale it, that's one way to get it?

5    A.   That's the worst way to get it.

6    Q.   What's the mortality if you inhale it?

7    A.   Mortality is not -- is 85 percent or higher.

8    Q.   What about if you eat it, you ingest it?

9    A.   The mortality rate in that is less than that.  GI is

10   10 to 60 percent mortality with untreated victims.

11   Q.   What about if you just get it on your skin?

12   A.   That is around 10 to 40 percent mortality untreated,

13   less than one percent treated.

14   Q.   Is there a window there where you must begin

15   treatment in order for it to be effective?

16   A.   Immediately.  If not immediately, the bacteria will

17   continue to grow, and some of the prophylactics and

18   stuff will not help the victim.

19   Q.   What are some of the symptoms of anthrax?

20   A.   Flu-like, besides the rhinorrhea and runny eyes and

21   runny nose.

22   Q.   You used a term I don't know, rhinorrhea.

23   A.   Runny nose and runny eyes.  It's just basic flu-like

24   symptoms initially, during the initial onset between one

25   and six days.  Flu-like symptoms will be the initial

1    onset.

2    Q.    How does it progress from there?

3    A.    It progresses from there -- the bacteria does two

4    things:   One, the bacteria will grow in your

5    bloodstream, and it will keep growing and growing, and

6    it will actually cause the displacement of oxygen due to

7    the fact that the bacteria itself in your blood stream

8    will not allow you -- it overcomes your blood and your

9    body.   Therefore, that's one way that it does it.   It

10   just basically takes over the blood.

11          And the other way is the toxins that's

12   produced.   The edema factor that a toxin produces by the

13   bacteria will inhibit the natural production of water in

14   your body, and you will actually have water in your

15   lungs, in the lower part of your lungs, your body, and

16   your body will not be able to regulate your water.

17          Another is a lethal factor, which basically

18   kills your cells.   Everywhere that the lethal factor

19   kills the blood cells, the skin tissue, necrosis of all

20   those tissues.

21   Q.    About how long does it take to progress from being

22   infected until --

23          THE COURT:   Let me just say this:   I don't see

24   the relevance.   So if you want to finish on up here, I

25   just don't see the relevance of what this disease does.

1    I mean, he's charged in Count One with --

2            MR. WHISONANT:  An anthrax hoax.

3            THE COURT:  An anthrax hoax, and you've gotten

4    out that it could be deadly, and it's a very serious

5    thing.  I just don't know that showing how it progresses

6    and whether there's a cure or anything else, I don't

7    know how far you plan to go with this.

8            MR. WHISONANT:  Not much further, Your Honor,

9    but I just wanted to be able to show that this is a very

10   deadly substance.

11           THE COURT:  I think you've shown it, but if you

12   want to ask one or two more questions, but I think

13   you've shown it.

14   Q.   (By Mr. Whisonant)  How is anthrax treated?

15   A.   Through antibiotics.

16   Q.   And is the treatment regimen very successful?

17   A.   No.  If the treatment is initialized during the

18   onset, it can be but if it's inhalation anthrax, even if

19   I get a vaccination for it, if I get inhalation anthrax,

20   especially in a weaponized form, there will be pretty

21   much 90 percent still mortality rate.

22           THE COURT:  Inhalation would come if you opened

23   a letter and anthrax was in the letter, is that how you

24   would --

25           THE WITNESS:  Yes, ma'am.

1        MR. WHISONANT:  That's all we have, Your Honor.

2        THE COURT:  Thank you.

3                      **CROSS-EXAMINATION**

4    **BY MR. STEEN:**

5    Q.  Major Smith, did you receive any document from the

6    FBI concerning the case that you're testifying on today?

7    A.  No, I did not.

8    Q.  Did you perform any tests on any speculative

9    documents that you might have gotten?

10   A.  I did not.

11   Q.  You have no knowledge of this case whatsoever, do

12   you?

13   A.  I do.

14   Q.  What knowledge do you have?

15   A.  Just being in the business of what I'm doing, we

16   always --

17   Q.  So you're aware that Birmingham Fire retrieved a

18   document?

19   A.  Just through people in my profession, yes, not any

20   particulars or nothing about --

21   Q.  Would it be easier to say that you've just got a

22   small synopsis of what happened and --

23   A.  Yes.

24   Q.  But you didn't perform any tests?

25   A.  I wasn't involved whatsoever.

1    Q.    Okay.

2              MR. STEEN:  No further questions, Your Honor.

3              THE COURT:  All right.  You can step down.

4    Thank you.  Let me see the lawyers at sidebar.

5              (Sidebar outside the presence of the jury)

6              THE COURT:  All right.  Actually, it does have

7    a flag.  Go tell her to make sure the flag does not

8    apply to this point.  Actually, it's not going apply to

9    this.  Never mind.

10             This is a case right on point, and it says it's

11   not admissible.  It's United States of America

12   I-G-N-A-S-I-A-K, 667 F.3d 1217.  Even though there's a

13   flag, it doesn't apply to this part.

14             Here's what it says:  It's quoting Crawford

15   versus Washington.  The Eleventh Circuit case that's

16   quoted is Crawford Ford versus Washington, 541 U.S. 36

17   (2004).  I'm not going to paraphrase, but I'm going to

18   skip over.  "Forensic reports constitute testimonial

19   evidence.  In Malendez-Diaz versus Massachusetts, the

20   Supreme Court held that a forensic laboratory report

21   stating that an unknown substance was cocaine qualifies

22   as testimony of evidence and the confrontation laws

23   applies.  The court reasoned that because the

24   certificates are incontrovertibly a solemn declaration

25   or affirmation made for the purpose of establishing or

1    proving some fact" -- I will just stop here to say you

2    all want to show it's not anthrax -- they are

3    functionally identical to live, in-court testimony doing

4    precisely what a witness does on direct examination.  As

5    a result and because scientific evidence is no more

6    neutral or reliable than other testimonial evidence,

7    confrontation serves to insure its accuracy by leaving

8    out, not only the fraudulent analyst, but the

9    incompetent one as well.  Moreover the scientific nature

10   of forensic reports does not justify subjecting them to

11   lesser scrutiny than other testimonial evidence.  To the

12   contrary, in Bull Cumming versus New Mexico, the court

13   made clear that the Sixth Amendment requires that when

14   introducing testimony of forensic evidence, the

15   prosecution must present testimony" -- and that's

16   Supreme Court case -- "must present testimony by a

17   scientist who was actually involved in preparing that

18   forensic evidence."

19            MR. WHISONANT:  Okay.

20            THE COURT:  So I do not think she can testify

21   based on that.  And, again, even though this case has a

22   flag, that is quoting from a Supreme Court case.

23            Let me read a little bit more.  "So the court

24   specifically rejected the use of so called surrogate

25   testimony, which in Bull Cumming was that of a colleague

1    from the same lab that prepared the disputed forensic

2    report but who had not specifically worked on the

3    reports in question.  Even though the colleague was able

4    to testify as to the efficacy and reliability of the

5    laboratory equipment and also whether normal protocol

6    was followed, the court explained that the comparative

7    reliability of an analyst's testimonial report drawing

8    from machine-produced data does not owe come the Sixth

9    Amendment clause because the obvious reliability of a

10   testimonial statement does not dispense with the

11   confrontation clause.  And instead only testimony by the

12   actual scientist who prepared the forensic report could

13   provide insight into the particular test and testing

14   process employed and also expose any lapses that lies on

15   this certifying analyst's part."

