FILED
128
2014 Mar-25  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ALABAMA
2                         SOUTHERN DIVISION

3

4    UNITED STATES OF AMERICA,          2:13-CR-154-SLB-JEO

5              V.                       Birmingham, Alabama

6    CLIFTON LAMAR DODD,                October 8-9, 2013

7              Defendant.               9:00 a.m.

8    * * * * * * * * * * * * * * * * * * * * * * * * * *

9

10                  REPORTER'S OFFICIAL TRANSCRIPT OF
                              JURY TRIAL
11                            VOLUME II

12
            BEFORE THE HONORABLE SHARON LOVELACE BLACKBURN
13                  UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19   COURT REPORTER:

20   Julie A. Martin, RMR, CRR
     Federal Official Court Reporter
21   1729 Fifth Avenue North, Ste 325
     Birmingham, Alabama  35203
22

23

24

25
```

```
1                      *  *  *  *  *
                  A P P E A R A N C E S
2                      *  *  *  *  *

3   FOR THE UNITED STATES:

4   Michael Whisonant
    Chinelo Dike-Minor
5   1801 4th Avenue North
    Birmingham, Alabama  35203
6

7   FOR THE DEFENDANT:

8   P. Russell Steen
    2172 Pelham Parkway
9   Pelham, Alabama  35124
```

```
10                    I N D E X

11  GOVERNMENT'S WITNESSES:    D     C     RD     RC

12  Shannon Williams         135

13  Evelyn Geeter            151   160

14  Carolyn Warner           163   167

15  Jessica Thomas           171   175

16  Shannon Williams         177   207

17  Shawn Williams           212   215

18  Steven Mathews           222   239   242    244

19  James Preuitt            245   250   251

20  Craig Hellman            254   275   277

21  Haley Elliott            279   317

22  Brian Lindsey            320   328

23  DEFENDANT'S WITNESSES:

24  Clifton Dodd             340   363   371    372

25  Verdict. . . . . . . . . . . . . . Page  385
```

```
1                      *  *  *  *  *

2                P R O C E E D I N G S

3                      *  *  *  *  *

4          (Open court, outside the presence of the jury.)

5          THE COURT:  Can you go through with me each of

6    the counts and what the evidence is going to with regard

7    to proving the case other than the 404(b) evidence?

8          With regard to Count One, what is your evidence

9    that he placed it in the mails, number one, outside the

10   404(b) evidence?

11         MR. WHISONANT:  Ms. Williams testified that

12   they received it in the mail.

13         THE COURT:  Ms. Williams said they received

14   something in the mail.  They received something in the

15   mail.  But what's the evidence that he did it, that the

16   defendant was the one who did it?  You have that a

17   letter was received in the mail.

18         MR. WHISONANT:  And we have that the --

19         THE COURT:  Speak up if you would.  Come to the

20   podium.  With intent to convey knowingly placed or

21   caused to be placed in the mails a communication

22   containing a threatening -- what is it that he put it in

23   the mail?

24         MR. WHISONANT:  I don't have any evidence

25   showing where it was mailed or --
```

1        THE COURT:  But that he did it, do you have a

2  fingerprint on it, do you have a handwriting expert

3  saying --

4        MR. WHISONANT:  Yes.  Our handwriting expert is

5  going to say that he was the author of that letter along

6  with the letters Two, Three, Four, Five and Six, that

7  they were a common author.

8        THE COURT:  The common author and that was

9  him?  Are they going say it was with him?

10        MR. WHISONANT:  No.  She will say it was a

11  common author, the same person wrote all of them.  Then

12  we have other evidence --

13        THE COURT:  Wait a minute.  Letters One, Two

14  Three, Four, Five and Six?

15        MR. WHISONANT:  Right.  The one letter to

16  Jefferson County Courthouse.

17        THE COURT:  All right.

18        MR. WHISONANT:  Then you've got the five

19  letters --

20        THE COURT:  Tell me the count numbers though.

21        MR. WHISONANT:  Count One is Jefferson County

22  and Counts Two, Three, Four, Five and Six were the ones

23  that were --

24        THE COURT:  A common author.

25        MR. WHISONANT:  Right, a common author.  And

1  then we have evidence that he wrote the other letters,

2  those Two through Six.  Mr. Shannon Williams is going to

3  testify about seeing him write the letters, about being

4  asked to mail the letters for him, and he took the

5  package containing those five letters and put them in

6  the mail, which was later intercepted by the postal

7  authorities.

8           THE COURT:  Did he see Two, Three, Four, Five

9  and Six?

10          MR. WHISONANT:  Yes, ma'am.

11          THE COURT:  He saw each of the letters?

12          MR. WHISONANT:  Yes, ma'am.

13          THE COURT:  Okay.

14          MR. WHISONANT:  And then we have fingerprints

15  on various letters, and I don't think I know that right

16  off the top of my head, but fingerprints were found on

17  either the envelope or on the letter in virtually all of

18  them.  I don't have that in front of me.

19          Well, actually, fingerprints of the defendant

20  were found in Count Two on the envelope, and there were

21  two fingerprints on the envelope, one on the letter.  In

22  Count Three, there were no fingerprints found on the

23  envelope.  There were six fingerprints found on the

24  letter.  In Count Four, there were two fingerprints

25  found on the envelope.  No fingerprints found on the

1   letter.

2          On Count Five, there was one fingerprint found

3   on the envelope, and one fingerprint found on the

4   letter.  On Count Six, there were no fingerprints

5   found.  In Count Seven, there was one fingerprint found

6   on the envelope, but it was not Mr. Dodd's, and no

7   fingerprints found on the letter.  And this Count Seven

8   --

9          THE COURT:  So you don't have any fingerprints

10  on Seven?

11         MR. WHISONANT:  On Count Seven, that's right,

12  but we have --

13         THE COURT:  Let's talk about what your evidence

14  is with regard to Count Seven.

15         MR. WHISONANT:  We have Mr. Preuitt who

16  received the letter.  He will say he's received letters

17  from Mr. Dodd in the past.  And when he got the letter,

18  he recognized the handwriting as that of Mr. Dodd's.  He

19  then turns the letter over to the local sheriff, who

20  gives it to the postal inspectors.

21         They sent it to the lab, and they will say that

22  Mr. Dodd probably wrote that letter.  They have a scale

23  of like one to nine in which they make findings, and

24  this would be about number six.

25         THE COURT:  And it was a what?

1          MR. WHISONANT:  And it would be about seven on

2     the ranking.

3          THE COURT:  What about Two through Six besides

4     a common author, do you have any probability of

5     handwriting?

6          MR. WHISONANT:  No, ma'am.

7          THE COURT:  Did you all try to do that?

8          MR. WHISONANT:  We tried that, and she will

9     testify about that.  Because it wasn't true handwriting,

10    it was apparently attempted to disguise it, that she

11    couldn't say about that.

12         THE COURT:  They say common author between One

13    through Six, but One is cursive and Two through Six are

14    printed.

15         MR. WHISONANT:  Right, but she could not make

16    an identification.

17         THE COURT:  But she still says that's a common

18    author even though one was cursive and the others were

19    printed?

20         MR. WHISONANT:  Yes, ma'am.

21         THE COURT:  Okay.  I'm just trying to think,

22    I'm jumping ahead, but I'm really trying to think of it

23    for purposes of letting in the 404(b) evidence.  Besides

24    there was a common author, I'm just trying to think if

25    that's enough for the jury to find beyond a reasonable

1  doubt just on Count One.

2  MR. WHISONANT:  That --

3  THE COURT:  Common author, and then you have

4  the fingerprints on all those, on Two through Six, and

5  you have Mr. Williams who is going to say he wrote them

6  and he saw him write them and he helped him mail them.

7  MR. WHISONANT:  Not Count One, but the others.

8  THE COURT:  Right.  Let's just bring him in.

9  And all I really want you to ask him about is what --

10  and don't lead him -- what did the defendant say to him

11  about why he was writing the letters.

12  MR. WHISONANT:  Yes, ma'am.

13  THE COURT:  And ask him, and don't lead him,

14  when did he say that.

15  MR. WHISONANT:  Okay.

16  THE COURT:  Okay.  All right.  Mr. Williams, I

17  will have you sworn in again later before the jury.

18  **SHANNON WILLIAMS, GOVERNMENT'S WITNESS, SWORN.**

19  THE COURT:  All right.  Be seated.

20  Mr. Williams, I'm having you brought in because I'm

21  trying to make an evidentiary ruling about some things,

22  and so this is going to be just a very brief part of

23  your testimony that I want to hear.  Go ahead.

24  **DIRECT EXAMINATION**

25  **BY MR. WHISONANT:**

1    Q.   State your name for the record, sir.

2    A.   My name is Shannon Jackie Williams.

3         THE COURT:  Lean in and speak into the

4    microphone.

5    Q.   Mr. Williams, do you know Clifton Dodd?

6    A.   Yes, sir.

7    Q.   Do you see him in the courtroom today?

8    A.   Yes, sir.  He's sitting there (indicating).

9    Q.   How do you know him?

10   A.   I met him in Calhoun County jail in 2011.

11   Q.   And what, if anything, did Mr. Dodd tell you about

12   writing some letters in jail?

13   A.   He told me that the reason why he was writing the

14   letters was to make the Feds need him, and he said that

15   it was going to help his case go away, and that

16   basically that was the reason why he was writing the

17   letters, and he needed someone to mail the letters out

18   for him.

19   Q.   Did he ask you to mail the letters out?

20   A.   Yes, sir.

21        THE COURT:  When did that conversation take

22   place, if you remember?

23        THE WITNESS:  In 2011 around July.

24        THE COURT:  How was it going to make his case

25   go away?  What did he say to you in that regard?

1        THE WITNESS:  He said that he had been lying to

2   the Feds, and he said he made up a story about him being

3   a hired hit man, and that he would need to mail letters

4   out saying -- stating that -- to federal judges stating

5   that he had been watching them.  And that's what he had

6   initially told the Feds, that he was a hired hit man.

7        So he wanted to make it look like someone was

8   actually hired to kill the judges.  So he wrote the

9   letters and asked me to mail the letters out.

10        THE COURT:  Wait a minute.  Say that again to

11   me so I understand what you're saying he said.

12        THE WITNESS:  He said that he had told the FBI

13   that he was hired to kill some federal judges, and that

14   he needed to get some letters mailed out to the judges

15   so that it would make it look like that he was

16   actually -- someone had wrote the letters and made it

17   look like he was hired to kill judges.

18        THE COURT:  Wait.  The letters would be from

19   whom, from him or from --

20        THE WITNESS:  From someone else.

21        THE COURT:  Who were they supposed to be from?

22        THE WITNESS:  I don't actually know who he was

23   supposedly told they were from.  I remember him saying

24   he met a guy in Jefferson County jail named Mike,

25   somebody named Mike, and that's kind of where he got the

1  idea from.

2          THE COURT:  He got the idea from Mike to what?

3          THE WITNESS:  To mail letters off.

4          THE COURT:  Mike just gave him the idea to mail

5  the letters, so what, so that the FBI would think, what,

6  he was hired to kill somebody?

7          THE WITNESS:  Yeah.  I know it sounds crazy,

8  and that's what I thought, but that's what he told me.

9          THE COURT:  Why did you get involved in it?

10  Why did you agree to mail the letters?

11          THE WITNESS:  Well, he asked me to mail the

12  letters off for him.  I told him that I didn't have no

13  way to mail letters off.  I would have to call someone

14  to get them to mail the letters off.

15          THE COURT:  Why would you agree to do something

16  like that?  Why did you agree to do something like that?

17          THE WITNESS:  Well, I knew I could get some

18  type of sentence reduction or something because it was

19  illegal, to be honest with you.  So when I initially

20  called my brother, I told him on the phone to get in

21  contact with my attorney and let him know about it.

22          THE COURT:  Do you have that on tape?  Is that

23  somewhere on tape that he said that to his brother?

24          MR. WHISONANT:  Yes, ma'am.  That's in the

25  conversation.

1          THE COURT:  It's in the conversation?

2          AGENT MATHEWS:  Yes, ma'am.

3          THE COURT:  Have you listened to that and it's

4    in there?

5          MR. STEEN:  I have not listened to it, Your

6    Honor, but I have read the transcript and it does depict

7    that there is some kind of conversation to get it to the

8    DA or his lawyer or something like that.

9          THE COURT:  So you were going to do it.  At the

10   same time, you were going to tell people that you were

11   doing it?

12         THE WITNESS:  Well, when you say do it, what do

13   you mean?

14         THE COURT:  You were going to mail the letters

15   for him, which you knew were illegal?

16         THE WITNESS:  Well, there was no way I could

17   actually mail the letters out because I was incarcerated

18   also.

19         THE COURT:  But you had it done though.  You

20   sent the package to your brother to have him --

21         THE WITNESS:  No.

22         THE COURT:  That's right, you all intercepted

23   them beforehand, right.  How did that happen though?

24         MR. WHISONANT:  After the conversation is

25   overheard by Inspector Mathews, he then goes to Shannon

1  Williams, who the package was addressed to, who is this

2  man's brother, and he had not received the package yet.

3  They asked him for permission to intercept the package

4  and to open it.  He gave it.  Inspector Mathews goes to

5  the mail processing facility and finds the package.

6        THE COURT:  But there's conversation in there

7  that -- in the conversation where he's asking his

8  brother to do it.  There's conversation where he says

9  contact the DA about this?

10        MR. WHISONANT:  Yes, ma'am.  I can read it to

11  you.  Toward the end of the conversation, Shannon says,

12  "Hold them and take copies of them and take it to the

13  DA.  He's a black dude.  He's cool.  Take it to the DA

14  for me and ask him would that help me in my sentencing

15  so -- and I can guarantee you it will.  It's a hoax.

16  See, he's in here for mail hoax.  Okay.  But then it

17  ain't going to get you in trouble.  It's just the fact

18  that it -- and I'm debating on what to do.  If you

19  was -- you was down for just taking it to the DA for me,

20  showing them what's going -- to tell him what -- just

21  like I told you, what happened, dude sending threatening

22  letters out.  Know what I'm saying?"  And then it goes

23  on a little bit further.

24        THE COURT:  Okay.  Let me ask you all to have

25  him step out and hold him right there in the hall for

1   me.

2           THE WITNESS:  Me?

3           THE COURT:  Yes, sir.  I need to say something

4   to the lawyers outside your presence.  One more thing

5   Mr. Williams.  Did he say he thought it would help his

6   case?

7           THE WITNESS:  He said he knew it would help his

8   case.  He said that he had been telling them he was

9   hired to kill some federal judges, and that this would

10  help his case.  I didn't understand how.  I just knew he

11  wanted me to mail the letters out.

12          THE COURT:  Just step out there in the hall.

13          MR. WHISONANT:  May I ask one more thing?

14          THE COURT:  Sure.

15  Q.   (By Mr. Whisonant)  Did he say anything about being

16  released from prison?

17  A.   He said he was going all the way home.  He wasn't

18  going to do any time.  He was going home.

19          THE COURT:  Okay.

20          (Witness excused from courtroom.)

21          THE COURT:  All right.  You need to close the

22  door.  I don't want him to hear this.  Can you close the

23  door?

24          THE MARSHAL:  There's only two of us, just for

25  security reasons.

1          THE COURT:  Well, just take him to the jail

2    cell.  I think I'm through with him.  Just take him on

3    to the lock up right here.

4          That's different than what you said he was

5    going to say.  It's still motive.  What you told me

6    yesterday is that he was going to try to pin it on Mike

7    Bole.  His testimony doesn't say that.

8          MR. WHISONANT:  Earlier he had said that.  He

9    didn't say that this morning.

10         THE COURT:  Well, he didn't say that today.  He

11   said he talked to a guy name Mike.  He didn't say that

12   today.

13         MR. WHISONANT:  Right.

14         THE COURT:  First, I don't know that it's

15   really required that I let in the conviction.  In other

16   words, there's enough evidence -- I know that he did

17   plead guilty, that there was a crime.  It's really only

18   probative to Count One.  Well, actually, it's probative

19   to all of them.

20         MR. WHISONANT:  Yes, ma'am.  I don't propose to

21   ask what the defendant was charged with.  I don't

22   propose to ask what he was convicted of.  I don't

23   propose to ask what any of the underlying charges were

24   about, what the facts were underlying those charges.

25         What I would propose to ask is whether

1  Inspector Mathews has investigated the defendant in the

2  past and --

3          THE COURT:  Well, now, he isn't going to know

4  that.

5          MR. WHISONANT:  Not him, but when Inspector

6  Mathews testifies.  I will also ask Inspector Mathews

7  whether that investigation involved the mailing of items

8  in the U.S. Mails.

9          THE COURT:  Whether it involved what?

10          MR. WHISONANT:  Whether it involved mailing

11  items in the U.S. Mails.  And during the course of the

12  investigation, did he observe the defendant's

13  handwriting.  Then we'll ask Mr. Shannon Williams

14  about -- to testify about conversations with and what he

15  observed the defendant doing while he was in jail.

16          THE COURT:  I'm sorry, say that one more time.

17          MR. WHISONANT:  We'll ask Mr. Williams about

18  the conversations he had with the defendant and what he

19  saw the defendant doing while they were in jail

20  together, and then about the phone call that was made.

21  And then during the course of the phone call, there is

22  one section in here where it says, "see, he's in here

23  for a mail hoax."  That's part of the conversation.

24          THE COURT:  Okay.

25          MR. WHISONANT:  That's all I propose to go

1  into.  I think that's important for us to be able to

2  tell the story, the whole story, to put those things

3  out.  I'm not sure this even rises to the level of

4  404(b), but in the abundance of caution --

5        THE COURT:  I think it's admissible.  I will

6  dictate some findings in the record later.  Do you want

7  to make an objection though for the record?

8        MR. STEEN:  I would, Your Honor.  I think the

9  bringing up of the other cases in any form whatsoever is

10 going to be so prejudicial to him that the jury is

11 already going to have the one strike against him that he

12 probably did it anyway.

13       THE COURT:  Well, it's certainly not as damning

14 as if they had found out what he actually -- and he's

15 not trying to get into the convictions.  All right.  I

16 overrule it.  I think it's admissible, and I'm going to

17 dictate some findings later.  I don't want to hold us up

18 right now.

19       MR. WHISONANT:  I need to bring something else

20 to your attention.

21       THE COURT:  And we need to talk about your

22 witnesses, but go ahead.  Let me ask everybody but

23 Ms. Wallace to step out.  There's a lawyer in the back.

24 I let lawyers stay in.  I'm going to ask the rest of you

25 all to step out for just a minute.

1          MR. WHISONANT:  There are two things I would

2     like to bring up this morning.  One, in light of

3     Dr. Massingale yesterday, we now have three witnesses

4     from the Alabama lab who are going to testify.  They

5     will be fairly brief.  We would like to put them on

6     first thing this morning.

7          THE COURT:  That's fine.

8          MR. WHISONANT:  And then we have --

9          THE COURT:  You all can go ahead and take

10    Mr. Williams down.  Thank you.

11         MR. WHISONANT:  We have a handwriting expert

12    brought here today.  The original handwriting expert has

13    retired from the service.  We have a supervisor here who

14    reviewed all of her work, and it's the lab's policy that

15    they have somebody do that in case the original examiner

16    is not available.  So she, in essence, did the same

17    thing as far as looking at the handwriting, and she will

18    be testifying this morning.  In light of Dr. Massingale,

19    I wanted to bring to your attention what we will looking

20    at this morning.

21         THE COURT:  Wait a minute.  I will have to look

22    back at that case to see.  I don't know if you all

23    looked at it.  Did you all look at it?

24         MR. WHISONANT:  We looked at it, yes, ma'am.

25         THE COURT:  Did you look at it again last

1    night?

2          MR. WHISONANT:  Yes, ma'am.  I read a lot of

3    cases last night.

4          THE COURT:  What does it say and what case do

5    you want to cite me to say that I can look at that?

6          MR. WHISONANT:  I will have to pull that case

7    and get it back over here, but she examined -- it's not

8    like she just is testifying about general procedures.

9    She actually went back and looked at the items herself.

10          THE COURT:  When did she do that?

11          MR. WHISONANT:  She did it more recently, after

12   when we called her to like --

13          THE COURT:  Like yesterday or --

14          MR. WHISONANT:  No, no, it's been several

15   months ago.  But when we called about having this

16   handwriting examiner come and testify, they told us that

17   she was not available.  Then this new supervisor went

18   back and looked at it, and she reviewed everything that

19   was done, and she can testify to that, but she's not the

20   person who made the original report.

21          THE COURT:  What cases do you have that say

22   that she can testify?  Why didn't you just have her do a

23   new -- I don't know.  Is there a case that says that's

24   okay?  That one yesterday seemed very strong that it has

25   to be the tester.

1      MR. WHISONANT:  Right.  She is a tester.  She's
2  not the original tester.
3      THE COURT:  Then why does she testify not about
4  her own examination, not the original test?  I don't
5  know.  That's what I'm trying to say.
6      MR. WHISONANT:  She's going to testify about
7  her examination.
8      THE COURT:  Okay.
9      MR. WHISONANT:  And I will caution her about
10  not talking about the other test, but I just wanted to
11  bring that to your attention this morning.
12      THE COURT:  Okay.  But did you find a case that
13  talks about that she could talk about the old test if
14  the examiner is not present?
15      MR. WHISONANT:  No, ma'am.  I don't have a case
16  like that.  That's why I'm saying she's not going to be
17  testifying about what happened before, although she
18  reviewed that.
19      THE COURT:  And you all provided her
20  examination results to the defendant?
21      MR. STEEN:  No, Your Honor.
22      MR. WHISONANT:  We don't have any written
23  results.
24      THE COURT:  Well, she's an expert.  What does
25  Rule 16 say?  When are we talking about she did this?