16           So go to your next witness.  Overnight maybe

17   you all can get somebody from the lab to say that it's

18   not anthrax.  So if you want to take -- actually, what

19   time is it right now?

20           MR. WHISONANT:  Ten till 3:00.

21           THE COURT:  We're going -- who is your next

22   witness?  I was going to break at 3:15, not break for

23   good.  I was going to take our afternoon recess.  Who is

24   your next witness?

25           MR. METHENY:  Eric Starr, he will just be

1   talking about the phone system.  So he should be pretty

2   quick.

3            THE COURT:  I will wait while you go tell her

4   she's excused and then we'll all go in together.  You

5   can explain to her why.  I'm going to stay right here

6   until you go tell her.

7            (Brief pause)

8            THE COURT:  The government has stepped away,

9   but what is he going to say, Mr. Smith?

10            MR. STEEN:  I feel like he's going to say that

11   Shannon Williams also threatened him and was trying to

12   set him up on a similar scheme to this right here.

13            THE COURT:  Well, that's not saying I did it.

14   That's different.

15            MR. STEEN:  I know that.  I don't think it's

16   going to -- but if he starts into a scheme to working on

17   it, then that could be additional charges for him.  I'm

18   not worried about the pertinentness, Your Honor, because

19   you've got an inmate talking about an inmate, but I'm

20   thinking if he comes --

21            THE COURT:  You're bringing him here not

22   knowing what he's going to say?

23            MR. STEEN:  I'm going on what my client has

24   been telling me and what we presented to Judge Ott.

25            THE COURT:  Well, what did you present to Judge

1    Ott?

2         MR. STEEN:  We presented to Judge Ott that he

3    was in the cell with my client and that Shannon Williams

4    also approached him to help him write letters to set up

5    another inmates.

6         THE COURT:  Well, that's not inculpatory.  That

7    is not -- I don't see that as something that --

8         MR. STEEN:  I just wanted to bring it to your

9    attention just in case there was something in there.

10        THE COURT:  Well, I'm not going to have them go

11   out this late in the afternoon.  At the end of the day

12   today, we will put that on the record.  The U.S.

13   Attorney has stepped away to let their witness go, so I

14   am just here talking to defense counsel briefly.  I

15   wanted to put it on the record, so we will put it back

16   on the record.  It's on the record now.  Yes?

17        THE CLERK:  Do you want that on the record?

18        MR. STEEN:  No, I don't have anything to hide

19   from them.

20        (Government counsel present.)

21        THE COURT:  I want to read just a little bit

22   more of this case on the record just for the purpose of

23   this.  This is following where I was, "Applying the

24   reasoning of Crawford, Malendez-Diaz and Bull Cumming,

25   we conclude that the five autopsy reports admitted into

1    evidence, in conjunction with Dr. Minyard's testimony

2    where she did not personally observe or participate in

3    those autopsies and where no evidence was presented to

4    show that the coroners who performed the autopsies were

5    unavailable and the accused had a prior opportunity to

6    cross-examine them, violate the confrontation clause."

7    And it goes on and says a lot more like that.  Okay.  So

8    we'll call your next witness.

9              MR. WHISONANT:  Okay.

10             (Open court.  Jury present.)

11             MS. DIKE-MINOR:  The United States calls Eric

12   Starr.

13             **ERIC STARR, GOVERNMENT'S WITNESS, SWORN.**

14             THE CLERK:  Would you state your name, please?

15             THE WITNESS:  Eric Starr.

16             THE CLERK:  And spell your last name for the

17   record, please.

18             THE WITNESS:  S-T-A-R-R.

19             THE CLERK:  In what city and state do you

20   reside?

21             THE WITNESS:  Anniston, Alabama.

22             THE CLERK:  Thank you, sir.

23                       **DIRECT EXAMINATION**

24   **BY MS. DIKE-MINOR:**

25   Q.  Mr. Starr, if you could talk into the microphone,

1    please.

2    A.   Yes, ma'am.

3    Q.   Thank you.  Where are you employed?

4    A.   Calhoun County Sheriff's Office.

5    Q.   And what is your current position?

6    A.   I'm the jail administrator.

7    Q.   How long have you been employed by Calhoun County?

8    A.   Since June of 2002.

9    Q.   And how long have you been jail administrator?

10   A.   Since February of 2009.

11   Q.   So did you hold that position on June 9th, 2011?

12   A.   Yes, ma'am.

13   Q.   Would you tell the jury what are your duties

14   generally?

15   A.   I oversee the jail operations.

16   Q.   What does that involve?

17   A.   Every aspect of the jail.

18   Q.   Does it -- is one of your duties to oversee the

19   phone system?

20   A.   Yes, ma'am.

21   Q.   That's the phone system that inmates use?

22   A.   Yes, ma'am.

23   Q.   Could you describe the phone system to the jury?

24   A.   It's an inmate service we contract with, inmate

25   telephone communication service we contract with.  It's

1  for the inmate's use to communicate with their family,

2  friends, counsel, whoever they may want to communicate

3  with.

4  Q.   And how do inmates gain access to the phone system?

5  A.   When they're originally processed into the jail,

6  they're booked in, and they're issued a PIN number,

7  personal identification number, unique to them, and then

8  they access it through that PIN number.

9  Q.   And how do you -- how does an inmate make a phone

10  call?

11  A.   Generally, they would pick up the receiver.  They

12  would be prompted to enter their PIN number.  On the

13  initial open phone call, they set up their account with

14  their voice stating who they are and the PIN number.

15  And then from there, each time they pick up the phone,

16  it will prompt them to enter their PIN number and speak

17  into it to initiate the phone call.

18  Q.   Just so I'm clear, each time an inmate needs to make

19  a call, that inmate would have to put in his or her PIN

20  number -- his PIN number?

21  A.   Yes, ma'am.

22  Q.   And then the inmate would have to also say something

23  so that there is a voice recognition software that would

24  recognize his voice?

25  A.   Yes, ma'am.

1  Q.   You would have to do both things to make the call?

2  A.   Yes.

3  Q.   And after the inmate puts in a code and the voice

4  recognition system works, what happens?  Is the inmate

5  told anything?

6  A.   Yes.  The communication from the inmate telephone

7  company notifies both parties that the call is monitored

8  and recorded and subject to review.

9  Q.   At the start of each call, the inmate is informed

10  that this call is recorded?

11  A.   Yes.

12  Q.   Are there any signs around the phone that say

13  anything similar?

14  A.   Generally, yes.  We post signs around the housing

15  area and the telephones.  Those signs don't stay up a

16  long time.  The inmates will take them down and use them

17  for other things, but we try to keep those posted.

18  Q.   Are the calls, in fact, recorded?

19  A.   Yes.

20  Q.   Was the phone system properly functioning on June

21  9th, 2011?

22  A.   Yes, ma'am.

23  Q.   And the recording system, was it also properly

24  functioning?