```
 1   Did you make a request under Rule 16?
 2           MR. STEEN:  Yes, Your Honor.
 3           THE COURT:  Because it says, "At the
 4   defendant's request, the government must give the
 5   defendant a written summary of any testimony the
 6   government intends to offer under Rule 702, 703 and 705
 7   during its case in chief at trial."
 8           MR. WHISONANT:  We provided notice of the
 9   witness and what she would testify about.  That was
10   filed with the court.
11           THE COURT:  You did?
12           MR. WHISONANT:  Yes, ma'am.
13           THE COURT:  Okay.
14           MR. WHISONANT:  And we gave a summary of what
15   she would testify about.
16           MR. STEEN:  I got the same notice on
17   Ms. Massingale, too, that she would be testifying like
18   that.  However, in this particular case right here, the
19   examiner -- and, Judge, I can fall back on my own
20   experience.  After I retired from the sheriff's
21   department, I still had to come and testify on what I
22   did when I was at the sheriff's office.
23           THE COURT:  It seems very strong to me, that
24   case, that it has to be the tester.  I will have my law
25   clerk look at it again.  If she does her own and she
```

1    doesn't refer at all to the previous reports, not even

2    in front of her, and she just says that she did her own

3    comparison, I guess that could come in, assuming you

4    gave the information provided by Rule 16(g).  Can you

5    pull up their discovery responses?  Are they not filed?

6              MR. WHISONANT:  There was a recent filing of

7    the experts, the expert notice.

8              THE COURT:  I'm just looking at this 2012 case

9    that we talked about yesterday.

10             MR. WHISONANT:  Yes, ma'am.  And I have nothing

11   much different than that.

12             THE COURT:  It can't just be her reviewing what

13   this other woman did.  It has to be her own

14   examination.  Did she look at the original documents?

15             MR. WHISONANT:  Yes.

16             THE COURT:  And she made her own comparison?  I

17   mean, she's a tester?

18             MR. WHISONANT:  I think that might be -- the

19   best way to handle it would be, before she testifies,

20   maybe we should bring her and qualify her before the

21   jury hears it.

22             THE COURT:  Okay.

23             MR. WHISONANT:  That way you can make a

24   determination.

25             THE COURT:  Her name is what?  I don't even see

1  her name.

2          MR. STEEN:  Haley Elliott is the expert.  It's

3  number four.

4          THE COURT:  It says mister, but it's a miss?

5  It says he.  Is it a she?  Is Haley Elliott a she?

6          MR. WHISONANT:  Yes, ma'am, it's a she.

7          THE COURT:  Okay.  We'll just call her in ahead

8  of time and see what she says.

9          MR. WHISONANT:  Would you like to hear her now,

10 Your Honor?

11         THE COURT:  No.  I don't want to hold the jury

12 up.  What were you going to say?

13         MR. WHISONANT:  Nothing.  We're ready.

14         THE COURT:  So your first witness is

15 Mr. Williams.  The next witness is who?

16         MR. WHISONANT:  Actually, we would like to call

17 the three forensic examiners.

18         THE COURT:  Okay.  We'll take her at a break,

19 Ms. Elliott.

20         MR. WHISONANT:  Yes, ma'am.

21         THE COURT:  Did she ever give you a written

22 report?

23         MR. WHISONANT:  No, ma'am.  I don't believe

24 that she did.

25         THE COURT:  Because she was relying on -- let

1    me see the written report of the previous person.  I

2    don't want her to even have this in front of her when

3    she testifies.  I'm going to have Susan make a copy of

4    this for me.  We will start in just a second.

5              (Brief pause)

6              (Open court.  Jury present.)

7              THE COURT:  Good morning.  Call your next

8    witness.

9              MS. DIKE-MINOR:  The government calls Evelyn

10   Geeter.

11             THE COURT:  By the way, I'm not doing other

12   work.  I take notes myself, but I have the advantage of

13   having a computer.

14        **EVELYN GEETER, GOVERNMENT'S WITNESS, SWORN.**

15             THE CLERK:  Would you state your name, please?

16             THE WITNESS:  Evelyn Franklin Geeter.

17             THE CLERK:  And spell your last name for the

18   record, please.

19             THE WITNESS:  G-E-E-T-E-R.

20             THE CLERK:  In what city and state do you

21   reside?

22             THE WITNESS:  Montgomery, Alabama.

23             THE CLERK:  Thank you.

24                     **DIRECT EXAMINATION**

25   **BY MS. DIKE-MINOR:**

1   Q.   Good morning, Ms. Geeter.  Would you please

2   introduce yourself to the jury?

3   A.   My name is Evelyn Franklin Geeter.  I am currently a

4   supervisor at the Bureau of Clinical Laboratories that

5   is part of the Alabama Department of Public Health.

6   Q.   And has your name always been Evelyn Geeter?

7   A.   No.  I got married about almost a year ago.

8   Q.   And what was it previously?

9   A.   Evelyn Franklin.

10  Q.   Thank you.  Were you personally involved in the

11  testing of a white substance on April 14, 2011?

12          MR. STEEN:  Objection to leading, Your Honor.

13          THE COURT:  Overruled.  And, once again, I'm

14  going to beg you, please project your voice, loudly.

15          MS. DIKE-MINOR:  I'm sorry, Your Honor.

16          THE COURT:  For once, she's supporting me on

17  this.  She wrote me back, I can't hear either.  I know

18  she's trying to make me feel better.  I'm throwing her

19  under the bus.  It's not just me.  I know they can hear,

20  but I can't.  It's important that I hear.  Project your

21  voice.

22          MS. DIKE-MINOR:  Will do.

23  Q.   Were you personally involved in the testing of a

24  white substance on April 14, 2011?

25  A.   Yes.

1    Q.   Before we get into that, let's learn a little bit

2    more about you.  Could you tell the jury what your

3    educational background is?

4    A.   I have a BS degree in laboratory technology, and I

5    have a master's in business administration in

6    healthcare.

7    Q.   When did you receive your BS degree?

8    A.   In 2005.

9    Q.   And your master's?

10   A.   In 2007.

11   Q.   Do you have any other training?

12   A.   Yes.  I've gone to the CDC several times to receive

13   training such as for influenza, Clostridium botulinum

14   toxin testing, and I learned methods training, which

15   involves bio-terrorism agents.

16   Q.   Thank you.  And you said you're a supervisor in the

17   emerging infectious section of the Alabama Department of

18   Public Health?

19   A.   Yes.

20   Q.   How long have you been with the Alabama Department

21   of Public Health?

22   A.   On the 16th, I will have been there for seven years.

23   Q.   And how long have you held the current position you

24   have?

25   A.   A week.

1    Q.    And what was your position before that?

2    A.    I was a microbiologist.

3    Q.    And were you a microbiologist in April of 2011?

4    A.    Yes.

5    Q.    And what were your duties as a microbiologist?

6    A.    I conducted testing for influenza virus, bordetella

7    pertussis, Clostridium botulinum toxin, biological

8    agents, salmonella, e-coli, testing for food-borne

9    illnesses.

10   Q.    And you've touched on it, but just to be clear, do

11   your duties include conducting tests on substances to

12   determine whether they are biological agents?

13   A.    Yes.

14   Q.    And about how many such tests would you say you've

15   conducted in the course of your career?

16   A.    Hundreds.

17   Q.    Have you conducted tests specifically to determine

18   whether a substance is anthrax?

19   A.    Yes.

20   Q.    And about how many such tests would you say you've

21   conducted in the course of your career?

22   A.    Again, hundreds.

23   Q.    Okay.  Thank you.  Now, you said that you were

24   personally involved in the testing of a white powder

25   substance on April 14, 2011; correct?

1   A.   Yes.

2   Q.   Do you recall where that white powder came from?

3   A.   Based on the review of the report that was

4   submitted, I recall that it came from the Jefferson

5   County Criminal Justice building in Birmingham.

6   Q.   And who brought it to your office?

7   A.   After it was collected by the fire department hazmat

8   team, it was brought down to Montgomery by an FBI agent.

9   Q.   To help the jury, without getting into the actual

10  testing, could you walk us through what happens when a

11  substance is first brought to your lab for testing for

12  biological agents?

13  A.   First, the form is reviewed.  The bioterrorism

14  environmental form and the chain of custody is reviewed

15  and signed to make sure that all the parts are

16  completed.  Then we take the paperwork and the substance

17  down to our area for testing and it is logged into our

18  computer system.

19       And then it's taken back into our special

20  facility where we conduct testing that in particular can

21  propose certain hazards, so we take it to a BSL III

22  facility is what it's called, so we can have extra

23  precautions taken when we're dealing with these type of

24  agents.

25  Q.   Thank you.  Do you recall whether those steps were

1  taken when the white powder that you conducted testing

2  on April 14, 2011 was brought to your lab?

3  A.   Yes.

4  Q.   What tests specifically, if you can give us a

5  general overview, what tests were conducted on that

6  white powder?

7  A.   We conduct a PCR test which is a preliminary chain

8  reaction test; and then there's a TRF, time-resolved

9  florescence, test; and then there's a culture test

10  that's also performed.

11  Q.   Are those standard tests that are typically

12  conducted on biological agents?

13  A.   Yes.

14  Q.   Which of these tests did you personally conduct?

15  A.   I did the PCR.

16  Q.   If you could explain to the jury, what does the PCR

17  testing involve?

18  A.   The particular PCR test for biological agents is a

19  multiple agent panel that includes six specific

20  biological agents, and the test is basically conducted

21  by combining the sample with some reagents and placing

22  it on the instrument to see if any of those agents are

23  present.

24  Q.   Okay.  When you conduct the PCR, does it give you --

25  what does the response look like?  Do you get a

1   percentage of certainty that this has biological agents

2   or is it a yes/no, answer?

3   A.   It's a quantitative result, so it says that either

4   this agent is detected or present or not.

5   Q.   Just to be clear, did you conduct a PCR test on a

6   white substance on April 14, 2011?

7   A.   Yes.

8   Q.   And that was the white substance that was brought to

9   your lab by the FBI from Jefferson County jail?

10  A.   Yes.

11  Q.   County court.  I'm sorry.  Did that test you

12  conducted detect anthrax in the white substance?

13  A.   No.

14         MR. STEEN:  May I voir dire the witness,

15  please?

16         THE COURT:  Well, I understand what you're

17  asking, but I don't see the need to voir dire her right

18  now.  Well, go ahead briefly, I mean, very briefly.

19                  **VOIR DIRE EXAMINATION**

20  **BY MR. STEEN:**

21  Q.   Ms. Geeter, you said that you checked it out to do

22  the testing on the 14th of April, 2011?

23  A.   I don't understand what you mean by "checked out."

24  Q.   Okay.  How did it come into your possession in order

25  to test?

1    A.    FBI Agent John Ronsisvalle dropped it off at my

2    facility.

3    Q.    So you took it from him to test?

4    A.    Yes.  I received the specimen from him.

5              MR. STEEN:  Your Honor, may I approach the

6    witness?

7              THE COURT:  Let me see you at sidebar.

8              (Sidebar outside the presence of the jury)

9              MR. STEEN:  Your Honor, I think this goes to

10   the chain.

11             THE COURT:  The chain goes to the weight, and

12   it's admissible if there's a break in the chain, but

13   that goes to the weight of the evidence, not the

14   admissibility, unless you're saying there's --

15             MR. STEEN:  She's saying that she received it

16   from the FBI agent.  The documents that we received does

17   not have her name receiving it from anyone or taking it

18   out from anyone in order to test.

19             THE COURT:  Okay.  Well, I'm going to let you

20   do that on cross.

21             MR. STEEN:  Okay.

22             MS. DIKE-MINOR:  Thank you.

23             (Open court, outside the presence of the jury.)

24                  **DIRECT EXAMINATION CONT'D**

25   **BY MS. DIKE-MINOR:**

1   Q.   I'm going to show you what's been previously marked

2   as Government's Exhibit 19.   Could you please review it?

3   A.   (Witness complies.)

4   Q.   Do you recognize it?

5   A.   Yes.

6   Q.   What is it?

7   A.   This is the chain of custody and the environmental

8   report form that was submitted with the specimen.

9   Q.   The first page is the chain of custody?

10  A.   Yes.

11  Q.   What does that chain of custody show?

12  A.   It shows that the FBI dropped it off, and it was

13  received at our facility by our current -- well, our

14  manager at the time.

15  Q.   And who is that person?

16  A.   Joanna Roberson.

17  Q.   And does it show whether Joanna then turned it over

18  to you?

19  A.   It does, in the laboratory use only section.

20  Q.   Okay.   Do you see your signature on that first page

21  in the chain of custody page?

22  A.   Yes, down at the laboratory use only where the

23  specimen was received by the lab by me.

24  Q.   Okay.   And your signature, just to be clear, what

25  does that reflect?

1   A.   That I took custody of the specimen for testing.

2   Q.   Thank you.  If you could turn to the second page.

3   What does the second page reflect?

4   A.   This is the report that's filled out with all the

5   information about the specimen that's submitted and then

6   it also has the results.

7   Q.   And do you see your signature on that page?

8   A.   Yes.

9   Q.   And do you see any entries with your handwriting?

10  A.   Yes.

11  Q.   What do those entries say?

12  A.   It says, "No select agents detected by PCR.  No

13  ricin detected by TRF."

14  Q.   Just to be clear, specifically, as to the PCR, or as

15  to both, what does that mean?

16  A.   That there were no biological select agents detected

17  with this particular specimen.

18        MS. DIKE-MINOR:  At this time, we would seek to

19  offer this Government's Exhibit 19 as an exhibit.

20        THE COURT:  No objection, received.

21        MR. STEEN:  No objection, Your Honor.

22        MS. DIKE-MINOR:  Nothing further.

23                    **CROSS-EXAMINATION**

24  **BY MR. STEEN:**

25  Q.   When you signed it out on the 14th, who did you sign

1   it out from?

2   A.   I'm sorry?

3   Q.   When you signed out this specimen that you were

4   going to test, did you have to go to some place in your

5   office in order to sign it out to continue the chain of

6   custody?

7   A.   It was -- that probably was conducted down in my

8   laboratory, in my area.

9   Q.   Okay.  So you didn't take it in order to start

10  testing it, did you?

11  A.   According to the chain of custody form, no, I did

12  not receive it from the FBI agent personally.

13  Q.   So when it was received in your office, I think you

14  said this Joanna -- what's her last name?

15  A.   Roberson.

16  Q.   Roberson.  She's the one that accepts everything

17  that is sent into your office; is that correct?

18  A.   No, not necessarily; but, in this particular case,

19  she did.

20  Q.   So she's accepting it just to take it into the

21  office for y'all's processing after that; correct?

22  A.   Yes.

23  Q.   Okay.  And then you signed it out -- well, who

24  signed it out in order to give it to you to test it?

25  A.   I took custody of it down in the area of the

1   laboratory where I work at for testing to be conducted.

2   Q.   So it was taken out of a storage place and placed

3   into your laboratory?

4   A.   No, I wouldn't necessarily say that it was stored at

5   that particular time.  It probably was just she accepted

6   it at the front of our facility and took it from the

7   FBI, and then she brought it down, and she was the

8   manager.  So, because she wasn't herself going to

9   necessarily perform the testing, that's why I took

10  custody over it.

11  Q.   Did you take custody from her, Ms. Roberson?

12  A.   Yes.  For laboratory purposes, yes.

13           THE COURT:  Stay behind the podium a little

14  bit.  Mr. Steen, can you move further back a little bit

15  and speak into the microphone?

16  Q.   It came into your office on the 13th and was signed

17  by Ms. Roberson; is that correct?

18  A.   Yes.

19  Q.   And from the 13th to the 14th when you started

20  testing it, where was it put?

21  A.   I guess that was a question that needed to be asked

22  -- answered by Ms. Roberson, because it wasn't in my

23  custody at that point in time.

24  Q.   Okay.  So how did it come into your custody?

25  A.   She brought it to me.

1    Q.   Okay.  And did she bring it to you on the 14th?

2    A.   According to the date that I signed on that

3    document.

4         MR. STEEN:  No further questions, Your Honor.

5         THE COURT:  All right.

6         MS. DIKE-MINOR:  Nothing further, Your Honor.

7         THE COURT:  All right.  Thank you.  Ms. Geeter,

8    you're excused.

9         MS. DIKE-MINOR:  The government calls Carolyn

10   Warner.

11        **CAROLYN WARNER, GOVERNMENT'S WITNESS, SWORN.**

12        THE CLERK:  Would you state your name, please?

13        THE WITNESS:  Carolyn Warner.

14        THE CLERK:  And spell your last name for the

15   record.

16        THE WITNESS:  W-A-R-N-E-R.

17        THE CLERK:  And in what city and state do you

18   reside?

19        THE WITNESS:  Montgomery, Alabama.

20                    **DIRECT EXAMINATION**

21   **BY MS. DIKE-MINOR:**

22   Q.   Could you introduce yourself to the jury, tell them

23   where you work and what your title is?

24   A.   I'm Carolyn Warner.  I work at the state lab in

25   Montgomery, Alabama Department of Public Health.  I'm a

1  senior microbiologist there.

2  Q.   And were you personally involved in the testing of a

3  white substance on April 14th, 2011?

4  A.   Yes.

5  Q.   Let's just tell the jury a little bit more about

6  your background.   Could you tell them what your

7  educational background is?

8  A.   I have a BS in medical technology from the

9  University of Alabama, and I'm certified by the American

10 Society of Clinical Pathologists.

11 Q.   And how do you obtain that certification?

12 A.   After graduation, you take an exam.   And then if you

13 pass, you're certified.

14 Q.   And you said you're a senior microbiologist with the

15 Alabama Department of Public Health?

16 A.   Yes.

17 Q.   How long have you had that position?

18 A.   Almost nine years.

19 Q.   And so that would mean you held that position in

20 April of -- around April 13th and 14th of 2011?

21 A.   That's correct.

22 Q.   What are your duties?

23 A.   Primarily, I do molecular testing of enteric

24 pathogens.   I also test for -- I test specimens for

25 bioterrorism and select agents.   I do some rabies

1   testing and West Nile testing.

2   Q.   And do your duties -- you mentioned this already --

3   but do your duties include conducting tests on

4   substances to determine whether they are biological

5   agents?

6   A.   Yes.

7   Q.   About how many such tests would you say you've

8   conducted in the course of your career?

9   A.   Probably between 30 and 40.

10   Q.   Okay.  And you said you were personally involved in

11   the testing of a white powder substance on April 14,

12   2011?

13   A.   Yes.

14   Q.   Do you recall how that white powder came to your

15   office?

16   A.   It was collected at the Jefferson County Criminal

17   Justice Building by the fire department, Birmingham Fire

18   Department and Hazmat Team, and then passed to the FBI,

19   who brought it to us.

20   Q.   What tests did you personally conduct on that

21   substance?

22   A.   I did a TRF test.

23   Q.   What does that stand for?

24   A.   It's time resolved florescence.

25   Q.   And what does the TRF test seek to detect?

1   A.   Ricin toxin.

2   Q.   And for those members of the jury who may be not

3   familiar, what is ricin?

4   A.   It's a toxin that is extracted from the seed of a

5   castor bean plant.

6   Q.   Is it toxic?

7   A.   Yes.

8   Q.   If you could explain to the jury on sort of a

9   general level what is involved in a TRF test?

10  A.   We have reagents that we mix with the specimen which

11  was, in this case, a white powder.  And if ricin is

12  present in the specimen, the reagents will cause the

13  combination to fluoresce and that florescence is

14  detected by our equipment.

15  Q.   And did the TRF test you conducted on April 14,

16  2011, detect ricin?

17  A.   It did not.

18  Q.   I'm showing you Government's Exhibit 19.  Do you

19  recognize that document?

20  A.   Yes.

21  Q.   What is it?

22  A.   This is our chain of custody form and the report,

23  our environmental specimen report.

24  Q.   And turning to the bioterrorism section of the

25  report, do you see your signature on that page?

1    A.    Yes.

2    Q.    And what does the report reflect about your

3    conclusions on the TRF testing?

4    A.    That no ricin toxin was detected by TRF testing.

5         MS. DIKE-MINOR:   Nothing further at this time,

6    Your Honor.

7         THE COURT:   So does that mean it was not

8    anthrax?

9         THE WITNESS:   The TRF test does not test for

10   anthrax.   It tests for ricin.

11        THE COURT:   Okay.

12                   **CROSS-EXAMINATION**

13   **BY MR. STEEN:**

14   Q.    Ms. Warner, when you performed your test, did you go

15   to any place to pick it up and sign for it?

16   A.    It was brought to our lab by the FBI agent.

17   Q.    So you received it from the FBI agent?

18   A.    I personally did not, but the lab received it from

19   the FBI agent.

20   Q.    Okay.   Give me some protocol of your office.   When

21   you're going to do a test on a specimen that's sent in,

22   do you just pick up the specimen and start doing the

23   test, or does somebody bring you the specimen and tell

24   you what test they're wanting to be done, or how does it

25   get into your hands?

1    A.   Well, the FBI agents bring the specimen to the lab.

2    And usually, you know, we're told beforehand to expect

3    it, and we receive it and fill out our chain of custody

4    form.   And then the specimen is processed and split in

5    different sections of the laboratory.   Each do their own

6    testing on the specimen.

7    Q.   So your portion of the lab is different from -- is

8    it Geeter that just testified that y'all came up

9    together with; is that correct?

10    A.   No.   We are in the same part of the lab.

11    Q.   In the same lab?

12    A.   Yes, sir.

13    Q.   But my question is you said that you fill out a

14    chain of custody, which you know is very important --

15         MS. DIKE-MINOR:   Objection, Your Honor.

16    Misstates her testimony.

17         THE COURT:   I sustain.

18    Q.   You're testifying that there's a chain of custody;

19    is that correct?

20    A.   Yes, sir.

21    Q.   And that chain of custody included you; is that

22    correct?

23         MS. DIKE-MINOR:   Objection again.

24         THE COURT:   I think that's fine.   If I

25    understood the question, it's fine.   Ask it again.   The

1   chain of custody what?

2   Q.   The chain of custody that you received, does that

3   include you when you take it out for testing?

4   A.   My name is not on this chain of custody form.

5   Q.   So the question that I have is how did you get the

6   substance in order to test it?

7   A.   It was received by the lab and then processed and

8   split into parts for testing.  There's several tests

9   that have to be done with the specimen, and each test

10  requires that the specimen be processed in a certain

11  way.  And I received my section of the specimen for

12  testing, the one test that I performed.

13  Q.   And do you know where that specimen came from?  Not

14  the FBI, after it got to your lab, who gave you that

15  specimen to test?

16  A.   Well, Ms. Geeter received the specimen at the lab,

17  and she processed the specimen and gave me my portion.

18  Q.   Okay.  So it went from her to you?

19  A.   Yes.

20  Q.   Is that documented on any form that y'all have?

21  A.   Not that I know of.

22  Q.   So we've got this specimen that comes in that's

23  going to be tested.  One person signs for it, Ms. Geeter

24  in this instance, and then it's divvied up to other

25  analysts for exams?

1  A.    That's correct.

2  Q.    And none of that is documented?

3  A.    That is our procedure.  That's our protocol that we

4  go by.

5  Q.    That you don't document it?

6  A.    The protocol is documented.

7  Q.    So this would list that you got it from Ms. Geeter;

8  is that correct?

9  A.    No, no.  We sign the results form.  Each

10 technologist that works on the testing signs the results

11 form.  So their signature would be on that form

12 indicating they have performed the testing.  They

13 received the specimen and performed the testing.

14 Q.    So the specimen --

15        THE COURT:  I think you've covered this

16 though.  I will let you ask one or two more questions,

17 but I think you've covered this.  You're going to the

18 chain which goes to the weight and not the admissibility

19 of the evidence.

20        MR. STEEN:  Plus the fact, Your Honor, she says

21 there's no documentation for it either.

22        THE COURT:  I think you've covered anything --

23 I'm not saying I agree with what you've just stated.  I

24 don't comment on the evidence.  That's for you all to

25 decide based on what she said.  I'm just saying I think

1    you covered this area.  If you have a few more

2    questions, I'm not going to cut you off completely.

3              MR. STEEN:  Nothing further, Your Honor.

4              THE COURT:  All right.  Redirect.

5              MS. DIKE-MINOR:  Nothing further.

6              THE COURT:  Ms. Warner, thank you very much.

7              MS. DIKE-MINOR:  The government calls Jessica

8    Thomas.

9              **JESSICA THOMAS, GOVERNMENT'S WITNESS, SWORN.**

10             THE CLERK:  Would you state your name, please?

11             THE WITNESS:  Jessica Thomas.

12             THE CLERK:  And spell your last name for the

13   record, please.

14             THE WITNESS:  T-H-O-M-A-S.

15             THE CLERK:  And in what city and state do you

16   reside?

17             THE WITNESS:  Montgomery, Alabama.

18                     **DIRECT EXAMINATION**

19   **BY MS. DIKE-MINOR:**

20   Q.   Ms. Thomas, could you tell the jury who you are and

21   what you do?

22   A.   My name is Jessica Thomas.  I am currently a student

23   at Auburn University Montgomery in clinical laboratory

24   science.

25   Q.   And were you formerly with the Alabama Department of

1   Public Health?

2   A.   That is correct.

3   Q.   Until what year, what month and year?

4   A.   August of 2012.

5   Q.   Could you tell the jury a little bit about your

6   educational background?

7   A.   I have a Bachelor of Science degree in laboratory

8   analyst scientist.

9   Q.   Do you have any other training?

10  A.   I do have the LIN training in bioterrorist agents,

11  the culture aspect of it.

12  Q.   And that's a certification of some sort?

13  A.   Correct.

14  Q.   And any additional certifications?

15  A.   No, ma'am.

16  Q.   What was your title before you left the Alabama

17  Department of Public Health?

18  A.   Microbiologist.

19  Q.   What were your duties as a microbiologist?

20  A.   I did conventional bacterial testing of unknown

21  organisms.

22  Q.   And did your duties include conducting tests on

23  substances to determine whether they were biological

24  agents?

25  A.   Yes.

1   Q.   About how many such tests would you say you've

2   conducted in the course of your career?

3   A.   At least hundreds.

4   Q.   And would one of your duties also be to, more

5   specifically, conduct tests on substances to determine

6   whether they have anthrax?

7   A.   Yes.

8   Q.   About how many such tests would you say you've

9   conducted in the course of your career?

10  A.   Hundreds as well.

11  Q.   Now, you said you were personally involved in the

12  testing of a white powder substance on April 14, 2011?

13  A.   Correct.

14  Q.   Do you know where that white powder came from?

15  A.   After reviewing the chain of custody form, I do

16  remember that it came -- it was collected from the

17  Jefferson County Courthouse building and then was taken

18  over by the FBI, and the FBI brought it to the

19  Department of Public Health.

20  Q.   What test did you personally conduct on that

21  substance?

22  A.   I performed the culture testing.

23  Q.   Can you briefly explain to the jury what culture

24  testing is?

25  A.   We have a standard protocol in which five to six

1  media plates, which contain nutrients that are -- all

2  the plates contain nutrients that are conducive to

3  growing these unknown biological organisms, if they are

4  present in the sample.  So it's plated on the media, and

5  we wait seven days and check for growth.  And I didn't

6  find characteristics according to the organism that we

7  were looking for.

8  Q.   And how do you know what the results of the test

9  are?  I think you already said actually, but just --

10  A.   Based on identifying characteristics of the

11  organisms in question.  It's visually inspected, and

12  subsequent tests are done if further characteristics are

13  needed to confirm the presence of the organism.

14  Q.   So you can see something, to put it plainly, you can

15  see something on this plate?

16  A.   That is correct.

17  Q.   Now, did the culture test you conducted, at least

18  you started to conduct on April 14, 2011, detect anthrax

19  in the white substance?

20  A.   No, ma'am.

21  Q.   I am now going to show you what's Government's

22  Exhibit 19.  Do you recognize that document?

23  A.   Yes.

24  Q.   What is it?

25  A.   It's the chain of custody form.

1   Q.   What is the second page?

2   A.   We have the bioterrorism environmental report.

3   Q.   Do you see your signature on that page?

4   A.   Yes.

5   Q.   And do you see any entries with respect to your --

6   with your handwriting?

7   A.   Yes.   "No select agents isolated by conventional

8   methods" would be my handwriting.

9   Q.   What does that mean?

10  A.   That no agents were identified after completion of

11  conventional testing.

12  Q.   Does it mean -- what does it mean with regard to

13  anthrax, does it mean anthrax was found in the

14  substance?

15  A.   No, ma'am.   That would include anthrax.

16          MS. DIKE-MINOR:   Nothing further, Your Honor.

17                      **CROSS-EXAMINATION**

18  **BY MR. STEEN:**

19  Q.   Ms. Thomas, when you get your specimen to test, how

20  is it presented to you?

21  A.   In a small vial.

22  Q.   And how is that vial marked?

23  A.   It will have -- when it's processed, the specimen

24  gets a requisition number, an identification number.

25  Q.   Does that vial that contains -- it just contains the

1   subject specimen that you're going to test; correct?

2   A.   That's correct.

3   Q.   Is that divided at your lab when it's received from,

4   in this case, the FBI?

5   A.   Yes, sir.

6   Q.   And did you share that vial for testing with any

7   other laboratory technician in there?

8   A.   No, sir.

9   Q.   Did they each have their own vial to test?

10  A.   That is correct.

11          MR. STEEN:  Thank you.

12          MS. DIKE-MINOR:  Nothing further.

13          THE COURT:  All right.  Ms. Thomas, you're

14  excused.  Thank you.

15          MR. WHISONANT:  Your Honor, we would call

16  Shannon Williams to the stand.

17          THE COURT:  Mr. Williams is in custody, and the

18  marshals have to get him from downstairs.

19      **SHANNON WILLIAMS, GOVERNMENT'S WITNESS, SWORN.**

20          THE CLERK:  Would you state your name, please?

21          THE WITNESS:  My name is name Shannon Jackie

22  Williams.

23          THE CLERK:  And spell your last name for the

24  record, please.

25          THE WITNESS:  W-I-L-L-I-A-M-S.

1          THE CLERK:  Thank you, sir.

2                **DIRECT EXAMINATION**

3    **BY MR. WHISONANT:**

4    Q.   Mr. Williams, do you have any nicknames?

5    A.   Yes, sir.

6    Q.   What are they?

7    A.   They call me Lump Head.

8          THE COURT:  They call you what?

9          THE WITNESS:  Lump Head.

10         THE COURT:  Okay.

11   Q.   Where do you reside?

12   A.   Sylacauga, Alabama.

13   Q.   Are you currently in prison?

14   A.   Yes, sir.

15   Q.   Are you in federal prison?

16   A.   Yes, sir.

17   Q.   And where are you incarcerated?

18   A.   In Forrest City, Arkansas.

19   Q.   And what are you serving time for?

20   A.   Felon in possession of a firearm.

21   Q.   And do you recall when you were convicted?

22   A.   2011.

23   Q.   And what was your sentence?

24   A.   58 months.

25   Q.   Do you know when your earliest release date is?

1   A.   December 2015.

2   Q.   Back in 2002, were you convicted of any felony crime

3   back then?

4   A.   Yes, sir.  Trafficking in cannabis and possession of

5   marijuana first.

6   Q.   And where did that occur?

7   A.   In Talladega County.

8   Q.   What kind of sentence did you get?

9   A.   Ten years suspended, five years probation.

10  Q.   And then in 2010, were you convicted of a felony?

11  A.   Yes, sir.

12  Q.   What was that?

13  A.   Unlawful manufacturing of methamphetamine and

14  possession of controlled substance.

15  Q.   And where did that conviction occur?

16  A.   Talladega County.

17  Q.   And what was your sentence then?

18  A.   15 years in state prison.

19  Q.   And what's your earliest release date on that

20  sentence?

21  A.   I think it's November 2015.

22  Q.   Have you been convicted of any other felonies that I

23  haven't asked you about?

24  A.   No, sir.

25  Q.   Are you serving your federal and state sentences at

1   the same time or do you have to serve one after the

2   other?

3   A.   They were run concurrent.

4   Q.   So that means that they're being served at the same

5   time?

6   A.   Yes, sir.

7   Q.   Now, do you have an agreement under which you're

8   here testifying today?

9   A.   I have hopes of some sort of sentence reduction.

10  Q.   And can you tell me anything else about your

11  agreement?

12  A.   No, sir, just to tell the truth, speak the truth.

13  Q.   And is there any guarantee that you'll get a

14  sentence reduction?

15  A.   There's no guarantees, no, sir.

16  Q.   And what will happen if you don't tell the truth?

17  A.   I'm not sure, probably nothing good.  If I tell the

18  truth or don't tell the truth, I don't know.  I don't

19  plan on not lying -- I mean, lying, so I don't know.

20  Q.   Well, will you tell the truth and the whole truth

21  here today?

22  A.   Yes, sir.  I will tell the truth.

23  Q.   Do you know the defendant?

24  A.   Yes, sir, I do know Mr. Clifton Dodd.

25  Q.   Do you see him in the courtroom here today?

1   A.   Yes, sir.

2   Q.   Would you point him out?

3   A.   (Indicating).

4         MR. WHISONANT:  May the record reflect the

5   witness has identified the defendant in this case,

6   Clifton Dodd?

7         THE COURT:  It will.

8   Q.   How do you know him?

9   A.   I met Clifton in 2011 in the Calhoun County jail.

10  Q.   Were you in jail at that time?

11  A.   Yes, sir.

12  Q.   And was Mr. Dodd in jail at that time?

13  A.   Yes, he was.

14  Q.   Were you cellmates?

15  A.   No, sir.

16  Q.   Is the Calhoun County jail set up in pods?

17  A.   Yes, it is.

18  Q.   Was Mr. Dodd in the same pod with you?

19  A.   Yes, sir.  Our cells were right next to each other.

20  Q.   Could you describe how those pods are set up for the

21  jury?

22  A.   There's a top tier and a bottom tier, and there's

23  one set of stair cases on the left, and we slept on the

24  top.

25  Q.   Is there an open area in the middle of the pod?

1    A.    Yes, sir.   There's a day room.

2    Q.    A day room, does that mean during the day inmates

3    are allowed to come out of their cells and congregate in

4    the pod?

5    A.    Yes, sir.

6    Q.    How big an area are we talking about?  Is it as big

7    as this courtroom?

8    A.    No, sir.  It's very small.  The section we were in

9    was the lavender section, and it's the smallest dorm in

10   the jail.  The day room may have been the size of this

11   area here (indicating).

12   Q.    What kind of interactions did you have with Dodd?

13   A.    We talked some.  I didn't come out of my cell much.

14   I did a lot of exercise and pushups, pullups, stuff like

15   that.  And I watched very little TV.  I just stayed to

16   myself.  He would come to my cell some and I go to his

17   and talk.

18   Q.    Did you have a roommate at that time?

19   A.    Briefly, when I first got there, I had a roommate

20   about a week or maybe two weeks, and then he left and

21   went to prison, so I was in the cell by myself.

22   Q.    Did Mr. Dodd have a roommate?

23   A.    Yes, sir.

24   Q.    What was his roommate's name if you remember?

25   A.    James Smith.

1    Q.    Did you have occasion to talk with Mr. Dodd?

2    A.    Just about everyday.

3    Q.    Would this happen in your cell?

4    A.    Some in my cell, some in his, some just standing

5    hanging out on the tier.

6    Q.    At some point, did Mr. Dodd talk to you about

7    mailing some letters?

8    A.    Yes, sir, he did.

9    Q.    What did he say?

10   A.    He asked me if I knew of anyone or if I knew anyone

11   that I could get to mail some letters out for him.  And

12   I tell him -- I told him not off the top.  I said, if I

13   knew someone, it would probably have to be my brother

14   because he's the only one that I interacted with.

15   Q.    Your brother, was he in custody?

16   A.    No, sir.

17   Q.    He's on the outside?

18   A.    Yes, sir.

19   Q.    Well, did you agree to mail some letters for

20   Mr. Dodd?

21   A.    I agreed to find someone to mail the letters for

22   him.  I told him that I had no way to use the phone

23   because I didn't have any money on my commissary.  And

24   so he agreed to let me use his phone on his phone time.

25   Q.    Did you call someone?

1   A.   Yes, sir.

2   Q.   Who did you call?

3   A.   I called my brother, Shawn Williams.

4   Q.   Now, are you aware that all of the phone calls that

5   are made by inmates at the Calhoun County jail are

6   recorded?

7   A.   No, sir, I wasn't.

8   Q.   Have you learned that since the time you were in

9   jail?

10  A.   Yes, sir.

11  Q.   The phone call -- did you place a phone call to your

12  brother?

13  A.   Yes, sir, I did.

14  Q.   Have you had an opportunity to listen to that

15  recording?

16  A.   Yes, sir.

17  Q.   And did one of the agents play that recording for

18  you?

19  A.   Yes, he did.

20  Q.   It had an entire recording where you talked to your

21  brother, and then there's a shorter version of it where

22  it's only a couple of minutes long.

23       Did you listen to both the entire version and

24  the shortened version?

25  A.   I listened to both.

1  Q.   Did you recognize your voice on the phone call?

2  A.   Yes, sir.

3  Q.   Did you recognize your brother's voice on the phone

4  call?

5  A.   Yes, I did.

6  Q.   Do those recordings accurately reflect what was said

7  during the course of that phone call?

8  A.   They did.

9  Q.   After you listened to that phone call, did you --

10  did the agent show you a CD or a DVD?

11  A.   Yes, he did.

12  Q.   That had the recording on it?

13  A.   Yes, sir.

14  Q.   Did you place your initials on that?

15  A.   Yes, I did.

16       MR. WHISONANT:  Your Honor, I would like to

17  show the witness Government's Exhibit 16.

18       THE COURT:  You may.

19  Q.   Would you open that up and look at that?  I think

20  that's a CD.

21  A.   That's it.

22  Q.   How do you know that?

23  A.   I remember looking at it, and I initialed -- put my

24  initials and the date on it.

25  Q.   Are those your initials on that CD?

1   A.   Yes, sir.

2   Q.   Next let me show you -- let me ask you, were you

3   shown a transcript of what was said during that

4   telephone call?

5   A.   Yes, sir.

6   Q.   And were you allowed to compare that transcript to

7   the CD?

8   A.   Yes, sir, I was.

9   Q.   And did you make some corrections to the transcript?

10  A.   Yes, sir.

11  Q.   And ultimately was another transcript shown to you

12  that was corrected?

13  A.   Yes, sir.

14  Q.   And let me show you what's been marked Government's

15  Exhibit Number 18 for identification.   Would you look at

16  that, please, sir, and what is that?

17  A.   This is the phone conversation.

18  Q.   Is that the transcript of the phone conversation you

19  had with your brother?

20  A.   Yes, sir.

21  Q.   Does that transcript accurately reflect what was

22  said during the conversation?

23  A.   Yes, it is.

24  Q.   And did you place your initials on that?

25  A.   Yes, sir.

1  Q.   Are those -- is that your signature on those --

2  A.   This is my signature at the bottom and my date.  I

3  put the date on there.

4          MR. WHISONANT:  Your Honor, we would move for

5  admission of Government's Exhibit 16 and 18 into

6  evidence.

7          MR. STEEN:  No objection.

8          THE COURT:  Received.

9          MR. WHISONANT:  Your Honor, we would ask to be

10  allowed to play Government's Exhibit 16 for the jury and

11  to provide them with an aid of the copy of the

12  transcript, which is Government's Exhibit 18.

13          THE COURT:  You've offered --

14          MR. WHISONANT:  16 and 18.

15          THE COURT:  Okay.  And there's no objection.

16  All right.  Received, and you may.

17          MR. WHISONANT:  May I pass out copies of the

18  transcript?

19          THE COURT:  Yes.

20          (Brief pause)

21          MR. WHISONANT:  We have some witnesses that

22  have been excused and would like to sit in the

23  courtroom.

24          THE COURT:  That's fine.

25          MR. WHISONANT:  With the court's permission, we

1    will play the recording now.

2              THE COURT:  All right.  If you have an extra

3    copy, I have one, but I left it in my notebook.  Thank

4    you.

5              Ladies and gentlemen, this exhibit,

6    Government's Exhibit 18, which is the transcript of the

7    tape, is admitted to assist you in following along, but

8    whether it is actually correct is for you to decide

9    because the tape is the evidence of what was really

10   said.  So if this is not correct, then you should

11   disregard this to the extent that you do not hear what

12   is written here.

13             Do you understand what I'm saying to you?

14             (Jury affirms.)

15             (Government's Exhibit 16 played in open court.)

16   Q.  At the beginning of that phone call, there was a

17   third person's voice that was heard on the phone.  Do

18   you recognize that?

19   A.  Yes, sir.

20   Q.  Who is that?

21   A.  That's Clifton Dodd

22   Q.  The defendant in this case?

23   A.  Yes, sir.

24   Q.  Now, explain to us why he would be on that phone

25   call?

1    A.   It was his PIN number.   It was his money.   And in

2    order for me to use the phone, he would have to put his

3    PIN number in and say his name.

4    Q.   So how did that work?

5    A.   We went to the phone.   He asked me to call my

6    brother, went to the phone.   He put his PIN number in,

7    said his name, and that's when the recording started.

8    And my brother pushed two to accept the phone call, and

9    then he gave me the phone to talk to my brother.

10   Q.   Where is the phone located in the pod?

11   A.   In the day space on the walls close to the tables.

12   Q.   And during the phone conversation, where was Dodd?

13   A.   For a few minutes, he was standing kind of behind

14   me, and then he went up the stairs.

15   Q.   So I show, on the transcript, it says there's a

16   break.   Now, that indicates that -- was there some

17   additional conversation between the first part of the

18   phone call and the next part down there?

19   A.   I think so.

20   Q.   And during that conversation, do you recall saying

21   anything about the letters or about Mr. Dodd during that

22   portion of the phone call?

23   A.   I don't recall.

24   Q.   And then Mr. Dodd walked back upstairs to where his

25   cell was and your cell was?

1    A.    Yes, sir.

2    Q.    Now --

3          THE COURT:  Let me stop you.  You don't recall

4    or you didn't say anything about him at the part of the

5    break?

6          THE WITNESS:  I don't remember exactly.  In

7    this break, it could have been anything that was talked

8    about with my brother, probably some family issues, like

9    what was he doing, how has he been doing.  So I don't

10   remember exactly what it was, but --

11         THE COURT:  Okay.

12   Q.    (By Mr. Whisonant)  Now, in the phone call, you're

13   asking your brother to not -- to take the package but to

14   --

15         THE COURT:  Don't lead, don't lead.

16         MR. WHISONANT:  I'm sorry.

17   Q.    During the phone call, what did you tell your

18   brother to do?

19   A.    I told my brother to hold on to the letters and to

20   call my lawyer.  I think it was my lawyer.  What I was

21   referring to was to call my lawyer and have him to get

22   in touch with the attorney that was on my case.

23   Q.    And why did you do that?

24   A.    I did that because my lawyer had advised me to do

25   something to help myself.

1  Q.   Was it your intention that your brother should take

2  these -- this package and remail these letters?

3  A.   No, sir.

4  Q.   Now, did you actually -- after the phone call, what,

5  if anything, did Mr. Dodd do to make any letters?

6  A.   Sometime after, he wrote the letters, he worked on

7  the letters.

8  Q.   Where did he work on them?

9  A.   In his cell.

10 Q.   Did you see him working on the letters?

11 A.   Yes, sir, I did.

12 Q.   Did you see him writing the letters?

13 A.   Yes, sir.

14 Q.   Did you have the opportunity to read any of the

15 letters?

16 A.   Yeah.  He asked me to read them, and he asked me

17 what I thought.

18 Q.   What else did he say?

19 A.   Excuse me.  I asked him was he sure he wanted to do

20 this because the letters were -- to me, they were kind

21 of crazy, you know.  You know, he was talking about I

22 know where you live, I've been following you, I was

23 hired to kill you.

24      And to me, that was kind of crazy to do that.

25 So I asked him was he sure he wanted to do that, you

1    know.  And he said, yeah, it was going to work.  This

2    was going to work.  It's been working.

3            So after that, I just went -- I remember I was

4    working out at the time.  I was walking back and forth

5    on the tier, and I just went back and did some pushups,

6    and he went back in the cell and finished what he was

7    doing.

8    Q.   Did you -- were you familiar with Mr. Dodd's

9    handwriting?

10   A.   Somewhat, yes, sir.

11   Q.   How were you familiar with his handwriting?

12   A.   He kept -- he wrote down everything.  He wrote down

13   the lunch menu.  He kept up with all kinds of numbers

14   and football games and scores.  And anything that people

15   did or if they left the dorm or if they came back or if

16   they went to a visitation, he wrote it down.  He kept

17   like legends of it.

18           And he had the menu on the wall that he wrote,

19   he changed the menu.  He put the menu on the wall, so I

20   knew his handwriting.

21   Q.   Was his handwriting on the letters different from

22   his regular handwriting?

23   A.   Yes, sir.

24   Q.   How so?

25   A.   It just didn't look like his handwriting.   The

1   letters didn't look the same.  He just wrote them

2   differently from what he usually writes.

3   Q.   What, if anything, did Mr. Dodd tell you about why

4   he wrote those letters?

5   A.   He said that he had been in contact with the Feds,

6   and that he had been telling them that he was a hired

7   hit man, and he had them believing that it was true.

8          He said that he needed these letters to go out

9   at a certain time, and he needed them mailed out, and

10   that it was going to help his case somehow.  I don't

11   know why or how, but he just kept saying he was going to

12   beat the Feds, and that they were stupid and dumb, you

13   know.  And, basically, that's it.

14   Q.   What, if anything, did he say to you about what he

15   hoped to get out of this?

16   A.   He told me he wasn't going to do any time.  He said

17   they were offering him little time, but he wasn't going

18   to take that.  He was going home.  This was going to

19   help him go home.

20   Q.   At some point, were you given the letters -- let me

21   withdraw that.

22          At some point, were the letters mailed out?

23   A.   Yes, sir.

24   Q.   How did that happen?

25   A.   The same night he wrote the letters, it was right

1   before count.  Head count was at 9:30.  When he finished

2   preparing the letters, he brought me a manila envelope,

3   and he wanted me to sign my brother's name on it, put my

4   brother's address on the big envelope.  And he put his

5   cellmate's name on the bottom part, James Smith.

6           And after that, he put the letters in there.

7   And when the guard came in to do head count to lock us

8   down, he handed the envelope to the guard.

9   Q.   Did you see the envelopes that were inside the

10  manila package?

11  A.   I saw him put the envelopes inside the package, yes,

12  sir.

13  Q.   Did they already have stamps on them?

14  A.   I didn't see if he had -- I just saw -- I didn't see

15  the stamps or what was on them.  I just seen the

16  letters.

17  Q.   Have you seen any of those letters or that manila

18  envelope since that time?

19  A.   I saw the actual letter, not the envelope.  I saw

20  the letters that he wrote.

21  Q.   Okay.  When did you see those?

22  A.   I think it was in 2011 or -- I can't remember

23  exactly when it was.  I know it was shown to me, and I

24  remember what was said, what he wrote in the letters.  I

25  remember reading the letters, and I remember it was

1    exactly what he showed me the night he wrote the
2    letters.  It said the same thing.
3    Q.   What was the occasion for you seeing those letters
4    back then?
5    A.   It was shown to me to see if it was the same thing
6    that he --
7    Q.   Who showed them to you?
8    A.   I think it was a postal inspector and a federal
9    agent.
10   Q.   Let me show you what's been marked Government's
11   Exhibit Number 2 for identification.  Would you look at
12   that, and do you recognize it?
13   A.   Yes, sir.
14   Q.   What is it?
15   A.   This is the manila envelope in which he put the
16   other envelopes into.
17   Q.   And how does the mail go out at the jail?
18   A.   The only way the mail goes out is you have to hand
19   it to -- hand it to a correctional officer and take the
20   mail to the front or -- I just know that you hand your
21   letter or whatever you're sending out to an officer.
22   And they, in turn, mail the letters out.
23   Q.   Did you see Mr. Dodd hand that envelope to an
24   officer?
25   A.   Yes, I did.

1    MR. WHISONANT:  Your Honor, we move to admit
2  Government's Exhibit 2.
3    MR. STEEN:  No objection.
4    THE COURT:  Received.
5  Q.  Let me show you what's been marked Government's
6  Exhibit Number 3 for identification.  Before I ask you
7  about Number 3, let me go back to Number 2 for just a
8  second.
9    What's written on the outside of that envelope,
10  Number 2, the manila envelope?
11  A.  This one?
12  Q.  Yes, sir.
13  A.  It's my brother's name, Shawn Williams, 1004 North
14  Helen Avenue, Sylacauga, Alabama, 35150.  And James
15  Smith, 201114251.
16  Q.  Who is James Smith?
17  A.  James Smith was Clifton's cellmate.
18  Q.  Did you write the address on the outside of that
19  manila envelope?
20  A.  I wrote Shawn Williams my brother's address.  I
21  wrote that.
22  Q.  Who wrote the rest of the things on the outside of
23  the envelope?
24  A.  I didn't see if Clifton wrote James Smith's name on
25  here, but he told me he did.  So I don't --

1    Q.    Who told you he did?

2    A.    Clifton.

3    Q.    He said he wrote -- Mr. Dodd said he wrote whose

4    name on there?

5    A.    He told me he wrote his cellmate's name on there.

6    Q.    I notice there's something else written in large

7    letters on the envelope.  What is that?

8    A.    Legal mail.

9    Q.    What does that indicate?

10   A.    Legal mail indicates that it's some kind of legal

11   documents inside the envelope.

12   Q.    And is there any significance to that as far as the

13   jail is concerned?

14   A.    I'm not sure, but sometimes when you receive legal

15   mail, they don't open your mail in the front and inspect

16   it.  They bring it back to you and open it in front of

17   you or you have to open it in front of the officer, take

18   it out, and then they inspect it.  That's the only thing

19   I can think of.

20   Q.    And if it's marked legal mail, they don't do that?

21   A.    They don't open it up.  When they receive it, they

22   don't open it.  They bring it back to you.  You sign for

23   it, and you open it in front of the officer.

24   Q.    And when you mail it out, do they open it?

25   A.    No, sir.

1   Q.   Let me ask you about Government's Exhibit Number 3

2   there.   What is that, if you know?

3   A.   This?

4   Q.   Yes, sir.

5   A.   It's one of the letters that Mr. Dodd wrote.

6   Q.   How do you know that?

7   A.   By looking at it.  It's the same handwriting.  I

8   remember this same handwriting, and it's the same from

9   -- I read this letter.  It's one of the letters he let

10  me read the night he wrote them.

11         It's saying basically the same thing I

12  remember.  I was hired to kill you back in December.

13  When I take a job, I do it.  I've been watching you, so

14  on and so on.

15  Q.   And who was that letter addressed to?

16  A.   Greg Stephens, Mr. Scott Coogler.

17  Q.   Okay.  Who was it addressed to and who is the return

18  addressee?

19  A.   This is the return address right here.

20  Q.   Who is it addressed to?  Who is the letter addressed

21  to?

22  A.   It's addressed to Mr. Scott Cooger at the Hugo Black

23  Building, 1729 Fifth Avenue North, Birmingham, Alabama,

24  35203.

25  Q.   And what's the return address on it?

1    A.   The return address is to Greg Stevens or Stephens at

2    752 19th Street, number -- it doesn't say what number.

3    It says number, and then it says Birmingham, Alabama,

4    35203.

5    Q.   Do you know that person?

6    A.   No, sir.

7         MR. WHISONANT:   We move to admit Government's

8    Exhibit 3 into evidence.

9         THE COURT:   All right.   Received.

10   Q.   Would you read Government's Exhibit 3?   Would you

11   read the letter, please?

12   A.   "Mr. Scott Cooger, we need to talk.   I was hired to

13   kill you back in December.   When I take a job, I do it.

14   I have been watching you, and I know where you live and

15   where you go.   If you want to die, okay.   If not, I want

16   $5,000 in a blue bag put in the trash can at the park.

17   I want all the money in twenties put in Sunday's paper.

18   The ad must say pool cleaner, two days a week.   I will

19   call and tell you where to bring the money.   I will call

20   and tell you.   I am Mr. Fish.   If I see anything that

21   looks funny, I will kill you."

22   Q.   Mr. Williams, who wrote that letter?

23   A.   Mr. Clifton Dodd wrote that letter.

24        MR. WHISONANT:   Your Honor, may I publish

25   Exhibit 2 to the jury?

1       THE COURT:  You may.

2  Q.  Mr. Williams, let me show you what's been marked as

3  Exhibit 4 for identification.  Do you recognize that,

4  sir?

5  A.  Yes, sir.

6  Q.  What is that?

7  A.  It's another letter that was written to Jefferson

8  County jail to Tommy Nail.

9  Q.  I'm sorry, say it again.

10  A.  To Tommy Nail at Jefferson County, 809 2159, Number,

11  Birmingham, Alabama 35203.

12  Q.  The return address is who?

13  A.  To Greg Stephens at 759 -- 752 19th Street, Number,

14  Birmingham, Alabama, 35203.

15  Q.  Have you seen that letter before?

16  A.  Yes, sir.

17  Q.  Do you know who wrote that letter?

18  A.  Yes, I do.

19  Q.  Who did?

20  A.  Mr. Clifton Dodd.

21       MR. WHISONANT:  Your Honor, we would move to

22  admit Government's Exhibit 4 into evidence.

23       THE COURT:  Received.

24  Q.  Mr. Williams, would you read that letter?

25  A.  "Mr. Tommy Nail, we need to talk.  I was hired to

1  kill you back in December.  When I take a job, I do it.

2  I have been watching you, and I know where you live and

3  where you go.  If you want to die, okay.  If not, I want

4  $5,000 in a blue bag put in the trash can at the park.

5  I want all the money in twenties.  Put an ad in

6  Sundays's paper.  The ad must say pool cleaner, two days

7  a week.  I will call and tell you where to bring the

8  money.  I will call and tell you.  I am Mr. Fish.  If I

9  see anything that looks funny, I will kill you."

10 Q.   Who wrote that letter?

11 A.   Mr. Dodd wrote that letter.

12         MR. WHISONANT:  Your Honor, may I publish

13 Government's Exhibit 4 to the jury?

14         THE COURT:  You may.

15 Q.   Mr. Williams, let me show you what's been marked

16 Government's Exhibit 5 for identification.  Do you

17 recognize that, sir?

18 A.   I don't remember seeing this letter.

19 Q.   Who is that letter addressed to?

20 A.   It's addressed to James O'Kelley at the Hugo Black

21 Building, 1729 fifth Avenue North, Birmingham, Alabama,

22 35203.

23 Q.   Who is the return addressee?

24 A.   It's to Greg Stephens at 752 19th Street, 19th

25 Number, Birmingham, Alabama, 35203.

1  Q.   You do not recall seeing that letter?

2  A.   No, sir.

3  Q.   Let me show you what's been marked as Government's

4  Exhibit 6 for identification.  Do you recognize that?

5  A.   I recognize seeing this letter but not -- I glanced

6  at this letter.  It was laying on his bed.

7  Q.   Who is that letter addressed to?

8  A.   It's addressed to Sheila Weil.

9  Q.   Where?

10 A.   At Jefferson County at 809 21st Street Number,

11 Birmingham, Alabama, 35203.

12 Q.   And what's the return address?

13 A.   Greg Stephens at 752 19th Number, Birmingham,

14 Alabama, 35203.

15 Q.   And did you see that letter in Mr. Dodd's cell?

16 A.   Yes, sir.

17 Q.   Did you see him write that letter or just see it in

18 his cell?

19 A.   I saw this letter laying on his bed with the rest of

20 his letters that he wrote.

21      MR. WHISONANT:  Your Honor, we would move to

22 admit Government's Exhibit 6 into evidence.

23      THE COURT:  Received.

24 Q.   Would you read that letter, please, sir?

25 A.   "Ms. Sheila Weil, we need to talk.  I was hired to

1   kill you back in December.  So when I take care of Tommy

2   Nail, me and you will talk.  I am watching you, and I

3   know where you live.  I will write you back later.

4   Mr. Fish."

5           MR. WHISONANT:  Your Honor, we request to

6   publish Government's Exhibit 6 to the jury.

7           THE COURT:  You may.

8   Q.   Mr. Williams, let me show you what's been marked as

9   Government's Exhibit 7 for identification.  Do you

10  recognize that, sir?

11  A.   I don't remember it.  I don't remember seeing this

12  letter.

13  Q.   Who was it addressed to?

14  A.   It's addressed to Michael Bole at Jefferson County

15  jail, 809 21st Number, Birmingham, Alabama, 35203.  And

16  the return address is to Greg Stephens at 752 19th

17  Number, Birmingham, Alabama, 35203.

18  Q.   Let me show you what's been marked as Government's

19  Exhibit 8 for identification.  Do you recognize that,

20  sir?

21  A.   Is it okay if I open this where I can look at it?

22  This is blocking some of it.

23  Q.   Yes, sir.

24  A.   I remember -- I remember glancing at this one.

25  Q.   Where was it when you saw it?

1    A.   He handed me two or three of them to read, and this
2    was like one of the last ones.
3    Q.   He who handed it to you?
4    A.   Mr. Dodd.
5    Q.   Where were you when he handed it to you to read?
6    A.   Standing right inside his cell.
7    Q.   Did you read that letter at that time?
8    A.   Yes, sir.
9           MR. WHISONANT:   Your Honor, we move to admit
10   Government's Exhibit Number 8 into evidence.
11          THE COURT:   Received.
12   Q.   While that's out, would you read that, please, sir,
13   the front and back?
14   A.   The front says, "In a sky full of stars, there are
15   always some that shine a little brighter."  The back
16   says, "Michael, sometimes it is us and only us.  I will
17   kill all of the SOBs that fucked you" -- excuse my
18   language -- "and me over.  Your girlfriend is hot, and I
19   am going to" --
20   Q.   Say it?
21   A.   "Fuck the shit out of her.  Friend."
22   Q.   And who showed you that letter?
23   A.   Mr. Dodd.
24          THE COURT:   Let me see that letter.  Just one
25   second.  Let me see y'all about this one.

1               (Sidebar outside the presence of the jury)

2               THE COURT:  I remember reading this one, but it

3    goes to which one?

4               MR. WHISONANT:  Count Six I believe it is.

5    That one that contained --

6               THE COURT:  I mean, I will look at this more

7    closely at the Rule 29, kill all the SOBs.  Is that

8    specific enough?  I don't know, but I will look at that

9    later.  I will admit it in the record.

10              MR. WHISONANT:  Okay.  Thank you.

11              (Open court.  Jury present.)

12              THE COURT:  All right.  Government's 8 is

13   received.

14              MR. WHISONANT:  May we publish to the jury?

15              THE COURT:  Yes.

16   Q.   Mr. Williams, how many letters were placed inside

17   that manila envelope?

18   A.   I'm not sure how many there was.  There was a lot of

19   letters on his bed.  I'm thinking I saw him put five or

20   six letters.

21   Q.   And did any of those letters contain any white

22   powder?

23   A.   No, sir, they didn't.

24   Q.   During the conversations with Mr. Dodd, did he ever

25   mention to you a man by the name of Jim Preuitt?

1    A.   Yes, sir.

2    Q.   What, if anything, did he say about that?

3    A.   He said that he told the FBI that he knew something

4    about Mr. Preuitt's son is missing.  He was missing, and

5    he knew something about it.  He said that he told the

6    Feds that he knew something about Mr. Preuitt's son

7    coming up missing; but, actually, he didn't.  He just

8    said that.

9    Q.   So he admitted to you that he did not know anything

10   about the missing son?

11   A.   Right.

12   Q.   Do you know Michael Bole?

13   A.   No, sir.

14   Q.   Did Mr. Dodd ever mention that name to you?

15   A.   I don't remember him mentioning Bolden.  I think he

16   was talking about a guy named Mike.  I don't know if

17   that's the same guy, but he was just talking about a guy

18   named Mike he met at Jefferson County jail.

19   Q.   How long were you at Calhoun County jail back in

20   '11?

21   A.   I'm going to say from May, like six, maybe seven

22   months.

23   Q.   That would be starting in May 2011 you were there

24   about six or seven months?

25   A.   Yes, sir.

1          MR. WHISONANT:  Okay.  Thank you.

2          THE COURT:  All right.  We're going to take our

3    morning break until a quarter of 11:00.  Remember my

4    instructions about not discussing the case.  Thank you

5    very much.

6          (Jury excused.)

7          (Open court, outside the presence of the jury)

8          THE COURT:  I want to talk about your

9    witnesses.  You all can take the witness here.

10         (Witness excused.)

11         THE COURT:  Let's go to sidebar.

12         (Sidebar outside the presence of the jury)

13         THE COURT:  All right.  So we're here because I

14   wanted to talk to the defendant's counsel about

15   potential witnesses and whether or not I need to appoint

16   counsel for them, and he had asked one of our CJA

17   lawyers to go and talk to the witnesses.  And what did

18   you find out?

19         MS. WALLACE:  Mr. Spencer is the only one

20   here.  So far, he will not be testifying.

21         THE COURT:  Okay.  The other one was Mr. Smith?

22         MR. STEEN:  Mr. Smith should be here at 11:00.

23         THE COURT:  And you're going to check on him?

24         MS. WALLACE:  I am talk to him, and we will

25   find out.