25  A.   Yes, ma'am.

1  Q.   Mr. Starr, did your office provide investigators in
2  this case with access to the phone recording system?
3  A.   Yes, ma'am.
4  Q.   And did they specifically allow them to have access
5  to recording of phone calls for the account of an inmate
6  by the name of Clifton Dodd?
7  A.   Yes, ma'am.
8  Q.   Who did your office provide access to?
9  A.   I do not remember.  It was someone at the FBI.  I do
10 not remember what agent it was at the FBI, but either
11 myself or my lieutenant sets that account up.  I either
12 did it myself or authorized her to do it.  I don't
13 remember which -- in this case, I simply don't remember
14 which one it was that did that.
15 Q.   How would investigators gain access to the recording
16 system?
17 A.   It is a web-based system.  We would set them an
18 account up with a user name and password and supply them
19 the website for the log in, and then they would use that
20 user name and password that we assign them to log in to
21 that.
22 Q.   So with the user name and password you provided,
23 they simply just go on line and listen to the calls, and
24 they can then download them as well?
25 A.   Yes, ma'am.

1    Q.   Okay.  One moment.

2            MS. DIKE-MINOR:  Nothing further at this time,

3    Your Honor.

4                    **CROSS-EXAMINATION**

5    **BY MR. STEEN:**

6    Q.   How are you doing, Deputy Starr.  Do you have a

7    rank?  I don't want to short you.

8    A.   Administrator.

9    Q.   Administrator.  Now, do you actually see over the

10   telephone system or do you delegate that to someone

11   else?

12   A.   It's myself, and I have a lieutenant that is

13   directly under me.

14   Q.   Okay.  Now, you said that the way they set this up

15   is they enter a PIN number.  Is that PIN number given by

16   your staff?

17   A.   Yes.  It's given to the inmate at the time when he's

18   processed into the facility.

19   Q.   And then there was something mentioned about voice

20   recognition?

21   A.   Yes, sir.

22   Q.   Is the system set up to recognize the inmate's

23   voice?

24   A.   Yes.  When we originally issue the PIN number, and

25   they set the account up, the first time they pick up the

1  phone to use it, they're prompted to speak into the
2  phone.
3  Q.   But is that used for voice recognition or is that
4  used to be the prelude for the person that picks it up,
5  hears that name?
6  A.   Both.
7  Q.   So you know who is on that system at that time?
8  A.   Yes.
9  Q.   Hypothetically, I get John Doe's PIN number, and I
10  make a phone call with it, is it going to recognize my
11  voice when I start speaking?
12  A.   That's the way it's designed to.
13  Q.   Okay.  So it's going to know it's not John Doe then;
14  right?
15  A.   Right.
16  Q.   How does it know who it is?
17  A.   Well, let me start a little bit before that.  They
18  set the voice recognition up, and it's not uncommon for
19  inmates to swap PIN numbers or sell PIN numbers.
20        Generally, the way they defeat the voice
21  recognition is the inmate that sets the voice
22  recognition up, the one with the PIN number will pick up
23  and initiate a phone call and then pass the phone to
24  another inmate to start using it.
25  Q.   Okay.  What if I start a telephone call with someone

1  else's PIN number and --

2  A.   The system --

3  Q.   Let me finish.

4  A.   I'm sorry.

5  Q.   And I don't say anything but my true name, is it

6  going to recognize who I am?

7  A.   If you're using another inmate's PIN number, it

8  should cut the call off immediately.

9  Q.   So there's no way that someone using someone else's

10  PIN number should be able to complete a phone call; is

11  that correct?

12  A.   Yes.

13  Q.   So in this case that we're talking about, I used

14  John Doe's PIN number, and I start speaking, it

15  recognizes that that's not John Doe's voice, so it cuts

16  the phone off; is that correct?

17  A.   That's what it's designed to do.

18        MR. STEEN:  No further questions.

19                    **REDIRECT EXAMINATION**

20  **BY MS. DIKE-MINOR:**

21  Q.   Just to be clear, if an inmate -- when an inmate is

22  trying to use the phone, that inmate will put in the

23  code; correct?

24  A.   Yes.

25  Q.   Then the inmate with the account would need to also

1  speak to activate the voice recognition?

2  A.   Yes.

3  Q.   But that inmate could then pass the phone to someone

4  else to use?

5  A.   Yes.

6  Q.   You just would need the inmate who has the account

7  to initiate the call?

8  A.   Correct.

9          MS. DIKE-MINOR:  Nothing further.

10         THE COURT:  So if an inmate starts a phone call

11 and then hands it to somebody else, it doesn't stop the

12 phone call?  It's just the very first thing that's

13 spoken as to what initiates the voice recognition?

14         THE WITNESS:  Yes, ma'am.

15         THE COURT:  Someone can keep talking that's not

16 the inmate, and it won't cut it off?

17         THE WITNESS:  No, ma'am.  It's just the initial

18 entry they made when they set the account up.

19 Generally, it's the inmate's name.

20         For example, when they set the account up, they

21 make this initial voice recognition and greeting, hi,

22 I'm Eric Starr, Calhoun County jail, this is a phone

23 call from, that's the voice recognition part of it.

24 After that, it doesn't matter who is speaking into it.

25         THE COURT:  All right.  Any recross?

1    MR. STEEN:  Yes, Your Honor.

2    **RECROSS-EXAMINATION**

3    **BY MR. STEEN:**

4    Q.   To initiate the phone call and it gets started, the

5    first thing I think you said it says, this is a Legacy

6    long distance automated operator with a free call from,

7    and if another person, other than who that PIN number

8    is, speaks and gives somebody else's name, that should

9    shut it off?

10   A.   That should shut it off.

11   MR. STEEN:  No further questions.

12   THE COURT:  Anything further?  Before the

13   witness steps down, let me see you.

14   (Sidebar outside the presence of the jury).

15   THE COURT:  Okay.  I missed what he is --

16   what's the relevance of what he's talking about?  I

17   mean, you didn't identify or show any phone call

18   particularly that you're trying to get in.

19   MS. DIKE-MINOR:  We were with agent --

20   THE COURT:  You were just explaining how the

21   system worked.

22   MS. DIKE-MINOR:  To understand the phone

23   system, that calls are in fact recorded, that inmates

24   are told about that, but also that for an inmate who

25   uses another inmate's account, you would have to have

1   the inmate whose account -- that an inmate whose account

2   it is would have to give permission.  They would do that

3   by using the code and also speaking into the phone.  In

4   other words, Shannon Williams who is the person who is

5   going to call couldn't just steal his code and make the

6   call.

7           THE COURT:  Okay.

8           MR. STEEN:  May I say something on that?  The

9   transcript that they're going to offer specifically

10  starts out just like I read at the first sentence, that

11  this is a phone call made from Calhoun County jail.

12  Shannon Williams is the voice that says Clifford Dodd's

13  name according to that transcript.

14          MS. DIKE-MINOR:  That's not right.

15          THE COURT:  Is Shannon Williams going to

16  testify?

17          MR. WHISONANT:  He's the next witness.

18          MS. DIKE-MINOR:  Not until tomorrow.

19          THE COURT:  It's hearsay unless he testifies --

20  I mean, you can't get -- it's not Clifton Dodd, right,

21  because y'all are saying it's Shannon Williams using his

22  phone card.

23          MS. DIKE-MINOR:  The prerecording that he's

24  referring to, we believe the initial words are actually

25  Clifton Dodd.

1    THE COURT:  Let's let the jury go and talk

2    about this.

3         (Open court.  Jury present.)