```
 1              THE COURT:  Great.  Thank you.
 2              MS. WALLACE:  He was here as of ten minutes
 3   ago.
 4              (Open court.  Jury present.)
 5              THE COURT:  Thank you.  Be seated.  All right.
 6                      CROSS-EXAMINATION
 7   BY MR. STEEN:
 8   Q.   Mr. Williams, just a few questions for you, okay?
 9   A.   Yes, sir.
10   Q.   Do you remember being interviewed by Postal
11   Inspector Mathews in this case?
12   A.   Yes, sir.
13   Q.   Did he show you some documents to look at?
14   A.   I think so, yes, sir.
15   Q.   And one of those documents was a document that
16   Mr. Dodd had written to the courthouse here at federal
17   court; is that correct?
18   A.   Yes, sir.
19   Q.   If I show you that document, will you be able to
20   look at it and see if this is one that you saw?  Would
21   you?
22   A.   Yes, sir.
23   Q.   Okay.
24   A.   I don't think this is it.
25   Q.   That's not one that you saw?
```

208

```
 1   A.   No, sir.
 2   Q.   So if the agent says that --
 3        THE COURT:  I don't permit that type of
 4   question.  I mean, did you mark it as a defendant's
 5   exhibit?
 6        MR. STEEN:  No, Your Honor.  It's a
 7   government's exhibit.
 8        THE COURT:  That's the government's exhibit.
 9   What was the number again?
10        MR. STEEN:  Number 12.  It's part of Number 12.
11        THE COURT:  Okay.
12   Q.   (By Mr. Steen)  So you don't recall seeing that
13   letter?
14   A.   No, sir.
15   Q.   Did he show you any document that reflected
16   Mr. Dodd's true handwriting?
17   A.   I do remember looking at something, but I can't
18   remember exactly what it was.  I remember reading a
19   letter that he wrote, but I can't remember if that was
20   it or which one it was.
21   Q.   And did you recognize that as being Mr. Dodd's
22   handwriting?
23   A.   That didn't look like his handwriting.
24   Q.   What about the document that you just looked at?
25   A.   That's the one I'm speaking of.
```

1   Q.   That's the one you're talking about?

2   A.   Yes.

3   Q.   That doesn't look like his handwriting?

4   A.   No, sir.

5   Q.   Let's go back --

6   A.   The envelope kind of looked like it, but the letter

7   itself looking at it didn't.

8   Q.   Now, the telephone call that you made to your

9   brother, Mr. Dodd began the telephone conversation and

10   then you took over and talked to your brother?

11   A.   Uh-huh.

12   Q.   Did I hear your testimony correct that he left and

13   went back upstairs to his cell?

14   A.   Yeah.  He stood there for a few minutes, a brief

15   moment, and then he left.

16   Q.   So he didn't hear all of your conversation with your

17   brother then, did he?

18   A.   No, sir.  I don't think he heard any of it.

19   Q.   He didn't hear any of the conversation with your

20   brother.  Okay.

21        Have you ever used his PIN number before to

22   make a telephone call?

23   A.   No, not that I can remember.  I don't think so.

24   Q.   Is that common in the jail setting to swap up,

25   people that don't have it, they will let somebody that

1  does have it?

2  A.   The PIN number?

3  Q.   Let me rephrase that.  Is it common in that setting

4  in Calhoun County that, if you didn't have money to make

5  a phone call, that you may trade something in order to

6  get some other inmate to let you use his pin number to

7  make a telephone call?

8  A.   It's not -- I mean, if you were like -- if you had

9  some -- I used to let somebody borrow my phone.  Like

10  after a while I got money, and I remembered when I

11  didn't have money, so I would let someone use a phone

12  call off my account.  So it just depends on what kind of

13  person you are.

14  Q.   So it would be feasible for another inmate to do

15  that?

16  A.   Yes, sir.

17  Q.   When were you at Calhoun County jail?

18  A.   2011.

19  Q.   Do you know what month in 2011?

20  A.   Close to the end of May.

21  Q.   So toward the end of May.  And when were you

22  transferred out of there?

23  A.   I think September, the end of September, yeah,

24  either September or October.

25  Q.   And you said you had several visits with Mr. Dodd in

1  his cell, and he had several visits with you in your

2  cell; is that correct?

3  A.   That's correct.

4  Q.   Conversations about your cases that you had at the

5  present time?

6  A.   We discussed -- yeah, I kind of got an idea from him

7  about how much time I was looking at.   We just talked

8  about all kind of stuff.

9  Q.   And you talked about how much time you were looking

10  at for being a felon in possession of a firearm; is that

11  correct?

12  A.   Yes.

13          MR. STEEN:   Your Honor, just a second, please.

14          (Brief pause)

15  Q.   Just one other question.   You were the one that

16  addressed the larger envelope that went out of the jail;

17  is that correct?

18  A.   That is correct.

19          MR. STEEN:   Okay.   No further questions, Your

20  Honor.

21          MR. WHISONANT:   Nothing further of this

22  witness, Your Honor.

23          THE COURT:   Mr. Williams, you can step down.

24  Thank you.

25          MR. WHISONANT:   The United States would call

1  Shannon Williams to the stand -- I'm sorry -- Shawn

2  Williams to the stand.

3          THE COURT:  All right.

4          **SHAWN WILLIAMS, GOVERNMENT'S WITNESS, SWORN.**

5          THE CLERK:  Would you state your name, please?

6          THE WITNESS:  My name is Shawn Jason Williams.

7          THE CLERK:  Would you spell your first name for

8  the record, please?

9          THE WITNESS:  S-H-A-W-N.

10          THE CLERK:  In what city and state do you

11  reside?

12          THE WITNESS:  Sylacauga, Alabama.

13          THE CLERK:  Thank you.

14                    **DIRECT EXAMINATION**

15  **BY MR. WHISONANT:**

16  Q.   Mr. Williams, are you the brother of Shannon

17  Williams?

18  A.   Yes, I am.

19  Q.   Is he your older or younger brother?

20  A.   Younger.

21  Q.   How old are you, sir?

22  A.   35 today.

23  Q.   Today is your birthday?

24  A.   Yes, sir.

25  Q.   Congratulations.

1    A.    Thank you.

2    Q.    And how old is your brother?

3    A.    He is 31 -- excuse me, 33.  He's two years younger

4    than me.

5    Q.    Where are you employed, sir?

6    A.    Sylacauga Wal-Mart Super Center.

7    Q.    Do you also serve in the military?

8    A.    Yes, I do.

9    Q.    What branch?

10   A.    Army National Guard.

11   Q.    And what unit?

12   A.    167 FSC in Oxford, Alabama.

13   Q.    And have you had occasion to be deployed overseas in

14   the past?

15   A.    Yes, I have.

16   Q.    Where to?

17   A.    Afghanistan.  I just got back in May.

18   Q.    And do you have any other siblings besides Shannon?

19   A.    I have two sisters, Cherie and Shavon.

20   Q.    Are they older or younger?

21   A.    Younger.  I'm the oldest.

22   Q.    Back in the May-June time frame of 2011, do you know

23   where your brother was?

24   A.    He was in Calhoun County Detention Center, I

25   believe.

1   Q.   And did you have occasion to talk with him while he

2   was in the detention center?

3   A.   Yes, I did.

4   Q.   And did you do this in person or by phone?

5   A.   Phone.

6   Q.   Do you recall -- excuse me.  Do you recall having a

7   conversation with him regarding some mail?

8   A.   Yes.

9   Q.   And just would you tell the jury the gist of that

10  conversation.

11  A.   Well, my brother called me one day, and he asked me

12  for my address.  I was like okay.  And then he said,

13  "I'm going to mail you something, and I don't want you

14  to open it, and I don't want you to do anything with

15  it.  I just want you to put it up and somebody is going

16  to come pick it up."  So I was like okay.  It sounded

17  kind of fishy to me.

18  Q.   Sometime after that, did you receive a visit from

19  the postal inspectors?

20  A.   Yes, I did.  It was a couple of days later.

21  Mr. Mathews, I believe, showed up --

22  Q.   Is that Mr. Mathews who's seated here at the table?

23  A.   Yes.

24  Q.   All right, sir.

25  A.   He showed up, and he told me what was going on.

1   Q.   Did he ask you if you had received that package?

2   A.   Yes, he did.  I said I haven't received it yet, and

3   he asked me for permission to go to the post office to

4   pick it up if it was there, and I gave him permission.

5   Q.   Did you give him permission to open that mail?

6   A.   Yes.

7   Q.   Did you give him permission to keep that mail in his

8   custody?

9   A.   Yes.

10        MR. WHISONANT:  Thank you.  That's all we have,

11  Your Honor.

12        THE COURT:  All right.  Cross-examination.

13                    **CROSS-EXAMINATION**

14  **BY MR. STEEN:**

15  Q.   Mr. Williams, when you got the phone call from your

16  brother about receiving that and to call his attorney or

17  the DA or someone about that, when you got the phone

18  call, did you call his attorney after that?

19  A.   No.

20  Q.   Did you know when you were going to receive that?

21  A.   He said within a couple of days.

22  Q.   And was there anything unusual about the phone call

23  when you first got it?

24  A.   Just the fact that he told me to hold a piece of

25  mail and don't open it up.

1  Q.   And nothing else unusual about the phone call at

2  all?

3  A.   No, not that I recall.

4  Q.   Okay.

5       MR. STEEN:  No further questions, Your Honor.

6       THE COURT:  Mr. Williams, you can step down.

7  Thank you very much.

8       MR. WHISONANT:  We would call Inspector Steven

9  Mathews to the stand.

10      THE COURT:  Before we do, let me see you all

11 briefly.

12      (Sidebar outside the presence of the jury)

13      THE COURT:  Let me just get one more time what

14 you plan to ask him about his focusing on the

15 defendant.  And why is that necessary?  In other words,

16 is there a reason that you have to bring that up?

17      MR. WHISONANT:  I think, because I don't want

18 the jury to think that we are persecuting this one guy

19 by just picking him out of the blue to go after him.

20      THE COURT:  What are you going to say?

21      MR. WHISONANT:  I'm going to ask him --

22      THE COURT:  Well, but let me just say this:

23 Let's just say a regular case, in a regular case, you

24 know, you can't just say because they were a bad guy and

25 we've had this happen before, we go after him.  You

1    can't say that.  Can you not just say I focused on him

2    based on information that came into my possession?  I

3    mean, without saying that, why is it --

4         MR. WHISONANT:  That's not the same thing.  He

5    has seen his handwriting in the past and that's what

6    clued him in on this defendant is his handwriting.  And

7    he saw it, of course, in the investigation, and it ties

8    into him being in jail.  It's just part of the story.

9         THE COURT:  Well, Mike, I'm just trying to save

10   you from yourself if it turns out like it did on the

11   confrontation clause.

12        MR. WHISONANT:  You did.

13        THE COURT:  We would have been reversed, and

14   that would have been it.  So I'm trying to make sure

15   this is admissible.  I'm not trying to hurt your case.

16        MR. WHISONANT:  I know.

17        THE COURT:  I am other just trying to make sure

18   I really think it's admissible.  What do you plan to ask

19   him?

20        MR. WHISONANT:  I plan to ask him -- I need to

21   refer to my notes, but I plan to ask him were you -- let

22   me see.  When you received the letters, was there

23   anything about the letters that caused you to think --

24   to focus on him.  I'm not going to use that word.

25        THE COURT:  How about going to get your notes

1   And get Inspector Mathews, too.  How about that?  We

2   won't make the jury move.

3          (Brief pause)

4          THE COURT:  I'm just tying make sure that I

5   think what you're going to say is admissible, but I

6   don't want to violate the rules of evidence with regard

7   to getting into prior bad acts.

8          AGENT MATHEWS:  Yes, ma'am.

9          THE COURT:  I just want to hear what you plan

10  to ask and then --

11         MR. WHISONANT:  I'm going to ask him whether or

12  not he's investigated the defendant in the past and

13  whether that investigation involved a number of items in

14  the U.S. Mails; and, during the course of that

15  investigation, did he have an opportunity to observe the

16  defendant's handwriting.  And then was there anything

17  about this letter, this Exhibit 1, that focused his

18  investigation.

19         THE COURT:  And what will your answer be to the

20  last question, to that question?

21         AGENT MATHEWS:  I will say what the judge wants

22  me to say.

23         MR. STEEN:  See, I knew it.

24         AGENT MATHEWS:  I say that meaning that one of

25  the things that we talked about yesterday was -- and I

1   would say that the actual letters --

2          THE COURT:  What is your answer?  What really

3   happened when you got it?

4          AGENT MATHEWS:  When I got it, as I highlighted

5   here, I looked at the letters that looked familiar from

6   the other previous letters, but the fact that it also --

7   that it was a powder letter and I had known that Dodd

8   had sent powder letters in the past, that was another

9   reason to look at it.

10         The misspellings and what we talked about

11  yesterday, about that liar was misspelled and that was

12  the same as misspellings that he had done previously,

13  and then I did the exclusion of Bole from there.  But

14  that was the reason I looked at him.

15         THE COURT:  Is there a reason -- what else were

16  you going to get out of this witness?

17         MR. WHISONANT:  A lot of things.  We're going

18  to introduce Exhibit Number 1 because he was in the

19  chain of custody there.  There's also two other

20  exhibits.  He collected Exhibit 2, the package that

21  contained the five letters that are named in Counts Two

22  through Six and how he came to do that.  He also went to

23  the Calhoun County jail, listened to that recording and

24  then he went to see Shawn Williams.

25         THE COURT:  Mike, to get all that in, really,

1    is more than -- it would have to come in, I think, under

2    like identity, like an exception under 404(b), because I

3    think you really are getting into prior bad acts.  It

4    was part of it that it was a powder that made him focus

5    on it, that he knew he had done it in the past.  And I

6    just think that --

7            MR. WHISONANT:  I'm not going to ask him about

8    any of the underlying facts.  We're not going to ask him

9    whether he was charged with it.  We're not going ask him

10   what he was convicted of, and the cases say that this

11   evidence -- that the prejudice can be reduced by not

12   going into those extraneous details, and that's what

13   we're doing here is not going into the details.  We're

14   just trying to tell as little of that -- just as little

15   as we can to be able to tell the story.

16           THE COURT:  Okay.

17           MR. STEEN:  Judge, a lot of the case law talks

18   about it has to be a signature crime.  It has to be

19   something that's right there with him.  The only thing

20   in common that they've got on this is that he's looking

21   at an anthrax hoax letter, which there's thousands of

22   them, and putting it in the mail.  They all use the mail

23   to do that.

24           And then if you start talking about even just

25   an investigation into a similar act like this, then the

1  prejudicial scale just -- it tops out.  It flings past

2  the lever.  They've got enough evidence to present in

3  this case alone for a conviction.  They don't need to

4  bring in prior acts on this.

5         MR. WHISONANT:  They already know that he was

6  in jail from the witness who testified already.  We're

7  just explaining how the inspector went to him.

8         THE COURT:  Well --

9         MR. WHISONANT:  So if he says I looked at the

10  handwriting --

11         THE COURT:  I understand, I understand.  I'm

12  going to find that it comes under 404(b) on the

13  exception based on identity.  I will make a more

14  detailed finding later, but the prejudice does not

15  outweigh the probative value, but I'm just going to tell

16  you I think it's really close, and that's on the record

17  that I think it's close.  I hate for you, if you get a

18  conviction and the Eleventh Circuit reverses, because it

19  is highly prejudicial.

20         MR. WHISONANT:  I realize that.  And I'm trying

21  to mitigate that as much as I can.  I would also ask you

22  to make it to not only identity, but also as evidence of

23  motive and intent in that the evidence that Mr. Dodd

24  told Shannon Williams that he --

25         THE COURT:  Mr. Williams comes in under

1    whatever he testified about, but this is different.  His

2    is coming in -- well, I guess it can still come in under

3    motive, because he's already testified.  His testimony

4    also will come in under motive and intent.  Okay.

5              (Open court, outside the presence of the jury.)

6              THE COURT:  I want to make another finding, and

7    I will do that later.

8              MR. WHISONANT:  We call Inspector Mathews to

9    the stand, please.

10             **STEVEN MATHEWS, GOVERNMENT'S WITNESS, SWORN.**

11             THE CLERK:  Would you state your name, please?

12             THE WITNESS:  Steven Mathews.

13             THE CLERK:  And spell your last name for the

14   record, please.

15             THE WITNESS:  M-A-T-H-E-W-S.

16             THE CLERK:  In what city and state do you

17   reside?

18             THE WITNESS:  Pelham, Alabama.

19             THE CLERK:  Thank you, sir.

20                        **DIRECT EXAMINATION**

21   **BY MR. WHISONANT:**

22   Q.   Mr. Mathews, where are you employed?

23   A.   I'm a postal inspector with the U.S. Postal

24   Inspection Service.

25   Q.   How long have you been a postal inspector?

1    A.   12 years.

2    Q.   And are you the case agent in this investigation

3    with Mr. Dodd and this prosecution?

4    A.   Yes, sir, I am.

5    Q.   Let me show you Exhibit 1, if I can find it.   During

6    the course of your duties, did you receive a letter that

7    had been sent to the Jefferson County Judicial Center

8    that contained a white powder?

9    A.   Yes, sir.

10   Q.   Back in April?

11   A.   Yes, sir.

12   Q.   Let me show what's been marked as Government's

13   Exhibit Number 1.  Do you recognize that, sir?

14   A.   Yes, sir, I do.

15   Q.   What is that?

16   A.   That is the letter that was received at the judicial

17   building in Jefferson County that contained the white

18   powder.

19   Q.   And who did you receive that letter from?

20   A.   I received it from FBI Special Agent Joe

21   Ronsisvalle.

22   Q.   And what, if anything, did you do with the letter?

23   A.   I examined the letter and subsequently submitted it

24   to our lab for further analysis.

25   Q.   When you first received that letter, was it in the

1  same condition that it's in now?

2  A.   No, sir, it was not.

3  Q.   How is it different today?

4  A.   It is -- as I said, I submitted it to our lab, and

5  they did several exams on it, fingerprints and

6  handwriting examinations.  And right now it's darker

7  because it's been processed for fingerprints.

8  Q.   And while that was in your care, custody and

9  control, was it altered in any way or fashion?

10  A.   No, it was not.

11          MR. WHISONANT:  We would move to admit

12  Government's Exhibit 1 into evidence.

13          THE COURT:  Received.

14  Q.   When you looked at that letter, was there -- did you

15  notice anything about it that was unusual or important

16  to your investigation?

17  A.   Yes, sir.  I noticed some handwriting similarities

18  to the previous case I had investigated.

19  Q.   And who would that have been?

20  A.   That would have been Mr. Clifton Dodd.

21  Q.   Have you had occasion to see his handwriting in the

22  past?

23  A.   Yes, sir, I had.

24  Q.   What about that letter came to your attention?

25  A.   There were several items.  The way the letter was

1  written, just the lettering.  There was some "K"s that

2  were familiar, some "H"s, some "S"s, some different

3  letters, as I said, that looked to me similar to

4  previous letters that I had seen.

5  Q.  Were there any spellings of any words that came to

6  your attention?

7  A.  Yes, sir.  There was the word liar in the letter,

8  typically written L-I-A-R; however, it was misspelled in

9  this letter, L-I-E-R on several occasions, which was

10 similar to what I had seen in a previous letter written

11 by Mr. Dodd.

12         MR. WHISONANT:  Your Honor, we would request

13 permission to publish Government's Exhibit 1 to the

14 jury.

15         THE COURT:  You may.

16         MR. WHISONANT:  This exhibit actually has an

17 envelope and the letter inside of it and they may wish

18 to -- they are in separate plastic bags.

19         THE COURT:  Okay.  Great.

20 Q.  Now, after noticing those similarities in the

21 letters, in the writing, what did you do in your

22 investigation?

23 A.  As I said, I submitted that letter to our forensic

24 laboratory in Dulles, Virginia for further analysis.

25 Q.  What, if anything, about that caused you to check

1   with the Calhoun County jail's phone system?

2   A.   Yes, sir, it also did.  I checked because there were

3   other letters that also had been coming out.  I checked

4   with Calhoun County jail about what their visitation

5   process was, how mail is handled, how things generally

6   in that respect are handled.  I spoke with Lieutenant

7   Abernathy about that.

8   Q.   During the course of your conversation with

9   Lieutenant Abernathy, what, if anything, did you learn

10  about their phone system?

11  A.   I learned that all their visitations and their phone

12  calls are recorded, and that each inmate is given a

13  specific PIN number within -- that they use to make

14  phone calls that identifies who is making the phone

15  call.

16  Q.   And are all the phone calls at the Calhoun County

17  Detention Center recorded?

18  A.   Yes, sir, they are.

19  Q.   Did you make arrangements to listen to any phone

20  calls?

21  A.   Yes, sir.  Lieutenant Abernathy gave me access to

22  the phone system, the Telmate System, and provided me

23  with user name and password, wherein I was able to

24  listen to phone calls through that system.

25  Q.   Whose phone calls did you listen to?

1  A.   I listened to ones indicated they belonged to

2  Mr. Clifton Dodd.

3  Q.   Based on -- well, let me ask you this:  You heard a

4  recording played here in the courtroom today, which is

5  Government's Exhibit 16.  Was that one of the phone

6  calls that you listened to?

7  A.   Yes, sir, it was.

8  Q.   Based upon that phone call, what did you do?

9  A.   I then made arrangements to interview Mr. Shannon

10  Williams at the Calhoun County jail and his brother

11  Shawn Williams at his residence.

12  Q.   And when you went to see Mr. Shawn Williams, what

13  did you discuss with him?

14  A.   We discussed the phone call, whether that was an

15  accurate phone call, if he recalled the phone call.  He

16  stated that he did.  I also asked him permission or

17  asked him if he had received the letters first.  He said

18  he had not received the letters.

19         I asked him permission to intercept those

20  letters through the postal service.  He granted

21  permission to do that and subsequently granted me

22  permission to open the letters or open the envelope and

23  recover the letters.

24  Q.   And did you take steps to recover the letters?

25  A.   Yes, sir.  I got in contact with the Sylacauga post

1  office, put them on alert to look for the package.  The

2  next day the package actually came in.  I drove to the

3  Sylacauga post office, picked that package up and

4  recovered it.

5  Q.   Let me show you what's been marked as Government's

6  Exhibit 2 for identification.  Would you look at that,

7  please, sir?

8  A.   (Witnesses complies.)

9  Q.   Do you recognize that?

10  A.   Yes, sir.

11  Q.   What is that?

12  A.   That is the package that was mailed from the Calhoun

13  County jail.  It was received at the Sylacauga post

14  office and contained five of the letters.

15  Q.   Let me show you first what's been marked for

16  identification as Government's Exhibit Number 3 for

17  identification.  Before I ask you anything else about

18  that, did you take the letters out of the package that's

19  Government's Exhibit 2?

20  A.   Yes, sir, I did.

21  Q.   Did you look at all the contents of the letters?

22  A.   Yes, sir, I did.

23  Q.   Do you recognize Government's Exhibit Number 3?

24  A.   Yes, sir, I do.

25  Q.   What is that?

1   A.   That is one of the letters removed from Government's

2   Exhibit Number 2, this mailing envelope, addressed to

3   Mr. Scott Cooger.

4   Q.   Are you familiar with a U.S. District Judge who is

5   in the Northern District of Alabama whose name is

6   similar to that?

7   A.   Yes, sir.

8   Q.   What is his name?

9   A.   Scott Coogler.

10  Q.   How is his name different than the name that's on

11  the envelope there?

12  A.   On the envelope, there is a missing "L."  It's

13  C-O-O-G-E-R, and I believe the correct spelling is

14  C-O-O-G-L-E-R.

15  Q.   Next let me show you what's witness marked

16  Government's Exhibit 4 for identification.  Do you

17  recognize that, sir?

18  A.   Yes, sir, I do.

19  Q.   What is that?

20  A.   That is another one of the letters that was taken

21  out of Government's Exhibit Number 2 out of the mailing

22  envelope.  It's a letter and envelope addressed to

23  Jefferson County Court, Tommy Nail.

24  Q.   And are you familiar with Tommy Nail?

25  A.   Yes, sir, I am.

1  Q.  Do you know whether or not he is a judge in

2  Jefferson County?

3  A.  Yes, sir.  He's, I believe, a circuit court judge in

4  Jefferson County.

5  Q.  Let me show you what's been marked as Government's

6  Exhibit 6 for identification.  Do you recognize that,

7  sir?

8  A.  Yes, sir, I do.  It's also one of the letters taken

9  out of Government's Exhibit 2 of the mailing envelope.

10 It's a letter addressed to Jefferson County Court,

11 Sheila Weil.

12 Q.  Are you familiar with Sheila Weil?

13 A.  Yes, sir.  She is, I believe, a defense attorney at

14 Jefferson County Court, either a defense attorney or

15 ADA.  I believe it's a defense attorney at Jefferson

16 County Court.

17 Q.  And let me show you what's been marked as

18 Government's Exhibit 5 for identification.  Do you

19 recognize that, sir?

20 A.  Yes, sir, I do.

21 Q.  What is that?

22 A.  It's another one of the letters taken out of Exhibit

23 Number 2.  It's a letter addressed to James O'Kelley at

24 the Hugo Black Building.

25 Q.  Are you familiar with Mr. O'Kelley?

1   A.   Yes, sir.

2   Q.   Who is he?

3   A.   He is an attorney, a defense attorney, in

4   Birmingham.

5   Q.   Let me show you what's been marked as Government's

6   Exhibit 7 for identification.  Do you recognize that?

7   A.   Yes, sir, I do.

8   Q.   What is it?

9   A.   It is another one of the letters taken out of

10  Exhibit Number 2.  It's a letter addressed to Michael

11  Bole at the Jefferson County jail.

12  Q.   Are you familiar with Michael Bole?

13  A.   Yes, sir, I am.

14  Q.   Let me show you what's marked as Government's

15  Exhibit Number 8 for identification.  Do you recognize

16  that?

17  A.   Yes, sir, I do.

18  Q.   What is that?

19  A.   It is a greeting card that was actually inside the

20  envelope here with the Mr. Bole letter addressed to

21  Mr. Bole.

22  Q.   I don't know that I asked -- if you can refer back

23  to Exhibit Number 1 if you still have it up there,

24  please, sir.

25  A.   I believe you have it.

1   Q.   On the envelope contained in Exhibit Number 1, who

2   is that one addressed to?

3   A.   Teresa McClendon at the Tenth Judicial Circuit.

4   Q.   Are you familiar with Teresa McClendon?

5   A.   Yes, sir.

6   Q.   Who is she?

7   A.   She's an assistant district attorney with the

8   Jefferson County Courts.

9   Q.   At some point, did you send all of these letters or

10  exhibits to the laboratory for examination?

11  A.   Yes, sir, I did.

12  Q.   What kind of examinations did you request?

13  A.   I requested handwriting and fingerprinting

14  examinations of the documents.

15  Q.   These letters, do they all appear the way they did

16  when you first received them?

17  A.   No, sir, they do not.

18  Q.   How are they different?

19  A.   Again, they have the -- they were all submitted for

20  fingerprint examinations, so they have the fingerprint

21  dust or whatever they use on it to produce fingerprints,

22  and it has made the documents darker than they

23  originally were.

24  Q.   After the examinations were done, did they return

25  those documents to you?

233

1   A.   Yes, sir, they did.

2   Q.   Did you bring them here to court?

3   A.   Yes, sir, I did.

4        MR. WHISONANT:  Your Honor, we would move to

5   admit Government's Exhibits Number 5 and 7.

6        THE COURT:  All right.

7        MR. STEEN:  No objection.

8        THE COURT:  Received.

9   Q.   The first letter, are you familiar with where it was

10  received?

11  A.   At the Jefferson County Court, yes, sir.

12  Q.   Is that in Birmingham, Jefferson County, Alabama?

13  A.   Yes, sir, it is.

14  Q.   Is that within the Northern District of Alabama?

15  A.   Yes, sir, it is.

16  Q.   And the Calhoun County Correctional Center, are you

17  familiar with where that's located?

18  A.   Yes, sir.

19  Q.   Is that in Anniston, Calhoun County, Alabama?

20  A.   Yes, sir, it is.

21  Q.   Is that within the Northern District of Alabama?

22  A.   Yes, sir.

23  Q.   And Talladega, Alabama and Talladega County, is that

24  within the Northern District of Alabama as well?

25  A.   Yes, sir.

1  Q.   Now, when you sent those letters up to the

2  laboratory, when you sent them for fingerprint

3  examinations, did you have to send anything else with

4  them?

5  A.   Yes, sir.  We had to send known handwriting.

6  Q.   What does that mean?

7  A.   I'm sorry, fingerprints, known fingerprints.  We had

8  to send fingerprints that were known to be who we wanted

9  them to compare them to.

10 Q.   On this occasion, what did you use for the known

11 fingerprints?

12 A.   I used a fingerprint card belonging to Mr. Clifton

13 Dodd.

14 Q.   Where did the fingerprint card come from?

15 A.   From the Talladega County Sheriff's Office.

16 Q.   And so you sent that along with the letters for the

17 fingerprint examination?

18 A.   Yes, sir.

19 Q.   Now, when you sent the letters up for the

20 handwriting examination, did you do all this at one

21 time, send all the letters at one time?

22 A.   Those letters, I did, yes, sir.

23 Q.   Did you send anything else for the handwriting

24 exemplars?

25 A.   Yes, sir.  I sent what is known as known

235

1   handwriting, known handwriting for Mr. Dodd.

2   Q.   And what did you use for known handwriting?

3   A.   There were three pieces of known handwriting, I

4   believe, a letter that he had signed actually in my

5   presence, a letter he had sent I believe to the

6   courthouse, and the third one was -- and a third piece

7   of handwriting that Mr. Dodd had written.

8   Q.   And the purpose of sending these known handwritings

9   up there or the known fingerprints up to the laboratory,

10  what's the purpose of that?

11  A.   It's so that the examiners will have something to

12  compare what we call the questioned documents to.  The

13  letters we sent to be examined would be called the

14  questioned documents.  So they have to have a base line

15  to say, all right, we have our questioned documents,

16  does it compare to the known documents.

17          MR. WHISONANT:  Okay.  May I have just a

18  moment, Your Honor?

19          THE COURT:  All right.

20          (Brief pause)

21  Q.   Let me show you what's marked Government's Exhibit

22  11.  Do you recognize this, sir?

23  A.   Yes, sir, I do.

24  Q.   And what is that?

25  A.   That is the fingerprint card for Clifton Dodd.

1  Q.   And where is that card from?

2  A.   It's actually from the Lincoln Police Department,

3  Talladega County Sheriff's Office.

4  Q.   And explain what's on that card.

5  A.   It's fingerprints, it's individual fingerprints of

6  each hand.  And then at the bottom, there's four

7  fingerprints and then thumb prints.

8  Q.   Are you aware of whether or not that's a standard

9  process or standard card that's used?

10  A.   Yes, sir, it is.

11  Q.   Is that the card that you sent up as the known

12  fingerprints?

13  A.   Yes, sir, it is.

14       MR. WHISONANT:  We move to admit Government's

15  Exhibit Number 11.

16       THE COURT:  All right.

17       MR. STEEN:  No objection, Your Honor.

18       THE COURT:  Received.

19  Q.   Do you know Mr. Jim Preuitt?

20  A.   Yes, sir, I do.

21  Q.   At some point, did Mr. Preuitt or did you receive a

22  letter addressed to Mr. Preuitt?

23  A.   Yes, sir, I did.

24  Q.   Would you tell us about that?

25  A.   I actually received a letter on October 18th, but I

1   had been notified previously from the Talladega County

2   Sheriff's Office that they had been contacted by

3   Mr. Preuitt and indicated that he had received a

4   suspicious letter, a threatening letter, that he had

5   turned over to their office.

6           And on October 18th, I met with investigator

7   Bill Kennedy at the Talladega County Sheriff's Office

8   and recovered that letter from him.

9   Q.   Let me show you what's marked Government's Exhibit

10  Number 9.  Do you recognize that, sir?

11  A.   Yes, sir, I do.

12  Q.   What is that?

13  A.   It is the letter we just discussed.  It was

14  addressed to Mr. Jim Preuitt in Talladega Alabama.

15  Q.   And what, if anything, did you do with that letter?

16  A.   I submitted it to our forensic lab in Dulles,

17  Virginia.

18  Q.   For what kind of tests?

19  A.   Same as the others, for fingerprints and

20  handwriting.

21  Q.   Did you send that letter at the same time you had

22  sent the other letter?

23  A.   No, sir.  I sent this on a separate occasion.

24  Q.   At some point, did they return that letter to you?

25  A.   Yes, sir, they did.

1  Q.   Did you bring it here to court today?

2  A.   Yes, sir, I did.

3  Q.   I notice that Government's Exhibit 7 is addressed to

4  a Michael Bole.  Are you familiar with Michael Bole?

5  A.   Yes, sir, I am.

6  Q.   And do you know how he might be related to Mr. Dodd?

7  A.   I know that Mr. Dodd and Mr. Bole were sharing a

8  jail cell at one time in Jefferson County jail in 2011.

9          MR. WHISONANT:  Your Honor, may I have just a

10  moment?

11          (Brief pause)

12  Q.   All the recipients of those letters, are they

13  somehow linked to Michael Bole?

14  A.   Yes, sir, they are.

15  Q.   How so?

16  A.   Can I go through each one?  James O'Kelley was an

17  attorney that represented Mr. Bole I believe in a

18  federal case that he had.  Sheila Weil was an attorney

19  that represented Mr. Bole in a state case that he had.

20  Tommy Nail was the circuit court judge in Mr. Bole's