4    THE COURT:  We're going take a break a little

5    bit longer until a quarter till 4:00.  Okay.  Thank

6    you.

7         (Jury excused.)

8         (Open court, outside the presence of the jury)

9    THE COURT:  I just want to understand more

10   about this voice automation system.  Is it fool proof?

11   In other words, just saying this is Sharon Blackburn, a

12   lot of people could say it.  I mean, how fool proof is

13   it?  I mean, you don't consider yourself an expert in

14   this; right?

15        THE WITNESS:  No, ma'am.

16        THE COURT:  This is how it's supposed to work?

17        THE WITNESS:  This is how it's designed to

18   work.  Just like with any technology, yes, it can be

19   defeated.  If someone speaks close, and we have found

20   that if someone speaks close in tones or whatever, it

21   can be defeated.  For the most part, we see it working.

22   Yes, it gives an actual score, we can see an actual

23   voice score when a call is initiated that shows in our

24   system.

25        THE COURT:  What do you mean?  Like in other

1   words, it's 95 percent that it's Eric Starr or 60

2   percent that it is?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  With regard to this tape that's

5   coming up -- I don't know if you're familiar with it --

6   do you know what percentage it showed up voice

7   recognition?  Do you know about anything about that?

8          THE WITNESS:  No, ma'am, I haven't looked at

9   that particular call to see what --

10          THE COURT:  Would it exist somewhere what the

11   percentage certainty that --

12          THE WITNESS:  It exists on our software.  If I

13   pulled that software up in our office right now and went

14   back to that phone call, I could still see that.

15          THE COURT:  And back to your testimony about

16   the PIN number, only the inmate has their own PIN

17   number; is that right?

18          THE WITNESS:  We give the inmate their own PIN

19   number when they're initially processed into the jail.

20   They're instructed when they're processed in the jail,

21   this is your PIN number, don't give it out, don't

22   release it, don't trade it, don't sell it.

23          THE COURT:  How many minutes do they get on

24   that?  Is there a certain amount of minutes that they

25   each get or do they buy their minutes?

1        THE WITNESS:  They buy their minutes or family

2    or friends buy their minutes.  They have either a

3    prepaid account or they make collect calls.

4        THE COURT:  Okay.  But, again, after the -- how

5    many words are spoken for the voice activation?  Is it

6    just, this is such and such or --

7        THE WITNESS:  Generally, just their name and at

8    Calhoun County jail or Calhoun County jail.

9        THE COURT:  It would just say Eric Starr at

10   Calhoun County jail, that's all that's said?

11       THE WITNESS:  Yes.

12       THE COURT:  All right.  You can step down.

13   Thank you, sir.

14            (Witness excused.)

15       THE COURT:  Now, let me hear about what the

16   next witness is going to say and what your evidence is

17   that you're offering.

18       MR. WHISONANT:  Your Honor, our next witness

19   would be Shannon Williams.

20       THE COURT:  Shannon Williams is actually going

21   to say what?

22       MR. WHISONANT:  He's going to say that he made

23   a phone call -- that Mr. Dodd placed a phone call, and

24   then he got on the phone.  He was calling his brother

25   Shawn.  And through the course of that conversation --

1   the entire conversation is like 15 minutes.  We've

2   narrowed down the pertinent part.  It's about two or

3   three minutes when he tells his brother that another

4   inmate has asked him to mail out a package containing

5   some letters, that he is to take and to mail out, take

6   the letters out of the package and mail them for him.

7            THE COURT:  Government's Exhibit 16, does it

8   show that it came from Mr. Dodd's PIN number?  Is that

9   coming from another witness that's going to show that?

10  I mean, if you plan to offer that, where is it going to

11  come that this came from Mr. Dodd's PIN number?  16, is

12  Shawn Williams going to listen to this recording and say

13  that this is his voice on 16, and what he's talking

14  about is that Mr. Dodd asked him to do that?  Is that

15  what this is, or is it 18?  No, 18 is the transcript.

16           MR. WHISONANT:  18 is the transcript.

17           THE COURT:  It's 16.

18           MR. WHISONANT:  16 is the audio recording.

19           THE COURT:  All right.  You say here on the

20  transcript, "Shannon, Clifton Dodd, I'm at the Calhoun

21  County jail."  Is that supposed to be Mr. Dodd?

22           MR. WHISONANT:  Mr. Dodd.

23           THE COURT:  But you say Shannon.  The

24  transcript says that Shannon is saying, "Clifton Dodd,

25  I'm at the Calhoun County jail."

1          MR. WHISONANT:  There's a corrected version of

2    the transcript.  I'm going to make sure you've got the

3    corrected version.

4          THE COURT:  The one I have says that Shannon

5    says Clifton Dodd.

6          MR. STEEN:  Your Honor, that's the one that I

7    have.

8          MR. WHISONANT:  We had Shannon listen to this

9    last week again, and he made some corrections.

10          THE COURT:  Let me see what he made.  Have you

11    given this to the defense lawyer?  Is this the first

12    time he's seen it?

13          MR. STEEN:  Mine is another copy of what I have

14    here, Mike.

15          THE COURT:  Do you have extra copies of this

16    one?

17          MR. WHISONANT:  Yes, ma'am, we have copies of

18    that.

19          THE COURT:  Let me look at it for a minute.

20    When you say break, what's the break there?

21          MR. WHISONANT:  The phone call is like 15

22    minutes long.  We played the very first of the phone

23    call, those first five or six lines there in the

24    transcript, then we skip to the pertinent part.

25          THE COURT:  Okay.  I've got you.

1          MR. WHISONANT:  And we made two disks.  We've

2    got the disk of the full phone call and we've got the

3    disk with just --

4          THE COURT:  And the rest of the call is just

5    conversation between Shannon and his brother?

6          MR. WHISONANT:  Yes, ma'am.

7          THE COURT:  All right.  Anything else you want

8    to say about this at this point?

9          MR. STEEN:  Your Honor, the only thing I would

10   say is the tape itself is the best evidence.  We've seen

11   that there's been a mistake.

12         THE COURT:  Well, the tape will come in, and I

13   think you need -- do you have a redacted part of the

14   tape so they can hear the tape in addition?

15         MR. WHISONANT:  Yes, ma'am.

16         THE COURT:  You're going to play the short

17   version of the tape?

18         MR. WHISONANT:  Yes, ma'am.

19         THE COURT:  Right.  So they can decide, if they

20   can tell, whether there are two different voices that

21   are speaking.  Okay.  We're on break.  You've got 30

22   minutes.

23         MR. WHISONANT:  I've got one problem.  Shannon

24   Williams is not here yet.  He's in marshal's lock up.

25   He won't be here until tomorrow.  We have to go to some

1   other witnesses.

2         THE COURT:  Who is your next witness?

3         MR. WHISONANT:  We're going pretty quick.

4   We'll probably go with Inspector Mathews next.

5         THE COURT:  And what is he going to testify

6   about?

7         MR. WHISONANT:  A number of things.

8         THE COURT:  Okay.

9         MR. WHISONANT:  He has quite a bit to cover.

10         THE COURT:  All right.  Is this going to

11   involve any of the 404(b) issues?