21  state case, and Judge Coogler was Mr. Bole's lawyer --

22  I'm sorry -- judge in the federal case against him.

23          MR. WHISONANT:  That's all I have, Your Honor.

24  Thank you.

25                    **CROSS-EXAMINATION**

1  BY MR. STEEN:

2  Q.   Good morning.   How are you doing this morning?

3  A.   Fine.   Thank you.

4  Q.   Just a few things.   The letter, the Jim Preuitt

5  letter, I think it's Number 7; is that correct?

6  A.   9.

7  Q.   9?

8  A.   Yes, sir.

9  Q.   Is that letter pretty much in the condition it was

10  when you sent it off?

11  A.   It's torn a little bit.   I don't recall it being

12  that ragged; but, yeah, it is a little different, and

13  it's got the fingerprint dust.

14  Q.   And the reason I ask that is because the copies I

15  got, it appears like it's not torn.   Would it be torn

16  during the process of them --

17  A.   I always make copies before we submit it to the

18  lab.   That way I have it in the best condition

19  possible.   So that was probably the copy that you had

20  received was the --

21  Q.   So we can blame the lab for the tear?

22  A.   We can try.

23  Q.   Okay.   I think you testified that you had other

24  letters coming out at the --

25  A.   Yeah.   I was referring to these five letters that

1    came here.

2    Q.   So there was no other additional letters that you

3    wanted to investigate other than these right here?

4    A.   Correct.

5    Q.   And when you talked to Lieutenant Abernathy at

6    Calhoun County -- is he a jail administrator?

7    A.   She's one of the lieutenants in the corrections

8    division.

9    Q.   Did you question her about how the mail operated

10   also?

11   A.   Yes, sir.

12   Q.   And is one of those that they're all sealed up; and,

13   if it's marked legal mail, it's not checked at all?

14   A.   I don't know that we specifically had that

15   discussion.  Our discussion was how it's handled.

16   First, do they have contact visits to see if anything

17   was passed hand to hand.  But then, on the mail, I asked

18   if outgoing mail is screened, and she told me that

19   typically outgoing mail is not screened, but incoming

20   mail is screened sometimes, at least more than outgoing

21   mail.

22   Q.   Okay.  Now, the telephone conversations, you

23   listened to some that were recorded, and I think you

24   said you pinpointed on Mr. Dodd; is that correct?

25   A.   Yes.

1   Q.   Did you listen to any other inmate's conversations

2   coming out of the Calhoun County jail?

3   A.   No, sir.

4   Q.   When is the first time you had contact with

5   Mr. Dodd?

6   A.   It would have been 2010.

7   Q.   Did you and him ever have a conversation about being

8   a witness against Mr. Bole?

9   A.   I don't know that I did.  I know he had approached

10  the Jefferson County Sheriff's Department about that,

11  but I don't believe I've ever had a conversation with

12  Mr. Dodd.

13  Q.   Do you know who at Jefferson County?

14  A.   I don't recall.  I remember it was one of their

15  investigators, but I don't recall who he had talked to.

16  Q.   Did you get a synopsis of his investigation of him

17  possibly being a witness against Mr. Bole?

18  A.   I recall that they discounted using Mr. Dodd as a

19  witness, that they discounted anything he told him.

20  Q.   But the question was did you receive any synopsis of

21  Jefferson County's investigation as to Mr. Dodd being a

22  witness against Mr. Bole?

23  A.   I didn't receive -- if you're asking if I received a

24  report, I don't recall receiving any reports from them.

25  Q.   Did you have any conversations with the detective

1  that was working it to know the intricacies of the case

2  they were building?

3  A.  The details, no, sir.

4  Q.  The conversation that occurred between inmate

5  Shannon Williams and his brother Shawn Williams, can you

6  recall the date of that?

7  A.  Yes, sir.  I believe it was June 9th, 2011.

8  Q.  And what date did you intercept the mail from them?

9  A.  June 16th, 2011.

10  Q.  Okay.  And you sent all the letters that were inside

11  to your lab to have further analysis; is that correct?

12  A.  That's correct.

13  Q.  Not only the ones that were in the larger envelope,

14  that you intercepted, but also the envelope that had

15  been received at the Jefferson County courthouse; is

16  that correct?

17  A.  Yes, sir.  That first letter, yes, sir.

18  Q.  And I think you said later you sent the Preuitt

19  letter that we're going to blame the lab for tearing up?

20  A.  Yes, sir.

21       MR. STEEN:  Thank you.  No further questions.

22                  **REDIRECT EXAMINATION**

23  **BY MR. WHISONANT:**

24  Q.  I asked you previously about sending up known

25  handwriting examples of Mr. Dodd.  Do you recall that,

1    sir?

2    A.   Yes.

3    Q.   Let me show you what's been marked Government's

4    Exhibit Number 12 for identification.  Do you recognize

5    that, sir?

6    A.   Yes, sir, I do.

7    Q.   What is that?

8    A.   That is -- do you want me to take it apart?

9    Q.   Yes, sir.

10   A.   The handwriting, the known handwritings, one is

11   entitled "Release of Mail" that was signed by

12   Mr. Clifton Dodd in my presence on March 17th, 2010.

13          Another is a letter -- let me take it out of

14   here -- is a letter written from Mr. Dodd to Senator Jim

15   Preuitt, and another one is a letter written by Mr. Dodd

16   to the FBI.

17   Q.   Were those samples of Mr. Dodd's known handwriting

18   that you submitted to the laboratory for analysis?

19   A.   Yes, sir, they are.

20          MR. WHISONANT:  Your Honor, we would move to

21   admit Government's Exhibit Number 12.

22          MR. STEEN:  No objection, Your Honor.

23          THE COURT:  Received.

24          MR. WHISONANT:  That's all we have, Your Honor.

25          THE COURT:  Thank you.  Did you have recross?

1          MR. STEEN:  Just briefly.

2                    **RECROSS-EXAMINATION**

3   **BY MR. STEEN:**

4   Q.   You just looked at Government's Exhibit 12?

5   A.   Yes, sir.

6   Q.   It had a letter that was addressed from Mr. Dodd you

7   said to the FBI but it came to this courthouse; is that

8   correct?

9   A.   That's correct.

10  Q.   Did you show that letter to Shannon Williams?

11  A.   I don't believe that was one I showed to him, no,

12  sir.

13          MR. STEEN:  Okay.  No further questions.

14          THE COURT:  Okay.  Thank you.  You may step

15  down.

16          MR. WHISONANT:  Your Honor, we have a brief

17  witness, Mr. Jim Preuitt.

18          THE COURT:  All right.

19       **JAMES E. PREUITT, GOVERNMENT'S WITNESS, SWORN.**

20          THE CLERK:  Would you state your name, please?

21          THE WITNESS:  James E. Preuitt.

22          THE CLERK:  And spell your last name for the

23  record, Please.

24          THE WITNESS:  P-R-E-U-I-T-T.

25          THE CLERK:  In what city and state do you

1  reside?

2          THE WITNESS:  Talladega, Alabama.

3                    **DIRECT EXAMINATION**

4  **BY MR. WHISONANT:**

5  Q.   Mr. Preuitt, what kind of business are you in, sir?

6  A.   The automobile new car business, Ford dealership.

7  Q.   How long have you been in the car business?

8  A.   For myself, 46 years ownership and 50 plus in the

9  business.

10  Q.   And you're from Talladega, Alabama?

11  A.   Yes, sir.

12  Q.   How long have you lived there, sir?

13  A.   It will soon be 46 years.

14  Q.   And in the past, have you served in the Alabama

15  legislature?

16  A.   I have.

17  Q.   And what was your position?

18  A.   I served in the Alabama House four years and Alabama

19  Senate 20, I guess, and six years as probate judge in

20  Talladega.

21  Q.   Would it be fair to say you're fairly well known in

22  Talladega?

23  A.   That's right.

24  Q.   If I could, let me direct your attention to what's

25  been marked Government's Exhibit Number 9.  Could you

1    look at that?  Do you recognize that?

2    A.   I do.

3    Q.   And what is that?

4    A.   It was a letter that I received back I think maybe

5    2011 or somewhere in that time period.

6    Q.   Did that come to you in the U.S. Mails?

7    A.   Yes, it did.

8    Q.   Where did you actually receive the letter?  Was it

9    at your home or business?

10   A.   At the dealership, the Ford store, on Battle Street.

11   Q.   When you saw that letter, did you actually receive

12   it from the postman or someone else?

13   A.   If I remember correctly, my secretary handed it to

14   me.  She picks up the mail either at the street address

15   and at the post office on a daily basis.

16   Q.   When you saw that letter, did you notice anything

17   about it that stuck out in your mind?

18   A.   Well, I thought the writing was unusual or it had a,

19   I guess, tendency to follow a pattern maybe of other

20   letters that I had received, likeness, and I thought of,

21   yes, sir, a particular person.

22   Q.   Who was that?

23   A.   It was Mr. Dodd from --

24   Q.   Mr. Clifton Dodd?

25   A.   Clifton Dodd from the Lincoln area, I thought.

1    Q.   And have you ever met Mr. Dodd before?

2    A.   I have not.

3    Q.   So you wouldn't know him if you saw him?

4    A.   That's correct.

5    Q.   What about that letter reminded you of Mr. Dodd?

6    A.   Well, he had previously apparently asked for monies

7    from me and talked of -- well, threatened me, I suppose,

8    prior and --

9    Q.   Let me stop you there and ask you, when you got that

10   letter, what did you do with it?

11   A.   I took it -- carried it to the county investigators

12   office.  Well, I called and the investigator directed me

13   where to bring the letter, and he opened it.

14   Q.   Do you recall --

15   A.   Or he looked at it.

16   Q.   Do you recall who you gave it to?

17   A.   I think the name will hit me in a moment, but it's

18   slipped me.

19   Q.   But it was someone at the --

20   A.   Special investigators of Talladega County Sheriff's

21   Department.

22   Q.   Did you open the letter and read it before you gave

23   it to him?

24   A.   Yes, I did.

25   Q.   And that letter that you're holding there today, is

1  it that the same letter?

2  A.   That's correct.

3  Q.   Has it been changed?   It looks like it's weathered

4  a little bit, but has it been changed in any way?

5  A.   It is weathered quite a bit.   It looks like the one

6  I received.   I think I have a copy of it also.

7         MR. WHISONANT:   Your Honor, we would move to

8  admit Government's Exhibit 9 into evidence.

9         MR. STEEN:   No objection.

10         THE COURT:   Received.

11  Q.   Mr. Preuitt, can you read that letter?   You may want

12  to take it out of the plastic to do that if you would

13  like.

14  A.   Yes, I can.

15  Q.   Please read it.

16  A.   "Jim, did you forget about me?   I want my money.   I

17  didn't forget about you."   Then I'm sorry where it's

18  broken up.   And it says, "I want my money, all of my

19  money.   I am out of town now, but I will be back.   Get

20  my money or die."

21  Q.   On the envelope, does it show a return address on

22  it, sir?

23  A.   Yes, sir, it does.

24  Q.   What's the return address?

25  A.   1409 Second Street, Talladega, Alabama.

1    Q.    Does it have a name?

2    A.    Todd Jones.

3    Q.    Do you know a Todd Jones?

4    A.    I do not, no, sir.

5    Q.    Are you familiar with that address?

6    A.    I think this street is -- the name, I believe, has

7    been changed.  I'm familiar with the location.

8    Q.    Do you know what's at that location?

9    A.    Not at this particular location, no, sir, I do not.

10   Q.    After turning that letter over to the investigator

11   at Talladega County, until today, have you seen that

12   letter?

13   A.    No, sir.  I have seen a copy that I have.

14   Q.    Thank you.

15             MR. WHISONANT:  Your Honor, that's all he have.

16             THE COURT:  Just one minute.

17             (Brief pause.)

18             THE COURT:  Let me see the lawyers for a

19   minute.

20             (Sidebar outside the presence of the jury)

21             THE COURT:  I don't know if you plan to go into

22   anything about his -- or if you're even familiar with

23   it.  He was earlier charged.

24             MR. WHISONANT:  He was charged and tried and

25   found not guilty.

1          THE COURT:  Okay.  So that won't be asked.  I

2    couldn't remember what happened on that, and I just

3    wanted to find out everything about it before any

4    questions started.

5          MR. WHISONANT:  There's something tragic about

6    his grandson, which his grandson committed suicide, but

7    he thought his grandson had been killed.  He still

8    believes that until today.  Mr. Dodd has sent him a

9    series of letters claiming to know what happened to his

10   grandson, where the body was.

11         THE COURT:  Okay.

12         (Open court.  Jury present.)

13                    **CROSS-EXAMINATION**

14   **BY MR. STEEN:**

15   Q.   How are you?  My name is Russell Steen and just a

16   couple of questions.  Have you ever talked to Mr. Dodd

17   on a telephone?

18   A.   I know one time, yes, sir.

19   Q.   And what was the gist of that conversation?

20   A.   That's probably been -- can I elaborate?  It was

21   probably six or seven years ago.  I do not remember all

22   the details.

23   Q.   So if you don't remember it, that's going to be your

24   answer, you just don't remember?

25   A.   It was pertaining to the death of my grandson is

1   what the phone call was about.

2          MR. STEEN:  Okay.  Judge, I have no further

3   questions.

4          THE COURT:  All right.  Mr. Preuitt, you're

5   excused.

6          MR. WHISONANT:  Let me ask one question.

7          THE COURT:  I'm sorry.

8                   **REDIRECT EXAMINATION**

9   **BY MR. WHISONANT:**

10  Q.   Where your dealership is located where you received

11  the letter, is that in Talladega Jefferson County,

12  Alabama?

13  A.   Talladega County, Talladega, Talladega County.

14  Q.   Is that in the Northern District of Alabama?

15  A.   That's correct.

16  Q.   Thank you, sir.

17          THE COURT:  Mr. Preuitt, thank you very much.

18  You're excused.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  All right.  Ladies and gentlemen,

21  we're going to be in recess for lunch until 1:15.  Thank

22  you very much.

23          (Jury excused.)

24          (Open court, outside the presence of the jury.)

25          THE COURT:  What I was going to say, and I'm

1    going to make a more detailed findings about the 404(b),

2    but I had said I thought it was close, but when I think

3    about the motive part of it, it does come in under that,

4    and I do not think it's close on that ground, and also

5    intent.

6           I just think the identity -- although, when I

7    go through all of the things with regard to identity, I

8    think it's pretty strong, too.  I had made a finding

9    that I said I thought it was close, but when I think of

10   all the factors, I really don't think it is.

11          Do we know anything more about the other

12   witness?  Have you had a chance to talk to that

13   witness?

14          MS. WALLACE:  Mr. Smith will not be

15   testifying.

16          MR. WHISONANT:  Not for the defense.

17          MS. WALLACE:  Not for the defense, that's

18   correct.

19          THE COURT:  Okay.  Then we don't need to get a

20   lawyer up here.  All right.  Thank you, Ms. Wallace.

21          MS. WALLACE:  Unless there has been some

22   changes with Mr. Spencer and you need me to stay on his

23   behalf, that would be the only --

24          THE COURT:  If you think you're going to call

25   him.

1        MR. WHISONANT:  We might call him, Your Honor.

2   We were going to go talk with him.

3        THE COURT:  Okay.  Then you just stay until we

4   determine that.

5        MS. WALLACE:  I will do that, Your Honor.

6        THE COURT:  Thank you.

7        (Lunch recess)

8        (Open court.  Jury present.)

9        THE COURT:  I have to tell you they're standing

10  out of respect for the jury.  It's a nice custom.  And

11  it's not that I don't respect you as much as they do.  I

12  just always come in and sit down, but they stand when I

13  walk in, which is a sign of respect to the court as an

14  institution.

15       Call your next witness.

16       MR. WHISONANT:  The United States would call

17  Craig Hellman to the stand.

18       **CRAIG HELLMAN, GOVERNMENT'S WITNESS, SWORN.**

19       THE CLERK:  Would you state your name, please?

20       THE WITNESS:  My name is Craig Hellman.  Last

21  name spelling is H-E-L-L-M-A-N-N.

22       THE CLERK:  In what city and state do you

23  reside?

24       THE WITNESS:  In the city of Manassas in

25  Virginia.

1          **DIRECT EXAMINATION**

2     **BY MR. WHISONANT:**

3     Q.    Mr. Hellman, where are you employed?

4     A.    Excuse me?

5     Q.    Where are you employed?

6     A.    I'm employed by the United States Postal Inspection

7     Service.

8     Q.    How long have you worked there?

9     A.    This past March was my tenth year.

10    Q.    What are your duties there?

11    A.    I'm a forensic analyst at the main forensic -- the

12    National Forensic Lab for the U.S. Postal Service.  We

13    offer forensic support to our investigators in the

14    field, our postal inspectors.  My specialty is in the

15    discipline of latent fingerprints and crime scene

16    analysis.

17    Q.    How long have you worked in that field?

18    A.    In excess of 35 years.

19    Q.    And could you tell us about your training and

20    education to be in that position?

21    A.    Certainly.  The beginning of my career I spent with

22    the Metropolitan Police at New Scotland Yard in London,

23    England, where I spent three years as an identification

24    officer and crime scene forensic photographer trainee.

25          Since being in the United States, I've been

1 employed by the Metro Dade Police Department in Miami,

2 Florida; Arlington County Police Department in

3 Arlington, Virginia; and, more recently, the U.S. Postal

4 Inspection Service.

5          I've received training in the field through the

6 training academies at the Metro Dade Police Department;

7 the State of Texas, the DPS academy in Austin, Texas;

8 and, since being in Virginia, with the Federal Bureau of

9 Investigation.

10 Q.   Do you have a judgment as to how many fingerprint

11 examinations you've conducted?

12 A.   It would be in excess of hundreds of thousands.

13 Q.   Could you explain to us what are friction ridges?

14 A.   Friction ridge fingerprints, palm prints on the

15 inside of our hands and the soles of our feet, we have

16 areas of skin known as friction ridge skin.  We have

17 this skin so that we can hold on this things, and we

18 have traction with our bare feet.

19          The skin is made of tiny ridges that flow from

20 one side of the hand or the finger to the other.  These

21 little ridges are not continuous.  They have ending

22 ridges.  They have bifurcations or forks, and each one

23 of these formations is unique in that no two formations

24 are ever the same.

25 Q.   What would a latent print be?

1   A.   A latent print is when an object is touched by an
2   area of friction skin and there is some kind of transfer
3   medium on those friction ridges, be it sweat, anything
4   coming out of the sweat pores, any kind of grease from
5   the hair or the skin or any dirt or any other material
6   that's on the fingers.  When an object is touched by
7   that friction skin, a replication of that fingerprint
8   detail, latent print detail, is transferred to the
9   object.
10  Q.   And do we have these friction ridges all over our
11  body?
12  A.   No.  It's just on the palms of the hand, the fingers
13  and the soles of the feet.
14  Q.   What is a known standard or a known fingerprint?
15  A.   A known standard is an area of friction ridge skin
16  such as a fingerprint that has been documented in a
17  controlled circumstance, such as a finger being coated
18  in ink and rolled on a fingerprint card; or, lately, we
19  use digital scanners to do the same thing.  Basically,
20  the finger is rolled across a glass plate, like a
21  scanner, and that detail is captured and put on a
22  contrasting card, such as white card stock.  It's then
23  documented who documented this so that we can relate who
24  the prints belong to.
25  Q.   Could you explain how prints are compared and

1   identifications are effected?

2   A.   Certainly.  As I mentioned, the friction ridge skin,

3   the formations are created randomly before birth due to

4   the movement of the hands and the body within the womb.

5   There is some amount of genetics involved in that people

6   that are twins can have similar types of fingerprint

7   patterns, but the minute ridge detail will be different

8   because it's totally random.

9        This ridge detail is fixed.  Once it grows by

10  the 24th week of gestation, the ridge detail is set, and

11  it remains in that formation until after death.

12       So when we look at prints, if we find areas of

13  these ending ridges and bifurcations in the same

14  relative position to each other in both examples, we can

15  determine they came from the same source.

16       MR. WHISONANT:  Your Honor, we would offer

17  Mr. Hellman as an expert in the field of fingerprint

18  examination.

19       THE COURT:  I will allow him to testify under

20  Rule 702.

21  Q.   Mr. Hellman, were you asked to do a fingerprint

22  examination in this case?

23  A.   Yes.

24  Q.   Were you provided with some documents that had

25  latent prints on them?

1    A.    Yes.

2    Q.    And were you also provided with some known

3    handwriting exemplars?

4    A.    Yes.

5    Q.    Would you please tell us about your examination?

6    A.    Certainly.  In this particular case, I received

7    evidence labeled Q-1 through Q-7.  It was envelopes with

8    written material on the inside of the envelopes.

9           When we first receive this kind of evidence, we

10   visually examine it to see if there is any of our

11   fingerprint evidence on the outside of the paper, things

12   like that.  And if there isn't, we use several chemical

13   processes to try to visualize any latent prints that

14   might be on the material.

15          In the case of paper, it's a porous item, in

16   that if I were to lay my hand on this wooden desk or a

17   glass counter, I may leave some fingerprints behind, but

18   the next time somebody wipes that surface, those

19   fingerprints would be wiped away.  Paper is one of

20   porous mediums, in that when fingerprints are deposited

21   on the paper, the detail actually soaks into the paper

22   fibers.

23          So we utilize a chemical.  One of the first

24   chemicals we utilize is a chemical called ninhydrin,

25   which was discovered in the medical field, and it's used

1    to look for amino acids and proteins, which happens to
2    be part of the residue from a fingerprint.  When we
3    exude residue from our sweat pores, amino acids,
4    proteins.
5           So that's the material that's captured within
6    these paper fibers.  So that is the first chemical
7    process that we use when we process paper for
8    fingerprints.  You process the ninhydrin.  The prints
9    become visible, and we photograph the detail, and then
10   we can make our comparisons.
11   Q.   Let me show you what's been marked as Government's
12   Exhibit 11 for identification.  Do you recognize that,
13   sir?
14   A.   Yes, I do.
15   Q.   What is that?
16   A.   That is a standard eight by eight fingerprint card
17   used to document the controlled prints that I talked
18   about earlier.
19   Q.   Is that the known fingerprint card that you used in
20   your examination?
21   A.   Yes, it is.
22   Q.   And how do you know that?
23   A.   It bears our lab file number and my initials.
24   Q.   Next, let me show you some other documents here.
25   This is Government's Exhibit 1.  Would you look at that,

1    please, sir, and what is that?

2    A.    That would be one of the written pages from Q-7.

3    Q.    You use Q numbers.  What does the Q mean?

4    A.    I'm sorry.  A Q number in our lab environment would

5    be a questioned document in that, as it comes into us,

6    we don't know the origin of it or what the results of

7    the examination is going to be.  So that becomes a

8    questioned item.

9            The fingerprint card comes in as known

10   evidence.  We know the source of that, so that becomes a

11   K item for known.

12   Q.    Let me show you what's been marked as Government's

13   Exhibit 2 for identification.  Can you look at that,

14   please, sir?  What is that?

15   A.    That would be a manila envelope.

16   Q.    Is that one of the questioned items?

17   A.    Yes.  That would be Q-6.

18   Q.    Let me show you what's been marked as Government's

19   Exhibit 3.  Do you recognize that, sir?

20   A.    Yes, I do.

21   Q.    What is that?

22   A.    That's Q-1 which is a written page and an envelope

23   bearing postage.

24   Q.    That's one of the documents that you examined?

25   A.    Yes.

1   Q.   Let me show you what's marked Government's Exhibit

2   4.  Do you recognize that?

3   A.   Yes, I do.

4   Q.   What is that?

5   A.   That would be Exhibit Q-2, an envelope bearing

6   postage with some written paper.

7   Q.   Would that be one of the documents that you

8   examined?

9   A.   Yes.

10  Q.   Let me show you what's marked Government's Exhibit

11  5.  What is that, sir?

12  A.   That would be another written piece of paper with

13  writing on it and an envelope bearing postage with my

14  initials.

15  Q.   Which questioned document is that?

16  A.   This one would be Q-3.

17  Q.   Again, is that one of the documents you examined?

18  A.   Yes, it is.

19  Q.   Let me show you what's marked as Government's

20  Exhibit Number 6.  What is that, sir?

21  A.   Again, it's a paper with some writing on it and an

22  envelope bearing postage labeled Q-4.

23  Q.   Again, is that a document that you examined?

24  A.   Yes, it is.

25  Q.   Let me show you what's marked Government's Exhibit

 1    7.   What is that, please, sir?

 2    A.   Again, this is a sheet of paper with writing on an

 3    envelope bearing postage, Q-5, bearing my initials.

 4    Q.   Is that a document you examined?

 5    A.   Yes, it is.

 6    Q.   Let me show you what's been marked Government's

 7    Exhibit 8.  What is that, please, sir?

 8    A.   That would be a card with some writing on it labeled

 9    Exhibit Q-5.

10    Q.   Again, is that a document that you examined?

11    A.   Yes, it is.

12    Q.   And, lastly, let me show you Government's Exhibit

13    Number 9.  Do you recognize that, sir?

14    A.   Yes, I do.  It's Exhibit Q-8, again, paper with

15    writing, an envelope bearing postage.

16    Q.   And is that one of these documents that you

17    examined?

18    A.   Yes, it is.

19    Q.   When you're making an examination, how do you go

20    about doing that?  How do go about determining your

21    identifications?

22    A.   The first stage of our examination is an analysis

23    phase; in that, once we have developed a latent print or

24    a latent print that now becomes visible on a piece of

25    evidence, we have to determine whether it has enough

1   value for us to make an examination.  So we make that

2   determination.

3          The first step we look for is is it a complete

4   fingerprint; is it a recognizable pattern type; the

5   ridges that flow, are they flowing in and out of the

6   pattern in a way that we can determine what kind of

7   pattern it is.

8          The second level of detail we look for are the

9   ending ridges and the bifurcations and maybe some dots

10  or other artifacts, ridges that haven't quite guide

11  formed yet for that.

12         And then the third level of detail, we actually

13  look for the shapes within those ridges that would

14  contain sometimes sweat pores, unique characteristics on

15  the edges of the ridges, that kind of stuff.

16         When we have deemed that we have enough to have

17  the quality to make an examination, we will then bring

18  in the known standard, and we will search for that

19  configuration of minutia in the same relative position

20  to each other in both examples.  Once we've established

21  that we have that detail in both examples, we can state

22  that they came from the same source.

23  Q.   And during the course of your examination, did you

24  find any latent prints of use on any of those questioned

25  documents?

1    A.   Yes, a total of 21 latent fingerprints of value for
2    identification.
3    Q.   And were you able to make any identifications of any
4    of those 21 latent prints?
5    A.   17.
6    Q.   If we could, could we kind of go through those
7    documents and tell us which documents you found
8    fingerprints on that you could identify and how many?
9         THE WITNESS:  If I can refer to my notes, Your
10   Honor?
11        THE COURT:  Yes, you may.
12   A.   The prints of value that were developed would be two
13   latent fingerprints on an envelope labeled Q-1-1.
14        THE COURT:  When you're doing that, can you
15   also refer, if it has an exhibit number, so Q-1-1 is
16   what Government's Exhibit Number?
17        MR. WHISONANT:  That's going to be Government's
18   Exhibit 3.
19        THE COURT:  Can you do that also?
20        MR. WHISONANT:  I don't know that he has that.
21        THE COURT:  If you can show him maybe at the
22   same time you're doing it.  Why don't you give him all
23   the exhibits maybe.  I don't know what the best way it
24   is.  But I want it for the record, not only the question
25   -- even though he's already testified, it will just be

1    helpful.

2            MR. WHISONANT:  Yes, ma'am.

3            THE COURT:  Or if you know what they are, you

4    can hand them to him one at a time.

5            MR. WHISONANT:  I was going to try to go

6    through and hand them to him.

7            THE COURT:  That's fine.  Q-1-1 is --

8    Q.   Is Exhibit Number 3, and that is a letter that's

9    addressed to who, sir?

10   A.   That letter is addressed to Mr. Scott Cooger.

11   Q.   And where did you find any latent prints of value?

12   A.   On this exhibit, there were two fingerprints

13   developed on the envelope and one fingerprint developed

14   on the letter.

15   Q.   Could you determine whose fingerprint that was?

16   A.   All three of those fingerprints belonged to

17   Mr. Dodd.

18   Q.   Clifton Dodd, the defendant in this case?

19   A.   (Witness nods head affirmatively.)

20   Q.   All right, sir.  Next would be Q-2; is that correct?

21   A.   Yes.

22   Q.   Let me show you what's been marked as Government's

23   Exhibit 4 for identification.  Can you look at that,

24   please, sir, and tell us who that is addressed to?

25   A.   Q-2 is addressed to the Jefferson County court.

266

1  Q.  Does it have the name of the person that the letter

2  is sent to?

3  A.  The return address?

4  Q.  No.  Who is it sent to, the addressee?

5  A.  I believe it says Tommy.

6  Q.  And did you find any latent prints that you could

7  use for identification on that letter or envelope?

8  A.  Yes.  On the letter itself, we developed seven

9  latent fingerprints.

10  Q.  Could you make an identification of who those

11  fingerprints were from?

12  A.  Of those seven, we identified six of those prints to

13  K-1.

14  Q.  Who is K-1?

15  A.  Mr. Dodd.

16  Q.  This is -- let me show you Government's Exhibit

17  Number 5.

18  A.  This exhibit developed one latent fingerprint on the

19  envelope, two latent fingerprints on the letter inside.

20  Q.  And whose fingerprints were you able to identify?

21  A.  We couldn't identify the fingerprint on the

22  envelope.  The two fingerprints on the letter belonged

23  to Mr. Dodd.

24  Q.  And who is that letter addressed to?

25  A.  James O'Kelley.

1   Q.   Let me show you what's been marked Government's

2   Exhibit Number 7.  Which questioned document is that,

3   sir?

4   A.   The piece of paper and writing and an envelope

5   addressed to a Michael Bole.

6   Q.   Which Q exhibit is that?

7   A.   That's Q-5.

8   Q.   All right, sir.  And did you find any fingerprints

9   on that?

10  A.   On Q-5, no, nothing was developed.

11  Q.   Nothing at all.  Okay.

12          THE COURT:  I'm sorry, I was looking at

13  something else.  There were no fingerprints on Number

14  7?

15          THE WITNESS:  No, ma'am.

16          THE COURT:  At all.  On Exhibit 7, on Q-5, did

17  you find any prints?

18          THE WITNESS:  No prints on Q-5, no.

19          THE COURT:  No prints at all?

20          THE WITNESS:  No.

21          THE COURT:  Not any that could not be

22  identified?

23          THE WITNESS:  No prints of value developed on

24  that piece of evidence.

25  Q.   (By Mr. Whisonant)  Let me show you the next one,

1    Government's Exhibit Number 9.  What is the Q number on

2    that one?

3    A.   That would be Q-8.  It's Government's Exhibit Number

4    9.

5    Q.   Did you find any fingerprints on that one?

6    A.   I think that was on the later submission.  There was

7    one print developed on that that was not identified.

8    Q.   Let me show you what's been marked Government's

9    Exhibit Number 6.

10   A.   That one was labeled Q-4 in our lab.  On this

11   exhibit, there was one latent print developed on the

12   envelope, two latent prints developed on the letter.

13   Q.   Were you were able to identify any of those

14   fingerprints?

15   A.   Yes.  One latent print on the envelope, one latent

16   print on the letter were identified to Mr. Dodd.

17   Q.   I believe I've shown you this one, Government's

18   Exhibit Number 1.

19   A.   Yeah, that's Q-7.  On this exhibit, there were no

20   fingerprints developed of value for identification.

21   Q.   And who was that letter addressed to?

22   A.   I can't see the envelope.

23   Q.   You can look inside the envelope.

24   A.   Teresa McClendon.

25   Q.   Let me show you Government's Exhibit 2.

1    A.    Exhibit Number 2 is another exhibit to Q-6.  There

2    were five latent fingerprints developed on the envelope,

3    four of which were identified to Mr. Dodd.

4    Q.    Have you prepared any charts that would help explain

5    how you make your identifications?

6    A.    Yes, I did.

7    Q.    Let me show you what's been marked Government's

8    Exhibit 23.  Do you recognize that, sir?

9    A.    Yes, I do.

10   Q.    What is that?

11   A.    That is a comparison chart that we will routinely

12   prepare to demonstrate how fingerprint identifications

13   are effective.

14   Q.    And do you have a known fingerprint and a questioned

15   fingerprint on there?

16   A.    Yes.

17   Q.    The known fingerprint, is that from Mr. Dodd?

18   A.    Yes.

19   Q.    The questioned fingerprint, where does that come

20   from?

21   A.    The known print was the right thumb that was scanned

22   from the fingerprint card.

23   Q.    Let me show you what's been marked Government's

24   Exhibit Number 11.  Is that the known fingerprint card

25   that you used to obtain that known fingerprint?