12         MR. WHISONANT:  Yes, ma'am, I believe it is.

13         THE COURT:  I thought you came close to the

14   line in your opening statement.  In other words, by

15   saying he recognized him, and I haven't ruled on it yet,

16   and I'm sure you didn't want to object in opening

17   statements, but you said he focused on him because he

18   recognized his writing from other things or something

19   like that, but we had talked about that that wasn't

20   going to be brought up in opening statement.

21         MR. WHISONANT:  And I didn't talk about any of

22   his convictions or anything like that.  I stayed away --

23         THE COURT:  But if you say that a law

24   enforcement officer focused on somebody, that gives the

25   impression to a jury that there's something bad there.

1        In any event, is that something I need to rule

2    on right this minute?  I don't know that -- I need to

3    look at some of the case law.  I'm not quite through

4    reading it yet.

5        MR. WHISONANT:  I would feel more confident if

6    you could rule on it.  If we need to take a break in

7    order to do that, I think that would be the best course,

8    because I don't want to cross any lines.

9        THE COURT:  Do you have another witness you can

10   go to without him?

11       MR. WHISONANT:  I've got Shawn Williams here.

12   That's really sort of out of order.  He's fairly short.

13       THE COURT:  What is he going to say?

14       MR. WHISONANT:  He's just going to say he got

15   the phone call.

16       THE COURT:  That is out of order.  Okay.  Tell

17   me what the 404(b) evidence is that you want to offer,

18   and then I will try to see if I can quickly read it.  It

19   could be -- what were the other convictions?  In other

20   words, were the other convictions anthrax or were they

21   threats to kill?

22       MR. WHISONANT:  They're anthrax.  They were

23   18 U.S.C. 1038 mailing anthrax and threats.

24       THE COURT:  Because there's only one count here

25   that's an anthrax count.

1    MR. WHISONANT:  That's right.

2    THE COURT:  How many convictions were there?

3    MR. WHISONANT:  23.

4    THE COURT:  They all were mailed and they were

5    all anthrax?

6    MR. WHISONANT:  Yes, ma'am.

7    THE COURT:  And who were they sent to?

8    MR. WHISONANT:  Various people and

9    organizations both in Alabama and outside.  They were

10   sent to Ashley White in Oxford, Alabama; to Jim Preuitt,

11   Talladega, Alabama, who is also a victim in Count

12   Seven.  There was one sent to Clifford Dodd in

13   Talladega, one to Roy Stevens in Childersburg.

14   THE COURT:  To Clifford Dodd, one sent to

15   himself?

16   MR. WHISONANT:  Yes, ma'am.

17   THE COURT:  He pled guilty to that count?

18   MR. WHISONANT:  Yes, ma'am.  There was Judge

19   Roy Hollingsworth in Talladega.

20   THE COURT:  Let me stop you.  Tell me some

21   things that were similar besides that it was an anthrax

22   threat.  What would Inspector Mathews say was similar

23   that made him think about this defendant?

24   MR. WHISONANT:  He will say that, first, there

25   were some misspellings of some words in the letters.

 1   For example, there was one word that I think was "bitch"

 2   that was spelled -- I'm sorry, I forget this.

 3        THE COURT:  One way to get it in, if it's not

 4   intrinsic, is that it shows identity.  And it has to be

 5   very similar.

 6        MR. WHISONANT:  There was a misspelling of

 7   another word, "liar," that Dodd had misspelled it the

 8   same way on previous letters.

 9        THE COURT:  But to get it in, I guess I have to

10   have a hearing to see the identity.  Do you see what I'm

11   saying?  I have my clerk researching motive.  And,

12   again, I think, even though you did a brief on it, there

13   could be a lot more in the brief -- I know you all are

14   swamped, but then I am, too -- on getting in this

15   evidence.

16        I mean, identity, and you found some cases that

17   talk about the similarity of the two offenses is

18   sufficient to mark the offenses of the handiwork of the

19   accused.  It talks about there has to be a much stronger

20   showing, I guess, if you're going to get it in under the

21   identity section of 404(b).

22        Now, I have my clerk researching motives.  You

23   said that you're going to have a witness who is going to

24   testify, but it seems like I would have to have that

25   outside the presence of the jury, too, for me to decide

 1   whether that's coming in.  Who is your witness that's

 2   going to say that?

 3          MR. WHISONANT:  Shannon Williams.

 4          THE COURT:  He's going to say what?

 5          MR. WHISONANT:  He's going to say that Mr. Dodd

 6   told him that the reason he mailed those letters was so

 7   that the Feds would need his testimony against another

 8   person, Michael Bole, and they would drop those old

 9   charges against him so he would testify against --

10          THE COURT:  He was going to try to make Michael

11   Bole be the person who did this?  Why is Mr. Williams

12   not here?  He wasn't schedule for today?

13          MR. WHISONANT:  No, ma'am, he was not.  He was

14   in marshal's lock up in Atlanta.  There was a mix up

15   about that, but they went over to get him today, and he

16   will be here tomorrow.

17          THE COURT:  I don't mean to say this, was it a

18   mix up on your part or a mix up on the marshal's part?

19          MR. WHISONANT:  My part.

20          THE COURT:  Okay.  When will he be here?

21          MR. WHISONANT:  Tomorrow morning.  Actually, he

22   should arrive late this afternoon or tonight.

23          THE COURT:  I guess I will let the jury go.

24   Let me hear on the identity issue from Agent Mathews and

25   all the things that caused him -- I would want to hear

1   every single thing that caused him to focus on

2   Mr. Dodd.  I will then go see what my clerks found on

3   motive.  We can hear from Mr. Williams early in the

4   morning about motive.

5          It is disconcerting with the government, when

6   there was that case right on point, that urges me to get

7   something in that would have been apparently reversible

8   error if I had let her testify.  So I think this is --

9   it shouldn't have happened.

10          MR. WHISONANT:  I understand, right.

11          THE COURT:  So, now I'm worried about this,

12   too.  You know what I'm saying?

13          MR. WHISONANT:  I understand.  For the record,

14   there's a case I would like to point out to the court,

15   United States versus McLean.

16          THE COURT:  Okay.  Is that one of the ones

17   cited in your brief or is it not?

18          MR. WHISONANT:  I believe it's been cited.

19          THE COURT:  Go ahead and give it to me.  I'm

20   not sure I have it.

21          MR. WHISONANT:  It's 138 F.3d 1398 at 1403.

22   It's Eleventh Circuit, 1998.

23          THE COURT:  Let me see if it's one of these.

24   McLean is the name of it?

25          MR. WHISONANT:  McLean, M-C-L-E-A-N.

1          THE COURT:  Susan, can you go tell the jury

2     we're going to be in recess until 9:00 in the morning.

3          (Brief pause)

4          THE COURT:  Okay.  Just so the government

5     knows, there's no evidence now that it wasn't anthrax.

6     There's no evidence that I think would be sufficient for

7     the jury to find beyond a reasonable doubt.  There's no

8     evidence that it wasn't anthrax.  That fireman's

9     testimony would not be enough, in my view, to say a

10     field test said that it appeared to be soap.  I would

11     have to have it pulled up.

12          MR. WHISONANT:  Okay.

13          THE COURT:  I would have to look exactly and

14     find exactly what he said.  Maybe it is enough.  He

15     wasn't qualified as an expert or anything.  This is what

16     I have, "We learned that it was soap.  We packed it up

17     and then we turned it over to the FBI who were there on

18     the scene."