```
 1  A.   Yes.
 2  Q.   And what is the -- what's the K number on that one,
 3  if it shows?
 4  A.   That is K-1.
 5  Q.   K-1, sir.  Did you prepare also an electronic copy
 6  of that chart?
 7  A.   Yes, I did.
 8  Q.   Would it assist you in explaining to the jury how
 9  you did that to use that electronic chart?
10  A.   Yes, it would.
11        MR. WHISONANT:  Your Honor, we would like to
12  play an electronic copy of Government's Exhibit 23 for
13  the jury so the witness can use it.
14        THE COURT:  You may.
15  Q.   All right, sir.  What are we seeing here?
16  A.   Okay.  What we have is an enlargement --
17        THE COURT:  I'm sorry, did you offer it?
18        MR. WHISONANT:  I would offer Government's
19  Exhibit Number 16.
20        THE COURT:  Okay.  Received.
21        MR. WHISONANT:  I'm sorry, 23.
22        THE COURT:  23.  Received.  We need to get a
23  smaller version for the record.
24        MR. WHISONANT:  Yes, ma'am.
25  A.   The image on the screen now is basically the
```

1   original image that this chart was prepared from.  And

2   what you see on the right of the screen is a capture of

3   the latent print that was on exhibit -- our exhibit Q-2,

4   one of the letters.

5           The diagonal black lines you can see on that

6   are actually the lines on the -- it's lined writing

7   papers.  So those lines are actually the lines that you

8   would try to write between.  The red numbers, the lines

9   and the text put on by myself to highlight some of the

10  minutia we look for when we make a fingerprint

11  identification.

12          The print to your left labeled known print is

13  the known print captured from the right thumb block of

14  the fingerprint card.  The black vertical line on the

15  right there is just the box that's printed on the card

16  when the card stock is printed.

17          So if I could draw your attention over to the

18  latent print.  At the end of the line I've labeled

19  number one, there is one of the bifurcations I was

20  talking about.  The ridges flow over the core or the

21  center of the print in a clockwise direction to the

22  right, and the one ridge forks into two.

23          If we move up to about 1:00 o'clock from there

24  and skip over one ridge and follow that down, we see

25  where that ridge actually basically crashes into another

1    ridge, causing a bifurcation in the other direction.  If

2    we back up that ridge towards point number three, you

3    see where again the right leg of that bifurcation moves

4    up to point number three, and it abruptly ends on the

5    shoulder of the ridge.

6          If we take those same points over to the known

7    print and start at number one, we can see that

8    bifurcation.  We skip over the one ridge and follow it

9    down.  You come to the opposing bifurcation of point

10   number two, and then we follow that back up to point

11   number three.

12         THE COURT:  I'm thinking you can touch the

13   screen, and I believe if you would like to use a marker.

14         THE WITNESS:  Can we do that on the screen?  If

15   it was a little larger, I could maybe point in between.

16         THE COURT:  Okay.

17   A.   So this is, again, basically for demonstrative

18   purposes to demonstrate how an identification is

19   effected.

20         So, again, on the latent print from point

21   number three, we can move up to point number four.

22   There's a progression there when you skip over the two

23   ridges, and it runs up to point number four.  Skipping

24   up to ridges to point number five, and then if we count

25   out the four ridges, we arrive at point number six.

1        Again, if you take that relationship over to

2   the known print, you will see that it follows right in

3   suit.  You can get from one point to the other by

4   following the numbers on the two charts.

5        So with these 11 points -- I mean, 11

6   characteristics in this print, plus there's a lot that

7   I've not marked that are present in this particular

8   print; and, once we examine it under magnification, it

9   brings us to the conclusion that both of these prints

10  came from the single source, the same finger.

11        Once we've made that determination, we document

12  the identification and then have our findings verified

13  by an examiner or analyst with similar training and

14  experience.

15  Q.   So did you do this type of examination on each one

16  of those prints where you made an identification?

17  A.   No.  This is just the demonstration on how we made

18  the identification.

19  Q.   But the type of examination, as far as looking for

20  these points on a fingerprint, that's what you did when

21  you're making an examination on each one of those that

22  you made an identification on?

23  A.   Yes, it is.

24  Q.   I see that you have 11 points marked here.  Is there

25  a minimum number of points that you look for before you

1   can make an identification?

2   A.   There is no minimum national standard of points.

3   The point standard, different states, different

4   countries used to have minimum point standards, but it

5   realized that sometimes there's a quality -- a balance

6   between quality and quantity of information.  And

7   sometimes we can have a really, really clear print with

8   fewer points in it.  Obviously, if we have marginal

9   prints, then we need more information to make that

10  determination.  In this case, these prints were very

11  good quality.

12  Q.   After you completed your examination, did you

13  prepare any reports?

14  A.   Yes.

15  Q.   Let me show you what's been marked Government's

16  Exhibit Number 20 and Number 21.  What are those,

17  please, sir?

18  A.   Those are our forensic laboratory examination

19  reports.

20  Q.   And are those the reports concerning the

21  examinations done in this case?

22  A.   Yes.

23  Q.   And the numbers you referred to, the Ks and the Q

24  numbers that you testified to, those are set out in

25  those reports?

1    A.    Correct.

2          MR. WHISONANT:  Your Honor, we would move for

3    admission of Government's Exhibit 20 and 21 into

4    evidence.

5          THE COURT:  No objection, received.

6          MR. WHISONANT:  If I may have just a moment,

7    Your Honor.

8          (Brief pause)

9          MR. WHISONANT:  That's all we have, Your Honor.

10         THE COURT:  All right.  Thank you.

11                      **CROSS-EXAMINATION**

12   **BY MR. STEEN:**

13   Q.    Good afternoon, Mr. Hellman.  How are you?

14   A.    Good.  Thanks.

15   Q.    When you received this from the field, you only had

16   one known print to compare it to?

17   A.    Correct.

18   Q.    Did you try to identify any other prints that were

19   developed?

20   A.    Yes.

21   Q.    And did you have any success with those?

22   A.    No.

23   Q.    Looking at the documents that you processed, the

24   prints that I want to say is your Q-2.  Do you need your

25   documents back, or do you still have them?

276

 1    A.    No.

 2    Q.    For Q-2, I think it's designated as Q-2-1 as the

 3    envelope and Q-2-2 as the letter; is that correct?

 4    A.    Right.

 5    Q.    And you developed seven prints on the letter?

 6    A.    It's six.

 7    Q.    And six were confirmed to K-1; is that correct?

 8    A.    Right.   Seven developed, six confirmed.

 9    Q.    And the other one was a valuable print?

10    A.    Yes.

11    Q.    Or a print of value?

12    A.    A print of value.

13    Q.    Was that print of value that was not identified

14    through K-1, how would you make a determination as to

15    how to develop who that might belong to?

16    A.    We, typically, if we have a print that is not

17    identified to one subject and we have no more subjects,

18    our procedure in the lab is to run it through the

19    National Fingerprint Database for a fingerprint search,

20    which was more than likely done in this case but still

21    did not result in identification.

22    Q.    When you received the documents to be examined, did

23    they tell you -- you knew it was a letter?

24    A.    Yes.

25    Q.    And when you developed the prints on the letter, are

1  the prints that you developed consistent with someone

2  who would be writing on the letter?

3  A.   That is not for us to determine.

4  Q.   That's okay.

5  A.   It's just the source of the prints.

6  Q.   And also you can't determine when that print was put

7  on that piece of paper either, can you?

8  A.   No.

9  Q.   It could be put on prior to the writing?

10  A.   Yes.

11  Q.   It could be put on after any writing?

12  A.   Yes.

13         MR. STEEN:  Your Honor, I think that's all I

14  have.

15         THE COURT:  All right.  Thank you.

16         MR. STEEN:  Thank you, Mr. Hellman.

17         THE COURT:  Any further questions?

18         MR. WHISONANT:  There's one thing.

19                    **REDIRECT EXAMINATION**

20  **BY MR. WHISONANT:**

21  Q.   I don't know if I asked him about Government's

22  Exhibit 2.  Have you got -- let me show you what's been

23  marked Government's Exhibit 2, sir.  Do you recognize

24  that?

25  A.   Yes, I do.

1    Q.   Is that one of the questioned documents that you

2    examined?

3    A.   That's one of the envelopes, yes.

4    Q.   Did you find any fingerprints on that one, sir?

5    A.   Yes.   Five latent fingerprints were developed.   Four

6    were identified.

7    Q.   Who were they identified to?

8    A.   Mr. Dodd.

9              THE COURT:   I'm sorry.   How many were --

10             THE WITNESS:   Five were developed.   Four of the

11   prints were identified.

12   Q.   And what's the K number on that one?

13   A.   K-1.

14             MR. WHISONANT:   Thank you, sir.   That's all.

15             THE COURT:   All right.   Mr. Hellman, you're

16   excused.   Thank you very much.

17             MR. WHISONANT:   Your Honor, we may have a

18   witness that you may want to take outside the presence

19   of the jury.

20             THE COURT:   I'm going to ask you all to step in

21   the jury room.   I'm going to ask you to clear the

22   courtroom, but I'm going ask you to stay in the jury

23   room.   Hopefully, this won't take very long.

24             (Jury excused.)

25             (Open court, outside the presence of the jury)

1      THE COURT:  I'm going to ask everybody to step

2  out.  Unless you're an intern or law clerk, then you can

3  stay.  All right.

4      MR. WHISONANT:  We would call Haley Elliott to

5  the stand.  She's the handwriting expert.

6      THE COURT:  Okay.  We will see.  Thank you for

7  bringing it up now.  Did he look at Government's Exhibit

8  8?

9      MR. WHISONANT:  Yes, ma'am.

10      THE COURT:  What did he say about that one?

11      MR. WHISONANT:  There weren't any prints on it.

12      THE COURT:  There were none.

13      **HALEY ELLIOTT, GOVERNMENT'S WITNESS, SWORN.**

14      THE CLERK:  Would you state your name, please?

15      THE WITNESS:  Haley A. Elliott, H-A-L-E-Y, A.,

16  E-L-L-I-O-T-T.

17      THE CLERK:  In what city and state do you

18  reside?

19      THE WITNESS:  I currently reside in Sterling,

20  Virginia.

21                    **DIRECT EXAMINATION**

22  **BY MR. WHISONANT:**

23  Q.  Ms. Elliott, where are you employed?

24  A.  I'm employed with the United States Postal

25  Inspection Service, Forensic Laboratory Services.

1   Q.   What's your position there?

2   A.   I am a forensic document examiner.

3   Q.   Do you examine --

4        THE COURT:  Can you just lead her right now and

5   get to it and then we will find out --

6        MR. WHISONANT:  Sure.

7   Q.   Did you conduct a handwriting analysis in this case?

8   A.   I conducted the technical review in this case.

9   Q.   All right.  You were not on the original case; is

10  that right, the case originally?

11  A.   That is correct.

12  Q.   Can you explain how you came to be involved in the

13  case?

14  A.   I was assigned as the technical reviewer when the

15  original examiner had completed her examination.

16  Q.   Can you explain --

17       THE COURT:  Say that one more time.

18       THE WITNESS:  I'm sorry.  I was assigned as the

19  technical reviewer when the original examiner had

20  completed her examination.

21  Q.   Can you explain how that review process works?

22  A.   Of course.  In our laboratory, our normal protocol

23  is, when you're finished with an examination, you put

24  your exam of the evidence in for review.  It then goes

25  to another examiner.

1          The evidence is transferred to that examiner

2    along with your case notes, and then the examiner will

3    review all of the evidence to make sure that, when they

4    look at the evidence, what they think should be

5    happening happened, review the notes, look over --

6          THE COURT:  When you say, you think should be

7    happening, meaning that they did everything they were

8    supposed to, or do you check it and you sort of do your

9    own independent exam to see if you agree?  Do you see

10   what I'm saying?

11         THE WITNESS:  I understand.  Both happen.  So

12   when I receive evidence, I look at the evidence by

13   itself, and I go through and I get an idea of what both

14   exams I would have conducted in the case, and I get an

15   idea, if I know it's a handwriting exam, what I think

16   the conclusion should be.

17         I then will take and go and look at their

18   notes, make sure they followed all proper protocol, all

19   of our procedures.  If they haven't completed an exam,

20   that I thought should be completed, I would note that.

21   And then go and talk to them about why that wasn't

22   done.  I would look and make sure that the findings that

23   they're reporting on are things that I also agree with.

24   Q.   Why is there a review process in place?

25   A.   The review process is in place to insure that all

1  proper procedure is followed, that everyone is following

2  the way examinations are conducted, how evidence should

3  be handled and also to confirm the findings and reports.

4      And it also is there so that when an examiner

5  is unable to make it to court, for whatever reason,

6  there's someone who has physically seen the evidence

7  firsthand, who has gone through the notes, has made

8  their own determination and can come and testify in

9  their stead.

10  Q.  So is the original examiner available in this case?

11  A.  The original examiner has retired from our office.

12  Q.  And did you follow all the laboratory procedures in

13  conducting your review?

14  A.  Yes, I did.

15  Q.  And did you make a separate report?

16  A.  No.  It is not our policy to make separate reports.

17  I wouldn't have even made notes other than notes as I go

18  through things to say, oh, I have a question about this,

19  why this wasn't done or how this was done.

20  Q.  Is your opinion consistent with that of the original

21  examiner?

22  A.  Yes, that is correct.

23  Q.  And would your report have been the same as hers?

24  A.  Yes.

25      THE COURT:  And I guess I just am trying to

1    understand, besides reviewing it to make sure she

2    followed all the procedures, did you do your own

3    independent analysis in looking at the handwriting?  Do

4    you understand what I'm saying?

5         You said you checked to say you agreed with

6    her, but did you agree that she followed the protocol or

7    did you agree with her analysis?

8         THE WITNESS:  I agreed with both.  I didn't

9    make my own notes, so it wasn't the same exam in terms

10   of, when I received it, I didn't make photocopies.  I

11   didn't go through everything I would have done had I

12   received it as my case.

13        When I received it from her, what happened is I

14   accepted the evidence.  And before I looked at her

15   report, before I looked at her notes, I went through the

16   evidence, looking at what was there, what the

17   handwriting looked like, doing the exam mostly in my

18   head, looking through things, consistency.  And then I

19   would go and look at her notes.

20        And after I had already said I'm leaning toward

21   -- this is what I think has happened in this case, this

22   is what the conclusion should be, this is what she

23   should have done, and then I go to her notes, and I go

24   through the notes and say, yes, she did everything by

25   our protocol, she has done exactly what I would have

1   done, and I agree with her every step of the way.

2          THE COURT:  You agree with her on what she

3   found, based on your own analysis, not just on the

4   protocol?

5          THE WITNESS:  That is correct.

6          THE COURT:  When did you do that, how soon

7   after she did it?  Was it before it was sent back to the

8   government you did it?

9          THE WITNESS:  Oh, absolutely.  Everything is

10  reviewed before it's released from the laboratory.

11         THE COURT:  All right.  I assume you wanted to

12  make an objection.

13         MR. STEEN:  I would, Your Honor.  If she

14  performed the test independent of it, I think that would

15  be different, but it's not an independent testing on her

16  part.  The original examiner did the testing, the

17  indepth testing, that she said she did not do.  And,

18  therefore, I'm not able to go into cross-examination

19  like I need to as to what was done.

20         And if she was here to testify on this behalf,

21  they still have the evidence in their possession, either

22  in the government's or at this postal inspector's office

23  to have it, you know, re-examined to come up with a new

24  report if that examiner is not going to be available for

25  trial.

1          MR. WHISONANT:  That is not my understanding of

2     what she would testify to.  It's my understanding that

3     she would testify that she conducted an independent

4     investigation of the handwriting prior to looking at

5     that other report, and she would be able to testify

6     about her independent examination.

7          THE COURT:  Is that true?

8          MR. WHISONANT:  Is that right?

9          THE WITNESS:  Yes.  Before I looked at the

10    report, I took the evidence and I sat down and I went

11    through it and I looked at it.  I did not make my own

12    set of notes because it was not my case, and I wasn't

13    working it in the same way.

14         What I was doing was looking through making

15    sure that I saw everything, making sure that I was able

16    to look for those characteristics.  I was pulling out

17    characteristics that I was noting.  And then, when I

18    said, okay, I am satisfied with what I would have said

19    in this case, I then sat down and looked through her

20    notes, and looked, yeah, she's finding all the

21    characteristics that I was noting.  She did the

22    examinations that our protocol calls for, and there were

23    no questions, and I had agreed with her finding that was

24    --

25         THE COURT:  You say she's retired?

1          THE WITNESS:  That's correct.

2          THE COURT:  Do you all have -- where do you

3   work again?

4          THE WITNESS:  I work for the United States

5   Postal Inspection Service.

6          THE COURT:  Do you all have an agreement that,

7   when you retire, that you have to be available to be

8   called back for court?  In other words, she's performed

9   this.  It's now a criminal case.  Is it part of your

10  contract that you have to be available to come back and

11  testify?

12         In other words, did the government try to get

13  in touch with her and try to get the person who actually

14  conducted it?

15         MR. WHISONANT:  We tried to get in touch with

16  her and was told she was retired.

17         THE COURT:  So you did not.  Okay.

18         THE WITNESS:  It is the policy of the

19  laboratory that when this occurs, that if whomever is

20  calling for our services, if they are okay with us

21  sending the reviewer in the case, that that is the

22  course that we would take.

23         THE COURT:  But is she -- is it a she or he?

24         THE WITNESS:  A she.

25         THE COURT:  Does she understand, once she

1  retires, she may be called back to testify?

2         THE WITNESS:  Yes, she does.

3         THE COURT:  That is something they have to do?

4         THE WITNESS:  That is correct.

5         THE COURT:  They have to do it?

6         THE WITNESS:  Yes.  If she were subpoenaed and

7  called back, then, yes, absolutely.

8         MR. WHISONANT:  Your Honor, may I ask a

9  question?

10        THE COURT:  Yes.

11  Q.  (By Mr. Whisonant)  Have you ever had to testify in

12  this situation before?

13  A.  No, I have not.

14  Q.  Okay.

15        THE COURT:  Let me study this a little bit

16  more.

17        (Brief pause)

18        THE COURT:  I'm looking at the Eleventh Circuit

19  case of United States versus I-G-N-A-S-I-A-K, Eleventh

20  Circuit 2012, where they're discussing the Supreme Court

21  case of Crawford.  And I am going to allow the witness

22  to testify.  It's not as clear as I would like it to

23  be.  And, obviously, if the defendant is convicted, this

24  would be a big issue on appeal which could have been

25  avoided if you had subpoenaed the actual person who

1    performed it, but I believe that it's permissible

2    looking at this case.

3         It says, "Forensic reports constitute

4    testimonial evidence."  But this witness was actually

5    involved.  Let me look.  I was going to read some

6    language here.  In this case, they excluded the reports

7    as I read into the record at sidebar the other day.  But

8    it talks about, in this particular case, the particular

9    witness that was offered by the government did not

10   personally observe or participate in the autopsies, and

11   there was no evidence presented to show that the

12   coroners who performed the autopsies were unavailable.

13        And here, although I don't think there's maybe

14   evidence that the person is unavailable, they have

15   retired, so they're not -- they maybe could have been

16   located.  I'm not sure if they could or couldn't, but I

17   think this witness is much more involved than the

18   witness that you offered the other day, who I think was

19   clearly just the supervisor.

20        I think this witness is subject to being

21   confronted and cross-examined, and I don't believe that

22   having the actual person here would be more of a benefit

23   than cross-examining this witness.  So I am going to

24   permit this witness to testify.

25        And I guess what she's going to say, I believe

1  you said, is she's going to say it is a common author

2  wrote 2 through 6, right?

3        MR. WHISONANT:  Yes, ma'am, that's correct.

4        THE COURT:  All right.  We'll have the jury

5  brought back in.  Obviously, you object to this for the

6  defendant, and you've objected at sidebar and in the

7  court.

8        MR. STEEN:  Do you want me to do it in open

9  court?

10        THE COURT:  I don't think you need to.

11        MR. STEEN:  Just as long as we preserve the

12  objection.

13        THE COURT:  It's preserved.

14        MR. STEEN:  Thank you, Your Honor.

15        THE COURT:  It says, "When producing testimony

16  of forensic evidence, the prosecution must present

17  testimony by a scientist who was actually involved in

18  preparing the forensic evidence."  I think she was

19  actually involved.

20        (Open court.  Jury present.)

21        **HALEY ELLIOTT, GOVERNMENT'S WITNESS, SWORN.**

22        THE CLERK:  Would you state your name, please?

23        THE WITNESS:  Haley A. Elliott.

24        THE CLERK:  And spell your last name for the

25  record, please.

1          THE WITNESS:  E-L-L-I-O-T-T.

2          THE CLERK:  In what city and state do you

3    reside?

4          THE WITNESS:  I currently reside in Sterling,

5    Virginia.

6                    **DIRECT EXAMINATION**

7    **BY MR. WHISONANT:**

8    Q.   Ms. Elliott, where are you employed?

9    A.   I'm employed with the United States Postal

10   Inspection Service, Forensic Laboratory Services.

11   Q.   How long have you been employed there?

12   A.   Approximately six and a half years.

13   Q.   And what is your position there?

14   A.   I'm a forensic document examiner.

15   Q.   And what are your duties as a forensic document

16   examiner?

17   A.   As a forensic document examiner, I look at

18   questioned documents in a variety of different ways.  I

19   would be looking at handwriting, type writing, different

20   printing processes, ink, paper, indented impression

21   examinations.  I would be looking for evidence of

22   altercation, obliteration.  If a document were purported

23   to be counterfeit, I would be authenticating whether or

24   not that were true.  There's a variety of things one

25   would look at just depending on the case.

1  Q.   Could you tell us about your education?

2  A.   Certainly.  I have a Bachelors degree -- a Bachelor

3  of Arts in biology, and I have a Master's in forensic

4  science from the George Washington University.

5  Q.   What formal training have you received in order to

6  be a forensic document examiner?

7  A.   My formal training was conducted by the United

8  States Postal Inspection Service.  It encompassed 26

9  different modules in questioned document examination.

10  And during those, I would have to read a number of

11  texts, journal articles.  I would be given oral and

12  written examinations on each module.

13        And I also had an apprentice style training for

14  case work.  So, senior examiners, I would work under

15  them on their case work, reviewing their notes.  And

16  then as I was signed off on different modules, I would

17  begin conducting my own case work in those areas.

18        I also had external training with the FBI for

19  their forensic handwriting analysis course.  I took a

20  course at Rochester Institute of Technology where I

21  learned about printing processes, both commercial and

22  what you would have in your home, ink jet and toner

23  processes.

24        I have also participated in a number of

25  workshops and lectures with different associations, for

1    instance, the American Academy of Forensic Sciences and

2    the American Society of Questioned Document Examiners.

3    Q.   Are you affiliated with any professional

4    organizations or societies?

5    A.   Yes, I am.  The American Academy of Forensic

6    Sciences, as I just mentioned, I am an associate

7    member.  And for the American Society of Questioned

8    Document Examiners, I am an affiliate member.

9    Q.   And have you testified in court as an expert witness

10   in the area of forensic document examinations in the

11   past?

12   A.   Yes, I have.  I testified one time previously in

13   federal court.

14        MR. WHISONANT:  Your Honor, we would submit

15   Ms. Haley Elliott as an expert in the field of forensic

16   document examination.

17        THE COURT:  I will allow her to testify again

18   under Rule 702.

19   Q.   Ms. Haley, did you conduct an examination in regard

20   to evidence in this case?

21   A.   I conducted an examination as a part of a technical

22   review.

23   Q.   Would you tell us how does -- how does -- how do you

24   do handwriting examinations?

25   A.   Okay.  What happens is I am assigned a case, and I

1    receive the evidence.  And once the evidence is

2    transferred to me, I would do an inventory, establish

3    what were questioned documents and what type of known

4    documents I have.

5             And then I do a side-by-side comparison.  So I

6    take my questioned document, and I would do an

7    examination of that, looking for characteristics that I

8    found unique, interesting, noting different types of

9    spacing or formatting, height relationships between

10   letters.  That means you're looking at how tall certain

11   letters are compared to other letters.

12            I would also be looking for the range of

13   variation, because two of the principals that

14   handwriting identification are based on is that everyone

15   has a unique set of characteristics, and everyone also

16   has natural variation in their handwriting.

17            So, as you learn to write, you start out copy

18   book style everybody writes in school.  It's very

19   similar.  And as you age and grow, you start to diverge

20   from that copy book style of level writing.  So you

21   might pick up, you know, a "B" that you like from your

22   friend Sarah, or you may like the way that your father

23   writes his capital "D" and start to incorporate those

24   things into your writing.

25            It also has to do with one person's just

1   musculature, your fine motor skills, what your ability

2   is.  And so, as you grow, you develop this set of

3   characters that makes it your handwriting.

4           And within that, there's some natural

5   variation.  We're not robots.  Even if you sat down and

6   you wrote your name five times, they wouldn't overlay

7   perfectly, but you would still be able to identify that

8   as your name.  And I'm sure everyone here can identify

9   handwriting of their sister or their friend Bob because

10  they're used to seeing it.

11          What I'm doing is looking at handwriting of

12  people that I do not know, and so I have to familiarize

13  myself with that handwriting.  So I would start with a

14  questioned document, and I would get a feel for who

15  wrote this, what their normal range of variation is,

16  what those individual characteristics are that I should

17  be looking for.

18          I would then set that aside, and I would look

19  at the known writing.  I need to establish that I have

20  the same type of writing.  When I say that, I mean, if

21  the known writing or -- excuse me -- the questioned

22  writing were written in cursive, and I was given known

23  writing that was capitalized printing, that is not

24  something that I can compare.  You need to be able to

25  compare cursive writing to cursive writing, capitalized

1    writing to capitalized writing.

2           And so I would look at the known writing and,

3    again, get a feel, do I think this was naturally

4    prepared or do I feel like perhaps there was something

5    else going on, do I have a full range of variation.

6           Once I have decided -- once I have established

7    that, I do what we call a side-by-side comparison.  So I

8    look at my questioned writing and those characteristics

9    that I pulled out as unique and individual, and I am

10   going to be looking to see if I see those represented in

11   the known writing.

12   Q.   Were you supplied some known handwriting exemplars

13   in this case?

14   A.   Yes.

15          THE COURT:  Let me see you just for one second.

16          (Sidebar outside the presence of the jury)

17          THE COURT:  I'm just curious, was the known

18   provided from the other case?

19          MR. WHISONANT:  No, ma'am.

20          THE COURT:  Were those printed?  I'm just

21   curious.  I know she's not able to say, but since those

22   were known because he pled guilty --

23          MR. WHISONANT:  He hadn't pled guilty -- well,

24   he had by the time she looked at that.  The way this

25   happened, those were used in evidence -- those were

1   going to be used in evidence in his trial in July, and

2   we didn't --

3           THE COURT:  I'm just wondering those would have

4   been known and might have looked like these.  In other

5   words, you know what I'm saying, when he pled guilty,

6   those were then known?

7           MR. WHISONANT:  Yes.

8           THE COURT:  Even though they might have been

9   disguised, but these are known, not disguised?

10          MR. WHISONANT:  Right.

11          THE COURT:  The ones you gave her?

12          MR. WHISONANT:  Yes.

13          THE COURT:  Have you compared -- we did a

14  little bit yesterday and --

15          MR. WHISONANT:  They are similar.

16          THE COURT:  They're very similar.  So she might

17  have looked at those maybe and said that those were by

18  the same person, because they were printed, too, weren't

19  they?

20          MR. WHISONANT:  I believe they were, yes.

21          (Open court.  Jury present.)

22  Q.  (By Mr. Whisonant)  Were you supplied some known

23  handwriting examples in order to conduct your

24  investigation?

25  A.   Yes.

1   Q.   Let me show you what's been marked Government's

2   Exhibit 12 for identification.  Would you look at that,

3   please, ma'am?

4   A.   It's okay to open it?

5   Q.   Yes, ma'am, it is.

6   A.   (Witness complies.)

7   Q.   And what are those?

8   A.   These items are Government's Exhibit 12.  They were

9   labeled in our laboratory as Exhibits K-1-1 through

10  K-1-3.  They are known writing of Clifton Dodd.

11  Q.   Did you use those in conducting your examination?

12  A.   Yes.

13  Q.   If you would put those back into that envelope,

14  please, ma'am.

15  A.   (Witness complies.)

16  Q.   Let me show you what's been marked as Government's

17  Exhibit Number 1 for identification.  I believe that

18  your lab has it marked as a different number.  Do you

19  see that?

20  A.   Yes, I do.

21  Q.   What number is your lab number on that?

22  A.   It is identified as Q-7, and then it was

23  sub-designated as Q-7-1, Q-7-2 and Q-7-22.

24  Q.   And was that one of the documents that you examined?

25  A.   Yes.

298

1   Q.   Was that one of the documents whose handwriting was

2   unknown that you were trying to determine whose it was?

3   A.   That is correct.

4   Q.   In conducting your examination of that document,

5   were you able to make a determination about that?  Let

6   me withdraw that.  Let me go to the next one.

7          Let's do it like this:  Let me show you what's

8   been marked as Government's Exhibit 2 for

9   identification.  Do you recognize that?

10  A.   No.

11  Q.   Does that reflect a questioned document?  This Q-6

12  that's on the outside of the envelope, does that relate

13  to you or would that be from the fingerprint analysis?

14  A.   I believe that's from the fingerprint analysis.

15  Q.   All right.  Thank you, ma'am.  Let me show you

16  what's been marked as Government's Exhibit 3 for

17  identification.  And what is your Q number on that one?

18  A.   This is identified as Q-1 and Q-1-1.

19  Q.   Was that one of the documents that you examined?

20  A.   Yes, it was.

21  Q.   Can you tell us who that was addressed to?

22  A.   This is addressed to -- excuse me -- addressed to

23  Mr. Scott Cooger, C-O-O-G-E-R.  Sorry.

24  Q.   Let me show you what's marked as Government's

25  Exhibit 4 for identification.  Do you recognize that?

299

1   A.   Yes.

2   Q.   And is that one of the documents that you examined?

3   A.   Yes.   This was identified in our laboratory as

4   Exhibit Q-2-1 and Q-2-2.

5   Q.   Let me show you what's been marked as Government's

6   Exhibit Number 5 for identification.   Do you recognize

7   that?

8   A.   Yes, I do.

9   Q.   What is that?

10   A.   This was identified in our laboratory as Exhibits

11   Q-3-1 And Q-3-2.

12   Q.   Is that one of the documents that you examined?

13   A.   Yes, it is.

14   Q.   Let me show you what's marked as Government's

15   Exhibit 6 for identification.   Do you recognize that?

16   A.   Yes, I do.

17   Q.   And what is that?

18   A.   This is identified in our laboratory as Exhibits

19   Q-4-1 and Q-4-2.

20   Q.   And is that one of the documents that you examined?

21   A.   Yes, it is.

22   Q.   Let me show you what's marked as Government's

23   Exhibit 7 for identification.   Do you recognize that?

24   A.   Yes, I do.

25   Q.   What is that?

1   A.   This was identified in our laboratory as Exhibit 5-1

2   and Q-5-2.

3   Q.   And let me show you what's marked as Government's

4   Exhibit 9 for identification.   Can you recognize that?

5   A.   Yes, I do.

6   Q.   What is that?

7   A.   This was identified in our laboratory as Exhibit Q-8

8   and Q-8-1.

9   Q.   This is identified as Government's Exhibit Number

10  8.   Could you look at Government's Exhibit 7 there,

11  too?   Would you look at those?   Those may be associated

12  -- those may be part of the same original exhibit.   If

13  you would look at that and see if you can tell.

14  A.   Yes.   Government's Exhibit 8 was identified in our

15  laboratory as Exhibit Q-5-3.   And Government's Exhibit

16  7, again, was identified as Q-5-1 and Q-5-2.

17  Q.   And that's -- is that a letter and envelope inside

18  of that?

19  A.   Government's Exhibit 7, yes, the envelope is Q-5-1,

20  and the letter is Q-5-2.

21  Q.   And did you conduct an examination of all of those

22  documents?

23  A.   Yes.

24  Q.   And what, if any, opinion did you determine based

25  upon your examination?

1  A.   On the whole stack of documents or just these three?

2  Q.   Yes.

3  A.   For Exhibits Q-1-1 through Exhibits Q-5-3 and

4  Exhibit Q-7-1, those documents were associated as having

5  been written by one writer.

6         THE COURT:   And can you get her to do the

7  exhibit numbers?

8  Q.   If you could, if you could go through the exhibit

9  numbers.

10 A.   Absolutely.   I apologize for that.   So in the

11 report, the exhibits were, as I stated, Q-1-1 through

12 Q-5-3 and Q-7-1, those would be Government's Exhibit

13 8, Government's Exhibit 7, Government's Exhibit 9 --

14 excuse me -- not Government's Exhibit 9.   I apologize.

15 Q.   Let me stop right there just to be very plain.   If

16 you could, tell us who that Government's Exhibit 7 was

17 addressed to?

18 A.   Okay.

19 Q.   If you would do that on each one of these.

20 A.   Okay.   I will start from the beginning.

21 Q.   Thank you.

22 A.   Okay.   Government's Exhibit 7, which is addressed to

23 Michael, I believe, Bole, B-O-L-E, that was an envelope

24 with a letter.   Government's Exhibit 8, which is a note

25 card with the first line reading "Michael, sometimes it

302

1   is us."  Government's Exhibit 6, which is addressed to

2   Jefferson County court.

3   Q.   Does it have a name above that?

4   A.   Below it is Sheila Weil.

5   Q.   Okay.

6   A.   Government's Exhibit 5, which is addressed to James

7   O'Kelley; Government's Exhibit 4, which is addressed to

8   Jefferson County court, Tommy Nail; Government's Exhibit

9   3, which is addressed to Mr. Scott Cooger; and

10  Government's Exhibit 1, which is addressed to Teresa

11  McClendon, M-C-C-L-E-N-D-O-N.

12  Q.   What were you able -- what opinion were you able to

13  come to based on the examination of those documents?

14  A.   Those documents were identified as having been

15  written by one writer.

16  Q.   Could you determine who that writer was?

17  A.   That examination was not conducted.

18  Q.   And if you go to Government's Exhibit 7, were you

19  able to form an opinion, based on your examination of

20  that -- I'm sorry -- Government's Exhibit 9, were you

21  able to form an opinion based on your examination of

22  Government's Exhibit 9?

23  A.   Yes.

24  Q.   What was your opinion on that?

25  A.   There were a couple of opinions.  Do you want it in

1    relation --
2    Q.   Please.
3    A.   In relation to the other set of documents that we
4    were just discussing that were identified as having been
5    written by one writer, Government's Exhibit Number 9,
6    which is a letter addressed to Jim Preuitt, there were
7    indications that it was also written by the same writer
8    that wrote the previous exhibits we were just
9    discussing, Government's Exhibit 1 --
10            THE COURT:   Indications.   The others you're
11   saying -- with regard to 1, 3, 4, 5, 6, 7, 8, you're
12   saying they were authored by the same person?
13            THE WITNESS:   Yes.
14            THE COURT:   And then Government's Exhibit 9,
15   you're saying indications that they were?
16            THE WITNESS:   Indications that this document
17   was written by the same writer that wrote the other set
18   of documents.
19            THE COURT:   Okay.
20   Q.   And have you prepared a chart here today?
21   A.   Yes, I have.
22   Q.   Would that pertain to these findings that you're