19          MR. WHISONANT:  Right.

20          THE COURT:  Do you have something that shows me

21     the dates of the -- I'm sure I could pull up the

22     indictment, but do you have something that has printed

23     out the dates of the anthrax letters in the other

24     indictment that I could have copied?

25          MR. WHISONANT:  No.

1       THE COURT:  I'm just not sure if a year's

2   difference is sufficient to make it intrinsic, Mike.

3   Just because it's the same type of crime and all that,

4   I'm not sure when there's a year's separation -- I mean,

5   it may be.  I just haven't looked at cases to say that

6   that would be okay, but I'm --

7       MR. WHISONANT:  McLean says it's evidence of

8   another crime that is necessary to tell the jury the

9   full story about the present count.

10      THE COURT:  That would be true if that motive

11  exception comes in; but, otherwise, I don't think --

12      MR. WHISONANT:  I agree with you, I'm hard

13  pressed to make an identity argument.

14      THE COURT:  Well, you might be able to.  It

15  could be that the handwriting on the letter is the same

16  and the -- I tell you what, I will be back.  We'll take

17  ten minutes here.  Go ahead and let the jury go.

18      (Brief recess)

19      THE COURT:  These are family members, I guess.

20      MR. STEEN:  Yes, ma'am.

21      THE COURT:  All right.  We could go forward, if

22  you want to, with the testimony of Inspector Mathews.

23      There's some other cases that my clerk found

24  that I think are stronger for the government than the

25  McLean case.  I will give you all those to look at

1    overnight if you want to.

2          I think one thing to still think about is that

3    it's so overwhelmingly prejudicial, because it really

4    only applies to Count One.  I just want to hear how

5    strong the evidence is of identity.

6          Hold on one second.  I want to find one thing

7    here.  I'm not saying the prejudice outweighs the

8    probative value.  I'm just saying it is very

9    prejudicial.

10          So I will let him testify as to the identity

11    aspect.  He can also testify as to motive, but I think

12    that's really going to pertain more to what Mr. Williams

13    says when I hear his testimony on this point, which I

14    also want to hear outside the presence of the jury.

15    Well, I actually don't need to hear it outside the

16    presence of the jury if he's going to testify first.

17    You're going to have him first thing tomorrow; right?

18          MR. WHISONANT:  Yes, ma'am.

19          THE COURT:  Do you want to call Inspector

20    Mathews?

21          MR. WHISONANT:  Inspector Mathews.

22        STEVEN MATHEWS, GOVERNMENT'S WITNESS, SWORN.

23          THE CLERK:  Would you state your name, please?

24          THE WITNESS:  Steven Mathews.

25          THE CLERK:  And spell your last name for the

1  record, please.

2          THE WITNESS:  M-A-T-H-E-W-S.

3          THE CLERK:  Thank you, sir.

4                  **DIRECT EXAMINATION**

5  **BY MR. WHISONANT:**

6  Q.   Mr. Mathews, where are you employed?

7  A.   I'm a postal inspector with the United States Postal

8  Inspection Service.

9  Q.   Are you the case agent involved in this case?

10  A.   Yes, sir, I am.

11  Q.   When did you first get involved in this case?

12  A.   In April 2011.

13  Q.   Did you become aware of this case after the letter

14  was sent to the Jefferson County courthouse on April the

15  12th?

16  A.   Yes, sir, I did.

17  Q.   And did you see those letters?

18  A.   Yes, sir, I did.

19  Q.   And do you know the defendant in this case?

20  A.   Yes, sir, I do.

21  Q.   Would you please identify him?

22  A.   Yes, sir, Clifton Dodd sitting at counsel table

23  (indicating).

24  Q.   How do you know him?

25  A.   Previous investigation of Mr. Dodd.

1  Q.   And did that investigation involve any letters?

2  A.   Yes, sir, it did.

3  Q.   Did you have occasion to observe his handwriting on

4  prior occasions?

5  A.   Yes, sir, I did.

6  Q.   Did you see the letter that was Exhibit 1 in this

7  case that was mailed to the Jefferson County courthouse

8  on April 11th -- April the 12th, 2011?

9  A.   Yes, sir, I did.

10  Q.   And when you saw that letter, did you notice

11  anything about the handwriting on the letter?

12  A.   Yes, sir, I did.

13  Q.   What was that?

14  A.   Several things.  Number one, I noticed that some of

15  letters such as a "K" and some "H"s and some "S"s in

16  there appeared to me to be similar to letters that I had

17  seen that had previously been written by Mr. Dodd.

18  Q.   Do you have some of those with you?

19  A.   I have some of those letters over there.  I do have

20  one letter that shows a misspelling with me, but I don't

21  have any of those letters with the "H"s and the "S"s.

22          THE COURT:  Do you have those with you though?

23          THE WITNESS:  I believe I do, Your Honor.

24          THE COURT:  Do you want to get them?  Were you

25  the case agent on the last case, Inspector Mathews?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  What is that, if you happen to

3   know -- I'm sorry to have you looking.  What is the

4   criminal number in that case?  Susan can get that.  My

5   courtroom deputy can get it.  Don't worry about it.

6          What I would like you to do is point out things

7   that you thought were similar about this letter and the

8   other letters.  Well, let me ask you first, when you

9   first looked at Government's Exhibit 1, before the other

10  letters were even received by you, did you think this

11  letter was written by Mr. Dodd?

12         THE WITNESS:  Government's Exhibit 1, yes,

13  ma'am.

14         THE COURT:  And then the others came later;

15  right?

16         THE WITNESS:  These are actually letters from

17  -- are you talking about in the current case?

18         THE COURT:  In this case.

19         THE WITNESS:  Yes, the others came later, yes,

20  ma'am.

21         THE COURT:  But it was this letter that made

22  you focus on Mr. Dodd; right?

23         THE WITNESS:  Yes, ma'am.

24         THE COURT:  While he's looking, it may be that

25  I find it relevant for identity but then also motive.

1  I'm not sure, and if I have time overnight, I'm going to

2  try to see, it would be intrinsic given the length of

3  time.  Do you see what I'm saying?

4          MR. WHISONANT:  Yes.

5          THE COURT:  But I also have to see if it's

6  identity for each of the letters.  Do you see what I'm

7  saying?

8          MR. WHISONANT:  Yes.

9          THE COURT:  It may be that it's for this one,

10  but not all.

11          MR. WHISONANT:  Right.

12  A.   There's a few examples if you want me to show them.

13  Q.   Okay.  If you would point those out.

14  A.   One of them is addressed to Richard Shelby, one of

15  the prior letters.  The "S" on Shelby to me looked very

16  similar to the "S"s that were in this current letter.

17          THE COURT:  Can I see?  This is one of the ones

18  he pled guilty to in the previous case?

19          MR. WHISONANT:  Yes, ma'am.

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  Speak up now.  The "S" shows what?

22          THE WITNESS:  In this letter to Mr. Shelby.

23          THE COURT:  All right.  I see that, and I will

24  just note for the record that I think they're similar,

25  very similar.

1          THE WITNESS:  The "H"s, the "H," the "H," "H."

2          THE COURT:  Yes, similar.  Can you give me some

3   others?

4          THE WITNESS:  Yes, ma'am.  There were other

5   things in the letter.