23   making?
24            THE WITNESS:   Yes.
25   Q.   Let me show you what's been marked Government's

304

1   Exhibit Number 15 and Government's Exhibit Number 14.

2   Do you recognize these, ma'am?

3   A.   Yes, I do.

4   Q.   What are they?

5   A.   They are chart -- excuse me -- charts that I made

6   for demonstration purposes in court today.

7   Q.   And did you also make an electronic version of these

8   charts?

9   A.   Yes, I did.

10  Q.   Would these charts help you to explain to the jury

11  your testimony?

12  A.   Yes.

13          MR. WHISONANT:  Your Honor, we would ask

14  permission to play the electronic version of these

15  charts, 14 and 15?  And I would offer them into

16  evidence.

17          THE COURT:  All right.  Received.

18  Q.   Let's go with the -- does it matter which one you

19  want to talk about first?

20  A.   The one that is up on the screens currently would

21  talk about the association that I had just been

22  discussing.

23  Q.   Do you need this, or are you going to reference to

24  the screen?

25  A.   I can do it either way.

1    Q.   If you'll just refer to the screen.

2    A.   Okay.

3         THE COURT:  And when you ask her, can you also

4    have her simultaneously refer to the exhibit number?

5         MR. WHISONANT:  Yes, ma'am.

6         THE COURT:  I mean, if Q-1-1 is -- again, I can

7    look it up, but it's just easier for you to say it.

8         THE WITNESS:  Not a problem.

9         THE COURT:  Are her questions the same as the

10   other one, or are they different?

11        MR. WHISONANT:  No, ma'am, they're different.

12        THE WITNESS:  Just give me one moment so I can

13   put these in order, and it will be easier for me when

14   I'm discussing them.

15        (Brief pause)

16   Q.   (By Mr. Whisonant)  All right.  If you would point

17   out on your screen there why you say these -- the

18   indications you had that these are from the same author?

19   A.   Okay.  Here on the screen you can see what I have

20   labeled as Exhibits Q-1-1, Q-1-2, 2-1, 2-2, 3-1 and 3-2.

21   Q-1-1 is Government's Exhibit 3.  Q-2-1 -- excuse me --

22   Q-1-1 and Q-1-2 are both under Government's Exhibit 3.

23        Q-2-1 and Q-2-2 two are both under Government's

24   Exhibit 4, and Exhibits Q-3-1 and Q-3-2 are both under

25   Government's Exhibit 5.  Q-4-1 and 4-2 are under

1  Government's Exhibit 6.  And Q-5-1, Q-5-2 are under

2  Government's Exhibit 7.  Q-5-3 is Government's Exhibit

3  8.  Q-7-1 is Government's Exhibit 1, and Q-8 and Q-8-1

4  are under Government's Exhibit 9.

5       Now, when conducting an examination in

6  handwriting, I will be talking about that side-by-side

7  comparison.  It's always most beneficial for us if we

8  have what we call verbatim writing.  That means it's the

9  same words and the same letters, same letter

10  combinations that we can compare.

11       Now, in this case, the return address on

12  Government's Exhibits 3, 4, 5, 6, 7 were all the same,

13  which made it very nice, both for demonstration purposes

14  and for that side-by-side comparison.  So you'll see

15  here that formation of the upper case "B" in Birmingham,

16  you have a curved staff to that "B."  You will see that

17  curved staff in all of the examples.  Maybe it would be,

18  because I keep have to go up and down -- I'm sorry -- if

19  I could have the large chart.

20       THE COURT:  Could we get the easel?

21       (Brief pause)

22       THE COURT:  Go ahead.

23  A.   So when conducting a side-by-side examination, we're

24  looking at the character here that I would like to draw

25  attention to here, the upper case "B" in Birmingham.

1    You see this curved staff, that's represented here on
2    Q-1-1, which is Government's Exhibit 3.  You see that
3    curved staff again in Q-2-1, which is Government's
4    Exhibit 4.  And you see it again here in Government's
5    Exhibit 5 and again here in Government's Exhibit 6.  You
6    have it here in Government's Exhibit 7, here in
7    Government's Exhibit 1, and you have it here in
8    Government's Exhibit 9.
9              I'm going to, just for this time being, not
10   discuss Government's Exhibit 9, and I will get back to
11   that in just a few more minutes.  So I'm going to
12   continue with this discussion on the top half of this
13   chart to save time.
14             So you'll see that in all of the questioned
15   documents, we then would look at things like height
16   relationships like I was talking about.  You'll notice
17   that you have this upper case "B," which is a tall "B"
18   as you would expect for an upper case letter at the
19   beginning of a word.  You then drop down and you have
20   this "I-R," which are shorter, and then you have a
21   capital "M" in the center of Birmingham, which again is
22   taller in Government's Exhibits 4, 5, 6, 7 and 1.  You
23   will also see here in Government's Exhibit 8 that you
24   have that tall "M" again in the center of a word, which
25   is "sometimes."

1     You'll see this curve in a lot of these
2  letters.  This lower case "H" has the curve.  You'll see
3  the curve in this upper case "N," and that is continued
4  through all of Government's Exhibits 3, 4, 5, 6 and 7.
5  In 3, the "N;" Government's Exhibit 4, the "N;"
6  Government's Exhibit 6, the "N," Government's Exhibit 7,
7  you see the "N."  You also see that in again here in
8  "Jefferson" in Government's Exhibit 1.
9     Drawing your attention now to this side of the
10  chart, which was the letter contained inside one of
11  these envelopes, you have the lower case "Y," which has
12  a nice pull to it, and this lower extension -- that's
13  any part of the letter that comes below the base line
14  which is where the letter sits -- that kind of shoots
15  off a little bit more angular back to the left-hand
16  side.  Then you will see that repeated throughout
17  Government's Exhibits 4, 5, 6, 7 and 8.  And you see
18  also the placement right on the base line for the entire
19  letter or, excuse me, the entire word of "you."
20     Then move into the word "back."  You'll see
21  again this curved staff of the lower case "B," which is
22  represented in a number of these characters, and then a
23  pen lift, which means you're taking the pen off of the
24  paper, to create the ball of the "B."
25     In Government's Exhibit 3, again, this curved

1  staff.  In Government's Exhibit 4, the pen lift to make

2  the ball with the "B."  In Government's Exhibit 5,

3  again, it's repeated throughout 5 and 6.

4        We then have a "C" in back, which you have the

5  normal formation of the "C," which is a little bit

6  heavier pen pressure, and then this added stroke of a

7  curve to the back side of the "C."  You see that in

8  Government's Exhibit 3, in Government's Exhibit 4, with

9  a heavier "C" form and a pen lift in this curved stroke

10  that's been added to the back side of the "C."

11        You see that again in Government's Exhibit 5,

12  Government's Exhibit 6.  You'll see it here in

13  Government's Exhibit 7 in the word "scare" this time,

14  and you see it here in Government's Exhibit 8.

15        You also have this "K" which is a three-stroke

16  "K."  When we say that, we mean that there's been

17  multiple pen lifts.  So you have a slightly curved staff

18  that's made, and then a pen lift to this first leg, and

19  then another pen lift to this leg, which meets it right

20  in the center for a three-stroke "K" formation.  That's

21  in Government's Exhibit 3, 4, 5, 6, 7 and 8.

22        Drawing your attention here to the word "put,"

23  the capital "P," which is a one-stroke "P."  So in this

24  case, you have the "P" with a nice curved back stroke.

25  Again in Government's Exhibit 4, and then that's not

1   represented in the remainder of the exhibits.

2        You also have a curved "T" in "put," with a

3   cross bar that -- it's height relationship, it's taller

4   than that "U."  It doesn't sit at the same level as the

5   upper staff of the "U" in Government's Exhibit 3,

6   Government's Exhibit 4, again that height relationship,

7   the cross bar sits a little taller on the staff of the

8   "T" in Government's Exhibit 7.

9        There are some instances where it wasn't

10  represented in some of the documents.  We just didn't

11  have the same wording in all of the documents which is

12  why it's not on the charts.

13       We also have this "J" with the curved top here

14  in Government's Exhibit 4, and we have a "J" down here

15  in Government's Exhibit 1 that has a curved top, but it

16  also has these extra flourishes that were added to it.

17       THE COURT:  All right.  So these indicated to

18  you what?  I'm sorry.  We just need to start --

19       THE WITNESS:  I apologize.  The totality of

20  these characteristics led to the conclusion that these

21  documents, Government's Exhibits 3, 4, 5, 6, 7, 8 and 1

22  were authored by the same writer, one writer.

23       Now, drawing your attention to Government's

24  Exhibit 9, I said I would talk about this a little bit

25  later.  Now, for this one, there were indications that

1    the writer that wrote these exhibits also wrote this

2    exhibit.  Okay.  So you'll see the same -- the "U," that

3    lower case "Y" that we talked about with the bold, and

4    that lower extension that moves off to the left-hand

5    side, the curve to the line of the lower case "B" and

6    the staff.  You'll see that three stroke "K" that we

7    talked about.

8              But you don't see that "C" with the added

9    flourish on it.  You see over here, in the address for

10   Government's Exhibit 9, my Exhibit Q-8, you'll see that

11   curve to the capital "E" on that staff.  You'll see the

12   curve to the capital "B" that we talked about up top.

13   You'll see the capital "A" with both the curve to the

14   staff.  You'll see this curve to the capital "T," the

15   cross on the capital "T," which we saw up here in the

16   capital "J."  Those aren't the same letter.  There are

17   some times, when you can look at other letter forms,

18   perhaps a lower case "A" and a lower case "D" because

19   they have the same basic formation with just a slightly

20   larger staff for a "D."  In this case, you have that

21   same cross on a capital letter, which was the capital

22   "J" here and a capital "T" here.  Just the bottom part

23   of the letter is different.  So we do make slight

24   extrapolations on some letter forms when we are looking

25   for those things that are consistent between them.

1        So that's why -- there were a number of
2   characteristics similar; however, there were things
3   missing, and that's why it was only an indication that
4   the writer that wrote these also wrote this.
5   Q.   Let me show you Government's Exhibit 15, which is
6   another chart.   What did you learn from this questioned
7   writing?
8   A.   Underneath the questioned heading here is my Exhibit
9   Q-8, which is Government's Exhibit 9, and that is the
10  letter that was contained that we were speaking to.
11  Under here, the known documents, those are words that
12  were taken from the known documents that I received,
13  K-1-1 through K-1-3.
14        When you're doing again a side-by-side
15  comparison, you're also looking from the question to the
16  known.   You're trying to find the characteristics in the
17  questioned document in the known.   You'll see here I
18  chose "about."   I was looking at the formation of this
19  lower case "B."   If you'll notice, there's a small tick
20  here at the top of the staff of the lower case "B."   As
21  you start the letter, there's just a slight tick that
22  starts off to the left and comes down.   You then have
23  that counterclockwise rotation into the ball of the "B,"
24  one stroke "B."   That is seen again here in the known
25  document, just a slight tick down and counterclockwise

1   rotation into the ball of the "B."

2           You also have some height relationships.  I was

3   looking at the height of the ball of the "B" here with

4   the height of the "O."  So the "O" is slightly shorter

5   than the "B."  I was also looking at the placement of

6   the crossbar of this "T" in relation to the lower case

7   "U."  It has -- the "T" starts at the left-hand side and

8   goes just slightly up as you move across to the right.

9   And, again, in the known document, you see it start at

10  the left-hand side and go slightly up, and it's shorter

11  than the "U" staff next to it.

12          For the word "me," you have the "M" that starts

13  right at the base line.  You have the hump that comes up

14  that's slightly tilted or arched.  It retraces down, not

15  quite to the center base line staff and retraces up into

16  the second hump and ends above the base line.  Again, in

17  the known document, you see that it has started at the

18  base line, makes that nice arch, doesn't quite go down

19  to the base line and back up where it terminates

20  slightly below or slightly above the base line.

21          You have this eyelet to the "E," which is

22  narrow and tall in the letter "E" in the questioned

23  document.  Again, narrow and tall in the letter "E" on

24  the known document.

25          You have this capital "Y" in the questioned

1   document where you have this curved staff, which is on

2   the left-hand side of the letter and then you have, on

3   the right-hand side, the "V" coming in to create the Y.

4   And, again, in the known document, you have this curved

5   staff on the left-hand side of the letter and this

6   curved "V" that comes in to complete the capital "Y."

7   You have again the tinted formation of the lower case

8   "N" in "didn't" here in the questioned document and

9   "and" here in the known document.

10          We spoke about letter forms that could be

11  similar.  We have the lower case "D," which here starts

12  at the ball, has this counterclockwise rotation and up

13  into the staff one stroke.  You'll notice here in the

14  known document, that you have that same rotation.  It

15  goes up into the staff, but then it comes down and has

16  that small little tail.  You see the tail here in the

17  questioned document in the lower case.  So we know that

18  the writer of the questioned document is capable of

19  making that retrace down into the tail, but it's not

20  seen in the lower case "D."

21          In the "W" here in "want," again, the center

22  staff is not as tall as the right and left hand staffs.

23  And on terminus at the end here of the "W," you have a

24  this little tick that's off to the right-hand side.

25  That's again seen in the known document where the center

315

1   staff is not as tall as the right and left staff, and

2   you have the small tick on the right-hand side.

3           The capital "A" here in the questioned, the

4   word "all" starts above the base line.  It has a curve

5   up, and then the end of the "A" is below that beginning

6   point.  Again, in the known document, you have that "A"

7   that starts a little bit above the base line, and it's a

8   curve and then it ends a little bit above the base line.

9           I would like to draw your attention to, again,

10  a three stroke "K" in the word "back."  It has the

11  curved staff.  You have that wide or the "V" formation

12  that comes in for the top of the "K" and then the leg

13  that meets it in the center of that and comes down for a

14  three-stroke "K."  You see that again in the known

15  document, the staff, the "V" that comes in for the top

16  leg and the other leg that meets.

17          These are just a number of things that I picked

18  out to demonstrate that this questioned document was

19  probably written by the known writer of the documents.

20  Q.   To recap, you're able to say that, as to the

21  government's exhibits contained in Government's Exhibit

22  1 and then the letters, Exhibits 3, 4, 5 and 6, that all

23  of those were authored by the same author; is that

24  right?

25  A.   Yes.

1  Q.   And then the last count dealing with Government's
2  Exhibit --
3  A.   9.
4  Q.   9, that that was probably written by the defendant?
5  A.   That is correct.
6  Q.   And that there are indications that it was the same
7  author that wrote 9 and all of the other letters, too;
8  is that right?
9  A.   That is correct.
10 Q.   Now, you say that he probably wrote it.  What does
11 that mean to a handwriting examiner?
12 A.   There were some limitations in the known writing.
13 We have a nine-point scale that we go by for our
14 conclusions that can be reached in handwriting
15 examination.  So, on the identification side, the top
16 finding would be an identification.  That means without
17 a doubt someone wrote those documents.
18      Right below that would be a highly probably
19 that an individual did write a document, and right below
20 that is a probably did write.  And then we have
21 indications did write and then a cannot determine.
22      And then it would move on to the other side of
23 the scale which would be the elimination.  So you would
24 have indications did not write, probably did not write,
25 highly probably did not write and then an elimination as

1    the writer.

2         So, for a probable, in this particular case,

3    the limitations were that there were characteristics in

4    the questioned document that were not being fully

5    reflected in the knowns that were supplied.

6    Q.   Were you able to make a determination after looking

7    at the questioned documents that the writer was

8    attempting to disguise their handwriting?

9    A.   There were indications in the questioned writing

10   that it was not normal, natural writing.  There were

11   added flourishes to letters.  There were pen lifts and

12   then an added flourish and patching, and that is an

13   indication that perhaps it was not normal, natural

14   writing.

15        MR. WHISONANT:  Let me have just a moment, Your

16   Honor.

17        (Brief pause)

18        MR. WHISONANT:  That's all we have, Your Honor.

19        THE COURT:  All right.

20                    **CROSS-EXAMINATION**

21   **BY MR. STEEN:**

22   Q.   Goods afternoon, Ms. Elliott.  How are you?

23   A.   Good.  Thank you.

24   Q.   I want to go back over some of your testimony and

25   your comparisons.  And I'm asking do you have

1  Government's Exhibit 22 in front of you?

2  A.   I do not.

3  Q.   Did you prepare a report for this presentation that

4  you did as to your findings?

5  A.   I did not write the report.

6  Q.   But you are in accordance with the report that is

7  submitted; correct?

8  A.   That is correct.

9  Q.   Government's Exhibit 9, questioned document 8-1, is

10  the only document that you actually reflect that

11  Mr. Dodd authored; is that correct?

12  A.   That he probably wrote, that is correct.

13  Q.   And so the envelope to Q-8 is not conclusive?

14  A.   That is correct.

15  Q.   Now, for Government's Exhibits 1, 3, 4, 5, 6, 7 and

16  8, are you following me?

17  A.   Yes.

18  Q.   Just making sure.  Those are written by one author?

19  A.   That is correct.

20  Q.   But you do not know who that author is?

21  A.   That is correct.

22  Q.   Is there any possibility that Exhibits 1, 3, 4, 5,

23  6, 7 and 8 were authored by more than one person?

24  A.   Government's Exhibits 1, 3, 4, 6, 7 and 8; correct?

25  Q.   Yes.

1  A.   I'm sorry, I'm trying to remember in my head what --

2  I just wanted to make sure that I am very clear as to

3  what I'm saying.

4  Q.   I hope I'm giving you the right --

5  A.   That's okay.  Okay.  So Government's Exhibit -- can

6  you please repeat the question now that I have these in

7  front of me?

8  Q.   Okay.  Is it a possibility that Exhibit 1, 3, 4, 5,

9  6, 7 and 8 were written by more than one author?

10  A.   No.  These have been identified as being written by

11  one individual.

12  Q.   So nobody could copy the handwriting that was

13  submitted to you?

14  A.   These were all identified as having been written by

15  one person.  Copy, I'm not sure I understand what you're

16  --

17  Q.   I think you testified that this handwriting was

18  disguised in a way.  If one person saw this handwriting

19  and tried to emulate it, is that possible?

20  A.   Based on the examination, it was determined that

21  these were all written by one person.  It's very

22  consistent the way that all letter forms are

23  constructed, even with those flourishes that we were

24  talking about that indicate that it may not have been

25  normal, natural writing, so one writer wrote these

1   documents.

2   Q.   But we don't know who that writer is, do we?

3   A.   Correct.

4        MR. STEEN:  No further questions, Your Honor.

5        MR. WHISONANT:  Nothing further, Your Honor.

6        THE COURT:  Ms. Elliott, you're excused.  Thank

7   you very much.

8        MR. WHISONANT:  Your Honor, we would call Brian

9   Lindsey to the stand.

10        THE COURT:  How long will this witness be?

11        MS. DIKE-MINOR:  Ten minutes on direct.

12        THE COURT:  We will take an afternoon break

13   after this witness.

14        **BRIAN LINDSEY, GOVERNMENT'S WITNESS, SWORN.**

15        THE CLERK:  Would you state your name, please?

16        THE WITNESS:  Brian Jerome Lindsey.

17        THE CLERK:  And spell your last name for the

18   record, please.

19        THE WITNESS:  L-I-N-D-S-E-Y.

20                **DIRECT EXAMINATION**

21   **BY MS. DIKE-MINOR:**

22   Q.   Mr. Lindsey, I'm going to be asking you a few

23   questions.  If you could lean into the microphone when

24   you talk and speak slowly, that would be helpful.

25   A.   Yes, ma'am.

1    Q.    Are you currently serving a prison sentence?

2    A.    Yes, ma'am.

3    Q.    What for?

4    A.    Armed bank robbery and possession of a firearm.

5    Q.    How long of a sentence did you receive?

6    A.    30 years.

7    Q.    When did you begin serving your sentence?

8    A.    June 1st, 2011.

9    Q.    Do you have any additional known prior convictions?

10   A.    No, ma'am.

11   Q.    Aside from your armed robbery and firearm, have you

12   previously been convicted in a court for any crimes?

13   A.    Yes, ma'am.

14   Q.    What were those?

15   A.    Trafficking marijuana, possession of marijuana and

16   distribution of a controlled substance.

17   Q.    Do you have an agreement with the United States

18   Attorney's office, that is our office, relating to your

19   testimony in this case?

20   A.    Yes, ma'am.

21   Q.    What is that agreement?

22   A.    To file -- submit for a Rule 35, which is a sentence

23   reduction.

24   Q.    Okay.  And have we promised you anything in return?

25   A.    No, ma'am.

1   Q.   What have we agreed -- what is the agreement with

2   respect to your testimony?

3   A.   Truth of the matter and leave to the judge during a

4   Rule 35.

5   Q.   And will we file this motion if you lie in

6   testifying in this case today?

7   A.   Ma'am?

8   Q.   Will we file a motion for a reduced sentence if you

9   lie during the testimony today?

10  A.   No, ma'am.

11  Q.   And what happens if you give your testimony and

12  you're truthful, but Mr. Dodd is acquitted?

13  A.   It will be up to the judge.

14  Q.   If Mr. Dodd is acquitted and you told the truth,

15  would our office still file a motion on your behalf?

16  A.   Yes, ma'am.

17  Q.   And you said this already, but does our office get

18  to decide how much time -- how much of a reduced

19  sentence you would get?

20  A.   No, ma'am.

21  Q.   Who decides that?

22  A.   The judge.

23  Q.   Mr. Lindsey, do you know a person by the name of

24  Clifton Dodd?

25  A.   Yes, ma'am.

1   Q.   How do you know him?

2   A.   From Calhoun County jail in 2011 and 2013.

3   Q.   And do you see that person in the courtroom today?

4   A.   Yes, ma'am.

5   Q.   Can you describe what he's wearing?

6   A.   A bluish-gray shirt.  That's all I can see.

7   Q.   Can you point him out?

8   A.   Yes, ma'am (indicating).

9          MS. DIKE-MINOR:  The record will reflect

10  Mr. Lindsey identified the defendant.

11         THE COURT:  It will.

12  Q.   Mr. Lindsey, have you had any conversations with the

13  defendant about any letters he wrote in this case?

14  A.   Yes, ma'am.

15  Q.   What were those conversations?

16  A.   He wanted me to say that he didn't write some

17  letters that was wrote.  He wanted me to say that a guy

18  named Lump had wrote them, which was involved in another

19  case in 2011.

20  Q.   Going back a second.  Did he mention -- did he tell

21  you that he wrote letters in this case?

22  A.   Yes, ma'am.

23  Q.   Did he mention who he wrote the letters to?

24  A.   I think it was like three, two was to -- one was to

25  a judge, and the other one was to, I think, a DA,

1    something like that.

2    Q.   Did he show you any of the letters?

3    A.   Yes, ma'am.

4    Q.   Do you recall -- how many did he show you?

5    A.   Two.

6    Q.   Two.  He showed you two full letters?

7    A.   No, ma'am.  An envelope on one and an envelope and

8    the full letter on another.

9    Q.   So he showed you an envelope on one letter and a

10   envelope and the full letter on another?

11   A.   Yes, ma'am.

12   Q.   Do you recall what the full letter said?

13   A.   Yes, ma'am.

14   Q.   What did it say?

15   A.   It was saying for a judge to bring some money and

16   put it in a park, but the money had to be in all

17   twenties, fifties or hundreds.  And when he seen -- when

18   the judge seen the newspaper for an add for a swimming

19   pool cleaner, that was when to take the money there.

20   Q.   Do you recall the name of the judge?

21   A.   It was Kruger or Cooger.

22   Q.   I'm going to show what's previously been admitted as

23   Government's Exhibit 3.  Do you recognize that document?

24   A.   Yes, ma'am.

25   Q.   What is it?

1   A.   The letter he showed me.

2   Q.   Why did he show it to you?

3   A.   I really don't know why he showed me the letter to

4   tell you the truth.  He showed me two letters.

5   Q.   Did he say anything else about that letter?

6   A.   Yes, ma'am.

7   Q.   What did he say?

8   A.   The handwriting was altered.

9   Q.   He said he altered the handwriting?

10   A.   Yes, ma'am.

11          MR. STEEN:  Objection, Your Honor.  She's

12   leading.

13          THE COURT:  Wait a minute.  That wasn't a

14   leading question.  That question wasn't leading.  So if

15   you object to that question, it's overruled.  Go ahead.

16          MS. DIKE-MINOR:  Thank you, Your Honor.

17   Q.   Had you seen the handwriting in that letter

18   previously?

19   A.   Yes, ma'am.

20   Q.   You talked about this previously, but did the

21   defendant make any other statements to you about this

22   case?

23   A.   Yes, ma'am, that if I got up there and said he

24   didn't do it, that I would be given $10,000 when he sued

25   the government.

1  Q.   He was going to give you $10,000?

2  A.   Yes, ma'am.

3  Q.   And how was he going to get that money?

4  A.   When he sued the government.

5  Q.   And were you -- how were you supposed to obtain that

6  money?

7  A.   He gave me information to his house, to his lawyer

8  and telephone numbers.

9  Q.   Did you write down your conversations with the

10  defendant anywhere?

11  A.   Yes, ma'am.

12  Q.   Where?

13  A.   In Calhoun County jail.

14  Q.   Did you record them -- did you use a pen and write

15  them down on paper?

16  A.   Yes, ma'am.

17  Q.   On what type of document?

18  A.   On a letter that I sent out to the judge.

19  Q.   What judge?

20  A.   Blackburn.

21  Q.   Okay.  And what date did you send that letter?

22  A.   It was in July.

23  Q.   Of what year?

24  A.   2013.

25  Q.   What happened after you sent the letter?

1  A.   The judge sent it to agents to come talk to me.

2  Q.   And two agents came to talk to you?

3  A.   Yes, ma'am.

4  Q.   And what did you tell them?

5  A.   Exactly what he had told me and what was on the

6  letters.  I explained the letters to him because he

7  brought it to me, and I went over it with him what was

8  said.

9  Q.   Did you tell him essentially what you've told us

10  today?

11  A.   Yes, ma'am.

12          MS. DIKE-MINOR:  One moment, Your Honor.

13          (Brief pause.)

14          MS. DIKE-MINOR:  Nothing further, Your Honor.

15          THE COURT:  Let me see you all briefly.

16          (Sidebar outside the presence of the jury)

17          THE COURT:  He said he sent a letter to me?

18          MS. DIKE-MINOR:  Yes.

19          THE COURT:  I don't remember him sending a

20  letter to me.  The defendant sent a letter to me?

21          MR. WHISONANT:  No, no.

22          THE COURT:  This man.  I don't remember him

23  sending a letter to me.

24          MR. WHISONANT:  The marshals then forwarded it

25  to us.

1           THE COURT:  Did it come to me and then I sent

2    it to the marshals?  I would remember if it was sent to

3    me.  Okay.

4           (Reading letter)

5           THE COURT:  All right.  I don't remember, but

6    if it came to me -- you're saying the marshals did get

7    this and did go see him about this letter?

8           MR. WHISONANT:  The marshals forwarded it to

9    us, and we sent the agents out there.

10          THE COURT:  I'm not saying I didn't get it.  I

11   get tons of letters.  This looks like it was addressed

12   to me.  It would be very likely reading what's in this

13   letter.

14          MR. STEEN:  You would have known him, Your

15   Honor, Mr. Lindsey, because Mr. Lindsey was brought

16   back -- remember the bank robbery cases we had from

17   Anniston, the credit union out there, Mr. Fluker.  He

18   was brought back to testify against all those people if

19   they didn't plead.  You would have known that.

20          THE COURT:  Seeing what's in here, it would be

21   likely that I would have sent it to the marshals.  I

22   just don't personally remember it right now.

23          (Open court.  Jury present.)

24                     **CROSS-EXAMINATION**

25   **BY MR. STEEN:**

1  Q.  Good afternoon, Mr. Lindsey, how are you doing?

2  A.  I'm doing fine.

3  Q.  You've also come back to testify against other

4  inmates that have been charged with crimes, haven't you?

5  A.  Yes, sir.

6  Q.  Part of them the bank robberies that you committed?

7  A.  Yes, sir.

8  Q.  And you have been available to the government for

9  that also, haven't you?

10  A.  Yes, sir.

11  Q.  Okay.  Now, when were you at Calhoun County jail

12  with Mr. Dodd?

13  A.  In 2011 and 2013.

14  Q.  And when did you see the letters that you say that

15  he showed to you?

16  A.  2013.

17  Q.  So that was this year?

18  A.  Yes, sir.

19  Q.  And do you know what time you were in Calhoun County

20  jail this year?

21  A.  Yeah, I was there from June to July.  I think it was

22  like that.

23  Q.  Okay.  And Mr. Dodd told you his attorney's name; is

24  that correct?

25  A.  He wrote it down.

1   Q.   And you included it in the letter that you wrote to

2   the judge?

3   A.   I can't remember.

4   Q.   If I show you the letter that you wrote to the

5   judge, would that refresh your memory?

6   A.   Yes, sir.

7   Q.   I'm going to show you what's been previously marked

8   as Government's Exhibit Number 17.

9   A.   Yes, sir.  This is the letter I wrote.

10  Q.   And in that, did you put the his attorney's name?

11  A.   Yes, sir.

12  Q.   Okay.  And the letters that you actually saw then,

13  if I may have that one back that you referred to that he

14  had shown you, I think one was exhibit -- Exhibit Number

15  3, the letter to Scott Coogler, I think, that you said?

16  A.   Yes, sir.

17  Q.   Was that part of his discovery in this case?

18  A.   I don't know what part of discovery is.  It was in

19  -- it was just a letter that he had.

20  Q.   That he had?

21  A.   Uh-huh.  I don't know if it was --

22  Q.   Okay.  Let's do this then.  Did he discuss that

23  letter with you, Mr. Lindsey?

24  A.   Yes, sir.

25  Q.   And you initialed it when you saw it?

1    A.   Yes, sir.

2    Q.   And that would have been July of this year?

3    A.   Yes, sir.

4    Q.   Had you seen that letter previous to July of this

5    year?

6    A.   No, sir.

7    Q.   So you don't know who authored it?

8    A.   He said he wrote it.

9    Q.   You don't know who authored it?

10   A.   I just know he said he wrote it.

11   Q.   But you don't know who authored the letter?

12   A.   He told me he wrote it.

13   Q.   Okay.  So he told you he wrote it?

14   A.   Yes, sir.

15   Q.   Does that mean he wrote it?

16   A.   I would think it would.

17   Q.   Would it?

18          MR. STEEN:  No further questions, Your Honor.

19          MS. DIKE-MINOR:  Nothing further.

20          THE COURT:  Mr. Lindsey, you're excused.  Thank

21   you very much.

22          THE WITNESS:  All right.

23          THE COURT:  Ladies and gentlemen, we're going

24   to be in recess until a quarter till 4:00.  Thank you

25   very much.

1          (Jury excused.)

2          (Open court, outside the presence of the jury)

3          THE COURT:  All right.  Thank you.  How many

4     more witnesses do you have?

5          MR. WHISONANT:  That's it.

6          THE COURT:  That's it.  Okay.  Let's clear the

7     courtroom except for all students and any agents that --

8     agents can stay in.

9          Let me let you go ahead and rest now.

10          MR. WHISONANT:  I want to double check with the

11     courtroom deputy that my exhibits are all in, but other

12     than that, we're ready to rest.

13          THE COURT:  All right.  Do you want to check

14     right this minute and see?  She's actually pulled it up.

15          (Brief pause)

16          THE COURT:  Okay.

17          MR. WHISONANT:  The government rests.  Okay.

18     Thank you.

19          MR. STEEN:  Your Honor, we would ask for a

20     motion for judgment of acquittal.  I present a motion

21     for judgment of acquittal.  The government has failed to

22     prove a prima facie case against Mr. Dodd.  We ask that

23     the case be dismissed and he be acquitted.

24          THE COURT:  All right.  I could go back through

25     my notes, but just to help me summarize, can you go

1  through the ones that Mr. Williams identified that he

2  knew -- I think I know the information about the

3  handwriting and the fingerprints and all that, but can

4  you tell me which ones he identified.  Some he said he

5  didn't recall, and some he said he knew for sure, and

6  some he said he thought he saw lying on the bed.  One I

7  know he said he saw lying on the bed.

8          MR. WHISONANT:  Yes, Your Honor.  Mr. Williams

9  identified Government's Exhibit 2.

10          THE COURT:  This is the one he said he read the

11  letter?

12          MR. WHISONANT:  Yes, ma'am.  That's not a

13  letter, but that's the manila envelope.  He said that he

14  saw that one.

15          THE COURT:  He saw the envelope that goes with

16  Exhibit 2.  I was looking at Count Two.

17          MR. WHISONANT:  Government's Exhibit 3, the --

18          THE COURT:  Let's go through the counts.

19          MR. WHISONANT:  Count Two, he identified that

20  one.

21          THE COURT:  All right.

22          MR. WHISONANT:  Let me look at the indictment,

23  Judge.  Count Two is Judge Coogler.  He identified that

24  one.  Count Three, that one was to Judge Tommy Nail.  He

25  identified that one.  Count Four, that was to Jim

1    O'Kelley.  He identified that one.  Count Five to Sheila
2    Weil, he did not recall.  Count Six to Michael Bole, he
3    identified that one.  Seven to Jim Preuitt, he did not
4    identify that one.
5         THE COURT:  I just wanted to get that for my
6    notes.  There is more than sufficient evidence, drawing
7    all reasonable inferences in favor of the government,
8    that the jury could find the defendant guilty beyond a
9    reasonable doubt.  So your motion for judgment of
10   acquittal is denied.
11        Now, do you plan to call any witnesses or do
12   you not?
13        MR. STEEN:  Your Honor, may I have just a few
14   minutes?  We probably need to talk.
15        THE COURT:  All right.  Well, after you do
16   that, then if he chooses not to testify, I want to say
17   something to him on the record.
18        MR. STEEN:  All right.
19        THE COURT:  Are the microphones off?  I can't
20   hear you all when you're talking.  I can't hear anybody
21   when they're whispering, so if you'll talk to him.  The
22   microphones are off.
23        (Brief pause)
24        MR. STEEN:  We would have one witness, and that
25   will be Mr. Dodd that will testify.

1          THE COURT:  Okay.  We will be on break, and you

2   can stay here.  If you need him to stay in here during

3   the break to work with him, you can.

4          THE DEFENDANT:  I'm going to use the restroom,

5   and then I need to talk to him.

6          THE COURT:  Okay.  Go use the restroom, and you

7   can come back in.

8          (Brief recess)

9          (Open court, outside the presence of the jury.)

10         THE COURT:  I do want to tell you, Mr. Dodd,

11  and I'm sure your attorney has told you this, but you

12  understand, if you testify, the government will be

13  permitted to go into your prior convictions for similar

14  crimes or any other convictions, any felony convictions

15  if they're not time barred.  My understanding is you

16  only have the --

17         THE DEFENDANT:  That's the only thing I've ever

18  been convicted of.

19         THE COURT:  Okay.  But you understand that if

20  you testify -- that didn't come in in the government's

21  case in chief.  You understand if you testify they can

22  cross-examine you about those convictions?

23         THE DEFENDANT:  I understand that, but the only

24  way to explain actually what all happened in there

25  specifically, there's nobody else that we have found

1   that will actually speak on my behalf, so I must be the

2   only one that can do it.

3           THE COURT:  I just want to make sure you do

4   understand that they can cross-examine you about those

5   prior convictions.

6           THE DEFENDANT:  Trust me, it's the honest

7   answers I'm giving.  That's for sure.  If I have to let

8   it all in, I have to let it all in.

9           Can I ask you a question about that, is there

10  any way that my mother and my sister do not have to be

11  in here?

12          THE COURT:  When you testify?

13          THE WITNESS:  Yes.  There's certain things that

14  may come out that may not be very good for them that my

15  family was involved with.

16          THE COURT:  Well, I will let you ask them not

17  to be in here, but I'm not -- when they come in, and

18  they can come in before everybody else, and I will let

19  you tell them that you would prefer them not to be in

20  here, but I'm not going to direct that they can't be in

21  here.

22          THE DEFENDANT:  I understand.

23          THE COURT:  Because this is an open proceeding.

24          THE DEFENDANT:  I understand that.

25          THE COURT:  But if you would like to say it to

1   them, and they are willing to step out, that's fine.

2           THE DEFENDANT:  Well, also, they may have to --

3   for some reason after what I say --

4           THE COURT:  What?

5           THE DEFENDANT:  Basically, they made end up

6   having to be a witness in what I'm telling, too, because

7   there's certain things that happened back then that the

8   family knows about, about my past conviction.

9           THE COURT:  I'm not sure I'm following what

10  you're saying, but you're welcome to tell them you don't

11  want them in here.  I'm not going to tell them that, so

12  we can have them come in in a minute.

13          Now, is there anything else anybody wants to

14  put on the record?

15          MR. STEEN:  Your Honor, just so the court will

16  be aware of, and I want to go on the record also, is we

17  have discussed him testifying.  It is against my advice

18  for him to testify.  But, like he said, he feels like

19  he's the only one that can present this story.

20          THE COURT:  All right.  So, Mr. Dodd, in a

21  criminal case, obviously, you consult with your lawyer,

22  and you do have the right to testify in your own