6          THE COURT:  The wording or --

7   Q.   Any other letters that stick out to you, in any of

8   the old letters?

9   A.   Yes, sir, there's a "K," and I'm trying to find it.

10  There's a "K" I have highlighted on the envelope, and

11  I'm trying to find that.

12         THE COURT:  You can come up.

13         THE WITNESS:  The "K" on this.

14         THE COURT:  Speak up.

15         THE WITNESS:  I'm sorry, the "K" on this looks

16  like this "K".

17         THE COURT:  It does.  So this is one of the

18  letters in the older case?

19         THE WITNESS:  Yes, ma'am.

20         THE COURT:  And this is Government's Exhibit 1?

21         THE WITNESS:  Yes, ma'am.

22  Q.   (By Mr. Whisonant)  In the older case, who is that

23  letter to?

24  A.   To Jewish Congress in Washington, D.C.

25         THE COURT:  Let me ask you this:  Did you look

1  at other letters and are they dissimilar?  I mean the

2  "S" is very distinctive to me more so than the "K."  The

3  "K" looks similar.  But did you compare other letters

4  and they don't look similar?  Are you following what I'm

5  saying?

6         THE WITNESS:  Yes, ma'am.  I didn't see any

7  that looked dissimilar to me, but that's --

8         THE COURT:  You didn't see any that looked

9  dissimilar?

10         THE WITNESS:  Correct, yes, ma'am, but that's

11  eventually why I sent it to the experts.

12  Q.   Other than the letters that you've already told the

13  judge about, were there any other areas about the letter

14  that stood out to you?

15  A.   There were a couple of things.  Some actually

16  pertained to Mr. Bole and some actually pertained to

17  Mr. Dodd.  Essentially about Mr. Bole, I had had

18  previous contact with Mr. Bole, had worked an

19  investigation on him, actually a couple of

20  investigations.

21         And one of the things that was dissimilar for

22  him for this type of letter was that, number one, in all

23  my previous letters I had been associated with with

24  Mr. Bole, he had always signed his name and put his name

25  on the letters.  He did not try to attempt to hide his

1   name or who actually wrote the letter.

2           THE COURT:  And Mr. Bole, I take it, is

3   somebody else who had sent anthrax letters or not?

4           THE WITNESS:  He sent threatening letters.  And

5   that was actually one of the things that was dissimilar

6   from Mr. Bole is that previously he had sent numerous

7   threatening letters, but he had never sent any type of

8   powder or anthrax letters, which would be dissimilar for

9   what he's customarily known for.

10          The other thing similar for Mr. --

11          THE COURT:  That really just excludes

12  Mr. Bole.  It doesn't mean that it's similar.  It just

13  means that those threatening letters wouldn't probably

14  have come from Mr. Bole.  I wouldn't say that means it's

15  similar, that there's an identity here for this

16  defendant.  Do you see what I'm saying on the

17  threatening letters?  That excludes Mr. Bole.

18          THE WITNESS:  That's why -- I wasn't just

19  trying to focus on Mr. Dodd.  I was trying to exclude

20  one and include the other.  Another thing was -- and,

21  again, it was toward Mr. Bole -- was that in these

22  letters, the word "bitch" is misspelled with B-I-C-T-H;

23  and, in a prior letter that Mr. Bole had written, he

24  correctly spelled "bitch" B-I-T-C-H in previous

25  letters.  So again not toward Mr. --

1      THE COURT:  What I'm looking for is similarity

2  between the prior letters that he pled guilty to and

3  these letters.

4      THE WITNESS:  Yes, ma'am.  And the one other

5  similarity was the misspelling of the word "liar."

6      THE COURT:  Can I see that?

7      THE WITNESS:  Yes, ma'am.  This is the current

8  letter and you see "liar, liar, liar."

9      THE COURT:  Right, three.  Okay.

10     THE WITNESS:  And there are previous letter

11  written by Mr. Dodd where it says liar, L-I-E-R.

12     THE COURT:  This is all capital, but it is

13  misspelled.

14     THE WITNESS:  Similar misspellings.

15     THE COURT:  The "K", the "S" and the

16  misspelling of the words.

17     THE WITNESS:  The "K" and "S" and the "H."

18     THE COURT:  And the misspelling of the word

19  "liar."

20     THE WITNESS:  Yes, ma'am.

21  Q.  (By Mr. Whisonant)  Mr. Mathews, was there anything

22  else about those letters that you saw that pointed

23  toward Mr. Dodd?

24  A.  No, sir.  That was -- and the fact that it was a

25  powder letter, which Mr. Dodd had previously done.

1    Q.   All right.

2                    **CROSS-EXAMINATION**

3    **BY MR. STEEN:**

4    Q.   The documents from the 2010 case, were there any

5    forensics done on those documents?

6    A.   Yes, sir.

7    Q.   And do they match up with any that you show now?

8    A.   As in fingerprints or handwriting?

9    Q.   Yes.

10   A.   I don't believe we did a comparison from one to the

11   other.

12   Q.   So this is your lay opinion on this?

13   A.   Yes, sir, that's correct.

14   Q.   No expert whatsoever?

15   A.   Well, like I said, initially --

16   Q.   I will rephrase that.  Are you an expert in

17   handwriting?

18   A.   No, sir, I'm not.

19   Q.   So no expert opinion whatsoever?

20   A.   From me, no.

21   Q.   Let me ask you a question, did you take any other

22   samples from anybody else to compare?

23   A.   No, sir.

24   Q.   Okay.  So you focused?

25   A.   That's correct.

1   Q.   And that's exactly where you stayed at, wasn't it?

2   A.   That's correct.

3   Q.   Okay.  Now, in your investigation of the 2010 case,

4   how many letters were actually sent out?

5   A.   There was 23 counts that he pled to.  I believe

6   there was actually a couple more that were sent.

7   Q.   All right.  And in those letters, are all those

8   handwritings similar to the ones that you just showed

9   Judge Blackburn that you have in your possession right

10  there?

11  A.   I believe the majority of them are, yes.

12  Q.   The majority of them are?

13  A.   Yes.

14  Q.   Are there any that are dissimilar from what you have

15  there?

16  A.   I would have to look back at them.  It's possible,

17  but I don't --

18       MR. STEEN:  Your Honor, may I approach for just

19  a second?

20       THE COURT:  You may.

21  Q.   What I'm handing you are some letters that are

22  marked with GX numbers and the case number 2010-156,

23  CR-156; is that correct?

24  A.   Yes, sir, that's correct.

25  Q.   Are those envelopes that were part of that case in

1  2010?

2  A.   Yes, sir, they are.

3  Q.   Some of the envelopes are dissimilar from each

4  other, aren't they?

5  A.   Yes, sir.   This is cursive as opposed to a block,

6  yes, sir.

7  Q.   Correct.   Most of the letters in this case are what?

8  A.   In this case, there's, I believe, cursive and block,

9  I believe.   I know there's cursive in this one.

10  Q.   Do you need to refresh your memory on that?

11  A.   I know the powder letter was cursive.

12  Q.   The what letter?

13  A.   The powder letter.   The extortion letters I would

14  have to look at.

15  Q.   The one that went to Jefferson County, that's

16  cursive?

17  A.   Yes, sir.

18  Q.   Any other letters in this case that are cursive that

19  matches up with that?