23  defense.  Is it your desire to testify even though your

24  lawyer recommends that you not testify?

25          THE DEFENDANT:  Yes, ma'am.  At this point in

1    time, I think it's the only way, because I'm not -- I'm

2    not very comfortable with the case, the way it's going.

3         THE COURT:  You are free to disregard your

4    lawyer's advice, but you understand he's recommending

5    that you not testify, but it's your desire to testify;

6    is that right?

7         THE DEFENDANT:  Yes, ma'am.

8         THE COURT:  If we can get the mother and sister

9    in here, and I'm going to let you just turn around, and

10   it can't be any physical contact, but you can just turn

11   around and talk to them quietly and you can tell them.

12   But I want to make sure they know I'm not telling them

13   they can't be in here.  Actually, I think I may say that

14   to them so that they know it, but I will let you

15   privately talk to them.

16        THE DEFENDANT:  Okay.

17        (Brief pause)

18        THE COURT:  The defendant has said to me that

19   he would prefer his mother and sister not to be in

20   during his testimony and wanted me to ask that you not

21   be present.  And I told him I'm not going to do that,

22   that he could ask you, but this is an open court, so you

23   absolutely don't have to leave.  I just want to say I'm

24   not requiring you to leave at all.  He said he didn't

25   want to, and I want to make sure you know that you're

1  free to stay if you would like to stay.  Do you all plan

2  to stay?  You don't have to leave.

3          THE DEFENDANT:  If you want to stay, you can

4  stay.

5          THE COURT:  He's now saying he doesn't mind.

6  You feel free to stay.

7          UNIDENTIFIED SPECTATOR:  I think he's fixing to

8  do something that he should not do, and I don't want to

9  be present.

10          THE COURT:  Okay.  I just want you to know you

11  all are free to stay.  You both understand that, that

12  I'm not closing the court to you.

13          (Open court.  Jury present.)

14          THE COURT:  All right.

15          MR. WHISONANT:  Your Honor, the government

16  rests.

17          THE COURT:  All right.  The motion is

18  considered timely filed.  Any witnesses for the

19  defendant?

20          MR. STEEN:  Your Honor, the defense would call

21  Clifton Dodd to the stand.

22          THE COURT:  Mr. Dodd, you know how to get in

23  right here?

24          THE DEFENDANT:  Yes, ma'am.

25          **CLIFTON DODD, DEFENDANT, SWORN.**

1      THE COURT:  State your name for the record.

2      THE WITNESS:  My name is Clifton Dodd.

3      THE COURT:  All right.

4                  **DIRECT EXAMINATION**

5  **BY MR. STEEN:**

6  Q.   Mr. Dodd, do you understand why you're here today;

7  is that correct?

8  A.   Yes, sir.

9      THE COURT:  I hate to do this right when he

10 starts his testimony, but I just thought of something I

11 need to ask you both.

12      (Sidebar outside the presence of the jury)

13      THE COURT:  I've forgotten what the rules are

14 about any problem with you eliciting testimony -- but he

15 hasn't told you that it's filed, so I think that you're

16 free to ask him.  I forget what those rules are.

17      MR. STEEN:  I cannot ask him anything that

18 would be contrary to what he's told me already.  I can

19 illicit --

20      THE COURT:  That would illicit false testimony

21 from him or what he has said to you.

22      MR. STEEN:  Right.  So his denial of anything

23 to do with this --

24      THE COURT:  To you allows you to ask him

25 questions like that.  I just wanted to make sure.

1    MR. STEEN:  Some may be in narrative form, Your

2    Honor.

3         THE COURT:  That's probably going to be all you

4    can get.

5         (Open court.  Jury present.)

6    Q.  (By Mr. Steen)  You're aware that the United States

7    has charged you with sending a hoax letter in 2011?

8    A.  Yes, sir.

9    Q.  Okay.  Do you want to make a response to anything

10   that they have presented at trial already?

11   A.  I'm sorry, I don't understand.

12   Q.  Do you want to make a response to anything that they

13   have submitted as evidence to that charge?

14   A.  To which letters, all seven?

15   Q.  No.  Let's start with the letter that went to the

16   criminal court building for Jefferson County.

17   A.  Yeah, yes, sir.

18        THE COURT:  You need to project your voice into

19   the microphone.

20   A.  Yes, ma'am.  Okay.  Around it was about February or

21   March of 2011, during my case, I came to Jefferson

22   County.  I was on the sixth floor, A section, and I was

23   in THE room -- I was in the bottom floor all the way at

24   the end.  I think it was room six or five.  I can't

25   remember.

1              I was there about two and a half, three months,

2      and I was roommates with a person named Hill, Manuel

3      Hill.  I met a guy named Michael Bole.  He was a real

4      tall guy, long hair, and the whole time all he did was

5      simply walk around there and, you know, he just cussed

6      and screamed and talked about this person, talked about

7      that person.

8              Well, I try to be a nice person.  I talked to

9      him a little bit and everything, and he started telling

10     me a little about his case and about this and that and

11     about how he thought the government was after him and

12     all this stuff.

13             So I try to be nice to people.  Anybody will

14     tell you that.  When I found out what his charge was, I

15     started getting more talking to him, because what he was

16     saying was -- he was talking kind of nutty about he was

17     out to get this person, he was out to get that person,

18     stuff like that.

19             So I started to talking to him, and he started

20     telling me that he was trying to beat his case.  They

21     tried to give him 20 years, and he wanted to take

22     revenge on a Judge Nail.  That was the judge he kept

23     talking about.  He said that was the judge that

24     railroaded him.

25             And he was talking about he was sleeping with a

343

1   lawyer's daughter.  I don't know their name, Lindsey or

2   something like that.  And Elizabeth I think was her

3   name.  And he was telling me all the story about what

4   all happened and everything.

5           During the middle of many conversations we had

6   through time, he basically tried to hire me and other

7   people to kill for him.  Well --

8   Q.   Let's go back.  Actually, how did he let you know

9   that he wanted to hire you to kill someone?

10  A.   After the long talks and stuff like that, he was

11  telling me about -- at first, he was trying to tell me

12  that people were setting him up.  A couple of inmates

13  were supposed to testify against him saying that he had

14  tried to hire them.  That was the first thing.

15          Then he came to me and later on, when he found

16  out he got 20 years in prison, and I just told him to

17  try -- because he wasn't all there.  When you talked to

18  him, you could tell he was crazy.  That's why he's in

19  the nut house now.

20          The idea is -- the idea was that all I was

21  trying to do was try to figure out a way to help him

22  out.  We talked about my case, and I talked about his

23  case.  Well, when he specifically came to me and he was

24  trying to hire me, I tried to talk him out of it.  I

25  tried to talk to him just about his case, try to see a

1    psychiatrist, I think you can beat the case because you

2    need help.

3         Well, he told me the state wouldn't allow him

4    to see a psychiatrist, but he wanted to try to get in

5    the Feds.  So during the conversation, me and him had

6    talked and everything, and I told him about my case.  I

7    told him how I originally got charged with some

8    threatening letters myself, and he told me would that

9    work for him.  And I told him, I don't know, but I

10   wouldn't try it.

11        But he told me -- I'm trying to see a date line

12   of this all.  It was like a two or three month period.

13   It's not like one day.  He was there like eight months

14   before I got there.  He told me that -- it was around

15   late March, early April when he got sentenced to 20

16   years in prison.  And he started talking to a lot of

17   people.  There was this one black guy where he went to

18   him, and he tried to get him to --

19        THE COURT:  I'm going to ask you to -- you're

20   going into a long discussion here about a conversation

21   you had with Mr. Bole.  You need to get to the point.  I

22   think you were asked about Government's Exhibit 1.  Is

23   that where you are, Government's Exhibit 1, which was

24   the letter where there was the soap -- I'm not saying

25   there was soap.  I'm not saying that's what's the

345

1   evidence is.  You all decide what the evidence is.  But

2   you need to focus on that first letter.

3            THE WITNESS:  That's exactly what I was getting

4   to.  It wasn't just like one day or something like

5   this.  What happened was is when he actually went to

6   this one inmate, and he said -- I overheard him.  I came

7   to him and I told him, I said, don't mess with these

8   people.  These people will get you in trouble.  I said I

9   will take care of that.

10           So I told him I would take care of all these

11  people.  He wanted me to -- he was talking about people

12  he wanted to kill.  So I specifically talked to him.  I

13  wrote a note.  I passed it to the Feds, and I wrote a

14  letter to my sister that -- y'all have this evidence

15  showing that I told my sister to get this to the Feds

16  that this guy is trying to hire me and other people to

17  kill for him.

18           Well, when -- let's see here.

19  Q.   Did the Feds contact you after receiving the letter?

20  A.   The police did.  Detective Edge, I think that was

21  his name, him and another detective came and met me

22  downstairs, and they talked to me for about a good hour

23  or so, and I told them what was going on.  And they

24  asked me could I move in the room -- did I have a

25  problem moving in the room with Michael Bole, because

1   they had him under investigation for like five or six

2   other threatening letters he had sent out.

3         Now, at this time, he wanted to have a letter

4   sent out, but he also made some threatening phone calls,

5   and he was actually passing letters to people to go mail

6   out to Elizabeth and Paul and other people that he was

7   supposed to have been -- I seen that with my own eyes.

8         And so I told them that was fine.  I told them

9   I would keep an eye on everything.  They asked me what I

10  wanted.  I told them, I was like, if it helps my case,

11  it helps my case.  I'm not really trying to do

12  that.  I'm trying to help him out, but if it helps my

13  case, of course.  You know, I'm not going to gripe or

14  anything.

15        So two days later, they call me up in the

16  intercom.  They told me to move into Michael Bole's

17  room.  It was the very first room at the end.  I'm

18  closer to this side.  I moved there, and I was there for

19  about a couple of days.  And me and him talked about the

20  my original case and everything.  And I told them

21  basically what I did and stuff like that, and that's

22  kind of part of the conversation.

23        And I hate to say it, but I kind of actually

24  may have even put the words into his mouth, that that

25  would help you get into the Feds.  But later on when I

1   talked to him, I explained to him not to do something

2   like that, and I went to other inmates and told them not

3   to give this guy any envelopes, anything like that,

4   because I think he's going to try to send some kind of

5   threatening letter or something like that.

6       I was upstairs about a week later.  I think it

7   was probably around maybe -- it was about the 10th or

8   the 11t or something like that, he came up to me and he

9   --

10  Q.  Clifford, let me stop you.  The 10th or 11th of?

11  A.  Of April 2011.  It was somewhere around that period

12  of time.  He came to me.  I was upstairs talking to a

13  friend of ours.  Actually, a friend of his, too.  And he

14  said, I took care of that.  I said, you took care of

15  what.  He said, I took care of that letter.  I was like,

16  what letter.  And he just kind of smiled and walked off.

17      Well, I looked at my buddy beside me, and I

18  asked him, I said, you didn't give him an envelope?  He

19  said no.  So he asked the other guy down there that he

20  talked to all the time, and he didn't give him one.  So

21  I went and asked a couple more people.

22      So I went and asked him, where did you get an

23  envelope from.  He said, I have my ways.  And I told

24  him, I was like, Michael, I says -- I was like, man,

25  they're going to blame me for this.  They're going to

1  blame me for this.  He said, no, no, I will take the
2  blame for it.  I was like, Michael, I wanted to help you
3  out.  I wanted to simply get you into a nut house where
4  you belong because you've got serious problems.  I said,
5  but I've got enough stuff to deal with.
6        So I contacted the Feds again, and I told them
7  what was going on.  Well, a couple of days later, they
8  shut down the courthouse.  With the courthouse and
9  everything, he's at the TV, and he's all cheering and
10  stuff like that.  And I'm kind of looking at him.  He's
11  doing high fives and stuff like that.  And I went to my
12  buddy Kellog at the time -- one of the letters in is my
13  discovery.  And I told him, I was like, this guy's
14  nuts.  He's insane.
15        He left a couple of days later and went to
16  prison or whatever he went, and then the Feds a couple
17  of days later come and got me and took me to the
18  courthouse and they talked to me and asked me about the
19  letter, and I told -- I thought the letter he had wrote
20  was to Judge Nail because the only letter he ever showed
21  me that he was trying to write was to a Judge Nail.  I
22  didn't find out until later on he had wrote one to a
23  Teresa McClellan or something like that.  I don't know
24  what her name is.  And I don't even know if they showed
25  me that letter or if I found out that later until

 1   December of that year when they showed me some more

 2   stuff.

 3            But when they moved me to Calhoun County, and I

 4   --

 5   Q.   When did move you from Jefferson County to Calhoun

 6   County?

 7   A.   I think it was the 15th or the 16th of April of

 8   2011.

 9   Q.   And you were at Calhoun County from the 15th or 16th

10   of April until when?

11   A.   February 17th of the next year, of the next year,

12   yeah.

13   Q.   And the next year being?

14   A.   2012.

15   Q.   Once at Calhoun County, what did you do?

16   A.   Well, Calhoun County, they told me that I was

17   specifically -- when I seen the detectives at the Hugh

18   Black building, they asked me -- they wanted to know

19   what I knew about the letter.  I thought the letter he

20   had wrote went to Judge Nail, because that's the only

21   letter he ever showed me.  He just started writing and

22   everything, and he told me he was going to chop off

23   fingernails and toe nails and stuff like that, and he

24   was going mail it to them.  Basically, he was going to

25   call him -- I don't know.  He said Toe Nail, Tommy Toe

1  Nails or something like that.  I can't remember what it

2  was.  And he said he was going to mail that to him.

3  Well, that's when I went and told everybody not to give

4  letters and stuff like that right there.

5          Well, when I got to Calhoun County jail, I had

6  took all the notes.  I already had a lot of notes, the

7  names of all the people he had threatened, all the

8  people that he tried to hire, some of the handwriting

9  and stuff like that, because they asked me to write that

10 stuff down.  So just like the letter that I wrote that's

11 in my discovery where I told the Feds to tell them what

12 he was all doing, I had a copy my own self that they

13 allowed me to take to the county jail with me, and I

14 also sent a copy home.

15         And in that one, I had all the handwriting and

16 everything to try to describe what he was doing because

17 they wanted to know as much evidence as they can.

18         THE COURT:  Let me just stop you.

19         THE DEFENDANT:  Yes.

20         THE COURT:  Did you write that letter in Count

21 One, the first one that contained something in the

22 envelope?

23         THE DEFENDANT:  No, ma'am, no, ma'am.

24         THE COURT:  All right.  What are you saying?

25 Do you know who wrote that letter?

1        THE DEFENDANT:  Michael Bole told me he wrote

2   the letter.  He told many people he wrote the letter.

3   He had wrote many letters.

4        THE COURT:  All right.  Let me let your lawyer

5   ask a question.

6   Q.  (By Mr. Steen)  Now, when you're at Calhoun County,

7   there's five letters that they say through Shannon

8   Williams that you sent the letters out?

9   A.  Yeah.  See -- yeah.

10  Q.  All right.  The question would be any of those five

11  letters did you write?

12  A.  No.  I didn't know anything about those until

13  somebody told me about them.

14  Q.  Did anybody approach you about those letters that

15  went out?

16  A.  I'm sorry.  Could you rephrase what you mean?

17  Q.  Did anybody come to you to tell you about the

18  letters that were about to be sent out?

19  A.  Around the middle of June, I was still fighting my

20  case.  The -- they kept trying to offer me a deal to

21  testify against Michael Bole in the original case, to

22  give me two years.  And I was going to court all the

23  time.

24        And one time when I came back from court, I

25  went upstairs and I had like five or six of my cakes,

1  because I had a lot of snacks, so I had a lot of my

2  snacks missing.  I was thinking my roommate James Smith

3  took it.  So I went asked him, and he didn't.  I asked a

4  few other people.  Nobody knew it.

5          There was an inmate named -- the only thing I

6  knew about him is he's tall and slim.  He was locked up

7  in the room -- I don't know which one it was.  He was

8  locked up in there.  36 maybe it was.  And he had a TB

9  shot.  He was taking TB shots and had to do an x-ray or

10  something like that.

11          THE COURT:  I'm sorry to keep interrupting you,

12  Mr. Dodd, but you've got to focus on the question.  We

13  can't just have -- I'm letting you go on to say a lot.

14  We're having a lot of narratives, but we've got to get

15  to the issues.

16          THE DEFENDANT:  This is where it's getting to

17  the point, Your Honor.

18          THE COURT:  All right.  Go ahead.

19  A.   When I walk by that guy, I asked him.  He said,  I

20  don't know what happened to your cakes, but I need to he

21  tell you something.  I was like what?  He's like --

22          THE COURT:  Let me just say this:  The

23  government is not objecting, and they don't have to

24  object, but you've gone into a lot of things of what

25  people said.  You are not allowed to do that.  That's

1    not permissible.

2            THE DEFENDANT:  I understand that.  I'm sorry.

3            THE COURT:  You can't say what other people

4    told you and what this man you say has told you

5    something.  That's not admissible.  Go ahead.  You can

6    say what you did, what you didn't do, what you saw, but

7    you can't say this person told me this.

8            I don't know where you're going, but let's say,

9    if you were going to say Michael Bole told me something,

10   no, you can't say that.  You can say what you did or

11   didn't do, what you saw or didn't see.  That's it.

12           So with that in mind, you can answer your

13   lawyer's questions.  I'm not going to require the

14   government to object.  I'm going to pay attention to

15   what's admissible or not admissible.  You cannot say

16   what somebody else told you or conversations you had in

17   the jail.

18           Now, I've let you go on with all that, but

19   we're not going to continue that way.

20           THE WITNESS:  How do I answer the question?

21           THE COURT:  Let's have another question, and

22   then you can answer it.

23   Q.  (By Mr. Steen)  The letter that has been presented

24   to this court to Scott Coogler, who is a judge in this

25   courthouse, did you author that letter?

1  A.  Did I write that letter, no.  I didn't know anything

2  about that letter until later on.

3  Q.  When did you first become aware of that letter?

4  A.  I'm not sure how to answer from what she said, but

5  one inmate told --

6        THE COURT:  No, no.  The question is when did

7  you become aware of that, so that's like a time.

8  A.  June the 15th, probably around 1:00 or 2:00 o'clock

9  in the afternoon.

10  Q.  Okay.  And the letter that was written to Tommy

11  Nail, when did you become aware of that letter?

12  A.  See, I didn't hear about those specifically.  I only

13  heard about letters.  I didn't hear about actually

14  specific letters until December of that same year when I

15  heard actually what letters they were talking about.

16  Q.  December of what same year?

17  A.  2011.  That's when the Feds came and talked to me

18  about the letters being sent out.

19  Q.  Okay.  Did they show you some letters that had been

20  sent out?

21  A.  Yes, they did.

22  Q.  Did you write any of those letters?

23  A.  No, no, sir.

24  Q.  Did you advise them that you didn't write any of

25  them?

355

1    A.   I told them I heard that this one person said they

2    wrote the letters.

3    Q.   You gave them a name?

4    A.   I gave them a name.

5    Q.   What name did you give them as being the author of

6    those?

7    A.   The only name I knew of at the time was Lump that I

8    know now is Shannon Williams.

9    Q.   So you told federal agents investigating this case

10   that Shannon Williams was the author of those letters?

11   A.   He actually admitted to me and apologized to me for

12   writing them.

13   Q.   The letter that was sent to Jim Preuitt, did you

14   author that letter?

15   A.   I don't know if I knew about letter to be honest

16   with you.  I'm not sure if they showed me that letter.

17   Q.   The letter that has been presented in this court as

18   evidence that was written to Jim Preuitt that he

19   testified to, do you know who authored that letter?

20   A.   No.  I don't know nothing about that letter.

21   Q.   So you didn't author it?

22   A.   No, I don't know anything about that letter.

23   Q.   Did you let Shannon Williams use your phone PIN

24   number to make phone calls?

25   A.   Many times.  I unloaded certain foods, so he bought

356

1   some for breakfasts.

2   Q.   So he would trade --

3   A.   Breakfasts, like certain meals I could eat, he would

4   give them to me for a phone call.  He had no money, so I

5   gave him the phone call to let him call his brother or

6   his momma or whoever he needed to call once a week to

7   keep in touch with his family.

8   Q.   Now, Shannon testified that he saw some letters in

9   your cell?

10  A.   Yes, sir.

11  Q.   The letters that have been presented here as

12  evidence?

13  A.   Yes, sir.

14  Q.   Do you recall what letters those are?

15  A.   Could you repeat what you mean?  Are you talking

16  about -- no letters were in my room.

17  Q.   Did you recognize those letters as being in your

18  cell?

19  A.   Oh, no, no.  I've never seen them before.

20  Q.   Did you write those letters?

21  A.   No, I did not.

22  Q.   So if Shannon Williams testified that you did write

23  those letters, that would not be truthful testimony?

24  A.   No, it would be lying.  There's no doubt.

25  Q.   Now, the letters that were sent to Jim Preuitt, you

1   didn't write those?

2   A.   No, sir.  I didn't know anything about that.

3   Q.   Now, the letters that were mailed out to Shannon

4   Williams' brother Shawn, did you know anything about

5   those letters being mailed out to Shawn Williams?

6   A.   Like I said, in the middle of June, I had heard

7   rumors through people that told me that --

8           MR. WHISONANT:  Objection to what he heard.

9           THE COURT:  I sustain.

10          THE DEFENDANT:  I understand.

11          THE COURT:  I sustain.

12  A.   That is all I know is rumors, so no.

13  Q.   So do you recall the telephone call that he talked

14  about talking to his brother?

15  A.   I gave him many phone calls.  I would have no idea.

16  Q.   So you didn't stay around to see the context of the

17  telephone calls?

18  A.   It's rude for me to be standing there and listen to

19  somebody else's phone call.  That's just rude.

20  Q.   Did you ever, in the course of being incarcerated at

21  Calhoun County jail, give other inmates paper or

22  envelopes to write letters with?

23  A.   Any time they wanted it.  There's a lot of people

24  that do not have money.  I was lucky my family gave me

25  supplies every two months.  You can have paper and

1    pencils and stamps and envelopes and all that stuff sent

2    to you, so I had loads of it.

3            And like I said, I always had money because my

4    family always brought money for me, but yeah, I had

5    supplies all time.  If anybody needed it, I would give

6    it to them or they would take it when they needed it.

7    It was like a little desk about this big (indicating)

8    and so tall.  I just had it stacked in there.  And if

9    anybody wants to come and take it, that's up to them.

10   Q.  Did you trade -- did anybody trade you anything of

11   value to use your paper or envelopes?

12   A.  Oh, no.  That's ridiculous.  They're not really

13   valuable, I mean, just paper.

14   Q.  The reason I ask you is you say that some things

15   were traded for phone calls?

16   A.  That was food.  I'm not going to trade somebody for

17   paper or pencils, even a couple of stamps.  I don't mind

18   that.  There's a limit to it.  You don't want to give

19   too much away.  But if somebody asks you for five or ten

20   or something like that.  Sometimes, like the other day,

21   there was an inmate that come and got like five sheets.

22   Another guy come and got a couple of sheets, something

23   like that, but that happens all the time.

24   Q.  Did you ever make a phone call to Jim Preuitt?

25   A.  I made a phone call to Jim, no, no, I never made a

1   phone call to Jim Preuitt.  Jim Preuitt called me

2   somewhere about 2008 maybe.  His grandson specifically

3   disappeared.  I live in Lincoln, Alabama.

4           THE COURT:  No, no.  That's it.  Move on.  You

5   say Jim Preuitt called you one time.  You never called

6   him?

7           THE WITNESS:  No, no, he called me.

8           THE COURT:  All right.

9           THE WITNESS:  Do you want to know what the

10  phone call was about?

11          THE COURT:  No.  Go ahead.  I don't think

12  that's relevant.  That's why I'm not going to allow you

13  to testify.  It has no relevance to this case.

14  Q.   I guess, Clifton, I just want to reiterate the seven

15  counts that --

16          THE COURT:  Let me just stop for a second.  If

17  you need to see me at sidebar.  Do you think that has

18  any relevance to this case what he would say or not?

19          MR. WHISONANT:  I do not.

20          THE COURT:  No.

21          MR. STEEN:  No, not to that aspect, Your Honor.

22          THE COURT:  I think I know, but I don't think

23  it has any relevance.  Go ahead.

24  Q.   (By Mr. Steen)  The seven count indictment that you

25  are facing today that we're having your trial in, Count

1   One consists of a letter to Teresa McClendon at

2   Jefferson County courthouse?

3   A.   Yes, sir.

4   Q.   Did you write that letter?

5   A.   No, sir.

6   Q.   Count two talks about a letter to U.S. District

7   Judge Scott Coogler.  Did you write that letter?

8   A.   No, sir.

9   Q.   Count Three is a letter to Judge Tommy Nail.  Did

10  you write that letter?

11  A.   No, sir.

12  Q.   Count Four is a letter to attorney James O'Kelley.

13  Did you write that letter?

14  A.   No, sir.

15  Q.   Count Five is a letter to attorney Sheila Weil.  Did

16  you write that letter?

17  A.   No, sir.

18  Q.   Count Six is a letter to Michael Bole.  Did you

19  write that letter?

20  A.   No, sir.

21  Q.   There was a card sent to Michael Bole.  Did you

22  write on that card?

23  A.   No, sir.

24  Q.   And Count Seven is a letter to Jim Preuitt.  Did you

25  write that letter?

1    A.    No, sir.

2    Q.    Without saying what was discussed, did anyone come

3    to you with information of who might have wrote those

4    letters?

5    A.    They actually did.

6    Q.    You can't go into what was said.  That's what I want

7    to know.

8    A.    Shannon Williams, he admitted to me about, I don't

9    know when it was, but it was probably around August.  We

10   had already moved back to yellow from lavender.  And me

11   and him, we were dealing with each other.  He's a big

12   boy, so he traded a lot of foods.  And he came to me and

13   talked to me, and he apologized to me and told me it

14   wasn't his idea.  It was another guy's idea, and he told

15   me he was sorry for it.

16         I specifically tried -- I tried to deal with

17   him, but I didn't want to mess with him so much.  I just

18   dealt with foods, and that was it.

19   Q.    Is that the only conversation you had with any other

20   inmates in Calhoun County jail concerning the letters

21   that you've been accused of writing today?

22   A.    No.  That is not correct.  I had two other inmates

23   who told me the same thing.

24   Q.    You can't tell me what they said.

25   A.    There was a person named Coco.  I don't know their

362

1    real name.  Coco come to me and told me --

2            MR. WHISONANT:  Objection.

3            THE COURT:  Sustained.

4    Q.    You can't testify to what they say.

5    A.    I'm trying.

6    Q.    Okay.

7            MR. STEEN:  Your Honor, if I may have just have

8    a second, please.

9            (Brief pause)

10   Q.    Do you recall being incarcerated with Brian Lindsey?

11   A.    Yes, sir.

12   Q.    And did he ever visit with you in your cell?

13   A.    No, sir.

14   Q.    Did he visit you while you were in the day room?

15   A.    Yes, sir.

16   Q.    At any time that he visited you, did you have your

17   discovery from this case visible for him to see?

18   A.    Yes, sir.  We have a desk about the size of this

19   right here.  And since I was fighting my case, I had to

20   have it strowed out and write everything down.  So he

21   would come by, him and many other inmates would come by

22   and look at it and ask me about it.

23   Q.    Did you ever tell Brian Lindsey that you wrote those

24   letters?

25   A.    No, sir.

1  Q.   Did you ever tell anybody that you wrote those

2  letters?

3  A.   I never told a soul.

4        MR. STEEN:   Your Honor, that would be all its

5  question we have.

6        THE COURT:   Cross-examination.

7                    **CROSS-EXAMINATION**

8  **BY MR. WHISONANT:**

9  Q.   If it please the court.   Let me make sure I've got

10  this right.   You deny before the jury and this judge

11  that you did not write the letter that's named in Count

12  One; is that right?

13  A.   Which one Is Count One?

14  Q.   Count One, the letter to the deputy DA, Teresa

15  McClendon.

16  A.   No, sir, I didn't write that letter.

17  Q.   And you deny writing the letters in Count Two that's

18  addressed to Judge Coogler?

19  A.   No, sir.

20  Q.   And you deny the letter that's named in Count Three

21  that's addressed to Judge Tommy Nail?

22  A.   No, sir.

23        THE COURT:   When you say no, sir --

24        THE DEFENDANT:   No, sir, I did not write it.

25  Should I rephrase that?

1  Q.   And you deny writing the letter that's named in
2  Count Four to Jim O'Kelley?
3  A.   Yes, sir, I did not write that.
4  Q.   And you deny writing the letter that's in Count Five
5  that's addressed to Ms. Sheila Weil?
6  A.   Yes, sir, I didn't write that.
7  Q.   And you deny that you wrote the letter in Count Six
8  that was addressed to Michael Bole?
9  A.   Yes, sir, I didn't write that.
10 Q.   And, lastly, you deny that you wrote the letter in
11 Count Seven that was to Mr. Preuitt who testified here
12 today?
13 A.   Yes, sir, I didn't write that.
14 Q.   Now, isn't it true that back on April the 24th of
15 2010, that you were arrested shortly after placing some
16 anthrax hoax letters in the mail, and you were taken
17 into custody?
18 A.   Yes, sir, that's correct.
19 Q.   And you have been in custody sense that time?
20 A.   Yes, sir, that is correct.
21 Q.   And that you went to court in July of 2011, and you
22 were convicted of mailing 23 anthrax hoax letters?  Is
23 that true?
24 A.   That's true, yes, sir.
25 Q.   So while you're in jail awaiting your trial on those

1  anthrax hoax letters, a letter to Teresa McClendon went

2  out in the mail and was received by Jefferson County;

3  right?

4  A.   Not in July.

5  Q.   Between the time you were arrested and the time that

6  you weren't to trial, that first letter to Teresa

7  McClendon went out in the mail?

8  A.   Around the middle of April, yes, sir.

9  Q.   And then about the middle of June you had letters

10 that went out to -- the five letters that were in the

11 package that you heard both the Williams brothers

12 testify about; is that right?

13 A.   Could you repeat that?  I'm sorry, I got lost.

14 Q.   When you were in jail awaiting trial when those five

15 letters got sent out to Mr. Williams' brother, to Shawn

16 Williams?

17 A.   Yes, sir.

18 Q.   Okay.  And the last letter is sent in September of

19 2011 after you had pled guilty back in July; is that

20 right?

21 A.   Yes, sir.

22 Q.   Okay.  Now, isn't it a fact, as Mr. Williams said on

23 the stand, that this was all part of a plan on your part

24 to try to get the Feds to cut you a deal so you wouldn't

25 have to serve any time on that earlier case?

1   A.   No, sir.  Because I had no other --

2   Q.   I asked you a yes or no question.

3   A.   No, sir.

4   Q.   And you didn't say anything about that to

5   Mr. Williams?

6   A.   Could you repeat that?  I'm sorry.

7   Q.   Mr. Williams testified here today that you told him

8   that this was part of a plan that you came up with to

9   get the Feds to drop their charges against you so you

10  could testify against Michael Bole?

11  A.   No, sir.  I did not say that.

12  Q.   So Mr. Williams is not being truthful?

13  A.   That is correct.

14  Q.   You also said that the Feds came to you and offered

15  you a deal to testify against Michael Bole.  You want to

16  tell me the name of the Assistant U.S. Attorney who made

17  that offer to you?

18  A.   Sir, I don't have any idea who was --

19  Q.   No.  I asked you do you have a name?

20  A.   No, I do not.

21  Q.   Did an Assistant U.S. Attorney make that offer to

22  you?

23  A.   Yes, sir.

24  Q.   Who was it?

25  A.   I don't know the name.

1   Q.   Was it a man or woman?

2   A.   It was a man.

3   Q.   Was it -- do you know -- can you describe him for

4   me?

5   A.   Just kind of gray hair with glasses, I think.

6   I mean, it's been two and a half year ago.  I don't

7   remember.

8   Q.   Was he bald headed, too?

9   A.   I don't know.  Like I said, it's been a couple of

10  years ago.  I don't remember that.

11  Q.   You don't remember that?

12  A.   No, sir.

13  Q.   Did any FBI agents or postal inspectors come with

14  him when he talked to you and made this offer?

15  A.   Yes, sir.

16  Q.   Can you give me any of their names?

17  A.   Yes.  Mr. Brandon Scott, and I can't think --

18  Mathews, the one that is there.

19  Q.   Mr. Mathews was there?

20  A.   Yes, sir.

21  Q.   And Mr. Mathews offered you a two year deal if you

22  will testify against Michael Bole?

23  A.   It was 27 months.

24  Q.   27 months if you would testify against Michael Bole?

25  A.   That's what they asked me.

368

1  Q.  Where did this supposedly take place?

2  A.  You know, I'm not really sure.  We went into -- we

3  went into some --

4  Q.  I asked you if you remember where this took place,

5  and you're not really sure?

6  A.  No.  I don't know where we was at.

7  Q.  Are you aware that Michael Bole is now in a mental

8  institution?

9  A.  Yes, sir.

10  Q.  When you pled guilty to those 23 counts, those are

11  separate letters; is that right?

12  A.  There's 23 letters.

13  Q.  And each one of them contained a white powdery

14  substance?

15  A.  I think so.  I'm not really sure.

16  Q.  And some of them contained soap powders, didn't

17  they?

18  A.  I'm not sure.

19  Q.  You mailed them, Mr. Dodd.

20  A.  I pled guilty to them.

21  Q.  And you don't remember what was in them?

22  A.  Because I pled guilty doesn't mean I did them.

23  Q.  I'm sorry?

24  A.  I don't know -- I don't know what was in all of

25  them.

1  Q.   You said just because you pled guilty didn't mean
2  you did them?
3  A.   That is correct.
4  Q.   Did you pled guilty to something you didn't do?
5  A.   I did part of it.  I did.  I will admit that.
6  Q.   What part did you do?
7  A.   I mailed off eight letters and was trying to cover
8  up.
9  Q.   You were trying to cover up what?
10 A.   Well, I originally thought that maybe my brother and
11 police officers who had something to do with it and then
12 --
13 Q.   You think a police officer was involved in sending
14 some of these anthrax letters out?
15 A.   I don't know.  I really didn't know.
16 Q.   What police officer do you think was involved in
17 this?
18 A.   His name was Matthew Hill.
19 Q.   Where is Mr. Hill employed?
20 A.   He lives in Lincoln, Alabama.
21 Q.   And why do you think he would be involved in sending
22 hoax anthrax letters out?
23 A.   He arrested me like five times in the last few
24 months for bogus charges that got dismissed when I went
25 to court.  So I thought maybe that's what it was about.

 1    I'm not saying he done it.  I'm just saying that was a

 2    thought.

 3    Q.   Haven't you in the past claimed that this was all

 4    some sort of a game?

 5    A.   No.

 6    Q.   You saw a letter that you had written to Judge

 7    Kallon.  Would that refresh your recollection?

 8    A.   To a game?  Can I read that if you don't mind?

 9    Q.   Yes, sir, you sure can.

10         MR. WHISONANT:  Your Honor, we don't have this

11    marked.  What would this exhibit number be?

12         THE CLERK:  24.

13         MR. WHISONANT:  24.

14    Q.   Let me show you what's mark as Government's Exhibit

15    24.  Can you look at that?

16    A.   (Witness complies.)

17         THE COURT:  Have you read it?

18         THE DEFENDANT:  I'm almost done.

19    Q.   Do you see in there where it talks about a game?

20    A.   Yes, sir.

21    Q.   What did you mean by a game?

22    A.   That's a good question.  I'm not really sure on that

23    one.

24    Q.   Let me ask you one last thing.  You heard

25    Mr. Preuitt up here today?

1  A.   Yes, sir.

2  Q.   And are you telling this jury you never wrote

3  Mr. Preuitt any letters?

4  A.   The only letter I ever wrote Mr. Preuitt is what my

5  lawyer has that was telling him that I met with the

6  police and the police -- I told them everything I knew

7  about his grandson or what I thought I knew, because

8  when he called me and told me that, it wasn't correct.

9  That --

10  Q.   You heard Mr. Preuitt say that he received multiple

11  letters from you in the past.

12  A.   I never wrote Mr. Preuitt but one letter.

13  Q.   Did you hear Mr. Preuitt say that?

14  A.   If I did, I must not have understood what he was

15  saying.  I only wrote Mr. Preuitt one letter.

16        MR. WHISONANT:  That's all, Your Honor.

17        THE COURT:  Any redirect?

18                 **REDIRECT EXAMINATION**

19  **BY MR. STEEN:**

20  Q.   Mr. Dodd, the government asked you about the letter

21  that was written to Mr. Preuitt that Mr. Preuitt

22  testified to.  Let me show you a copy of Government's

23  Exhibit 9 that is in evidence.  Is that letter addressed

24  to Mr. Preuitt?

25  A.   Yes, it is.

372