20  A.   I'm not sure I understand.

21  Q.   In your comparison, are there any other letters

22  other than the powder letter that you say is there, are

23  there any other letters in there that are cursive that

24  you tried to match up?

25  A.   No.   And I guess I'm confused with the question;

1  but, initially, I was matching up this letter, you know,

2  to try to determine which direction to look at to

3  investigate.  So when I received the other letters, they

4  went to the lab instead of me looking at them.

5  Q.   So that is the only document that is cursive that is

6  in the present case that we're trying today?

7  A.   Again, I would have to look at the other letters.

8  Q.   Let's take a chance and look at them.  Take whatever

9  you need from your files and let's look at them.

10  A.   This one is a printed letter, printed enveloped,

11  printed letter, printed letter, printed letter,

12  printed.  So it looks like the only one that was --

13  well, that one is printed, too.  Yes, actually the

14  envelope for the powder letter is printed.

15  Q.   Printed?

16  A.   Correct.

17  Q.   So everything else is printed; correct?

18  A.   Correct.

19  Q.   Okay.  Now, taking the printed letters that are

20  there and the one cursive that you got, that pinpointed

21  your investigation, just that one letter?

22  A.   Well, because I didn't have the other letters at the

23  time.

24        THE COURT:  I will just make an observation.

25  I'm just flipping through, and it's Government's Exhibit

1   7, yes, it's printed, but the "M" to me looks very

2   similar to the "M" in Government's Exhibit 1 on the

3   envelope.

4          I guess you would say that the envelope of

5   Government's Exhibit 1 is printed, and the letter is

6   cursive.  And the "M" on the envelope -- and I wasn't

7   trying to look at any of the others.  I was just

8   flipping through to see if they were cursive or print.

9   The "M" of Michael Bole looks similar to me to the "M"

10  in McClendon.

11         I mean, he said he didn't try to look at any of

12  the others.  He was only trying to look at Government's

13  Exhibit 1.  That's what focused him on the others.  So

14  he wasn't trying to compare the others.

15              MR. STEEN:  And, Judge --

16              THE COURT:  I will just say the letter,

17  Government's Exhibit Number 8, the "M" in Michael looks

18  very similar to me to the "M" in McClendon in

19  Government's Exhibit 1.

20              MR. STEEN:  Yeah, but that has not been proved

21  to be his handwriting yet.

22              THE COURT:  I'm just saying.  It doesn't matter

23  because he's even -- I'm correct, you didn't look at

24  these other letters to compare them to the other case;

25  correct?

1          THE WITNESS:  Correct, because I didn't have

2     them at the time.

3     Q.   (By Mr. Steen)  So the similarities is just in the

4     one letter then; correct?

5     A.   Well, I'm looking at them now, and I see some

6     similarities.  I don't --

7          THE COURT:  His testimony is that he focused on

8     it.  But just like I just looked at them, and I didn't

9     try to study them, but I saw the "M."  It's a

10    distinctive "M" to me.  It's a very distinctive "M" the

11    way the "M" is written in McClendon and then the two

12    times I saw an "M" in other letters.

13         MR. STEEN:  But that's not in comparison to any

14    from the other case, Your Honor, that he's doing because

15    this is cursive --

16         THE COURT:  That's right.  It's similar to the

17    "M" in Government's Exhibit 1 that he found other

18    similarities.  You don't have an "M" in the other case

19    that looks similar to Government's Exhibit 1, or do you?

20         THE WITNESS:  I would have to look, Your

21    Honor.  I don't recall highlighting one.

22         THE COURT:  You see the "M" in McClendon and

23    the "M" in legal mail?

24         THE WITNESS:  Yes, Your Honor.  Well, I guess

25    it's one, aside from the curlicues -- do you want me to

1   approach?  I found one from the other --

2          THE COURT:  Let me see it.

3          THE WITNESS:  This document has a curlicue.

4   It's bigger on the second side.

5          THE COURT:  Wait.  Is this --

6          THE WITNESS:  That's the current.

7          THE COURT:  That's the current letter, and this

8   is --

9          THE WITNESS:  This is the prior letter.  The

10   "M" on Matt looks similar with the second -- besides the

11   curlicue on the end --

12          THE COURT:  Yes, it does look very similar.

13   Okay.  I will read the identity cases overnight.  Is

14   there any other evidence you wanted to offer through

15   this witness on that?

16          MR. WHISONANT:  That's all.

17          THE COURT:  If you could just proffer now what

18   you believe Mr. Williams is going to testify just one

19   more time so I can be thinking about it.  You can sit

20   down Inspector Mathews.

21          MR. WHISONANT:  Mr. Williams is going to say

22   that the defendant asked him to mail these letters to

23   his brother who would then mail them out, and that the

24   reason that he did that is so he would make himself,

25   Mr. Dodd, valuable to the federal authorities who would

1    then drop their charges, their current charges, in the

2    old case against him in order for him to testify against

3    somebody else.

4             THE COURT:  And the someone else was Mr. Bole?

5             MR. WHISONANT:  Mr. Michael Bole, yes, ma'am.

6             THE COURT:  All right.  I'm going to read

7    them.  Let me tell you the motive cases that my clerk

8    found, which I think are helpful to the government.  One

9    is 565 F.3d 1336 (11th Cir. 2009), and this discusses

10   404(b) evidence to prove motive.  And the other one is

11   U.S. versus Benton, 637 F.2d 1052 (1981), which of

12   course is precedent because of the date of the case.

13            MR. STEEN:  Your Honor, may I have the last

14   four pages of the second cite?

15            THE COURT:  Of the second cite, and I'm fine

16   for you all to have -- we can print these off for you

17   all, and you can take them.  That will save you all some

18   time, but it's 637 F.2d 1052.

19            Tell me how much more you have tomorrow.  I'm

20   just trying to gauge how much longer we have.

21            MR. WHISONANT:  We have Shannon Williams, Shawn

22   Williams, his brother, who should be fairly brief.

23   Inspector Mathews will take a little time.  Mr. Jim

24   Preuitt won't be a very long witness.  We have

25   Investigator Bill Kennedy listed, but he is a chain

1  witness, and he is having back problems, so he will not

2  be available.   Then we have Benny Sturdivant, if we need

3  to call him.   He took Mr. Dodd's fingerprints at the

4  Talladega County jail, and those known prints were then

5  used by the fingerprint analysis, Mr. Craig Hellman, who

6  will testify about a fingerprint examination that he

7  conducted.   Then Ms. Haley Elliott is the handwriting

8  examiner and last is Brian Lindsey.   I would think we

9  should be able to finish tomorrow.

10          THE COURT:   I'm fine if we don't.   I just was

11  trying to figure it out.   I need to work on my jury

12  charges and try to get them to you all at least by lunch

13  tomorrow if I can.

14          Anything further we need to take up today?

15          MR. STEEN:   Nothing I can think of.

16          THE COURT:   Let's meet at 8:30 so I can give

17  you the information about the 404(b) and just so we

18  don't hold up the jury.   Okay.   Thank you very much.

19          (Court adjourned.)

20

21

22

23

24

25

127

# C E R T I F I C A T E

I hereby certify that the foregoing transcript in the above-styled cause is true and correct.


Date:  3/25/2014


Julie A. Martin, RMR, CRR

Federal Official Court Reporter