```
 1   Q.   And what's the postmark on that letter?

 2   A.   The postmark is Dayton, Ohio.

 3   Q.   Have you ever been to Dayton, Ohio?

 4   A.   Not in my life.

 5   Q.   What's the date on it?

 6   A.   September 28th, 2011.

 7   Q.   Where were you on September 28th, 2011?

 8   A.   I was in Calhoun County jail.

 9        MR. STEEN:  No further questions, Your Honor.

10        THE COURT:  Anything further?

11                    RECROSS-EXAMINATION

12   BY MR. WHISONANT:

13   Q.   That last letter that's postmarked Dayton, don't you

14   have family in Dayton?

15   A.   No, sir.

16   Q.   You don't have family in Dayton?

17   A.   I don't have nobody in Dayton, Ohio.

18   Q.   No blood relatives?

19   A.   No, sir.

20   Q.   Nobody related by blood or marriage?

21   A.   No, sir.

22        MR. WHISONANT:  Your Honor, we would move to

23   admit Exhibit Number 24.

24        THE COURT:  Is that one he just looked at?

25        MR. WHISONANT:  Yes, ma'am.
```

373

1          THE COURT:  Let me see it for a second.  Let me
2    see you will at sidebar.
3          (Sidebar outside the presence of the jury)
4          THE COURT:  Where does this talk about this is
5    part of a game?  He doesn't say anything about Dayton
6    Ohio.
7          MR. WHISONANT:  No, he doesn't.  But he has
8    family -- that last letter was postmarked from Ohio.
9    He's got family there.  He just said on the stand that
10   he doesn't.
11         THE COURT:  I know.  But this letter, I thought
12   you were trying to offer this because it says this.  I'm
13   not letting this in.  You can point him to where he says
14   it's a game.
15         MR. WHISONANT:  I don't need it.  I don't need
16   it.  That's fine, that's fine.
17         THE COURT:  I'm not letting this in.  But do
18   you have --
19         MR. WHISONANT:  That's it.
20         THE COURT:  You just know that he has
21   relatives?
22         MR. WHISONANT:  Yes.
23         (Open court.  Jury present.)
24         THE COURT:  Does either side have anything
25   further?

1    MR. WHISONANT:  No, Your Honor.

2    MR. STEEN:  No, Your Honor.

3    THE COURT:  Let me just check one thing here.

4    (Brief pause)

5    THE COURT:  We will be in recess until 10:00

6    tomorrow.  There's some matters I need to take up with

7    the lawyers in the morning.  Well, first, any rebuttal

8    evidence?

9    MR. WHISONANT:  No, ma'am.

10    THE COURT:  Okay.  When you come back, we will

11    have closing arguments from counsel, and you will begin

12    your deliberations.  Thank you all very much.  Be safe

13    driving home and see you in the morning.

14    (Jury excused.)

15    (Open court, outside the presence of the jury.)

16    THE COURT:  Do you want to renew your motion?

17    MR. STEEN:  Your Honor, I renew our motion for

18    a Rule 29 judgment of acquittal.

19    THE COURT:  Again, drawing all reasonable

20    inferences in favor of the United States, I think

21    there's more than sufficient evidence from which the

22    jury could find the defendant guilty beyond a reasonable

23    doubt of all counts charged.  The motion is denied.

24    I'm still working on the charges.  If you'll

25    give me your emails, I will get them out to you, if not

1   tonight, first thing in the morning.  I will have them

2   out by 8:00, and hopefully tonight, probably tonight.

3   And if you all could come around -- I really think if

4   you come at 9:15, that will give us enough time to go

5   through the charges.

6           Okay.  So if you all will give Susan your email

7   addresses.  I'm sure, Mike, we have yours, and I'm sure,

8   Russell, we have yours, too, but it will just be easier.

9           Sorry to focus on him so much.  I know you've

10  probably had to do the hard work here.

11          MS. DIKE-MINOR:  No.

12          MR. WHISONANT:  She's carried the load.

13          THE COURT:  I know she has.  She's done a great

14  job.  You have really divided it evenly.  It's been

15  really evenly divided with the witnesses.

16          MR. WHISONANT:  Are you going to give the jury

17  charge before or after?

18          THE COURT:  I always give it before.

19          MR. WHISONANT:  Okay.  Thank you.

20          THE MARSHAL:  Does the defendant need to be

21  here for the jury charges?

22          MR. STEEN:  I wouldn't think so, Judge.

23          THE COURT:  All right.  This is just the law

24  that I'm going to charge them.  You let me know.

25          (Brief pause)

1     THE COURT:  We're in recess.  Are you okay to
2   have him here at 10:00?
3     THE MARSHAL:  Yes, Your Honor.
4     MR. STEEN:  Yes, Your Honor.
5     (Court adjourned.)
6   October 9, 2013                    9:15 a.m.
7     (Open court, outside the presence of the jury.)
8     THE COURT:  All right.  I have a few other
9   minor changes to the one I gave you all, the last one I
10  gave you.  Actually, I need to do one thing here.  Have
11  you all looked at the second thing I've given you?
12    MR. WHISONANT:  Yes, ma'am.
13    THE COURT:  Okay.  Let me see on the last
14  version if there was anything before you all tell me
15  your thoughts.  There's a typo on Page 6 that says
16  guilty, and it should say guilt.
17    On Page 7 -- well, I've moved something from
18  Page 11.  I don't think I need to tell you that.  It
19  just flowed better to put something that's on Page 11.
20  On Page 8 where it's talking about Counts Two, Three and
21  Seven.  Are you all there?
22    MR. WHISONANT:  Yes, ma'am.
23    THE COURT:  Where I have, "It's a federal crime
24  to use the U.S. Mails to send an extortionate
25  communication," and I am changing that to, "It is a

1  federal crime to use the U.S. Mails to communicate a

2  threat for the purpose of extorting; that is, unlawfully

3  compelling or coercing money or some other thing of

4  value."  I think "sending an extortionate communication"

5  is complicated.

6         On Page 9 where it says, "A thing of value or

7  anything that has value to the defendant."  Are you all

8  there?  I'm changing "whether it is tangible or not," I

9  am going to say, "And can include money."

10         After reviewing cases last night, and I will go

11  over those later, but we've got a lot to cover, I am

12  going to say that, I guess, grant the defendant's motion

13  for an acquittal with regard to Count One, the argument

14  that it would be in violation of Title 18, U.S. Code,

15  Section 2332A(2)(D).  Are you following me?

16         In other words, and I will go over the case

17  that I found on that point, I'm not granting a judgment

18  of acquittal on Count One, but they have alternative

19  ways that they say that he communicated a false

20  information, one of those that would have been in

21  violation of Title 18, U.S. Code, 2332A(a)(2)(D), which

22  requires some sort of proof of interstate commerce.  And

23  based on the evidence in the case, I don't think that

24  was established.

25         MR. WHISONANT:  Your Honor, for the record, I

1  would agree with the court on that.  We did not prove

2  the interstate commerce.

3       THE COURT:  But I'm not granting a motion for

4  judgment of acquittal on Count One, just on that one

5  little section.  So I would propose redacting the

6  indictment where it says and (D), not that the jury is

7  going to be able to pick up on this.

8       But on Page 2, where it says 2332A(2)(A) and

9  (D), I would propose redacting and (D).  Any objection

10  from the government?

11       MR. WHISONANT:  No, ma'am.

12       THE COURT:  Any objection from the defendant?

13       MR. STEEN:  No objection, Your Honor.

14       THE COURT:  Now, let's go back to the jury

15  charges.  And I know I sent you one at 8:00 o'clock this

16  morning, but I had a hard time, I stayed here until

17  about 9:00 o'clock last night, believe it or not,

18  working on these, particularly Count One.  I was reading

19  a lot of cases because I wanted to be sure that I agreed

20  with my decision about the motion for judgment of

21  acquittal, and I am satisfied that it was due to be

22  denied.

23       One of the things that I was concerned about or

24  thought about is whether it can be communicated when

25  there's no words written, and they even had some -- I

1   found some cases that talked about just corn powder in

2   an envelope with nothing written is a communication.

3           So that's why I have on here that the

4   information does not need to be written.  I'm not sure

5   the jury is going to understand what that means but I

6   think it's a little bit clearer that, if they get back

7   there, and say, well, he didn't actually threaten to use

8   anthrax because these cases say just the use of powder

9   is enough to communicate that that's what that's about.

10          All right.  I will go over those cases in a

11  little bit with you all, but let's first go through the

12  charges and let me ask the government if you have any

13  objections to the charges or suggestions, and I think

14  you did want to talk to me about adding 404(b)?

15          MR. WHISONANT:  Yes, ma'am, I do.  One thing,

16  and that's about putting in a 404(b) charge.  And

17  thinking back about the evidence, I can recall from my

18  memory two instances, one in the recording, during the

19  recording, I believe, Shannon Williams says something to

20  the effect that the defendant, Mr. Dodd, is in jail on a

21  mail hoax charge.  And then, secondly, when Mr. Pruitt

22  testified, he said the defendant had mailed threatening

23  letters to him in the past.

24          THE COURT:  Did he say threatening letters or

25  did he just say received letters?

1          MR. WHISONANT:  He wasn't responsive to the

2  question.  And when I asked him, it's my recollection he

3  said threatening letters.

4          THE COURT:  I'm going to look at my notes,

5  because I don't want you to --

6          MR. WHISONANT:  That's my recollection.

7          THE COURT:  Any objection to my adding the

8  404(b) charge?

9          MR. STEEN:  No, Your Honor.

10          THE COURT:  All right.  I will.  I will see

11  where I think it needs to go.  Any other objections to

12  the charges?

13          MR. WHISONANT:  No.

14          THE COURT:  Any other suggestions to the

15  charges?

16          MR. WHISONANT:  No, ma'am.

17          THE COURT:  All right.  I did add some things

18  about the defendant testifying that I didn't have in the

19  first one.  Any objections by the defendant to the

20  charges?

21          MR. STEEN:  None from the defendant, Your

22  Honor.

23          THE COURT:  Any suggestions from the defendant?

24          MR. STEEN:  Other than the change you're going

25  to make with 404(b).

1          THE COURT:  All right.  And are you all fine

2    with the verdict forms?

3          MR. STEEN:  I am, Your Honor.

4          MR. WHISONANT:  Yes, ma'am.

5          THE COURT:  I tell you because I need to work

6    on this a little bit more, when the jury goes back --

7    maybe I will tell you a little bit now.  Well, I want to

8    get these charges first.  I'm going to go through the

9    cases that I looked through last night.  I think they

10   support the denial of the motion for judgment of

11   acquittal with regard to Count One, and they also compel

12   the granting of it with regard to the element or the

13   charge that would require interstate commerce.

14          MR. WHISONANT:  I'm in an unusual position.  I

15   want to say for the record, I still don't believe that

16   there was 404(b) evidence in the case; but, in an

17   abundance of caution, I'm asking for the charge.

18          THE COURT:  Right.  Do you want the charge?

19   I'm looking at the defendant.  Do you want the charge?

20          MR. STEEN:  Your Honor, we would because simply

21   my recollection of the testimony from Shannon Williams,

22   and they're going to have the tape that they're going

23   listen to and the transcript -- I suppose the transcript

24   is going back -- that it says that he's in here on a

25   hoax.  And I recall Mr. Pruitt testifying, looking back

1    at my notes, that he received other letters.

2              THE COURT:  That were threatening?

3              MR. STEEN:  That were threatening.

4              THE COURT:  Okay.  All right.  We're in recess

5    until 10:00 o'clock.  30 minutes is fine for everyone?

6              MR. WHISONANT:  Yes, ma'am.

7              THE COURT:  I had a really tough time with

8    regard to those definitions.  I mean, those definitions

9    come directly from the statute, but what I did is I took

10   out the things that I thought did not apply.  Are you

11   following me?

12             MR. WHISONANT:  Yes, ma'am.

13             THE COURT:  Now, have you all looked at the

14   statute yourselves to see if I should have left anything

15   in?

16             MR. WHISONANT:  This is a very difficult

17   statute, and I believe that you did a good job in just

18   narrowing it down.

19             THE COURT:  Well, for instance, on 175, on Page

20   7, Title 18, U.S. Code, Section 175, and this is Page 7

21   of my jury charges, it says, "Whoever knowingly,

22   develops, produces, stock piles, transfers, acquires,

23   retains or possesses any biological agent, toxin or

24   delivery system for use as a weapon or knowingly assists

25   a foreign state or any organization to do so, or

1  attempts, threatens or conspires to do the same shall

2  fined.

3        I don't think there was evidence that he

4  knowingly developed, produced, stock piled, acquired,

5  retained or possessed.  He's charged with falsely doing

6  this anyway.  But I would say that there would be

7  evidence that he knowingly falsely transferred.  Are you

8  following what I'm saying?

9        MR. WHISONANT:  Yes, ma'am.

10        THE COURT:  So I took out all those other

11  words, developed, produced, stock piled, transferred.

12        MR. WHISONANT:  If you left those in, I think

13  that would be very confusing for the jury.

14        THE COURT:  And then similarly in 2332A,

15  Subsection (a)(2)(A), it has a number of other words

16  that I thought didn't apply to this fact situation.

17        By the way, the letter in one, it was sent to

18  Jefferson County courthouse, attention --

19        MR. WHISONANT:  Teresa --

20        THE COURT:  It was addressed to Teresa

21  McClendon; right?

22        MS. DIKE-MINOR:  Yes.

23        MR. WHISONANT:  It was addressed to Teresa

24  McClendon.

25        THE COURT:  Now, this may be confusing to the

1   jury about this third element.  This is on Page 8

2   again.  They obviously could find that he did both on

3   the third element.  Are you following me?  "Intended to

4   convey false or misleading information to the effect

5   that he had actually sent a biological agent or toxin

6   that could be used as a weapon."  I guess I should say

7   and/or.  That might be clearer.  "And/or that he used or

8   threatened use of a biological agent or toxin as a

9   weapon of mass destruction against any person or

10  property."  Are you following me?

11              MR. WHISONANT:  Yes, ma'am.

12              THE COURT:  But then when I say down here, "You

13  must find either that he intended" -- and/or, because

14  they can find he did both, but they've got to agree as

15  to which part of that that he did.  Are you following

16  me?

17              MR. WHISONANT:  Yes.

18              MS. DIKE-MINOR:  Yes.

19              MR. WHISONANT:  On the next paragraph, you're

20  going to change and/or there as well.

21              THE COURT:  I say, you will note that

22  paragraph.  And I say, "And/or that he used."  Okay.

23  I'm going to work right here, but you all are in recess

24  right now.

25              (Brief recess)

1          (Open court, outside the presence of the jury)

2          THE COURT:  I still am making not substantive

3    changes, but I will give you all obviously a copy.  You

4    have it essentially, but I have a few other minor

5    things.

6          By the way, I stop halfway through my charges.

7    I don't want the last word they hear to be rebuttal.  So

8    I'm going to stop right towards the end, and I have some

9    last minute instructions for them at the end.  It's all

10   part of what you all have.

11          (Open court.  Jury present.)

12          (Jury instructions and closing arguments)

13     (Jury began deliberations at approximately 11:10 a.m.

14    (Jury returned with verdict at approximately 3:20 p.m.)

15          (Open court.  Jury present.)

16          THE COURT:  Mr. Lundy, I understand the jury

17   has reached a verdict.

18          THE FOREPERSON:  Yes.

19          THE COURT:  Have you reached a verdict on all

20   counts in the indictment?

21          THE FOREPERSON:  Yes.

22          THE COURT:  If you would hand the verdict form

23   to Ms. Harper.  Would you read the verdict?

24          THE CLERK:  In the matter of United States of

25   America versus Clifton Lamar Dodd, 2:13-CR-0154-SLB, we,

1    the jury, find the defendant, Clifton Lamar Dodd, guilty

2    as charged in Counts One, Two, Three, Four, Five, Six,

3    Seven, dated 10/9/2013, signed Brandon Lundy,

4    foreperson.

5              THE COURT:  Be seated.  Ladies and gentlemen,

6    I'm going to ask that the jury be polled.  If the

7    verdict that's just been read represents your verdict,

8    if you would respond by saying yes.  If it is not your

9    verdict, please say no.

10             (Jury polled and all answered affirmatively.)

11             THE COURT:  Ladies and gentlemen, I want to

12   thank you for your participation in the case and your

13   careful attention to all the evidence.  I do think your

14   verdict is a responsible verdict given the evidence in

15   the case.

16             Normally, with the permission of the lawyers, I

17   go back and just thank the jurors personally, but if

18   there's an objection from either side, I won't do it.

19   Is there an objection from the government?

20             MR. WHISONANT:  No, ma'am.

21             THE COURT:  From the defendant?

22             MR. STEEN:  No, Your Honor.

23             THE COURT:  I had that was going to state some

24   things on the record.  I may or may not get that done.

25   It may be before sentencing, but I may not get it done.

1    I'm comfortable with the rulings I made on the

2    evidentiary issues.  I had found some more cases that I

3    thought supported my ruling, particularly with the

4    admission of the testimony of the handwriting expert.

5    If I get a chance, I do want to state some of those

6    cases on the record.  But if not, I will just live with

7    the ruling that I made at the time.

8            All right.  The defendant will be set for

9    sentencing in about three months, and he's in custody

10   now.  Actually, I don't think it really would take three

11   months, because he's -- it would probably be best for

12   the government if I could get him set sooner, right,

13   because where is he being housed?

14           THE MARSHAL:  Calhoun County jail, Judge.

15           THE COURT:  But you're in federal custody;

16   right?

17           THE DEFENDANT:  Yes, ma'am.

18           THE COURT:  So if I could get him sentenced

19   quicker, he could go to the Bureau of Prisons, and that

20   would be better.  And since he was just sentenced not

21   too long ago, just a few months ago, it should not take

22   much to update his presentence report.

23           MR. STEEN:  That's correct, Your Honor

24           THE COURT:  When was he sentenced?

25           MR. STEEN:  December of 2011.

1          THE COURT:  December of 2011.  He's been in

2    custody since that time.  So my thought are it's not

3    going to take very long.  If you would ask them, I would

4    like to try to hurry it up as soon as possible, giving

5    you the 35 days to make an objection, but as quickly as

6    they get it done, because it's costing the marshals to

7    keep him there everyday.

8          Now, I don't know how far some of you all live,

9    and you may need to go on home, but feel free to leave.

10   You don't have to wait on me, but I will come in there

11   in just a second.  But if you all need to go, that's

12   fine.  Go in the jury room.  But if you need to go home,

13   it's not going to hurt my feelings, but I will be in

14   there in just a second.  Thank you.

15          (Jury excused.)

16          (Open court, outside the presence of the jury)

17          THE COURT:  Mr. Dodd, you have a habit of

18   writing anybody that touches any of your cases, so I may

19   be the recipient of some of your future correspondence,

20   I don't know.  But this case is just incomprehensible to

21   me.

22          I believe the jury reached the right verdict.

23   I don't know why you did this and why you continue to

24   commit that crime, and now you're going to be getting

25   more time.  And you're obviously a smart person.  I

1    don't think you don't understand that this is illegal,

2    and it's just outrageous the things that you're doing.

3    And this is scary to people.  I mean, they don't know

4    this is coming from somebody that's not going to have

5    the ability to carry it out, but they don't know that

6    and maybe -- I don't know.

7            I hope this will be the end of your

8    corresponding with judges and lawyers and writing

9    threatening and scary things through the mails.  You've

10   got family members here who love you.  I might forget to

11   say all this when you're sentenced.  I hope you will

12   just do your time, whatever you get in this case.  You

13   have excellent representation.  He fought for you hard

14   in court, outside in the sidebars for you.

15           I don't know whether you'll have any chance on

16   appeal.  I hope I had a trial that is not reversible

17   error, but we'll see.  I hope you'll do your time and

18   stop all this.  It's illegal.  It's wrong.  It's scary,

19   and all it does is keep you in prison for more and more

20   years.  And you've got people back there that are

21   crying, that are upset and don't do it to them again.

22   Let this be the last time.

23           Do you have any record besides this prior thing

24   that you had before those prior counts?  Is there

25   anything else on your record?

1          THE DEFENDANT:  No, ma'am.

2          THE COURT:  This doesn't have to happen.  I

3  hope that you learned your lesson this time.  I hope

4  that you won't continue doing this while you're awaiting

5  sentencing in this case and cause yourself to get in

6  more trouble and prosecuted again.

7          I want to thank the lawyers.  I think they all

8  did an excellent job.

9          MR. WHISONANT:  Thank you, Your Honor.

10          THE COURT:  Thank you very much.

11          (Court adjourned.)

391

# C E R T I F I C A T E

I hereby certify that the foregoing transcript in
the above-styled cause is true and correct.


Date:  3/25/2014


*Julie A. Martin*

Julie A. Martin, RMR, CRR
Federal Official Court Reporter

1